## UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC

Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent.

CASE NO. 23-1232

### PETITION FOR REVIEW OF
### NATIONAL LABOR RELATIONS BOARD DECISION AND ORDER

Pursuant to Rule 15(a) of the Federal Rules of Appellate Procedure, CEMEX Construction Materials Pacific, LLC ("Petitioner"), hereby petitions the United States Court of Appeals for the District of Columbia Circuit for review of an Order of the National Labor Relations Board ("Respondent" or "NLRB") in the matter styled *Cemex Construction Materials Pacific, LLC and International Brotherhood of Teamsters*, NLRB Case Nos. 28-CA-230115, 28-CA-235666, 28-CA-249413, 31-CA-237882, 31-CA-237894, 31-CA-238094, 31-CA-238239, 31-CA-238240, and 28-RC-232059 reported in an Order at 372 NLRB No. 130, dated August 25, 2023. *See* Attachment "A." This Court has jurisdiction in this matter pursuant to Section 10(f) of the National Labor Relations Act because the NLRB's "Decision and Order" is a final order, and Petitioner is a party aggrieved by said

Decision and Order.  29 U.S.C. § 160(f).  Petitioner may file its Petition for Review within this Circuit because Section 10(f) authorizes any aggrieved party to file a Petition for Review in the United States Court of Appeals for the District of Columbia.

The NLRB's Decision and Order against the Petitioner is not supported by substantial evidence and is contrary to law.  Additionally, the NLRB's dramatic modification to the union representation process and remedial framework for unfair labor practice charges committed during the critical period preceding a representation election is inconsistent with the National Labor Relations Act and flawed in several respects.

WHEREFORE, Petitioner prays that its Petition for Review of the NLRB's Decision and Order be granted; that upon such review the NLRB's Decision and Order be set aside and denied enforcement; and that Petitioner be granted whatever other and further relief as the Court deems appropriate. Petitioner is also filing a Corporate Disclosure Statement herewith.

Respectfully submitted,

JACKSON LEWIS P.C.

By:    */s/ Alan M. Bayless Feldman*
        Alan M. Bayless Feldman (AZ Bar
        No. 019074, TX Bar No. 24050051)
        **JACKSON LEWIS P.C.**

2111 E. Highland Ave., Suite B-250
Phoenix, AZ 85016
Telephone: (602) 714-7042
Email:
Alan.Feldman@jacksonlewis.com

By: */s/ Ross M. Gardner*
   Ross M. Gardner (NE Bar 23922)
   **JACKSON LEWIS P.C.**
   10050 Regency Circle
   Suite 400
   Omaha, NE 68114
   Telephone: (402) 391-1991
   Email:
   Ross.Gardner@jacksonlewis.com
   (Application for Admission Pending)


   ATTORNEYS FOR PETITIONER,
   CEMEX CONTRUCTION
   MATERIALS PACIFIC, LLC


DATED: August 30, 2023

## UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC

                    Petitioner,

      v.

NATIONAL LABOR RELATIONS BOARD,

                    Respondent.

## <u>NOTICE OF SERVICE OF PETITION FOR REVIEW AND LIST OF THOSE SERVED</u>

Pursuant to Rule 15(c) of the Federal Rules of Appellate Procedure, Petitioner hereby certifies that on August 30, 2023, in conjunction with the filing of its Petition for Review, it caused copies of the Petition and this Notice to be served by mail, U.S. postage prepaid, on each party admitted to participate in the agency proceeding, as follows:

Fernando J. Anzaldua,
Regional Attorney
National Labor Relations Board
Region 28
2600 North Central Avenue, Suite 1400
Phoenix, AZ 85004-3019
*Counsel for the General Counsel*

Ruth E. Burdick, Esq.
Acting Deputy Associate General Counsel
Appellate and Supreme Court Litigation Branch
Office of General Counsel
National Labor Relations Board
1015 Half Street SE
Washington, D.C. 20570-0001

Cornele A. Overstreet,
Regional Director
National Labor Relations Board,
Region 28
2600 N. Central Avenue, Suite 1400
Phoenix, AZ 85004

Caren Sencer, Esq.
Weinberg Roger & Rosenfeld
1375 55th Street
Emeryville, CA 94608
Counsel for the *International Brotherhood of Teamsters*


DATED:  August 30, 2023


By: _____/s/ *Alan M. Bayless Feldman*_____
Alan M. Bayless Feldman


4866-8222-9884, v. 1

ATTACHMENT A

NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.

**Cemex Construction Materials Pacific, LLC *and* International Brotherhood of Teamsters.** Cases 28–CA–230115, 28–CA–235666, 28–CA–249413, 31–CA–237882, 31–CA–237894, 31–CA–238094, 31–CA–238239, 31–CA–238240, and 28–RC–232059

August 25, 2023

DECISION AND ORDER

By Chairman McFerran and Members Kaplan, Wilcox, and Prouty

On December 16, 2021, Administrative Law Judge John T. Giannopoulos issued the attached decision.[1] The Respondent filed exceptions and a supporting brief, the General Counsel and the Charging Party filed answering briefs, and the Respondent filed reply briefs. The General Counsel filed exceptions and a supporting brief and the Respondent filed an answering brief.

The National Labor Relations Board has considered the decision and the record in light of the exceptions and briefs and has decided to affirm the judge's rulings, findings,[2] and conclusions only to the extent consistent with this Decision and Order.[3]

On March 7, 2019, employees of the Respondent in a unit of about 366 ready-mix cement truck drivers and driver trainers voted against representation by the Charging Party, International Brotherhood of Teamsters (the Union), by a margin of 179 to 166.[4] The General Counsel and the Union allege that the Respondent engaged in extensive unlawful and otherwise coercive conduct before, during, and after the election, which requires, among other remedial measures, setting aside the results

---

[1] On exception, the Respondent argues that the Board should dismiss the complaint because President Biden unlawfully removed former General Counsel Peter B. Robb from office and former Acting General Counsel Peter Sung Ohr therefore lacked the authority to continue to prosecute the complaint upon which the judge issued the attached decision. The Board has determined that such challenges to the authority of the Board's General Counsel based upon the President's removal of former General Counsel Robb have no legal basis. See *Aakash, Inc. d/b/a Park Central Care and Rehabilitation Center,* 371 NLRB No. 46, slip op. at 1–2 (2021). In addition, the Fifth and Ninth Circuits have rejected similar challenges to the President's removal of the former General Counsel. See *Exela Enterprise Solutions, Inc. v. NLRB,* 32 F.4th 436 (5th Cir. 2022); *NLRB v. Aakash, Inc.,* 58 F.4th 1099 (9th Cir. 2023).

Further, on May 9, 2022, General Counsel Jennifer A. Abruzzo issued a notice of ratification in this case that states as follows:

The prosecution of this case commenced under the authority of former General Counsel Peter B. Robb when a consolidated complaint issued on April 30, 2020, as subsequently amended. The prosecution of the complaint continued under former Acting General Counsel Peter Sung Ohr.

Respondent has belatedly alleged, for the first time in its exceptions to the Board, that the continued prosecution of the complaint was an ultra vires act by former Acting General Counsel Ohr. Specifically, Respondent now alleges that President Biden unlawfully removed former General Counsel Robb and unlawfully designated former Acting General Counsel Ohr.

I was confirmed as General Counsel on July 21, 2021. My commission was signed and I was sworn in on July 22, 2021. In an abundance of caution, I was re-sworn in on November 29, 2021. After appropriate review and consultation with my staff, I have decided that the issuance of the complaint and its continued prosecution in this case were and are a proper exercise of the General Counsel's broad and unreviewable discretion under Section 3(d) of the Act.

My action does not reflect an agreement with Respondent's argument in this case or other arguments in any other case challenging the validity of actions taken following the removal of former General Counsel Robb. Rather, my decision is a practical response aimed at facilitating the timely resolution of the unfair-labor-practice allegations that I have found to be meritorious.

For the foregoing reasons, I hereby ratify the continued prosecution of the complaint and all actions taken in this case subsequent to the removal of former General Counsel Robb, including by former Acting General Counsel Ohr and his subordinates.

Applying *Wilkes-Barre Hospital Co. LLC d/b/a Wilkes-Barre General Hospital,* 371 NLRB No. 55, slip op. at 1 fn. 2 (2022) (collecting cases), we find that General Counsel Abruzzo's ratification renders the Respondent's argument moot.

Member Kaplan acknowledges and applies *Aakash* as Board precedent, although as noted in that decision, he disagrees with the Board's approach and would have adhered to the position that "reviewing the actions of the President is ultimately a task for the federal courts," as the Board concluded in *National Association of Broadcast Employees & Technicians Local 51 (NABET),* 370 NLRB No. 114, slip op. at 2 (2021). See *Aakash,* 371 NLRB No. 46, slip op. at 4–5 (Members Kaplan and Ring, concurring); see also *Exela Enterprise Solutions, Inc. v. NLRB,* above (reaching the same conclusion the Board reached in *Aakash* regarding the President's removal of General Counsel Robb, but based on de novo review and according the Board's decision no deference). Member Kaplan also acknowledges the General Counsel's notice of ratification, but for the same reasons he stated in *Aakash* and *NABET,* he expresses no view as to its legal effect.

[2] The Respondent and the General Counsel have excepted to some of the judge's credibility findings. The Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect. *Standard Dry Wall Products,* 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951). We have carefully examined the record and find no basis for reversing the findings. Member Kaplan agrees there is no basis for reversing the judge's credibility findings, but he believes that a generic claim of reliance on witness demeanor provides an insufficient basis for such findings. He relies on the judge's credibility determinations only insofar as specific justifications for those determinations were provided.

[3] We have amended the judge's conclusions of law and recommended remedy consistent with our findings herein. We shall modify the judge's recommended Order to conform to our findings and to the Board's standard remedial language, and we shall substitute a new notice to conform to the Order as modified.

[4] The parties challenged sixteen ballots, but subsequently resolved three challenges by stipulation, leaving a nondeterminative number of remaining challenged ballots which were not further litigated.

2                            DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

of the election and affirmatively ordering the Respondent to bargain with the Union under *NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969).

After a hearing conducted on 24 days between November 2020 and February 2021,[5] the judge found that the Respondent violated Section 8(a)(1) of the Act more than two dozen times, including by threatening employees with plant closures, job loss, and other reprisals if they selected the Union, surveilling employees and interrogating them about their union activity, prohibiting employees from talking with union organizers or displaying prounion paraphernalia, and hiring security guards in order to intimidate employees immediately before the election. The judge also found that the Respondent violated Section 8(a)(1) before the election by disciplining lead union activist Diana Ornelas for talking with union organizers on "company time" and Section 8(a)(3) and (1) after the election by suspending Ornelas for 8 days on July 10, 2019, and by discharging her on September 6, 2019, because of her union activity. In addition, the judge found merit in the Union's election objections alleging coercive threats of plant closure and other repercussions, surveillance, and increased use of security in order to intimidate employees. Most of the judge's findings and conclusions with respect to the Respondent's unlawful and objectionable conduct are firmly rooted in his record-supported credibility resolutions, and, with minor exceptions and clarifications discussed below, we affirm them.

In addition to the Board's ordinary remedies for the violations found, the judge recommended setting aside the election and ordering the Respondent to provide for the Board's remedial order to be read aloud to employees and to provide the Union with several special access remedies prior to a rerun election. The judge did not recommend the General Counsel's requested *Gissel* bargaining order. As discussed in detail below, we agree with the judge that the Respondent's conduct requires setting aside the election. We also adopt the judge's recommended notice-reading remedy. However, contrary to the judge, we find that the Respondent's conduct also warrants a remedial affirmative bargaining order, and we shall amend the judge's recommended remedy and Order accordingly.[6]

Finally, the General Counsel asks the Board, inter alia, to overrule *Linden Lumber*[7] and reinstate a version of the *Joy Silk* standard.[8] We find merit to the General Counsel's arguments, and, as explained below we shall modify the Board's approach in this area in certain respects.[9]

I. BACKGROUND

The Respondent is a Delaware-registered subsidiary of a multinational building materials company that provides ready-mix concrete, cement, and aggregates to construction-industry customers including, relevantly here, in Southern California and Las Vegas, Nevada.

In late 2017 or early 2018, a group of the Respondent's ready-mix drivers in Ventura County, California, approached the International Brotherhood of Teamsters (the Union) about organizing for the purpose of collective bargaining. The Union had already been working with a group of the Respondent's drivers who were trying to organize in Las Vegas, Nevada, and decided, upon the Ventura County drivers' overtures, to expand its campaign to organize a large unit which would ultimately encompass approximately 366 ready-mix drivers and driver trainers employed by the Respondent at approximately 24 facilities in Southern California and Las Vegas.[10]

During the spring and summer of 2018, a union organizing committee consisting of more than 35 drivers from various facilities met by conference call every other week to coordinate organizing efforts. Union organizers, both employees and nonemployees of the Respondent, distributed union paraphernalia and information and spoke with drivers during nonworking time at the Respondent's numerous plants and jobsites. The Union also set up public social media accounts, including YouTube and Facebook pages, which supported the campaign with photos and videos of prounion drivers. The Union's efforts achieved broad support: it gathered authorization cards signed by at least 207 drivers (approximately 57 percent of the unit) during October and November 2018.[11] The Union filed a petition for a

---

[5] The hearing involved testimony from 41 witnesses and produced a 3162-page transcript.

[6] In light of our determination that an affirmative bargaining order is warranted, we find it unnecessary to order the judge's recommended access remedies or to reach the Respondent's related exceptions. Absent a bargaining order, we would adopt these recommended remedies.

For the reasons stated in his separate partial dissent, Member Kaplan would not issue an affirmative bargaining order. Instead, he would order certain special remedies.

[7] *Linden Lumber Division, Summer & Co.*, 190 NLRB 718 (1971), revd. sub nom *Truck Drivers Union Local No. 413 v. NLRB*, 487 F.2d 1099 (D.C. Cir. 1973), affd. 419 U.S. 301 (1974).

[8] *Joy Silk Mills, Inc.*, 85 NLRB 1263 (1949), enfd. in relevant part, 185 F.2d 732 (D.C. Cir. 1950), cert. denied 341 U.S. 914 (1951).

[9] Member Kaplan does not join his colleagues in overruling *Linden Lumber* for the reasons given in his separate partial dissent below.

[10] The parties stipulated at the hearing that the appropriate unit included at most 366 drivers and driver trainers based at 24 facilities in six areas or districts: Las Vegas; Ventura County; Los Angeles County; Inland Empire; Orange County; and San Diego County.

[11] Based on testimony, stipulation, and his examination of cards and signature comparators at the hearing, the judge found that at least 207 of 281 signed authorization cards that the Union provided to the Board's regional office were valid.

Board-supervised representation election on December 3, 2018.

The Respondent reacted quickly and aggressively to the Union's campaign. Bryan Forgey, the Respondent's vice president/general manager for ready-mix business in Southern California, learned in October 2018 that the Union was collecting authorization cards.[12] He alerted the Respondent's national labor relations team, and the Respondent established a "steering committee" to coordinate its response. The steering committee consisted of Forgey, Iris Plascencia (the Respondent's human resources manager for Southern California ready-mix), the Respondent's vice president for national labor relations, and in-house and outside legal counsel. Before the end of October, the steering committee hired a company called Labor Relations Institute (LRI) to help execute the Respondent's campaign against the Union.[13] The steering committee also reviewed all formal discipline issued during the campaign, and a version of the steering committee continued to operate as of the hearing in this matter.

Over the course of the campaign, LRI supplied as many as five independent consultants, who trained the Respondent's managers and supervisors about the legal limits on their efforts to persuade unit employees not to support the Union.[14] Between late October 2018 and early March 2019, LRI consultants also met with unit employees, as often as daily, in small group and individual encounters at the various plants.[15] The consultants presented PowerPoint displays and answered questions at the small-group meetings. As discussed further below, the content presented in these small-group meetings was pre-scripted so that the same message would be presented to drivers across the unit. In December 2018, the Respondent recorded two video messages, which it referred to as "25th hour videos," urging employees to reject the Union.[16] LRI consultants presented these videos to all

unit employees in small-group meetings shortly before the March 7 election. Throughout the campaign, the Respondent also distributed stickers, flyers, pamphlets, and letters encouraging employees to reject the Union, with a special emphasis on the Teamsters' strike history and the potential economic impact of a strike on unit employees. The Respondent also monitored the Union's social-media messaging and communicated its antiunion message through its own social media sites.

As noted above, the Union lost the March 7, 2019 election by a margin of 166 to 179 and subsequently filed the election objections and unfair labor practice charges at issue here.

## II. DISCUSSION

### A. The unfair labor practice allegations

*Unfair labor practices before the critical period:[17]*

We affirm the judge's conclusions, for the reasons given in his decision, that the Respondent violated Section 8(a)(1) of the Act on five occasions in August 2018, when Estevan Dickson, the Respondent's plant foreman/batchman[18] for the Las Vegas Sloan and Losee plants: (1) threatened drivers Ibrahim Rida and Chris Lauvao that they could be fired or written up for having union stickers on their hardhats; (2) threatened Rida and Lauvao with discharge or reduced hours or benefits if they unionized; (3) instructed drivers Oscar Orozco and Lauvao that they were not to speak to "these union guys"; (4) instructed Orozco and Lauvao to "take those damn [union] stickers" off their hats; and (5) threatened Orozco and Lauvao with discharge or discipline if they refused to remove union stickers from their hardhats.[19]

---

[12] Forgey was in overall control of all of the Respondent's operations relating to this case, reporting directly to Cemex's regional president for the West Region. The Respondent promoted Forgey to a larger role in the company in March 2020 before he left the company in July 2020.

[13] The Respondent paid LRI approximately $1.14 million between October 2018 and July 2019.

[14] LRI paid each consultant $3000 per day plus travel expenses.

[15] The General Counsel requests that we overrule *Babcock & Wilcox*, 77 NLRB 577 (1948), which addresses the lawfulness of employer-mandated campaign meetings. But the General Counsel did not allege or litigate any issue relating to the lawfulness of mandatory meetings in this case, and the record does not establish, as a factual matter, that all or most employees here were required to attend the Respondent's consultant meetings on threat of discipline. We accordingly decline the General Counsel's request that we address that issue in this case.

[16] The term "25th hour video" reflects the Respondent's strategy to present the videos to employees at the last permissible hour under the Board's prohibition on mass campaign speeches during the 24 hours

preceding an election. See *Peerless Plywood Co.*, 107 NLRB 427, 429 (1953).

[17] Because these violations took place before the Union filed its petition, we do not rely on them in evaluating the Union's election objections. *Ideal Electric & Mfg. Co.*, 134 NLRB 1275, 1278 (1961).

[18] The Respondent's "plant foremen/batchmen" are front-line supervisors who typically oversee one or two ready-mix batch plants. Plant foremen/batchmen report to "plant superintendents," who typically oversee two to five plants. Plant superintendents generally report to area or district managers who typically oversee one or two of the six geographic areas or districts comprising the Respondent's total Las Vegas and Southern California operations. Area and district managers reported to VP/GM Bryan Forgey at all relevant times.

[19] The judge found that Dickson told Orozco and Lauvao "to 'take those damn stickers' off their hats or they would be written up or fired." We find that this statement violated the Act both as a direct instruction to refrain from engaging in protected union activity and as an explicit threat of discipline for failing to so refrain. No party has excepted to the judge's failure to treat Dickson's instruction to Orozco and Lauvao as the promulgation of an overly broad and discriminatory rule, as alleged in the General Counsel's complaint.

Member Kaplan agrees with his colleagues that this statement constituted an unlawful threat of discipline. Because a threat of discipline for engaging in union activity inherently instructs threatened employees

4                      DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

*Critical period unfair labor practices:*[20]

We also agree with the judge that the Respondent further violated Section 8(a)(1) four more times in January 2019—after the Union filed its petition—when Dickson: (1) threatened driver Gary Collins that "if the Union comes in . . . Cemex is just going to close their doors and take all their trucks to another state, because they don't want the Union";[21] (2) interrogated Collins by asking why he was wearing a union sticker on his hardhat and what the union was going to offer;[22] (3) implicitly threatened Collins by inviting him to go work for a different company if he wanted to be represented by the Union,[23] and (4) repeatedly instructed Collins to remove union stickers from his hardhat.[24]

We affirm the judge's conclusion that the Respondent violated Section 8(a)(1), in January 2019, when Ryan Turner, the Respondent's area manager for the Inland Empire and San Diego areas, interrogated driver Richard Daunch about his union sympathies by asking him "where's your 'Vote No' sticker? How come I don't see a 'Vote No' sticker on your hardhat?"[25]

We also affirm the judge's conclusion that the Respondent violated Section 8(a)(1) twice on January 28, 2019, when Lorenzo Ponce, Inglewood (LA County) plant foreman/batchman, and Robert Nunez, Orange County and LA County superintendent, engaged in surveillance and created an impression of surveillance by lingering for an unusually long time at the entrance to the Inglewood plant and waving to drivers entering and exiting the plant while organizers standing near the same plant gate were displaying a poster and answering driver questions about unionized wages and benefits.[26]

The judge found that the Respondent violated Section 8(a)(1) six more times on January 29, 2019, when VP/GM Forgey addressed drivers at a group meeting with LRI consultant Michael Rosado at the Respondent's Oxnard (Ventura County) plant. Forgey testified that he presented the same information at this meeting that he also presented at a large number of similar consultant small-group meetings throughout the unit.[27] LRI consultants Rosado and Amed Santana similarly testified

---

not to engage in that activity, he does not join his colleagues in finding a separate "instruction" violation.

[20] Because these violations occurred during the critical period between the Union's December 3, 2018 filing of the petition and the March 7, 2019 election, they bear directly on the Union's election objections and the validity of the election. *Ideal Electric*, above, 134 NLRB at 1278.

[21] As discussed further below, the Respondent delivered a similar highly coercive threat to different drivers on January 28, 2019, when LRI consultant Amed Santana told drivers at a small-group meeting at the Respondent's Perris (Inland Empire) plant that Cemex was a multi-billion-dollar company that did not need the ready-mix part of its business and could close its ready-mix operations if drivers unionized.

[22] Member Kaplan agrees that Dickson unlawfully interrogated Collins by asking why he was wearing a union sticker on his hat. He finds it unnecessary to pass on whether Dickson's question about what the Union was going to offer was also unlawful because such a finding would not affect the remedy and therefore would be merely cumulative.

[23] Member Kaplan does not find the question Dickson asked Collins—"If you want the Union, why don't you just go to work at Nevada Ready-Mix?"—unlawful on its face, but rather because it was accompanied by the other unlawful statements described above, including Dickson's threat that Cemex would "close their doors" if the Union came in. The context created by Dickson's other coercive statements reveals the threat of discharge implicit in the question, i.e., that supporting the Union is inconsistent with continued employment by the Respondent.

[24] The General Counsel excepts to the judge's failure to find that Dickson's repeated instructions to Collins violated the Act both by directly interfering with protected union activity and as implied threats of unspecified reprisals. We agree with the judge that Dickson's instructions did not constitute two separate violations of the Act.

The Respondent contends that, in evaluating the January 5, 2019 interaction between Collins and Dickson, the judge erroneously relied upon a handwritten note in which Collins documented the exchange. The Respondent read the contents of the note into the record for the purpose of impeaching Collins before objecting that the document itself should be excluded as hearsay and cumulative. The Board reviews administrative law judges' evidentiary rulings for abuse of discretion. *Pain Relief Centers, P.A.*, 371 NLRB No. 70, slip op. at 2 fn. 3 (2022) (citing *Aladdin Gaming, LLC*, 345 NLRB 585, 587 (2005)). Moreover, the Board may rely on hearsay if it is "rationally probative in force and . . . corroborated by something more than the slightest amount of other evidence." *Meyers Transport of New York, Inc.*, 338 NLRB 958, 969 (2003). Given that the Respondent had already introduced the contents of the note into the transcript when the General Counsel sought to

introduce the document itself, we find that the judge did not abuse his discretion by admitting the document and according it such weight as he adjudged it to be worth. In any case, the Respondent has not established that it was prejudiced by the judge's evidentiary ruling, because even absent the document, the preponderance of the record evidence clearly does not support reversing the judge's determination to credit Collins's testimony and discredit Dickson's. See *Standard Dry Wall Products*, above.

[25] Member Kaplan agrees that the Respondent unlawfully interrogated an employee when a high-level official asked the employee why he was not wearing a sticker supporting the company's position against unionization, thereby coercing him to manifest his choice for or against the Union. Consistent with his position in *Trinity Services Group, Inc.*, 368 NLRB No. 115, slip op. at 3 fn. 8 (2019), however, Member Kaplan would find it unnecessary to pass on the judge's reliance on additional factors not mentioned in *Rossmore House*, 269 NLRB 1176 (1984), affd. sub nom. *Hotel & Restaurant Employees Local 11 v. NLRB*, 760 F.2d 1006 (9th Cir. 1985), or *Bourne v. NLRB*, 332 F.2d 47 (2d Cir. 1964), specifically, that the official did not have a legitimate purpose for asking the questions and did not give the employee any assurances against reprisals.

[26] Member Kaplan agrees that the Respondent engaged in unlawful surveillance but would not find that it additionally created an impression of surveillance.

[27] When asked specifically at which plants he had conducted small-group meetings with LRI consultants, Forgey testified:

"I don't recall. I mean, it was a road show, we did a bunch of the plants, we tried to get in front of as many of the employees as we possibly could, so I don't recall all the specific locations, but it was a lot of the facilities, if not all of them."

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC    5

that the content of the consultant group meetings was pre-scripted in consultation with legal counsel and that individual consultants did not have discretion to depart from the pre-scripted message, so that the Respondent delivered identical messages to drivers throughout the unit.

The judge considered testimony from Forgey, Rosado, and Oxnard driver Diana Ornelas in making factual findings about what Forgey said at this meeting. Ornelas was a lead activist among the Ventura County drivers who helped initiate the Southern California campaign. She was a regular participant in the Union's organizing committee conference calls, where union organizer Scott Williams testified that he had held up the quality of her careful notetaking at the Respondent's consultant meetings as an example for other unit employees to follow. Finally, as discussed in more detail below, the Respondent issued a series of unlawful discriminatory disciplines to Ornelas because of her union activity, beginning before the election and culminating in her discharge on September 6, 2019.

With respect to the January 29 meeting, first, we affirm the judge's conclusions, for the reasons given in his decision, that the Respondent violated Section 8(a)(1) three times when Forgey: (1) threatened drivers by telling them that their work opportunities would be limited by strict contract classifications if they unionized; (2) blamed the Union for a delay in wage increases;[28] and (3) threatened drivers by implying that wage increases could be delayed for years if employees unionized.[29]

The judge also found that the Respondent violated Section 8(a)(1) when Forgey told employees that, if they selected the Union and participated in a strike, their return to work would be contingent on the company's operations and their level of seniority, pursuant to a "seniority status" provision of a future collective-bargaining agreement, implying that reinstatement of striking employees with low seniority would be indefinitely delayed. As the judge correctly found, it is well-settled Board law

that both unfair labor practice and economic strikers are generally entitled to reinstatement without delay upon their unconditional offer to return to work, except that the return to work of economic strikers may be delayed based on an employer's legitimate and substantial business justification, which may include its having hired permanent replacement workers.[30] The Board has long held, with court approval, that misrepresentations of striker reinstatement rights like Forgey's here constitute unprotected threats of job loss for engaging in protected strike activity that violate Section 8(a)(1).[31] Moreover, to the extent that Forgey's comments predicted that employees would necessarily suffer an adverse consequence as a result of seniority provisions contained in a future collective-bargaining agreement, they clearly fail to meet the *Gissel* Court's requirement that an employer's lawful predictions, protected under Section 8(c) of the Act, must be "carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences *beyond his control*," because the Act does not permit unions to unilaterally impose contract terms, including seniority provisions governing the return to work of economic strikers.[32]

Particularly in the context of the Respondent's persistent campaign focus on the Teamsters' strike history, the likelihood of a strike at Cemex if employees selected the Union, and the potential impact of a strike on employees' financial well-being, we find that drivers would have understood Forgey's comments as a threat of permanent job loss if employees selected the union.[33] For these

---

[28] In finding this violation, the judge credited Forgey's initial account of what he told drivers about the impact of the Union's campaign on scheduled wage increases and found that Forgey fabricated later contrary testimony in an effort to aid the Respondent's defense. The Respondent excepts to this credibility resolution, but the record does not support overruling it. See *Standard Dry Wall Products*, above.

[29] Member Kaplan agrees that the Respondent, by Forgey, violated the Act when Forgey told employees that their wage increases were delayed "because of the Union," but he disagrees that Forgey unlawfully threatened that wage increases could be delayed for years if employees unionized. Forgey simply described the collective-bargaining process. He explained that "everything was negotiable," that "things could get better, worse, or stay the same," and that bargaining could take days, weeks, months, or years. That description was accurate and lawful.

[30] See, e.g., *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378–379 & fn. 5 (1967).

[31] See, e.g., *Care One at Madison Ave., LLC v. NLRB*, 832 F.3d 351, 361 (D.C. Cir. 2016) (blanket statement that striking could cost employees their jobs was not truthful and could reasonably be construed as threatening in violation of Sec. 8(a)(1)), enfg. 361 NLRB 1462 (2014); *Grinnell Fire Protection Systems*, 236 F.3d 187, 201 (4th Cir. 2000) (employer's telling striking employees that it intended to hire permanent replacements without distinguishing between reinstatement rights of unfair labor practice and economic strikers was unlawful threat), enfg. 328 NLRB 585 (1999); *Virginia Concrete Corp.*, 334 NLRB 796, 796 (2001) ("It is well established that an employer may not tell employees, without explanation, that they could lose their jobs to permanent replacements in the event of a strike.") (citing cases).

[32] *Gissel*, above, 395 U.S. at 618 (emphasis added).

[33] We further find that the Respondent communicated its unlawful misrepresentation of striker reinstatement rights far more broadly than to the drivers present at Forgey's January 29 meeting at Oxnard. As the judge found, testimony elicited by the Respondent showed that LRI consultant Rosado also told employees at a different meeting that "if a strike occurs, Cemex has the ability to replace drivers who go on strike, and when the strike ends, anyone who has been replaced would go on a preferential recall list." One of the Respondent's consultant Power-Point decks, which were shown to all unit drivers, includes a slide stating that "[i]n both [unfair labor practice and economic strike] situations employees can be <u>replaced</u>" (emphasis in original). This slide is

6                          DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

reasons and those given by the judge, we affirm the judge's conclusion that the Respondent violated Section 8(a)(1) when Forgey implicitly threatened employees with job loss by misstating striking employees' legal reinstatement rights.

The judge also found that the Respondent violated Section 8(a)(1) when Forgey told employees that, even if they unionized, the company would retain a management right to turn plants into "satellites," meaning that Cemex could shift work from one plant to another, thereby "turning plants on and off as needed." The judge reasoned that Forgey's description of "satellite plants" implicated a transfer of work, and Forgey's statement conveyed a message that selecting union representation would be futile because the Respondent would not fulfill a bargaining obligation that would arise pursuant to any such transfer. We agree with the judge that Forgey's statements are unlawful threats, but as explained below, we find that employees would reasonably have understood Forgey's comments as a threat to close individual plants rather than as a threat to unilaterally transfer work.[34]

First, driver Ornelas testified that Forgey told drivers "that Cemex is a business and that he can legally close the plant down at any time, for any reason." The judge found that this testimony was a summary of what Forgey

said about satellite plants. But the accuracy and import of Ornelas's summary depends on what it would mean to drivers for a facility to be converted to satellite status. Record evidence on this point is sparse, but it appears from both the record and admissions in the Respondent's briefing to the Board that for a plant that had previously operated on a full-time basis to become a satellite would mean that that plant was essentially closed, "dormant," or "dark," except for such occasions that business demand, *as defined by the Respondent*, warranted its operation, at which point it would be serviced by drivers from other plants. There is no indication in the record that drivers previously based at a plant that was converted to satellite status would be maintained in employment, such as by being reassigned to another facility.

From this context, we conclude that the Oxnard drivers would reasonably have understood Forgey's remarks about satellite plants as a threat that, even if employees unionized, the Respondent would reserve the unilateral right effectively to close individual plants at any time, consistent with Ornelas's direct testimony.[35] While Forgey, unlike Dickson and Santana, did not threaten to close the Respondent's entire Southern California and Nevada ready-mix operations, the Board and the courts have treated an employer's threats to close some facilities within a multifacility unit as among the most serious violations of Section 8(a)(1) in a preelection context.[36] We accordingly affirm the judge's finding of this violation, but as a threat of plant closure rather than as a threat to refuse to bargain over work transfers.[37]

The judge found that the Respondent violated Section 8(a)(1) when Forgey told drivers (1) that unionization

---

bracketed by others conveying the Respondent's broader message that selecting the Teamsters would likely or inevitably lead to strikes and detailing attendant substantial financial costs to employees. This backdrop makes it apparent that Forgey's remarks at Oxnard were instances of, rather than departures from, a premeditated and broadly communicated unlawful campaign message.

[34] Member Kaplan would find that the record fails to establish that the Respondent threatened employees either with transfers or with plant closings. The judge found that, in a conversation about collective bargaining, Forgey told employees that the "the company had management rights and would still maintain the right to turn plants into 'satellites,' meaning that Cemex could shift work from one plant to another, based upon the location of any particular job, thereby turning plants on and off as needed." Forgey's statement was simply a reminder to employees that selecting a union would not insulate them from the consequences of the Respondent's business-driven decisions regarding its established operation of satellite plants, which involved turning them on and off as needed to make time-sensitive deliveries to construction sites at different locations. As the judge found, Forgey stated that the use of satellites was "based upon the location of any particular job," not the selection of the Union. The record evidence does not establish how often the Respondent uses satellite plants, how many plants it has turned into satellites, and what effects follow from such a conversion, including—crucially—whether the conversion would in fact result in the loss of jobs or transfer of work for its drivers, who routinely work out of multiple facilities. My colleagues, acknowledging that the record evidence is "sparse" in this regard, rely instead on what they characterize as "admissions" in the Respondent's briefing. But neither arguments nor assertions set forth in a party's brief constitute record evidence, and the Board's finding of a violation must be supported by record evidence.

[35] In this respect it is telling that Forgey responded to the question of whether he told drivers that the Respondent could close the Oxnard plant by discussing what he told them about the Respondent's authority to convert plants to satellite status.

[36] See, e.g., *Piggly Wiggly, Tuscaloosa Division*, 258 NLRB 1081, 1081, 1091 (1981) (employer's statements that unionization would result in closing some smaller stores in multistore unit violated Sec. 8(a)(1)), enfd. 705 F.2d 1537 (11th Cir. 1983). In enforcing the Board's bargaining order in *Piggly Wiggly*, the court noted that, while the company had not contested the Board's findings of unlawful threats of plant closure, these were among "the most serious of the company's violations," and "[t]hreats of plant closure are 'more effective [in] destroy[ing] election conditions for a longer period of time than other' unfair labor practices." *Piggly Wiggly, Tuscaloosa Division Commodores Point Terminal Corp. v. NLRB*, 705 F.2d 1537, 1541, 1543 (11th Cir. 1983) (quoting *Gissel*, above, 395 U.S. at 611 fn. 31).

[37] The General Counsel's complaint also alleged that the Respondent violated Sec. 8(a)(1) when Forgey told employees that the Respondent would no longer allow them to leave early in cases of emergency because they engaged in union activities. As the judge found, Ornelas testified that Forgey told the Oxnard drivers that he would not be able to let them go home early if they unionized. However, the judge did not expressly address this complaint allegation, and no party has excepted to the omission.

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC

7

would change their relationship with management; (2) that once they were under a collective-bargaining agreement, they would have to go through the Union instead of going directly to management; (3) that they would lose their ability to deal directly with their supervisors and instead, if they needed anything, would have to work through the union contract or union representative and could not go directly to him because he would not be able to do anything for them; and (4) that if employees unionized they were putting at risk their relationship with supervisors and batchmen. In finding this violation, the judge relied on *Economy Fire & Casualty Co.*, 264 NLRB 16, 20 (1982), *Tipton Electric Co.*, 242 NLRB 202 (1979), enfd. 621 F.2d 890 (8th Cir. 1980), and *Storktowne Products, Inc.*, 169 NLRB 974 (1968). After the Board issued its decisions in those cases, however, it issued a different series of decisions holding that similar statements were nonobjectionable campaign propaganda under *Midland National Life Insurance*, 263 NLRB 127 (1982)), and did not violate the Act. See, e.g., *Tri-Cast, Inc.*, 274 NLRB 377 (1985); *New Process Co.*, 290 NLRB 704, 707 (1988), enfd. 872 F.2d 413 (3d Cir. 1989). Because the judge's finding of this violation is inconsistent with currently controlling law, we reverse that finding and dismiss the relevant complaint allegation.[38]

We affirm the judge's conclusion, for the reasons given in his decision, that the Respondent violated Section 8(a)(1) on February 21, 2019, when plant superintendent Jason Faulkner told Ornelas and two other drivers that if the Union came in it might strip him of the ability to teach drivers to batch (i.e., work as a plant foreman/batchman) or drive a loader because the Union has a classification system and that he would lose the power to teach employees who wanted to learn and grow with the company if the drivers unionized.[39]

We affirm the judge's conclusion, for the reasons given in his decision, that the Respondent violated Section 8(a)(1) on February 25, 2019, when Faulkner and Daryl Charlson, the Respondent's director of plant and fleet maintenance, orally promulgated an overly broad directive not to talk to union representatives "on company time." In affirming this conclusion, we note that Ornelas testified that when plant foreman/batchman Juan Torres instructed her not to talk to the union representatives, she said she did not know this was prohibited, and Torres replied, "you can't be talking to them. Everybody knows it . . . . we told everybody." Similarly, Charlson testified that Faulkner told Ornelas that drivers had been informed about this in prior meetings, including meetings with the LRI consultants. In addition, Faulkner's contemporary written account of the disciplinary meeting recounts that he told Ornelas that she had previously been informed "during meetings with the consultant" that she was not allowed to talk to union organizers "on Company time," or "during working hours."[40] We accordingly conclude that the Respondent's unlawful instruction to Ornelas not to talk with organizers on company time was not merely a one-time instruction to one employee, but a generally promulgated rule, broadly communicated to unit drivers by managers and LRI consultants.[41]

---

[38] The General Counsel has asked the Board to affirm the judge's finding of this violation by overruling *Tri-Cast* and related precedent. We decline to do so in this case. Chairman McFerran and Members Wilcox and Prouty are willing to reexamine *Tri-Cast* and related precedent in a future appropriate case.

[39] Member Kaplan would not find that the Respondent threatened employees when Faulkner told the drivers that if the Union came in it may strip him of the ability to teach drivers to batch or drive a loader because the Union has a classification system. Sec. 8(c) permits an employer to make predictions about the effects unionization will have on its company so long as the prediction is based on "objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control" and does not carry "any implication that an employer may or may not take action solely on [its] own initiative." *Gissel*, 395 U.S. at 618. Consistent with Sec. 8(c), the Board has allowed employers to make predictions of what bargaining outcomes a union might seek based on objective facts gleaned from the employers' past experience. See, e.g., *Didlake, Inc.*, 367 NLRB No. 125, slip op. at 3 (2019) (finding unobjectionable employer's prediction that if union

won, it would require membership as condition of employment because it was based on employer's experience with that union at another facility); *Atlantic Forest Products*, 282 NLRB 855, 861 (1987) (explaining that Sec. 8(c) permits an employer to rely on previous experience with a union when making predictions).

Here, Faulkner told the employees that he had been involved with the Teamsters as a driver in the past, and during that time a classification system prohibited drivers from performing tasks in other classifications. He then said that although he currently could teach drivers skills from other jobs, "if the Union comes in, it may strip me of that power" by bargaining for a similar classification system. The prediction was rooted in Faulkner's personal experience with the Teamsters. Moreover, Faulkner explicitly stated it as a possibility, not a certainty, and he phrased it as a bargaining outcome the Union might seek rather than a unilateral action the Respondent would take. Accordingly, Member Kaplan would find that Faulkner's prediction was within Sec. 8(c)'s protection.

[40] In light of the credited testimony and documentary evidence, the judge found, and we agree, that Charlson's and Faulkner's testimony that Faulkner warned Ornelas about speaking to union organizers on "working time," not on "company time," was manufactured, after the fact, in an effort to aid Respondent's case.

[41] Contrary to our dissenting colleague, substantial record evidence supports our conclusion that the Respondent communicated its unlawful prohibition broadly. First, while the judge's analysis did not expressly rely on Ornelas's testimony about Torres's statement or Charlson's testimony about what Faulkner told Ornelas, the Board is a primary finder of fact under Sec. 10(c) of the Act and is not limited to reliance on record evidence expressly discussed by the judge. See, e.g., *Fort Dearborn Co. v. NLRB*, 827 F.3d 1067, 1074 (D.C. Cir. 2016) ("[T]he Board is the agency entrusted by Congress with the responsibility for making findings under the Act . . . and it is not restricted to the evidence cited by the ALJ.") (internal quotation, citation, and modifica-

8               DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

We also affirm the judge's conclusion that the Respondent violated Section 8(a)(1) when Faulkner and Charlson issued a disciplinary verbal warning to driver Ornelas for her protected conduct of talking with Union organizers during downtime while waiting to load her truck.[42] In this respect, we note Ornelas's uncontradicted testimony that drivers waiting to load could ordinarily eat lunch, get water, go to the bathroom, talk to coworkers, or take a phone call. Accordingly, we find that the actual conduct for which the Respondent disciplined Ornelas—talking with union organizers during downtime in which personal activity was generally allowed—was itself protected and could not have been prohibited even under an appropriately narrowly drawn policy.[43] Furthermore, the record establishes that the Respondent had in place at the time a formal progressive discipline policy with steps including verbal warning, written warning, suspension, and discharge. The Respondent's human resources manager Plascencia testified that there was no difference between a verbal coaching or counseling and a documented verbal warning for the purposes of the progressive discipline policy. We accordingly find, contrary to the Respondent's suggestion in its brief to the Board, that its February 25, 2019, verbal warning to Ornelas was a formal disciplinary action within the scope of the Respondent's progressive discipline policy.

We affirm the judge's conclusions that the Respondent violated Section 8(a)(1) three more times in late February or early March 2019, when area manager Ryan Turner: (1) told Corona (Inland Empire) driver Bernard Molina that Turner would no longer be able to provide help as he had done in the past if drivers selected the Union;[44] (2) told Temecula (Inland Empire) driver Donald Shipp that he would be granted a previously requested transfer if he voted against the Union;[45] and (3) impliedly threatened Corona (Inland Empire) driver Richard Daunch with a loss of benefits by telling him that if employees selected the Union, Turner would no longer be able to approve Daunch's periodic requests for time off in order to perform music.[46]

---

tion omitted). Moreover, as stated above, our conclusion is further supported by the contemporaneous documentary evidence of Faulkner's written account of the disciplinary meeting.

Member Kaplan agrees with his colleagues that, as discussed below, the Respondent violated Sec. 8(a)(1) by disciplining Ornelas for talking with union organizers during non-working time, but he would not find that the Respondent orally promulgated an unlawful rule. The Board has consistently held that a statement made to a single employee and not repeated to other employees as a general requirement does not constitute the promulgation of a rule. See, e.g., *Shamrock Foods Co.*, 366 NLRB No. 117, slip op. at 2 fn. 10 (2018) (finding statement made to single employee was not the promulgation of a rule), enfd. mem. 779 Fed. Appx. 752 (D.C. Cir. 2019); *Food Services of America*, 360 NLRB 1012, 1016 fn. 11 (2014) (same); *Flamingo Las Vegas Operating Co., LLC*, 360 NLRB 243, 243 (2014) (same). Here, the credited evidence shows only that Faulkner made the statement at issue to Ornelas. It does not establish that he repeated the statement to other employees as a general requirement. The majority relies on Ornelas's testimony that a supervisor, Juan Torres, told her "we told everybody," but the judge's summary of the credited evidence relevant to this issue omits this testimony. Indeed, in his analysis of this issue, the judge does not reference anything that Ornelas claimed that Torres said to her. Nonetheless, the majority attempts to rely on this testimony, citing *Fort Dearborn Co. v. NLRB*, 827 F.3d 1067, 1074 (D.C. Cir. 2016). In that case, however, the evidence at issue had *not been mentioned* by the judge. Here, by contrast, the judge expressly mentioned Ornelas's testimony regarding her purported conversation with Torres, but then pointedly omitted that testimony from his analysis. Accordingly, the only reasonable inference to draw from the fact that the judge chose not to cite that evidence in his analysis is that he did not find that evidence credible. The majority also relies on Charlson's testimony that Faulkner told Ornelas "that drivers had been informed about this [statement] in prior meetings," but the judge's summary of the credited evidence relevant to this issue omits this testimony, too. Accordingly, Member Kaplan would find that the credited evidence fails to establish the promulgation of an unlawful rule.

[42] The General Counsel did not allege that this conduct violated Sec. 8(a)(3). As director of plant and fleet maintenance, Charlson reported directly to VP/GM Forgey and was generally not directly involved in management of the Respondent's ready-mix operations. However, during the relevant period, Forgey had instructed Faulkner to seek, and Charlson to provide, guidance in Faulkner's management of several Ventura County ready-mix plants, including the Oxnard plant where Ornelas worked. In this capacity, Charlson was involved in all three unlawful disciplines issued to Ornelas. We agree with the judge's finding that Charlson's non-credible testimony about these incidents evidenced an effort to disguise his involvement in the unlawful disciplines.

[43] See, e.g., *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 803 fn. 10 (1945).

[44] In finding this violation, the judge relied in part on an adverse inference related to the Respondent's failure to elicit testimony about the exchange between Turner and Molina from plant foreman/batchman Mike Carmody. Molina testified that Carmody was among those present when Turner made the statements at issue, but Molina also testified that at least eight people were all talking at the time, and his testimony does not otherwise establish that Carmody would necessarily have heard Turner's remarks. We accordingly do not rely on the judge's inference from the absence of testimony from Carmody. Even absent the judge's inference, however, a preponderance of the record evidence does not support overturning the judge's determination to credit Molina's account over Turner's. See *Standard Dry Wall Products*, above.

[45] The General Counsel's complaint characterized this exchange as an unlawful threat of loss of benefits, but we find that it is better characterized as an unlawful promise of benefits. We further find that Turner followed through on this unlawful promise based on Turner's testimony that he offered Shipp the requested transfer after the election.

Member Kaplan agrees that Turner unlawfully promised Shipp a benefit but finds it unnecessary to pass on whether Turner followed through on his promise because a finding that he did so is irrelevant to the violation.

[46] The General Counsel excepts to the judge's failure to find that Turner additionally violated the Act by telling Shipp that drivers would only receive new trucks and raises if they rejected the Union. We find it unnecessary to pass on whether the General Counsel presented sufficient evidence to establish this violation because finding the violation would not materially affect the remedy.

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC

9

The judge found that the Respondent violated Section 8(a)(1) when it deployed security guards at numerous plants for 2 weeks prior to the election and at all the plant polling places on the day of the election for the purpose of intimidating unit employees. We affirm this conclusion for the reasons given by the judge and for the reasons stated below. The Respondent contends that finding this violation exceeds the scope of the General Counsel's complaint. However, it is well established that "the Board may find and remedy a violation even in the absence of a specified allegation in the complaint if the issue is closely connected to the subject matter of the complaint and has been fully litigated."[47] We find that the judge's Section 8(a)(1) finding here meets the requirements of the rule. First, the judge's general finding that the Respondent's overall use of security guards was unlawful coercive intimidation is closely connected to the General Counsel's specific complaint allegation that it unlawfully utilized security guards at its Inglewood (La County) plant.[48] Second, the broader issue was fully litigated pursuant to the Union's eighth election objection, which alleged that "[t]he Employer increased the use of security at all Employer locations during the critical period in attempts to intimidate employees." In this respect, we note that VP/GM Forgey and other managers and employees were examined in detail and testified at length about the Respondent's use of security guards at all locations prior to and during the election.[49]

---

Member Kaplan would affirm the judge's decision to dismiss this allegation because the credited evidence fails to establish that Turner unlawfully connected his comments about new trucks and raises to his request that Shipp vote against the Union.

[47] *Pergament United Sales*, 296 NLRB 333, 334 (1989), enfd. 920 F.2d 130 (2d Cir. 1990).

[48] Cf, e.g., *Greater Omaha Packing Co.*, 360 NLRB 493, 494 (2014) (holding general Sec. 8(a)(1) coercive statement violation closely connected to more specific Sec. 8(a)(1) interrogation allegation), enf. denied other grounds 790 F.3d 816 (8th Cir. 2015).

[49] Member Kaplan would find that the violation found by the judge and the majority fails to satisfy the Board's standard for unalleged violations. The Board "may find and remedy a violation even in the absence of a specified allegation in the complaint if the issue is closely connected to the subject matter of the complaint and has been fully litigated." *Pergament United Sales*, 296 NLRB at 334. Neither requirement is met here.

The violation found is not closely connected to the subject matter of the complaint. The complaint alleges that the Respondent violated the Act by using security guards on the day of the election to block or prevent employees from entering two plants, Inglewood and Santa Paula, and to surveil employees at a third plant, Oxnard. The judge dismissed these narrow allegations but found that the Respondent violated the Act by assigning security guards to 25 plants in the 2 weeks before the election and at all 12 polling locations on the day of the election, contrary to its past practices. The violation found by the judge was based on a separate and significantly more extensive set of facts than those that pertained to the alleged violations. The allegations in the complaint concerned only the specific conduct of guards at three

plants on a single day. The violation found is thus not closely related to the violations alleged.

The violation found was also not fully litigated. "'To satisfy the requirements of due process, an administrative agency must give the party charged a clear statement of the theory on which the agency will proceed with the case.'" *Lamar Advertising of Hartford*, 343 NLRB 261, 265 (2004) (quoting *Yellow Freight System, Inc. v. Martin*, 954 F.2d 353, 357 (6th Cir. 1992)). Even assuming the record contains evidence that would support the unalleged violation finding, neither the complaint nor any representations made by the General Counsel at the hearing put the Respondent on notice that such evidence was relevant to any claim that an unfair labor practice had been committed. "[T]he simple presentation of evidence important to an alternative claim does not satisfy the requirement that any claim at variance from the complaint be 'fully and fairly litigated.'" *NLRB v. Quality C.A.T.V., Inc.*, 824 F.2d 542, 547 (7th Cir. 1987). "'It is the opportunity to present argument under the new theory of violation, which must be supplied.'" *Piggly Wiggly Midwest, LLC*, 357 NLRB 2344, 2345 (2012) (quoting *NLRB v. Quality C.A.T.V., Inc.*, 824 F.2d at 548). The Respondent was not afforded that opportunity.

The majority claims that the Union's eighth objection in the representation case ensured that the issue was fully litigated for unfair labor practice purposes. It is well settled, however, that "the General Counsel serves as the master of the complaint and controls the theory of the case." *Fineberg Packing Co.*, 349 NLRB 294, 296 (2007), enfd. 546 F.3d 719 (6th Cir. 2008). A charging party cannot expand the scope of the complaint without the consent of the General Counsel. *Planned Building Services*, 330 NLRB 791, 793 fn. 13 (2000). Here, it is clear that the General Counsel did not consent to the expansion of the complaint to include conduct alleged in the Union's eighth objection. The General Counsel was aware of that alleged conduct when she issued the complaint because the complaint issued *after* the Union filed its objections in the representation case. Moreover, the General Counsel amended the complaint on the first day of the hearing, but neither at that time nor at any subsequent time during the hearing did the General Counsel put the Respondent on notice that the conduct alleged by the Union in its eighth objection was also being alleged as an unfair labor practice. Accordingly, that the Union put the conduct at issue for purposes of its eighth objection does not establish that it was fully litigated as an unfair labor practice.

Additionally, the record evidence fails to establish a violation on the merits. The judge found that the Respondent's posting of guards violated the Act under *Austal USA*, 349 NLRB 561 (2007), and *Beverly California Corp.*, 326 NLRB 232 (1998). In those cases, the unfair labor practice (in *Beverly California*) or objectionable conduct (in *Austal USA*) was not based on the mere presence of guards. In *Austal USA*, objectionable conduct was found based on the presence of guards *and* the fact that they demanded identification from employees before allowing them to enter the facilities to vote. 349 NLRB at 576. In *Beverly California*, the respondent was found to have violated Sec. 8(a)(1) when, prior to an all-staff meeting to discuss the union campaign, it posted guards outside some doors *and locked others*. 326 NLRB at 261.

Those cases are distinguishable from other cases, such as *Quest International*, where the Board found that an employer's unprecedented posting of guards and a guard dog at its facility starting 10 days before an election was not objectionable conduct because the guards did not engage in any coercive conduct toward the employees. 338 NLRB 856, 857 (2003).

This case is similar to *Quest International*, not *Austal USA* and *Beverly California*. There is no evidence that the guards hired by the Respondent engaged in coercive conduct toward employees. There is no evidence that they required employees to present identification or otherwise interfered with employees arriving to vote at the 12 polling sites.

10                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

*Postelection unfair labor practices:*

We affirm the judge's conclusion, for the reasons given in his decision, that the Respondent violated Section 8(a)(3) and (1) when it suspended Ornelas without pay from July 10 through July 17, 2019.[50]    The Respondent

contends that the suspension was warranted under its progressive discipline policy in light of Ornelas's prior disciplinary record.    But, as discussed above, Ornelas's prior disciplinary record included the unlawful verbal warning the Respondent issued to her on February 25, 2019 for her protected union activity.    Because the Respondent does not contend that it would have issued the same discipline to Ornelas absent the prior unlawful warning, the suspension was unlawful, in addition to the reasons given by the judge, because it relied in part on the earlier unlawful warning.[51]    We also affirm the judge's conclusions that the Respondent violated Section 8(a)(1) twice in relation to the same incident when Charlson interrogated Ornelas by asking whether she had called the Union for assistance at the Hallin & Herrera jobsite and when he threatened her by telling her that the Respondent had to do an investigation because Hallin & Herrera had reported that she had called a union organizer.[52]    Finally, we affirm the judge's conclusion that the Respondent violated Section 8(a)(3) and (1) when it discharged Ornelas on September 6, 2019, both for the reasons given by the judge and because of the Respondent's express reliance, in its discharge decision, upon both the earlier unlawful July 10 suspension and the earlier February 25 unlawful verbal warning.[53]

---

The judge relied on testimony from Charlson that the guards were told to ensure that individuals entering the plant were Cemex employees, but none of the General Counsel's employee witnesses testified that they were asked for identification.  Guards stopped one employee from entering the property before the polls opened, but the judge found that "there is no evidence that any employee was blocked or otherwise prevented from voting by the security guards, or anyone else, after the polls opened."  Accordingly, Member Kaplan relevantly dissents both on the merits and on due process grounds.

We note that the judge cited Board precedent under which certain statements in the Respondent's "25th hour" videos would appear to be unlawful or objectionable promise of benefits, while observing that neither the General Counsel nor the Union had so alleged.  On exceptions, the General Counsel asks the Board to find that the "25th hour" videos included unlawful implied promises of benefits to employees if they rejected the Union.  The Respondent argues on the merits that the statements at issue were lawful under Board precedent holding that similar statements, in isolation, were too vague to rise to the level of illegal promises.  The Respondent also argues that, because the General Counsel did not allege this violation in the complaint, both the Sec. 10(b) statutory limitations period and procedural due process preclude the Board's finding this violation.  But it is well established that Sec. 10(b) and procedural due process do not necessarily preclude the Board's finding and remedying a violation not alleged in the complaint under certain circumstances.  See *Pergament*, above.  The Respondent also contends that the judge's handling of this issue demonstrated bias or prejudice.  But the Board has expressly rejected allegations of prejudicial bias even where a judge found unalleged violations that the Board ultimately concluded had not been fully and fairly litigated.  *Q-1 Motor Express, Inc.*, 308 NLRB 1267, 1267 fn. 3, 1268 (1992), enfd. 25 F.3d 473 (7th Cir. 1994).  Accordingly, on careful examination of the judge's decision and the entire record, we are satisfied that the Respondent's contentions that the judge's decision demonstrated bias or prejudice are without merit.  We additionally note that, given our conclusion above that the Respondent unlawfully promised benefits when Turner offered Shipp a transfer if he would vote against the Union, finding additional unlawful promises of benefits would be duplicative and would not affect the remedy.  We accordingly find it unnecessary to pass on the General Counsel's request to find these additional violations.

Member Kaplan would deny the General Counsel's request to find the additional violations on due process grounds.  See *Pergament United Sales*, 296 NLRB at 334.  As the judge stated, "the government has not alleged that anything said in the videos constitute[s] an unfair labor practice."  There is also no contention that the General Counsel raised the issue at the hearing.  Accordingly, the Respondent was provided with no notice that the content of the videos was at issue in this proceeding, so the videos cannot serve as the basis for additional violations.  Member Kaplan notes that his colleagues do not find to the contrary.

[50] The judge found that the Respondent suspended Ornelas in part because of her protected activity of consulting with union organizer Fabian Leon during the July 9, 2019, incident at the Hallin & Herrera jobsite.  The Respondent argues that this conduct was not protected because Ornelas did not have a right to union representation in her nonunion workplace under *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251 (1975) and *IBM Corp.*, 341 NLRB 1288 (2004).  We reject the Re-

---

spondent's argument because this situation did not involve the context-specific *Weingarten* right to bring representation to a disciplinary meeting.  Rather, we affirm the judge's finding that Ornelas engaged in protected conduct when she sought advice or assistance with a workplace issue from a union agent during an active union campaign.  Cf., e.g., *Charles H. McCauley Associates, Inc.*, 248 NLRB 346, 350 (1980) (employee's threat to seek union assistance "must, itself, be deemed union activity"), enfd. 657 F.2d 685 (5th Cir. 1981).

[51] See, e.g., *Kitsap Tenant Support Services, Inc.*, 366 NLRB No. 98, slip op. at  20 (2018) (finding discipline unlawful because it was based in part on prior unlawful discipline) (quoting *Hays Corp.*, 334 NLRB 48, 50 (2001) ("It is well settled that, where a respondent disciplines an employee based on prior discipline that was unlawful, any further and progressive discipline based in whole or in part thereon must itself be unlawful.")), enfd. 2019 U.S. App. LEXIS 13055, 2019 WL 12276113 (D.C. Cir. Apr. 30, 2019); *NLRB v. Relco Locomotives, Inc.*, 734 F.3d 764, 787 (8th Cir. 2013) ("An adverse employment decision is unlawful if it relies upon and results from a previous unlawful action.").

Member Kaplan affirms the judge's finding that the Respondent violated the Act by suspending Ornelas based solely on the Respondent's reliance on the prior unlawful verbal warning.  *Hays Corp.*, 334 NLRB at 50.

[52] In affirming the judge's findings of these violations, we note that the Respondent excepted to these findings without stating on what grounds the purportedly erroneous findings should be overturned.  We therefore find, in accordance with Sec. 102.46(a)(1)(ii) of the Board's Rules and Regulations, that these exceptions should be disregarded.  See, e.g., *St. Paul Park Refining Co., LLC d/b/a Western Refining*, 366 NLRB No. 83, slip op. at 1 fn. 3 (2018), enfd. 929 F.3d 610 (8th Cir. 2019).

[53] See, e.g., *Hays Corp.*, above.  Member Kaplan affirms the judge's finding that the Respondent violated the Act by discharging Ornelas

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC

### B. The election and election objections

The Board ordinarily sets aside the results of a representation election whenever an unfair labor practice has occurred during the critical period between the filing of the petition and the election, unless it is virtually impossible to conclude that the misconduct has affected the outcome of the election.[54]  In determining whether misconduct could have affected the results of the election, the Board considers the number and severity of the violations and their proximity to the election, the size of the unit and margin of the vote, and the number of employees affected and extent of dissemination of the misconduct.[55]  A party seeking to set aside an election has the burden of establishing that coercive conduct was sufficiently disseminated to affect the election's result.[56]

Here, the impact of the Respondent's coercive conduct on the election is clear.  As detailed above and in the judge's decision, the Respondent engaged in more than 20 distinct instances of objectionable or unlawful misconduct spanning the entire critical period, including, but not limited to, numerous unfair labor practices related to the Union's election objections.  Specifically, the Union's second objection alleges that Cemex threatened employees with the closing of batch plants or other adverse consequences if they supported the Union.  Among the most serious threats supporting this objection were plant foreman/batchman Dickson's telling drivers that "if the Union comes in . . . Cemex is just going to close their doors and take all their trucks to another state," and VP/GM Forgey's telling drivers that the Respondent retained the right to turn plants into "satellites," which could be turned on and off as needed.  We also affirm the judge's finding that the Respondent delivered a third coercive threat of plant closure—not alleged by the General Counsel as an unfair labor practice—when LRI consultant Amed Santana told drivers during a meeting at the Respondent's Perris (Inland Empire) plant on January 28, 2019, that Cemex was a multibillion dollar company that did not need the ready-mix part of its business mix and could close its ready-mix operation if employees pushed enough and unionized.[57]

We also find that the Respondent made at least 10 more coercive threats of adverse consequences during the critical period.[58]  While all of these threats were serious, the Respondent's implied threat of termination for engaging in protected strike activity, in the context of the Respondent's pervasive and persistent message that a strike would be likely if employees selected the Teamsters, likely had a particularly significant impact because, as noted above, it was conveyed not only by VP/GM Forgey, but also by LRI consultant Rosado and by consultant presentation material that was shown to all or most unit employees.  Furthermore, the Board and the Courts have long recognized the particularly coercive nature of threats to close or transfer operations such as those delivered by Dickson, Santana, and Forgey.[59]

In addition to these numerous coercive and unlawful threats, we have affirmed the judge's findings of unfair labor practices supporting the Union's seventh and eighth objections, alleging coercive surveillance and intimidation by increased use of security guards, respectively.  We have also affirmed the judge's findings of at least seven more critical-period unfair labor practices not

---

based solely on the Respondent's reliance on the earlier unlawful disciplines.

[54] See, e.g., *Bon Appetit Management Co.*, 334 NLRB 1042, 1044 (2001) (citing cases).

[55] Id.

[56] *Crown Bolt, Inc.*, 343 NLRB 776, 779 (2004).

[57] The Respondent contends that the Union's objections are procedurally barred because they were insufficiently detailed to put the Respondent on notice of the conduct considered objectionable, including, specifically Santana's threat of plant closure.  On March 29, 2019, the Regional Director denied the Respondent's motion to dismiss the Union's objections on this basis, and on July 17, 2019, the Board denied

the Respondent's request for review of the Regional Director's determination.  We again reject the Respondent's argument in this regard because, as the Regional Director correctly found, the Union's objections met the specificity requirements of the Board's Rules and Regulations and the Respondent was, in any case, afforded a full opportunity to respond at the hearing.  The Respondent does not contend in its brief to the Board that the judge erred in finding that Santana made the statements at issue or that those statements, if made, were objectionably coercive.  We affirm the judge's finding that the Respondent made this threat based on the judge's record-supported credibility resolutions.

[58] These include unfair labor practices found above: (1) foreman/batchman Dickson inviting driver Collins to quit; (2) VP/GM Forgey's threats of limited work opportunities; (3) Forgey's threat of discharge for engaging in protected strike activity; (4) Forgey's threat of indefinitely delayed wage increases; (5) superintendent Faulkner's threats of lost ability to learn and grow in the company; (6) area manager Turner's threat to driver Molina to discontinue help provided in the past; and (7) Turner's threat to driver Daunch to cease allowing Daunch to leave early for musical performances.  We also affirm the judge's findings of several more objectionable threats not alleged as unfair labor practices: (1) Santana separately threatened employees with futility by telling drivers that they would not be able to achieve anything with the union because of Cemex's size; (2) Forgey threatened employees that the Respondent's policy of providing work boots would be up for negotiation, a false assertion because California regulations require employers like Cemex to pay for footwear protection for their employees; and (3) Forgey threatened driver Ornelas individually by asking her to consider what she had to lose by supporting the Union in the context of various other threats at the January 29, 2019 Oxnard meeting.  The Respondent does not except to the judge's findings of these last two threats.

[59] See, e.g., *Gissel*, above, 395 U.S. at 611 fn. 31 ("[C]ertain unfair labor practices [such as threats to close or transfer plant operations] are more effective to destroy election conditions for a longer period of time than others.").

12                                 DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

directly related to the Union's objections.[60]   Of these remaining unfair labor practices, the Respondent's unlawful directive to employees not to talk with union representative on "company time" may have had a particularly broad impact because, as discussed above, the record suggests that LRI consultants conveyed the same unlawful directive to drivers across the unit during individual and small group campaign meetings.

In short, the Respondent engaged in a large number of severe unfair labor practices and otherwise coercive conduct throughout the critical period.  While some of these instances would likely have directly affected only the individual employee involved,[61] many others included threats or other coercive conduct with unitwide consequences that would directly affect any unit employee who learned of them.[62]  Though the unit here was large, the election margin was small—a change of only 7 votes in the Union's favor from a total of 345 voting employees would have reversed the outcome.  On this record, the Union clearly carried its burden of establishing sufficient dissemination of the Respondent's coercive conduct to affect the election result under *Crown Bolt*, above.[63]  For these reasons and those given by the judge, we adopt the judge's recommendation to set aside the results of the election.[64]

### C.  The Gissel order[65]

The Supreme Court held in *Gissel* that, where a union has at some point achieved majority support and a respondent has engaged in unfair labor practices which "have the tendency to undermine majority strength and impede the election processes," the Board "should issue"

an order for the respondent to bargain with the union without an election if "the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order."[66]   In such a case, the Court emphasized, the bargaining order serves the two equally important goals of "effectuating ascertainable employee free choice" and "deterring employer misbehavior."[67]  The Court further observed that the Board "can properly take into consideration the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future."[68]  The Board accordingly properly considers a respondent's entire course of misconduct, both before and after the election, in determining whether a bargaining order is warranted.[69]

The Board's determination whether misconduct is more appropriately remedied by a bargaining order or a rerun election takes into account the seriousness of the violations and their pervasive nature, as well as such factors as the number of employees directly affected, the identity and position of the individuals committing the unfair labor practices, and the size of the unit and extent of dissemination of knowledge of the Respondent's coercive conduct among unit employees.[70]

Here, the General Counsel alleges that, prior to March 7, 2019, a majority of the Respondent's employees in a unit appropriate for the purposes of collective bargaining had designated the Union as their exclusive collective-bargaining representative; that the Union requested that the Respondent recognize it as the exclusive collective-

---

[60] These are: (1) Dickson's instructions to Collins to remove union stickers; (2) Dickson's interrogation of Collins; (3) Turner's interrogation of Daunch; (4) Forgey's blaming the Union for delayed wage increases; (5) Charlson and Faulkner's overly broad directive against talking to union representatives on "company time"; (6) Charlson and Faulkner's discipline of Ornelas for talking to union representatives; and (7) Turner's promise of benefit to Shipp in exchange for opposing the Union.

[61] These include threats, interrogation, or other coercive conduct directed to individual employees Collins, Daunch, Ornelas, Molina, and Shipp.

[62] These include threats of plant closure, job loss, or other unit-wide repercussions and other coercive conduct directed at unit employees in general.

[63] Because the Union clearly met its evidentiary burden under *Crown Bolt*, we decline the General Counsel's request that we revisit that precedent in this case.

[64] For the reasons he has already stated, Member Kaplan disagrees with some of his colleagues' violation findings.  He agrees, however, that the Respondent's unlawful and objectionable conduct requires the results of the election to be set aside.

[65] For the reasons stated below in his separate partial dissent, Member Kaplan would not issue a *Gissel* bargaining order.  Accordingly, he does not join in this section of the decision.

[66] *Gissel*, above, 395 U.S. at 614-615.

[67] Id. at 614; see also *Seattle-First National Bank v. NLRB*, 892 F.2d 792, 796 (9th Cir. 1989) ("[A] long line of cases . . . stands for the proposition that the purpose of an order to bargain is not simply to effectuate majority rule in a particular case but also to deter wrongful refusals by employers to recognize majorities promptly.").  This is the *Gissel* "Category II" standard, under which the parties and the judge have analyzed this case.

[68] *Gissel*, above, 395 U.S. at 614.

[69] See, e.g., *Aldworth Co.*, 338 NLRB 137, 150 (2002) (finding "pernicious effects of the Respondent's preelection unfair labor practices were exacerbated and renewed by independent unlawful postelection conduct."), enfd. sub nom. *Dunkin Donuts Mid-Atlantic Distribution Center v. NLRB*, 363 F.3d 437 (D.C. Cir. 2004); *General Fabrications Corp.*, 328 NLRB 1114, 1115 (1999) ("An employer's continuing hostility toward employee rights in its postelection conduct 'evidences a strong likelihood of a recurrence of unlawful conduct in the event of another organizing effort.'") (quoting *Garney Morris, Inc.*, 313 NLRB 101, 103 (1993)), enfd. 222 F.3d 218 (6th Cir. 2000).

[70] See, e.g., *Garvey Marine, Inc.*, 328 NLRB 991, 993 (1999) (citing *Holly Farms Corp.*, 311 NLRB 273 (1993)), enfd. 245 F.3d 819 (D.C. Cir. 2001).

bargaining representative of employees in the unit by filing its December 3, 2018 petition; and that the Respondent violated Section 8(a)(5) and (1) of the Act by failing and refusing to recognize and bargain with the Union while engaging in serious and substantial unfair labor practices such that there is only a slight possibility of traditional remedies erasing their effects and permitting a fair rerun election.[71]

As noted above, by the end of November 2018, at least 207 of the Respondent's 366 unit employees—approximately 57 percent—had signed authorization cards designating the Union as their exclusive representative for the purpose of collective bargaining.[72] As explained below, we agree with the judge that the Respondent's pervasive coercive misconduct here, including its unlawful discharge of Ornelas, multiple threats of job loss and plant closure, and numerous other unfair labor practices, were at least as severe as those found warranting a bargaining order in the consolidated cases before the Court in *Gissel*, above, and clearly supports

the issuance of a bargaining order "unless some significant mitigating circumstance exists."[73]

At the broadest level, the whole record here reflects that most of the Respondent's extensive coercive and unlawful misconduct stemmed not from the mistakes of a few managers who failed to understand the rules, but rather from a carefully crafted corporate strategy designed to skirt as closely as possible the fine line between lawful persuasion and unlawful coercion. The Board and the courts have long warned that an employer adopts such a strategy at its own risk.[74] The purposefulness of the Respondent's unlawful conduct here strongly suggests that it would likely meet a rerun election with a similarly aggressive union-avoidance strategy, similarly prone to stray into unlawful coercion. This inference is especially justified in light of the judge's record-supported findings that at least three high-level Respondent officials intentionally fabricated testimony at the hearing in this matter to conceal the Respondent's unlawful conduct. Specifically, as noted above, the judge found, and we agree that: (1) Charlson and Faulkner manufactured testimony after the fact that Faulkner warned Ornelas about speaking to union organizers on "working time," not on "company time"; (2) Forgey fabricated testimony about what he told drivers about the Union's impact on scheduled wage increases; and (3) Charlson intentionally offered non-credible testimony in an effort to disguise his involvement in the series of unlawful disciplines issued to Ornelas.[75]

---

[71] With respect to the Respondent's refusal to recognize and bargain with the Union, the Respondent and the Union entered a stipulation in Case 28–RC–232059 on December 13, 2018, that provides, inter alia: "Petitioner claims to represent the employees described in the petition, and the entity or entities that employ those employees decline to recognize Petitioner."

[72] The cards read:

**Authorization for Representation Under the National Labor Relations Act**

I the undersigned employee of

Company ____Cemex____

Address of Company _____

Authorize the International Brotherhood of Teamsters (or one of its Chartered Teamster Local Unions) to represent me in negotiations for better wages, hours and working conditions.

[spaces for employee identification information and signature]

*This is not a dues deduction card.*

The Respondent contends that cards are inherently unreliable as evidence of a union's majority status, but the Supreme Court specifically rejected this proposition in *Gissel*, 395 U.S. at 602. We also reject the Respondent's argument that authorization cards did not establish the Union's majority status in this case because some union agents allegedly verbally misrepresented the purpose of the cards while obtaining signatures. The *Gissel* Court held that where, as here, cards state "clearly and unambiguously on their face that the signer designated the union as his representative . . . employees should be bound by the clear language of what they sign unless that language is deliberately and clearly canceled by a union adherent with words calculated to direct the signer to disregard and forget the language above his signature." 395 U.S. at 606. We have carefully examined the record in this case and are satisfied that it does not support finding that any union adherent used language that deliberately and clearly cancelled or directed employees to disregard the clear authorization language printed on the cards here.

We further note that the Respondent has neither excepted to the judge's determinations that 207 individual signatures were valid nor disputed that those 207 cards comprised a majority of unit members.

[73] *NLRB v. Jamaica Towing, Inc.*, 632 F.2d 208, 212 (2d Cir. 1980), denying enf. in part to 247 NLRB 353 (1980).

[74] See *Gissel*, above, 395 U.S. at 620 ("[A]n employer . . . cannot be heard to complain that he is without an adequate guide for his behavior. He can easily make his views known without engaging in 'brinksmanship' when it becomes all too easy to 'overstep and tumble (over) the brink.'") (quoting *Wausau Steel Corp. v. NLRB*, 377 F.2d 369, 372 (7th Cir. 1967)); see also *NLRB v. Solboro Knitting Mills*, 572 F.2d 936, 940 (2d Cir. 1977) (holding ambiguous employer speech violated Act as threat of plant closure because "an employer who goes so close to the brink takes the risk that employees may honestly misunderstand him") (quoting *NLRB v. Rollins Telecasting, Inc.*, 494 F.2d 80, 82 (2d Cir. 1973)); *Georgetown Dress Corp.*, 201 NLRB 102, 116 (1973) (finding unlawful "preelection communications [which] . . . constantly hovered on the thin edge of what judges and lawyers know to be the shadow realm of ambivalence, double-edged expression, half-truth, and the potentially misleading—what has been called '"brinksmanship" when it becomes all too easy to "overstep and tumble into the brink"' [*Gissel*, above, 395 U.S. at 620] . . . . It is only simple justice that a person who seeks advantage from his elected use of the murky waters of double *entendre* should be held accountable therefor at the level of his audience rather than that of sophisticated tribunals, law professors, scholars of the niceties of labor law or 'grammarians.'") (second citation omitted).

[75] See *Eddyleon Chocolate*, 301 NLRB 887, 891 (1991) ("The futility of holding a fair rerun election is evident not only from the likely lingering effect of the Respondent's misconduct on employee free

14         DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

At a more granular level, the number and severity of the Respondent's violations, absent other considerations, clearly support a bargaining order.  The Respondent engaged in at least three categories of conduct—threats of plant closure, other threats of job loss, and discipline and discharge of a prominent union supporter—that the Board and the courts have recognized as "hallmark" violations, which tend to have such a coercive and long-lasting impact on employees' free choice in a potential rerun election that, absent "some significant mitigating circumstance," they generally warrant a bargaining order "without extensive explication."[76]

First, it is well established that threats of plant closure have an especially corrosive and long-lasting impact.[77] Because they implicate a potential loss of work for the entire unit, they directly affect all employees who learn of them,[78] and, unlike other threats, they involve employer decisions that a union may have limited power to contest or mitigate even if it prevails in the election.[79]  The Board and the courts have also recognized that the impact of a threat of plant closure may depend on its content and context.[80]  Here, drivers would likely have

found Dickson's and Santana's threats particularly plausible because, like one of the threats considered by the Supreme Court in *Gissel*, above, they expressly rested on the Respondent's ability—as a multibillion-dollar, multinational company—to absorb financial losses after closing unionized operations that comprise only a relatively small part of its overall business.[81]  Forgey's threat similarly emphasized the Respondent's ability "as a business" to "turn plants on and off" at its discretion.  The plausibility of these threats would have been further enhanced by the fact that they were delivered by Forgey—the Respondent's top official in charge of unit operations—and Santana, a labor relations specialist hired specifically to convey the Respondent's official campaign position to its drivers.[82]

Separately, the Board and the courts have also recognized the highly coercive impact of threats of job loss.[83]  Here, in addition to Dickson's threat of plant closure, his prepetition threats to discharge Las Vegas drivers Rida, Orozco, and Lauvao for displaying union stickers or otherwise supporting the Union were serious coercive conduct tending to support a *Gissel* order.[84]  The Respondent's implied threat of job loss for engaging in protected strike activity—which, as noted above, it conveyed broadly to all unit employees through presentations by the LRI consultants—also likely had a particularly widespread and long-lasting inhibitive impact in the context of the Respondent's strong campaign emphasis on the Union's strike history.[85]

---

choice, but also from the Respondent's apparent determination to avoid a fair election, even at the risk of abusing the Board's processes.").

[76] *Jamaica Towing*, above, 632 F.2d at 212-213; see also *NLRB v. General Wood Preserving*, 905 F.2d 803, 822-824 (4th Cir. 1990), enfg. 258 NLRB 956 (1988).

[77] See, e.g., *Stevens Creek Chrysler Jeep Dodge*, 357 NLRB 633, 638 (2011) ("Threats of job loss and plant closure are 'hallmark' violations, long considered by the Board to warrant a remedial bargaining order because their coercive effect tends to 'destroy election conditions, and to persist for longer periods of time than other unfair labor practices.'") (quoting *Evergreen America Corp.*, 348 NLRB 178, 180 (2006)), enfd. sub nom *Mathew Enterprise, Inc. v. NLRB*, 498 Fed. Appx. 45 (D.C. Cir. 2012); see also *Piggly Wiggly, Tuscaloosa Division Commodores Point Terminal Corp.*, above, 705 F.2d at 1542 ("[I]t is well established that threats of plant closures, by themselves, can justify a *Gissel* order.") (citing *Gissel*, above, 395 U.S. at 587-589, 618-620), enfg. 258 NLRB 1081 (1981).

[78] Cf. *Scott v. Stephen Dunn & Associates*, 241 F.3d 652, 665 (9th Cir. 2001) (directing entry of Sec. 10(j) interim bargaining order: "Because these violations affected the entire 97-person bargaining unit, there is no basis to contend that this violation will not continue to impact the deliberations of all of the eligible voters.  The size of the bargaining unit did not lessen the impact of the unfair labor practices here.").

[79] See, e.g., *Jamaica Towing*, above, 632 F.2d at 213 ("The prospect of unionization is not a sure safeguard against such tactics.").

[80] Cf. *NLRB v. General Stencils, Inc.*, 472 F.2d 170, 173 (2d Cir. 1972) (discounting impact of threat of plant closure made to single employee based in part on court's finding employees would "know how unlikely it is that a small local employer will in fact close down a flourishing operation simply in a fit of pique."); *Crown Bolt*, above, 343 NLRB at 779 ("[A] clear and unequivocal threat of plant closure is more likely than not to be disseminated [but] . . . the probability . . . and . . . extent of its dissemination may be reduced by the circumstances, including the manner in which the threat is conveyed, to whom, by whom and under what circumstances, and the size and makeup of the

unit.  Words that convey a threat of plant closure to one person may not necessarily carry the same meaning to another.  Words spoken by a plant owner or . . . chief executive officer in a formal meeting have a different level of seriousness than different words used during casual conversation by a low-level plant supervisor.").

[81] Cf. *Gissel*, above, 395 U.S. at 588 (employer coercively emphasized "that a strike 'could lead to the closing of the plant,' since the parent company had ample manufacturing facilities elsewhere."), affg. *NLRB v. Sinclair Co.*, 397 F.2d 157, 159 fn. 5, 160 (1st Cir. 1968) (enforcing Board's bargaining order based in part on employer's threat of plant closure).

[82] See, e.g., *Garvey Marine*, above, 328 NLRB at 993 ("In determining the propriety of a bargaining order, the Board . . . consider[s] such factors as . . . the identity and position of the individuals committing the unfair labor practices.") (citing *Holly Farms Corp.*, 311 NLRB 273 (1993)).

[83] E.g., *Stevens Creek Chrysler*, above, 357 NLRB at 638.

[84] See, e.g., *Alumbaugh Coal Corp.*, 247 NLRB 895, 914 fn. 41 (1980) (Board considers all unfair labor practices, not just those during critical period), enfd. in relevant part 635 F.2d 1380 (8th Cir. 1980).

[85] Cf. *Gissel*, above, 395 U.S. at 588-590 (affg. Board's finding that respondent's campaign communications, including emphasis on the Teamsters' strike-history, tended to convey a threat of plant closure and job loss that violated Sec. 8(a)(1) and warranted a bargaining order); *Homer D. Bronson Co.*, 349 NLRB 512, 514, 515 (2007) ("[L]abeling the Union 'strike happy' was a way of emphasizing that, if the employees elected representation, it would inevitably lead to plant closure and resulting job loss."), enfd. 273 Fed. Appx. 32 (2d Cir. 2008).

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC

15

The Respondent's series of disciplines and discharge of Ornelas fall within a third category of conduct the Board and the courts have long recognized as having a particularly strong coercive effect.[86] As noted above, Ornelas was a prominent activist within the Ventura County market that originated the Union's Southern California campaign in this case. Union organizer Williams testified that he held Ornelas up as an example to organizers throughout the unit for engaging in the singularly visible protected union activity of taking careful notes during the Respondent's campaign meetings. Ornelas's suspension and discharge would accordingly have acted as a powerful and enduring warning against supporting the Union to all employees who became aware of it.[87] Moreover, we agree with the judge that the record establishes that company officials at all levels, including VP/GM Forgey, were aware of Ornelas's active role in the Union's campaign, and that the Respondent's supervisors and managers watched her closely and reported any incident that could serve as a pretextual basis for further discipline.[88] The intentionality of the Respondent's targeting of Ornelas for further discipline and discharge even after the Union lost the election confirms that it remained intent on avoiding a collective-bargaining obligation even at the cost of continuing to violate the law and "evidences a strong likelihood of a recurrence of unlawful conduct in the event of another organizing effort."[89]

The impact of these most severe violations would have been enhanced and prolonged by the context of many other serious unfair labor practices committed by managers and supervisors at all levels and extending over a year-long period from well before the Union filed its petition to well after the election.[90] As found above, these included: Dickson's August 2018 instructions to Orozco and Lauvao not to speak with union organizers and to remove union stickers; Dickson's instruction to Collins to remove union stickers and interrogation of Collins; Turner's interrogation of Daunch; Ponce and Nunez' surveillance of Inglewood drivers; Forgey's threats that unionization would limit work opportunities; Forgey's blaming the Union for lack of raises and threat that wage increases could be delayed for years;[91] Faulkner's threat that unionization would limit work opportunities; Charlson and Faulkner's directive not to talk to union representatives while on company time; Turner's threat to Molina to withhold favors; Turner's promise of a requested transfer to Shipp—and follow-through by offering the transfer after the election; Turner's threat to Daunch to withhold schedule flexibility; the Respondent's use of security guards to intimidate drivers before the election; and Charlson's post election interrogation and threat to investigate Ornelas for her continued union activity. The Board and the courts have long recognized that such an extensive record of misconduct supports an inference that an order of a rerun election would be met by further misconduct undermining the potential accuracy of such a rerun election as an accurate measure of "ascertainable employee free choice."[92] Finally, the backdrop for all this conduct was the Respondent's vigorous campaign against the Union, involving many coordinated individual and group appeals by managers and hired consultants which, however individually lawful, could only have underscored to drivers the Respondent's commitment to its campaign, and, by extension, the seriousness and plausibility of its unlawful coercive communications.

We accordingly agree with the judge that the whole record of this case clearly supports concluding that the possibility of erasing the effects of the Respondent's

---

[86] See, e.g., *Stevens Creek Chrysler*, above, 357 NLRB at 638 (discharge of prominent union supporter "is a 'hallmark' violation, perhaps the most flagrant, 'because no event can have more crippling consequences to the exercise of Sec[.] 7 rights than the loss of work.") (quoting *Mid-East Consolidation Warehouse*, 247 NLRB 552, 560 (1980)).

[87] See, e.g., id. ("[T]he discharge of an active union adherent would likely 'have a lasting inhibitive effect on a substantial percentage of the work force," and would remain in employees' memories for a long time.") (quoting *Jamaica Towing*, above, 632 F.2d at 212-213).

[88] In addition to the considerations discussed by the judge, we find it telling that, as noted above, Forgey directed Charlson to assist Faulkner in managing the Ventura County drivers, Charlson was involved in all three unlawful disciplines issued to Ornelas, and Charlson attempted to disguise or deny his involvement in these disciplines in his testimony at the hearing in this matter.

[89] *Garney Morris, Inc.*, 313 NLRB 101, 103 (1993), enfd. 47 F.3d 1161 (3d Cir. 1995); see also *MJ Metal Products*, 328 NLRB 1184, 1185 (1999) (respondent's continuing hostility to employee rights in postelection misconduct evidences likelihood of recurrence supporting bargaining order), enfd. 267 F.3d 1059 (10th Cir. 2001); *General Fabrications Corp.*, above, 328 NLRB at 1115 (same); *Eddyleon Chocolate*, supra, 301 NLRB at 891 ("The likelihood of the Respondent's misconduct recurring in a rerun election is high, as the Respondent's postelection conduct reveals continued hostility to employee rights.").

[90] See, e.g., *Stevens Creek Chrysler*, above, 357 NLRB at 638 (pattern of continuing violations "particularly the interrogations and impressions of surveillance, accentuated the coercive effect of the hallmark violations by serving as a continuing warning of the dangers attendant to union adherence").

[91] We note in addition that Forgey confirmed in his testimony that the unitwide wage increase the Respondent would otherwise have given at the beginning of 2019 was withheld because he "understood" that – as he unlawfully told employees – "the National Labor Relation Board rules" required that the unit's terms and conditions of employment be frozen "in a status quo state" before the election. Although the withholding of the wage increase itself was not alleged to be independently unlawful, it affected the entire unit and would clearly have added to the ongoing coercive impact of the Respondent's misconduct.

[92] *Gissel*, above, 395 U.S. at 614; *Garney Morris*, above, 313 NLRB at 103.

16                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

highly coercive misconduct and ensuring a fair rerun election by the use of the Board's traditional remedies is slight. Simply requiring the Respondent to refrain from future threats and other coercive conduct, to reinstate Ornelas with backpay, and to post a notice, while remedially necessary, would not, in our view, be sufficient to dispel the coercive atmosphere the Respondent has carefully cultivated here. We accordingly find that the majority of employees' prior free designation of the Union as their representative by authorization cards would be better protected by the issuance of a bargaining order "unless some significant mitigating circumstance exists."[93]

Contrary to the judge, however, we do not find that a lack of dissemination of knowledge of the Respondent's coercive conduct among unit employees constitutes a mitigating circumstance warranting withholding a bargaining order. First, in determining the propriety of a bargaining order, the Board considers dissemination of knowledge of a respondent's coercive conduct not in isolation, but rather in the full context of its overall evaluation of whether the Board's traditional remedies are likely to suffice to ensure a fair rerun election.[94] Most relevantly here, in cases in which an election has been held, the Board and the courts have considered the closeness of the election in evaluating whether the likely continuing impact of employer misconduct warrants a bargaining order.[95] Here, the record clearly establishes, and the judge found, that the Respondent's most severely coercive misconduct was disseminated to a number of employees far greater than the seven whose changed votes would have sufficed to reverse the outcome of the election. Given the close margin of union support demonstrated by the past election, we conclude that a sufficient number of employees to determinatively affect the result of a rerun election would likely be aware of,

and coercively impacted, by the Respondent's past misconduct.[96]

Moreover, as noted above, in considering the likelihood that the Board's traditional remedies will suffice to ensure a fair rerun election, the Board and the courts take into account not only the impact of a respondent's past misconduct, but also the extent to which the record suggests that a renewed organizing drive is likely to be met by new misconduct.[97] Thus, independently of the continuing impact of the Respondent's past conduct, as we have found, that conduct itself—including particularly the post-election unfair labor practices—suggests that the Respondent would likely meet a renewed organizing effort with further unfair labor practices tending to make a fair rerun election unlikely.[98]

For all these reasons, we find that the extent of dissemination of knowledge of the Respondent's past misconduct in this case does not constitute a mitigating circumstance that would warrant concluding that an affirmative bargaining order is not necessary here.

---

[93] *Jamaica Towing*, above, 632 F.2d at 212.

[94] See, e.g., *Garvey Marine*, above, 328 NLRB at 993.

[95] See, e.g., *Chromalloy Mining & Minerals*, 620 F.2d 1120, 1130 (5th Cir. 1980) ("a threat made to a single individual . . . assumes significance here because the Union lost by one vote"), enfg. 238 NLRB 688 (1978); *Amalgamated Clothing Workers of America v. NLRB (Jimmy-Richard Co.)*, 527 F.2d 803, 807 (D.C. Cir. 1975) (noting "effect of . . . less pervasive violations on bare majority situations," and finding "promise of an additional holiday made to a small number of employees could have affected some of the six critical votes"), enfg. 201 NLRB 802 (1974), cert. denied 426 U.S. 907 (1975). While the closeness of the election bears on our analysis of dissemination in this case, we note that the Board does not require a close election as a condition of a bargaining order because "[s]uch a requirement might encourage an employer to escalate its misconduct in order to achieve an overwhelming election victory and avoid a bargaining order, thereby rewarding those who engage in the greatest misconduct." *United Dairy Farmers*, above, 257 NLRB at 775 & fn. 22.

[96] As noted above, record evidence also suggests that some of the Respondent's misconduct was, in any case, even more broadly disseminated than expressly discussed by the judge, including the Respondent's unlawful prohibition on talking with union organizers on company time and its unlawful implied threat of discharge for engaging in protected strike activity. Additionally, Forgey's testimony that he presented the same information at the Oxnard meeting that he presented at a large number of other campaign meetings suggests that many unit drivers were likely also exposed to his coercive threat to turn plants into "satellites," his blaming the union for a delayed wage increase, and his implied threat that future wage increases could be indefinitely delayed if employees selected the Union. Similarly, LRI consultant Santana's testimony that consultants were required to present the same information at all campaign meetings suggests that his coercive threat that the Respondent could afford to close its ready-mix operations if drivers selected the Union may also have been broadly disseminated. We also find, contrary to the judge's suggestion, that Ornelas's prominent role in the Union's regular committee meetings, both before and after the election, organizer Williams' testimony that after Ornelas's discharge, the discharge was "the big topic of conversation" with "just about every driver [he] spoke with," and Ornelas's continuing work on the Union's campaign throughout the unit after her discharge support concluding, as we do, that many employees throughout the unit—including drivers outside of Ventura County—became aware of her unlawful discipline. With the additional impact of the Respondent's other unfair labor practices, including its utilization of guards to intimidate drivers, surveillance, interrogation, and other discriminatory anti-union conduct, we conclude that the Respondent's unfair labor practices clearly were disseminated to and impacted a substantial proportion of employees in the unit.

[97] *Gissel*, above, 395 U.S. at 614 ("the Board can properly take into consideration . . . the likelihood of [misconduct's] recurrence in the future").

[98] Cf. e.g., *Garney Morris*, above, 313 NLRB at 103 (respondent's postelection discriminatory actions "evidence[d] a strong likelihood of a recurrence of unlawful conduct in the event of another organizing effort.").

Next, the Respondent has argued that the passage of time and employee and management turnover make a bargaining order inappropriate in this case. The Board's traditional policy is to consider the appropriateness of a bargaining order as of the time of the unfair labor practices, because taking into account subsequent changes incentivizes prolonged litigation, undermining the deterrence goal identified by the Supreme Court in *Gissel* as of coequal importance with the purpose of implementing ascertainable employee free choice.[99]  Some courts of appeals, including the Court of Appeals for the Ninth Circuit (in which this case arises) have similarly held that the Board may decline to consider changed circumstances during intervals of litigation because this rule "prevent[s] employers from intentionally prolonging Board proceedings in order to frustrate the issuance of bargaining orders."[100]  Other courts of appeals, however, including the Court of Appeals for the District of Columbia Circuit, have required, as a condition of enforcing a *Gis-*

*sel* bargaining order, that the Board determine the appropriateness of the order in light of the circumstances existing at the time it is entered.[101]

Here, as discussed in detail above, we have found that the Union had clear majority support by the end of November 2018 and that the Respondent's numerous severe unfair labor practices, including threats of plant closure or relocation and of job loss and its postelection discipline and discharge of a key union supporter, in combination with substantial other serious misconduct, clearly had a strong tendency to undermine the Union's majority support and impede the election process. We have also found that, absent mitigating circumstances, the possibility of erasing the effects of the Respondent's highly coercive misconduct and ensuring a fair rerun election by the use of the Board's traditional remedies is slight, and that the majority of employees' prior free designation of the Union as their representative by authorization cards would be better protected by the issuance of a bargaining order.

After examining the appropriateness of a bargaining order under the circumstances existing at the present time, we find, for the reasons discussed below, that the passage of time and management and employee turnover do not constitute mitigating circumstances warranting withholding a bargaining order in this case. In so finding, we have duly considered the Section 7 rights of all employees involved. Consistent with the careful balancing of employee rights described by the Court in *Gissel*, we find that issuing a bargaining order in this case protects the rights of the majority of the Respondent's employees who previously designated the Union as their representative for the purpose of collective bargaining,

---

[99] See, e.g., *Gissel*, above, 395 U.S. at 614 (emphasizing that, where a union has shown past majority support, bargaining order serves dual goals of effectuating ascertainable employee free choice and deterring employer misbehavior); *Garvey Marine*, above, 328 NLRB at 995 (explaining deterrence purpose of Board's traditional practice); see also *Franks Bros. Co. v. NLRB*, 321 U.S. 702, 705 (1944) (affirming Board's affirmative bargaining order over employer's argument employee turnover had removed union's card majority: "The Board might well think that, were it not to [order bargaining], but, instead order elections upon every claim that a shift in union membership had occurred during proceedings occasioned by an employer's wrongful refusal to bargain, recalcitrant employers might be able by continued opposition to union membership indefinitely to postpone performance of their statutory obligation. In the Board's view, procedural delays necessary fairly to determine charges of unfair labor practices might in this way be made the occasion for further procedural delays in connection with repeated requests for elections, thus providing employers a chance to profit from a stubborn refusal to abide by the law. That the Board was within its statutory authority in adopting the remedy which it has adopted to foreclose the probability of such frustrations of the Act seems too plain for anything but statement.").

[100] *NLRB v. Bakers of Paris*, 929 F.2d 1427, 1448 (9th Cir. 1991) (citing cases), enfg. 288 NLRB 991 (1988). See also, e.g., *East Bay Automotive Council v. NLRB*, 483 F.3d 628, 635 (9th Cir. 2007) (enforcing non-*Gissel* bargaining order despite 8-year litigation delay: "it would be inappropriate to upset the Board's order in light of a loss of employee support that was brought about by the very wrongs being remedied," and "changed circumstances during intervals of adjudication 'have been held irrelevant to the adjudication of enforcement proceedings.'") (quoting *Bakers of Paris*, above, 929 F.2d at 1448), enfg. 342 NLRB 1244 (2004); *United Dairy Farmers Cooperative Assn. v. NLRB*, 633 F.2d 1054, 1069 (3d Cir. 1980) (remanding for reconsideration of *Gissel* order 6 to 7 years after last unfair labor practice: holding Board may "ignore a possible dissipation of majority support through employee turnover after the unfair labor practice [because] '[t]o require the Board to determine whether a continuing majority supports unionization . . . would be to put a premium upon continued litigation by the employer' and allow the employer 'to avoid any bargaining obligation indefinitely.'") (quoting *Hedstrom Co.*, above, 629 F.2d at 312), remanding in relevant part 242 NLRB 1026 (1979).

[101] See, e.g., *Flamingo Hilton-Laughlin v. NLRB*, 148 F.3d 1166, 1171 & fn. 4 (D.C. Cir. 1998) (citing precedent from other courts of appeals considering changed circumstances, including passage of time and employee and management turnover), remanding in relevant part 324 NLRB 72 (1997). More specifically, the District of Columbia Circuit has held that, absent "outrageous and pervasive ULP's," the Board must find, based on substantial evidence, that: (1) the union, at some time, had majority support within the bargaining unit; (2) the employer's unfair labor practices had the tendency to undermine majority strength and impede the election process; and (3) the possibility of erasing the effects of past practices and of ensuring a fair rerun election by the use of traditional remedies is slight and that employee sentiment once expressed in favor of the union would be better protected by a bargaining order. *Traction Wholesale Center Co. v. NLRB*, 216 F.3d 92, 104 (D.C. Cir. 2000), enfg. in relevant part 328 NLRB 1058 (1999). The court additionally requires the Board to explicitly balance three considerations, as considered at the time the Board issues its order: (1) the employees' Sec. 7 rights; (2) whether other purposes of the Act override the rights of employees to choose their bargaining representatives; and (3) whether alternative remedies are adequate to remedy the violations of the Act. *Cogburn Health Center, Inc. v. NLRB*, 437 F.3d 1266, 1273 (D.C. Cir. 2006), denying enf. in relevant part to 335 NLRB 1397 (2001).

18                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

while the rights of those employees who may be opposed to representation are safeguarded by their access to the Board's decertification procedure under Section 9(c)(1) of the Act, following a reasonable period of time to allow the collective-bargaining relationship a fair chance to succeed.[102]  We have also considered whether other purposes of the Act override employees' Section 7 right to choose their bargaining representative.  We find, again consistent with *Gissel*, that, because a majority of the Respondent's employees in an appropriate unit have designated the Union as their representative for the purpose of collective bargaining, the Act's dual purposes of effectuating ascertainable employee free choice and of deterring employer misbehavior are aligned, so that, absent the likelihood of a fair rerun election, a bargaining order simultaneously serves both purposes without subordinating either to the other.[103]

It has now been approximately 4 years since the Respondent discharged Ornelas on September 6, 2019.  Since then, the record shows that the Respondent promoted VP/GM Forgey to a larger role in the company,[104] and transferred Las Vegas plant foreman/batchman Dickson to a position outside the unit.  The Respondent has also proffered evidence to show that, as of November 14, 2022, it had expanded the number of employees in the appropriate bargaining unit from 366 to 397, about half of whom—197 employees—were not employed in the unit at the time of the March 7, 2019, election.[105]

We cannot conclude, under the circumstances of this case, that these changes make it likely that the Board's traditional remedies could ensure that a fair election could be held today.  First, we find it unlikely that the Respondent's promotion of Forgey and transfer of Dickson will have significantly dissipated the impact of its coercive misconduct.  Despite these departures, many other managers directly involved in the Respondent's unlawful conduct apparently remain in place.  More importantly, as explained above, we have found that the Respondent's misconduct here stemmed primarily from its overall corporate campaign strategy, rather than from choices by individual managers.  In this context, we find that employees would be unlikely to conclude that such changes in management as have occurred reflect any fundamental change in the Respondent's manifest willingness to oppose their choice of representation for the purposes of collective bargaining by unlawful means.

Next, the Respondent represents that only approximately half of the current unit employees were employed at the time of the Respondent's unlawful preelection misconduct.[106]  Taking these representations into consideration, we nevertheless find that the circumstances of this case do not warrant a conclusion that employee turnover has rendered a fair election possible.  While many new employees may have joined the unit, a substantial proportion of current employees remain who would recall events surrounding the 2019 election.  As the Board has found in other cases, these employees will likely have shared their experience with new employees, so that new employees will likely also be affected by the continuing influence of the Respondent's unfair labor practices.[107]  The high voter turnout for the 2019 election (at least 345 of 366 eligible employees voted) demonstrates a level of employee engagement in the Union's campaign that reinforces our conclusion that employees present during the campaign would likely discuss the Respondent's prior conduct with later-hired employees hired before any rerun election ordered by the Board.

As for the passage of time, as we have discussed in detail above, the Board and the courts have long and broadly recognized that employer misconduct such as the Re-

---

[102] Cf. *Orland Park Motor Cars, Inc.*, 333 NLRB 1017, 1018-1019 (2001) (quoting *Gissel*, above, 395 U.S. at 612-613 & fn. 33), enfd. 309 F.3d 452 (7th Cir. 2002); *Stevens Creek Chrysler*, above, 357 NLRB at 639.

[103] *Gissel*, above, 395 U.S. at 614.

[104] As noted above, Forgey later resigned and is no longer employed by the Respondent.

[105] The Respondent proffered this evidence in a motion to reopen the record filed on December 6, 2022.  The General Counsel opposed the Respondent's motion to reopen the record, arguing that the Respondent's postelection misconduct considered in this case and further conduct that is the subject of currently pending unfair labor practice charges evidences a strong likelihood of recurring violations.  In this respect, we note that on January 20, 2023, the General Counsel issued a new consolidated complaint in Cases 28–CA–287970, 28–CA–293695, 28–CA–294448, and 28–CA–294908, alleging that the Respondent has engaged in further unlawful surveillance and interrogation of, and threats to, unit employees and has unlawfully suspended and discharged another unit employee because of their union activity.  As discussed below, our careful consideration of the evidence and arguments contained in the Respondent's motion does not persuade us that, taking the Respondent's factual representations as true, a fair election is likely at this time.  We accordingly deny the motion.

[106] The Respondent has made no representation to the Board about how many current unit employees were employed at the time of its unlawful postelection misconduct.

[107] See, e.g., *Garvey Marine*, above, 328 NLRB at 995, 996 (finding that approximately 70 percent employee turnover was not likely to have sufficiently dissipated the impact of respondent's unlawful conduct to ensure a free rerun election); *Dunkin Donuts*, above, 363 F.3d at 441-442 (District of Columbia Circuit affirming Board's finding that employer's retention of "a core of steady employees with whom the experience of [the companies'] unlawful conduct will remain" supported its determination that an affirmative bargaining order was necessary).  The respondents in *Dunkin Donuts* had proffered evidence showing 74 percent turnover in the year before the election, 81 percent in the year of the election, and 27 percent in the first half of the year following the election, but the Board concluded that "those who remain not only will recall [the respondent's unfair labor practices] but will continue to be affected by them, and will relate their experience to those newly hired." *Aldworth Co.*, above, 338 NLRB at 151, 152.

spondent's here tends to impede the possibility of a fair rerun election for extended periods of time after its commission. Accordingly, courts that require consideration of changed circumstances as a condition of enforcing Board bargaining orders have regularly enforced such orders after comparable or longer periods of time where other circumstances have not determinatively weighed against enforcement.[108] Here, we find that the passage of time, considered either by itself or in combination with management and employee turnover, does not warrant concluding that the impact of the Respondent's coercive misconduct has been sufficiently dissipated to permit a fair rerun election.[109]

Finally, apart from our conclusions about the continuing impact of the Respondent's past misconduct, we have found, as discussed above, that the whole record in this case—up to and including the noncredible testimony offered by several of the Respondent's managers at the hearing in this matter—suggests that the Respondent would likely meet a renewed union campaign with further misconduct.[110]

For all of these reasons, we conclude that a bargaining order is warranted, necessary, and appropriate to effectuate the purposes and policies of the Act under presently existing circumstances.[111]

---

[108] See, e.g., *Evergreen America Corp. v. NLRB*, 531 F.3d 321, 332-333 (4th Cir. 2008) (affirming Board's conclusion that passage of 4 years between respondent's unfair labor practices and Board order did not make *Gissel* order unacceptable), enfg. 348 NLRB 178 (2006); *NLRB v. Goya Foods of Florida*, 525 F.3d 1117, 1138 (11th Cir. 2008) (rejecting respondent's argument that enforcement of non-*Gissel* bargaining order—evaluated under *Gissel* standard—should be denied based solely on passage of 6 to 7 years between unfair labor practice conduct and Board order), enfg. 347 NLRB 1118 (2006); *Dunkin Donuts*, above, 363 F.3d at 441-442 (enforcing Board order issued 4 years after unfair labor practices); *NLRB v. U.S.A. Polymer Corp.*, 272 F.3d 289, 293-299 (5th Cir. 2001) (enforcing Board order issued more than 4 years after unfair labor practices), enfg. 328 NLRB 1242 (1999), cert. denied 536 U.S. 939 (2002); *Garvey Marine, Inc. v. NLRB*, 245 F.3d 819, 826–830 (D.C. Cir. 2001) (enforcing Board order issued more than 4 years after unfair labor practices), enfg. 328 NLRB 991 (1999); *Parts Depot, Inc.*, 332 NLRB 670, 674-676 (2000) (entering *Gissel* order more than 4 years after postelection unfair labor practice), enfd. 24 Fed. Appx. 1 (D.C. Cir. 2001); but cf. *Cogburn Health Center*, above, 437 F.3d at 1272–1276 (denying enforcement to Board order on finding Board failed to consider respondent's proffered evidence of changed circumstances during 5 years between unfair labor practices and Board order); *Flamingo Hilton-Laughlin*, above, 148 F.3d at 1170-1173 (remanding for reconsideration on finding Board failed to explain necessity of order at time of issuance 4 years after unfair labor practices). Contrary to the suggestion of our dissenting colleague, neither *Cogburn Health Center* nor *Flamingo Hilton Laughlin* supports denying enforcement to a Board bargaining order based solely on the passage of time where, as here, the Board has carefully considered all circumstances, including proffered evidence of relevant changes, required by the courts as a condition for enforcing the Board's orders.

[109] See *Flamingo Hilton-Laughlin*, above, 148 F.3d at 1178 (Rogers, J., concurring) (explaining that "while the passage of time, in and of itself, should not be dispositive," Board must consider "whether the intervening years, in conjunction with the changed circumstances, have helped dissipate the remaining effects of [the respondent's] unfair labor practices."). 
Courts reviewing Board *Gissel* orders have required the Board "to explain its own delay," and to address the impact of "extraordinary delays" upon the propriety of a bargaining order, as conditions of enforcing the Board's order. See *NLRB v. Intersweet, Inc.*, 125 F.3d 1064, 1069 (7th Cir. 1997) (reviewing 7th Circuit cases), enfg. 321 NLRB 1 (1996); *Cogburn Health Center*, above, 437 F.3d at 1275. While the Board strives for expeditious adjudication, it is impossible entirely to eliminate "procedural delays necessary fairly to determine charges of unfair labor practices." *Franks Bros. Co.*, above, 321 U.S. at 705; see also *Intersweet*, above, 125 F.3d at 1068–1069 (characterizing a 3– to 4–year period between unfair labor practices and Board

order as "an ordinary institutional time lapse inherent in the legal process."). Here, the Board's fair consideration of charges and election objections has required unavoidable delays at various stages of litigation. Factors contributing to these delays include: the large number of unfair labor practice allegations tried by the judge (more than 50) and the consequentially lengthy record (3162 transcript pages); the number of issues contested before the Board (the General Counsel filed 17 numbered exceptions to the judge's decision, and the Respondent filed more than 350); and extensive briefing to the Board pursuant to requests to exceed ordinary page and time limits (the parties filed 500 pages of exceptions and briefs over about 6 months following the judge's decision). The onset of COVID-19 during the pendency of this case also impacted the pace of both regional proceedings and the hearing, which ultimately extended to 24 days of fully remote video proceedings between November 2020 and February 2021.

[110] See *Gissel*, above, 395 U.S. at 614 ("In fashioning a remedy in the exercise of its discretion . . . the Board can properly take into consideration . . . the likelihood of [misconduct's] recurrence in the future.").

[111] The Respondent argued to the judge, and continues to contend to the Board, that the passage of time spent litigating this case should preclude a bargaining order under Board decisions like *Stern Produce Co.*, 368 NLRB No. 31 (2019), and *Sysco Grand Rapids, LLC*, 367 NLRB No. 111 (2019). We disagree. As discussed above, the Board and some courts have traditionally recognized that considering the passage of time spent in litigation as a condition on the issuance of a bargaining order risks creating an incentive for employers to complicate and prolong Board proceedings. See, e.g., *Garvey Marine*, above, 328 NLRB at 995; *Intersweet, Inc.*, 321 NLRB 1, 1 (1996), enfd. 125 F.3d 1064 (7th Cir. 1997); *Bakers of Paris*, above, 929 F.2d at 1448; *United Dairy Farmers*, above, 633 F.2d at 1069. Nevertheless, the Board has concluded in some cases, including *Sysco Grand Rapids*, that—despite the presence of severe unfair labor practices that would otherwise warrant the issuance of a bargaining order—employees' rights would be better served by proceeding directly to a second election, however flawed, because entering a bargaining order would likely engender further delay in litigation over the propriety of that order, and litigation delays might ultimately render a bargaining order unenforceable in some courts of appeals. *Sysco Grand Rapids*, above, 367 NLRB No. 111, slip op. at 2 (citing cases). We do not read *Sysco Grand Rapids* and other cases where the Board has declined to issue a bargaining order on similar pragmatic grounds as binding on our remedial determination in cases that present different facts. Cf., e.g., *Parts Depot*, above, 332 NLRB at 676 & fn. 35 (entering *Gissel* order more than 4 years after unfair labor practice, distinguishing cases in which Board declined to enter bargaining order based on enforceability considerations); *Garvey Marine*, above, 328 NLRB at 997-998 (same). Additionally, as discussed above, our order in this case rests not only on the continuing impact of the Respondent's extensive pre-election miscon-

### III.  JOY SILK, GISSEL, AND LINDEN LUMBER[112]

#### A.  Statutory framework

Section 9(a) of the Act provides that "[r]epresentatives *designated or selected* for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining[.]"  29 U.S.C. § 159(a) (emphasis added).  In turn, Section 8(a)(5) provides that it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees, subject to the provisions of Section 9(a)."  Id. § 158(a)(5).  Section 9(c) of the Act describes the Board's procedures for conducting representation elections and certifying unions that prevail in Board-conducted elections.  Id. § 159(c)(1)(A) & (B).[113]  Finally, Section 8(a)(2) prohibits an employer from recognizing and bargaining with a union that does not enjoy majority support.  Id. § 158(a)(2);[114]  *Garment Workers (Bernhard-Altmann Texas Corp.) v. NLRB*, 366 U.S. 731, 738-739 (1961).

As the Supreme Court has recognized, Section 9 is animated by the principle that representation cases should be resolved fairly and expeditiously.  See *NLRB v. A.J. Tower Co.*, 329 U.S. 324, 331 (1946) ("[T]he Board must adopt policies and promulgate rules and regulations in order that employees' votes may be recorded accurately, efficiently, and speedily.").  When interpreting Section 9, the Court has relied on the Act's legislative history, which reflects Congress's judgment that delays in resolving questions of representation can risk undermining employees' choice to seek union representation and increase the risk of labor disputes and disruptions to interstate commerce.[115]  In interpreting Section 9(a), the Supreme Court has acknowledged that "a 'Board election is not the only method by which an employer may satisfy itself as to the union's majority status' since § 9(a), 'which deals expressly with employee representation, says nothing as to how the employees' representative shall be chosen.'"  *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 597 (1969) (quoting *United Mine Workers v. Arkansas Oak Flooring Co.*, 351 U.S. 62, 71, 72 fn. 8 (1956)).  The Court emphasized that because Section 9(a) "refers to the representative as the one 'designated or selected' by a majority of the employees without specifying precisely how that representative is to be chosen," a union may establish a valid bargaining obligation "by convincing support, for instance, . . . by possession of cards signed by a majority of the employees authorizing the union to represent them for collective bargaining purposes."  *Gissel*, 395 U.S. at 596–597.[116]

Although Congress considered an amendment to Section 8(a)(5) in an early version of the Taft-Hartley legislation that would "permit the Board to find a refusal-to-bargain violation only where an employer had failed to bargain with a union 'currently recognized by the employer or certified as such [through an election] under section 9,'" that proposed change was not incorporated in the Taft-Hartley amendments.  *Gissel*, 395 U.S. at 598.  Instead, the Taft-Hartley amendments provided that a Board election is a precondition to a bargaining representative's *certification* by the Board, a status that confers certain additional advantages on the union.  See 29

---

duct, but also on evidence of its continuing hostility to employee rights after the election, which shows a likelihood that our direction of a second election would be met by further misconduct.  See, e.g., *Garney Morris*, above, 313 NLRB at 103.  Accordingly, we find that the circumstances of this case fully warrant the issuance of a bargaining order.

Our dissenting colleague would find that changed circumstances since the Respondent's unfair labor practices in this case render a bargaining order inappropriate and unenforceable, citing *Stern Produce*, above, *Sysco Grand Rapids*, above, and *Charlotte Amphitheater Corp. v. NLRB*, 82 F.3d 1074, 1078 (D.C. Cir. 1996), remanding in relevant part 314 NLRB 129 (1994).  We respectfully disagree.  As explained above, we do not read *Stern Produce* and *Sysco Grand Rapids* as precluding a bargaining order on the record of this case.  In *Charlotte Amphitheater*, in turn, the court remanded the remedial issue to the Board to explain the necessity of a bargaining order at the time of its issuance in light of specific relevant considerations that the court found the Board had failed to address.  As explained in detail above, we have carefully considered all of the factors bearing on the necessity of a bargaining order under presently existing circumstances, including those factors identified by the court in *Charlotte Amphitheater*, and we have concluded that those factors, considered in conjunction, do not warrant finding that a fair rerun election could be held today.  Finally, as also noted above, courts—including those that require consideration of changed circumstances as a condition of enforcing Board bargaining orders—have regularly enforced such orders, both before and after *Charlotte Amphitheater*, on similar records where the Board has adequately explained its reasoning.  We accordingly conclude, contrary to our dissenting colleague, that a bargaining order is appropriate at this time and should be enforceable under current circuit court precedent.

[112] Member Kaplan does not join in this section of the Board's decision for the reasons given in his separate partial dissent below.

[113] Sec. 9(c)(1)(A) provides that employees and unions may petition for elections, either for representation by a union (an "RC" petition) or to decertify an incumbent union (an "RD" petition).  Sec. 9(c)(1)(B) provides for employers to petition for an election (an "RM" petition).

[114] Sec. 8(a)(2) provides that "[i]t shall be an unfair labor practice for an employer . . . to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it[.]"  29 U.S.C. § 158(a)(2).

[115] See *Boire v. Greyhound Corp.*, 376 U.S. 473, 477-479 (1964) (quoting H. R. Rep. No. 972, 74th Cong., 1st Sess., 5).

[116] See also *Linden Lumber*, 419 U.S. at 312 (Stewart, J., dissenting) ("After rejection of the proposed House amendment, the House Conference Report explicitly stated that § 8(a)(5) was intended to follow the provisions of 'existing law.'  And 'existing law' unequivocally recognized that a union could establish majority status and thereby impose a bargaining obligation on an unwilling employer by means other than petitioning for and winning a Board-supervised election.").

U.S.C. § 159(c)(1)(A) & (B). In *Gissel*, the Supreme Court relied upon this legislative history to reject the contention that the Taft-Hartley amendments undermined the use of signed union-authorization cards to establish an enforceable statutory bargaining obligation.[117]

The Taft-Hartley amendments as enacted in 1947 did, however, create an avenue for employers to petition for a Board election when confronted with a demand for recognition.[118] Taft-Hartley expanded employers' access to the Board's election machinery by adding Section 9(c)(1)(B) to the Act. Section 9(c)(1)(B) provides, in pertinent part, that:

> [w]henever a petition shall have been filed, . . . by an employer, alleging that one or more individuals or labor organizations have presented to him a claim to be recognized as the representative defined in section 9(a) . . . the Board shall investigate such petition and if it has reasonable cause to believe that a question of representation affecting commerce exists shall provide for an appropriate hearing upon due notice . . . . If the Board finds upon the record of such hearing that such a question of representation exists, it shall direct an election by secret ballot and shall certify the results thereof."

29 U.S.C. § 159(c)(1)(B).

However, an employer's right to invoke the Board's election machinery is not inviolate. The Board, with Supreme Court approval, has long issued remedial bargaining orders for violations of Section 8(a)(5) of the Act. See, *Franks Bros. Co. v. NLRB*, 321 U.S. 702, 705 (1944) ("That the Board was within its statutory authority in adopting the [bargaining order] remedy which it has adopted to foreclose the probability of such frustrations of the Act seems too plain for anything but statement."). In *Gissel*, the Supreme Court made plain that "the 1947 amendments" creating the 9(c)(1)(B) election option "did not restrict an employer's duty to bargain under § 8 (a)(5) solely to those unions whose representative status is certified after a Board election." Id. at 601. The Court "agree[d] with the Board's assertion . . . that there is no suggestion that Congress intended § 9 (c)(1)(B) to relieve any employer of his § 8 (a)(5) bargaining obligation where, without good faith, he engaged in unfair labor practices disruptive of the Board's election machinery." Id. at 600.

*B. Administrative/ judicial interpretations*

In the years immediately following the passage of the Wagner Act in 1935, the Board exercised the power "to certify a union as the exclusive representative of the employees in a bargaining unit when it had determined, by election or 'any other suitable method,' that the union commanded majority support." *Brooks v. NLRB*, 348 U.S. 96, 98 (1954) (quoting Section 9(c) of the Wagner Act). After an employee or a union filed a petition requesting certification, the Board investigated the petition and conducted a hearing if it found that a question concerning representation existed. If the union presented evidence during the hearing sufficient to establish that employees had designated the union as bargaining representative, the Board would certify the union without an election.[119]

By 1939, the Board reversed course. In *Cudahy Packing Co.*, 13 NLRB 526 (1939), and *Armour & Co.*, 13 NLRB 567 (1939), the Board held that a Board-conducted election was a prerequisite to certification. In the Taft-Hartley amendments that followed in 1947, Congress amended the text of Section 9(c) of the Act to codify the requirement that an election precede Board certification. However, after *Cudahy Packing* and the passage of the Taft-Hartley amendments, the Board continued to enforce an employer's statutory bargaining obligation, regardless of certification, in unfair labor practice cases where a union that had not won a Board election could prove that it represented a majority when it requested recognition.[120]

Then, in *Joy Silk Mills, Inc.*, 85 NLRB 1263, 1264 (1949), enfd. 185 F.2d 732 (D.C. Cir. 1950), cert. denied 341 U.S. 914 (1951), the Board reaffirmed and restated

---

[117] *Gissel*, 395 U.S. at 596-598.
[118] See, e.g., *Linden Lumber*, above, 419 U.S. at 307-308.

[119] See, e.g., *Woodville Lime Products Co.*, 7 NLRB 396, 399–400 (1938) (certifying a union as employees' bargaining representative based on affidavits signed by a majority of employees in an appropriate unit); *Wilmington Transportation Co.*, 4 NLRB 750, 753–754 (1937) (certifying a union after a majority of employees in an appropriate unit testified that they desired union representation).
[120] See, e.g., *Georgia Twine & Cordage Co.*, 76 NLRB 84, 85–86 (1948) (employer violated Sec. 8(a)(5) by "stat[ing] that he would not bargain until the Union proved its majority in a Board election" where the employer's "challenge of the Union's representative status was not founded upon a good faith doubt of the majority"), enfd. sub. nom. *NLRB v. Lovvorn*, 172 F.2d 293 (5th Cir. 1949); *Consolidated Machine Tool Corp.*, 67 NLRB 737, 740 (1946) ("[B]y refusing to recognize or otherwise bargain with the [union] until its majority status was established in an election, after having engaged in unfair labor practices directed toward the dissipation of the [union's] majority status, the respondent refused to bargain collectively with the [union] in violation of Sec[.] 8(5) of the Act"), enfd. 163 F.2d 376 (2d Cir. 1947). As mentioned above, the version of the Taft-Hartley amendments that Congress ultimately enacted omitted the provision that would have required a Board election as a precondition to an enforceable statutory bargaining obligation.

22                          DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

the principles that had begun to emerge in unfair labor practice cases involving allegations that an employer violated Section 8(a)(5) and (1) of the Act by refusing to recognize and bargain with a union that claimed majority support in an appropriate unit. In *Joy Silk*, the Board held that an employer unlawfully refuses to recognize a union that presents authorization cards signed by a majority of employees in a prospective unit if it insists on an election motivated "not by any *bona fide* doubt as to the union's majority, but rather by a rejection of the collective bargaining principle or by a desire to gain time within which to undermine the union.'" Id. (quoting *Artcraft Hosiery*, 78 NLRB 333 (1948)). The Board explained that, in analyzing an employer's good-faith doubt, it would consider "all relevant facts in the case, including any unlawful conduct of the employer, the sequence of events, and the time lapse between the refusal and the unlawful conduct." Id.

Applying that standard, the Board found that because the employer in *Joy Silk* had "engaged in unfair labor practices during the preelection period, the first of its illegal acts having occurred only 5 days after it agreed to a consent election and less than 3 weeks after the Union's initial bargaining request," the "Respondent's insistence upon an election was not motivated by a good faith doubt of the Union's majority," but was instead intended "to gain time within which to undermine the Union's support." Id. at 1264–1265. The Board specifically emphasized that "the unfair labor practices, because of their nature and timing, color the [employer's] intent . . . and support a finding that the doubt advanced" as "the reason for refusing to bargain with the Union, was feigned and advanced in bad faith." Id. at 1265 fn. 5. The Board rejected the employer's contention that a remedial order directing it to bargain with the Union would "deprive the [employer] of its right under Section 9(c)(1)([B]) of the Act to petition the Board for an election" as "untenable" because the employer's refusal to recognize and bargain with the Union was not based on "an honest doubt as to the Union's majority status." Id. at 1265.

The District of Columbia Circuit enforced the *Joy Silk* decision. *Joy Silk Mills, Inc. v. NLRB*, 185 F.2d 732 (D.C. Cir. 1950). The District of Columbia Circuit agreed with the Board's view that determining "whether an employer is acting in good or bad faith at the time of the refusal is, of course, one which of necessity must be determined in the light of all relevant facts in the case, including any unlawful conduct of the employer, the sequence of events, and the time lapse between the refusal and the unlawful conduct.'" Id. at 742. In the years immediately following the District of Columbia Circuit's

enforcement, every circuit similarly approved the *Joy Silk* framework.[121]

Subsequent Board cases modified the *Joy Silk* framework in several significant respects.[122] In *John P. Serpa, Inc.*, 155 NLRB 99, 100 (1965), the Board clarified that the General Counsel, and not the employer, carried the burden of proving both "that a majority of the employees in the appropriate unit signed cards designating the union as bargaining representative," and "that the employer in bad faith declined to recognize and bargain with the union." Later cases required the General Counsel to show that the employer engaged in "substantial unfair labor practices calculated to dissipate union support" to establish that an employer did not have a good-faith doubt as to the union's majority status. *Aaron Bros.*, 158 NLRB 1077, 1079 (1966). For a time, the Board declined to issue remedial bargaining orders if a union lost an election after claiming that an employer unlawfully refused to recognize the union under Section 8(a)(5). See *Aiello Dairy Farms*, 110 NLRB 1365 (1954).[123]

In many *Joy Silk* cases, parties argued that union-authorization cards were not reliable indicators of employees' preferences regarding unionization. At times, individual Board Members also expressed skepticism about the evidentiary value of union-authorization cards.[124] But in *Cumberland Shoe Corp.*, 144 NLRB 1268 (1963), the Board held that authorization cards that clearly state their purpose are valid. Certain reviewing

---

[121] See, e.g., *NLRB v. Lunder Shoe Corp.*, 211 F.2d 284, 288 (1st Cir. 1954); *NLRB v. Pyne Molding Corp.*, 226 F.2d 818, 821 (2d Cir. 1955); *NLRB v. Epstein*, 203 F.2d 482, 484 (3d Cir. 1953); *NLRB v. Inter-City Advertising Co.*, 190 F.2d 420, 422 (4th Cir. 1951); *NLRB v. Stewart*, 207 F.2d 8, 13 (5th Cir. 1953); *NLRB v. Model Mill Co.*, 210 F.2d 829, 829-30 (6th Cir. 1953); *NLRB v. Taitel*, 261 F.2d 1, 4-5 (7th Cir. 1958); *NLRB v. Wheeling Pipe Line, Inc.*, 229 F.2d 391, 393 (8th Cir. 1956); *NLRB v. W. T. Grant Co.*, 199 F.2d 711, 712 (9th Cir. 1952); *NLRB v. Burton-Dixie Corp.*, 210 F.2d 199, 201 (10th Cir. 1954). These cases were considered before Congress established the Court of Appeals for the Eleventh Circuit in 1981.

[122] For a more extensive treatment of post-*Joy Silk* developments in Board law, see generally Brandon R. Magner, *The Good-Faith Doubt Test and the Revival of* Joy Silk *Bargaining Orders*, 56 U. MICH. J.L. REFORM 151, 167–178 (2022).

[123] In *Bernel Foam Products Co.*, 146 NLRB 1277, 1293 (1964), the Board overruled *Aiello Dairy Farms*. In subsequent cases, the Board issued remedial bargaining orders in certain cases where a union lost a representation election, but only if the election was set aside because of meritorious objections. See, e.g., *Kolpin Bros. Co.*, 149 NLRB 1378, 1380 (1964) ("Where, as here, the election has not been set aside on [the] basis [of meritorious objections] and its validity stands unimpaired, we will presume that the election, which the Union lost, truly expressed the employees' desires as to representation.").

[124] See, e.g., *Southeastern Rubber Mfg. Co.*, 106 NLRB 989, 994 (1953) (Chairman Farmer, dissenting).

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC          23

courts disagreed, priming the issue for consideration by the Supreme Court in *Gissel*.[125]

In *Joy Silk* cases, the General Counsel was also required to establish that the union sought recognition in a "unit appropriate for" collective bargaining within the meaning of Section 9(b) of the Act in order to establish an unlawful refusal-to-bargain allegation. While some *Joy Silk* cases also involved underlying representation cases, the Board often determined the appropriate unit itself in the context of resolving the unfair labor practice allegations.[126] And even though many *Joy Silk* cases involved units all parties conceded were appropriate,[127] other *Joy Silk* precedent indicated that "an employer's good-faith doubt as to the appropriateness of the unit is a good defense to a charge of unlawful refusal to bargain." *Trend Mills, Inc.*, 154 NLRB 143, 147 (1965) (citing *NLRB v. Dan River Mills, Inc.*, 274 F.2d 381, 386–389 (5th Cir. 1960)).[128]

Although the employer in *Joy Silk* itself committed unfair labor practices that served to undermine the claim that it had a good-faith doubt as to the union's majority support, the Board also applied *Joy Silk*'s requirement that an employer recognize a union not certified through an election to another category of cases where the employer's actions at and after the presentation of signed authorization cards were deemed inconsistent with it having a good-faith doubt as to the union's majority support, even absent independent unfair labor practices. See *Snow & Sons*, 134 NLRB 709 (1961), enfd. 308 F.2d 687 (9th Cir. 1962). As explained by the trial examiner in *Groh, George & Sons*, 141 NLRB 931, 939–940 (1963), in reasoning adopted by the Board:

> An analysis of the cases wherein the Board has made this "good-or-bad faith determination" suggests rather strongly the pervading importance of contemporaneous unlawful conduct as a cardinal criteria. However, it does not perforce follow that a finding of such unlawful conduct is the sine qua non to a rejection of a good-faith defense. While accompanying unlawful conduct may render more discernible an unlawful motive, its absence is but a factor, and not a preclusive one, to be weighed in a discriminating analysis and appraisal of all the relevant evidence. The absence of good faith, then, may be manifested as well by attitudes and conduct demonstrating a rejection of the collective-bargaining concept as by more overt, readily discernible Section 8(a)(1) and 8(a)(3) conduct potentially more immediately destructive of the Union's majority status.
>
> (footnotes and internal quotations omitted), enfd. 329 F.2d 265 (10th Cir. 1964).

The Supreme Court in *Gissel* explained that this "second category" of "*Joy Silk* doctrine" cases were cases in which:

> [T]he Board could find [ ] that the employer had come forward with no reasons for entertaining any doubt and therefore that he must have rejected the bargaining demand in bad faith. An example of the second category was *Snow & Sons* where the employer reneged on his agreement to bargain after a third party checked the validity of the card signatures and insisted on an election because he doubted that the employees truly desired

---

[125] See, e.g., *NLRB v. S. S. Logan Packing Co.*, 386 F.2d 562, 569–571 (4th Cir. 1967).

[126] In *Lane Drug Co.*, 160 NLRB 1147, 1165-1166 (1966), enf. denied on other grounds 391 F.2d 812 (6th Cir. 1968), a Trial Examiner rejected the employer's contention that because "the Board has held no hearing (prior to the instant case) to determine what bargaining unit is appropriate here," there was "no Board determination as to what constitutes an appropriate unit," and therefore the employer was "privileged to reject any." Id. at 1165. The Trial Examiner was "unable to discern any requirement that the Board hold a representation case hearing as a precondition to entertaining an unfair labor practice charge of refusal to bargain collectively in violation of Sec[.] 8(a)(5) of the Act," observing that "[u]nder Sec[.] 9(b) of the Act, determination of unit questions by the Board is not restricted to representation cases." Id.

Under *Joy Silk*, the Board at times found that an employer was estopped from relitigating the scope of the appropriate unit and from making arguments regarding the unit which it could have raised with the Regional Director in the underlying representation case. See, e.g., *Bryant Chucking Grinder Co.*, 160 NLRB 1526, 1530 & fn. 11 (1966), enfd. 389 F.2d 565 (2d Cir. 1967). In addition, the Board would issue a *Joy Silk* bargaining order even when there were pending issues regarding unit placement, so long as the number of voters who voted subject to challenge was not determinative. See *Levi Strauss & Co.*, 172 NLRB 732, 732 (1968). The Board sometimes set aside the results of elections and dismissed petitions for certification when issuing *Joy Silk* bargaining orders. See, e.g., *Northwest Engineering Co.*, 158 NLRB 624, 631 (1966).

[127] See, e.g., *Preston Products Co.*, 158 NLRB 322, 356 (1966) ("Conceding the appropriateness of the bargaining unit, Respondent has nevertheless raised a number of contentions to the effect that the Union was not in fact the legally authorized representative of a majority of its unit employees."), enfd. sub nom. *UAW v. NLRB*, 392 F.2d 801 (D.C. Cir. 1967); *Edro Corp.*, 147 NLRB 1167, 1176 (1964) (parties stipulated at the hearing that the unit was appropriate for collective bargaining), enfd. sub nom. *Amalgamated Clothing Workers of America v. NLRB*, 345 F.2d 264 (2d Cir. 1965); *Bernel Foam Products Co.*, 146 NLRB 1277, 1293 (1964) ("Respondent answered, admitting . . . that the unit of its employees alleged in the complaint constituted a unit appropriate for collective bargaining.").

[128] See also *Clermont's, Inc.*, 154 NLRB , 1402-1403 (1965) (where employer's "doubt about the Union's majority status in an appropriate unit was expressed in good faith" against the backdrop of changes in Board law regarding the appropriate unit in that employer's industry, the employer "was entitled to have its doubt resolved by a representation proceeding" and therefore did not violate Sec. 8(a)(5) by refusing to recognize the union). By contrast, other cases suggested that if an employer's asserted concern regarding the appropriateness of the unit was not bona fide, it might be evidence of bad faith. See *Lou De Young's Market Basket, Inc.*, 159 NLRB 854, 863 (1966).

24      DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

representation. The Board entered a bargaining order with very broad language to the effect that an employer could not refuse a bargaining demand and seek an election instead "without a valid ground therefor."

395 U.S. at 593 (internal citations omitted) (quoting *Snow & Sons*, 134 NLRB at 710–711).

As reviewing courts considered more cases involving the *Joy Silk* framework, some courts began to criticize the Board's application of the good-faith doubt standard. For example, in *NLRB v. River Togs, Inc.*, 382 F.2d 198, 206–207 (2d Cir. 1967), the Second Circuit Court of Appeals criticized the Board's application of *Joy Silk*, observing that it saw "no logical basis for the view that substantial evidence of good faith doubt is negated solely by an employer's desire to thwart unionization whether by proper or even by improper means[.]" Instead, the Second Circuit observed that the relevant inquiry appeared to be whether the employer's unlawful conduct "made a fair election impossible." Id. at 207.[129]

*Joy Silk* remained Board law until the late 1960s, but was significantly modified by cases such as *John P. Serpa, Inc.*, supra, and *Aaron Bros.*, supra, which placed the burden on the General Counsel to demonstrate the employer's lack of good-faith doubt in its refusal to recognize and bargain with the union, and required a showing of "substantial unfair labor practices" to establish the lack of that doubt. During oral argument in *Gissel*, the Board's attorney stated that the Board had abandoned *Joy Silk*.[130] The *Gissel* Court acknowledged the Board attorney's statement,[131] but it found that, in the consolidated cases before it, it "need not decide whether a bargaining order is ever appropriate in cases where there is no interference with the election processes." 395 U.S. at 594-595.

As discussed extensively above, the Supreme Court held in *Gissel* that, where a union has achieved majority support and an employer engages in unfair labor practices which "have the tendency to undermine majority strength and impede the election processes," the Board "should issue" an order for the respondent to bargain with the union without an election if "the Board finds that the possibility of erasing the effects of past practices

and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order."[132] In this context, the Court emphasized, the bargaining order serves the two equally important goals of "effectuating ascertainable employee free choice" and "deterring employer misbehavior."[133] The Court in *Gissel* also explicitly approved the Board's view that union-authorization cards provided reliable evidence of employees' views regarding unionization in *Cumberland Shoe*, concluding that "[w]e cannot agree with the employers here that employees as a rule are too unsophisticated to be bound by what they sign unless expressly told that their act of signing represents something else." Id. at 607.

In *Linden Lumber*, the Board formally abandoned the *Joy Silk* doctrine and held that an employer does not violate Section 8(a)(5) "solely upon the basis of its refusal to accept evidence of majority status other than the results of a Board election."[134] The Board emphasized the criticism that *Joy Silk* required the Board to enter the "'good-faith' thicket" by incorporating an assessment of the employer's subjective state of mind and relied significantly on its doubts as to "the wisdom of attempting to divine, in retrospect, the state of employer (a) knowledge and (b) intent at the time he refuses to accede to a union demand for recognition." Id. at 720.

In a 5–4 decision, the Supreme Court upheld the Board's interpretation of the Act as a permissible construction of the statute. *Linden Lumber Div., Summer & Co. v. NLRB*, 419 U.S. 301, 309–310 (1974) ("[I]n light of the statutory scheme and the practical administrative procedural questions involved, we cannot say that the Board's decision that the union should go forward and ask for an election on the employer's refusal to recognize the authorization cards was arbitrary and capricious or an abuse of discretion.").

Following the Supreme Court's approval of the Board's decision in *Linden Lumber*, the Board permitted employers to insist on a Board-conducted election as a precondition to an enforceable statutory bargaining obligation. See, e.g., *Churchill's Supermarkets, Inc.*, 285

---

[129] As noted above, other courts specifically objected to the role union-authorization cards played in the Board's application of the *Joy Silk* framework. See, e.g., *S. S. Logan Packing Co.*, 386 F.2d at 564–568.

[130] Brian J. Petruska, *Adding* Joy Silk *to Labor's Reform Agenda*, 57 SANTA CLARA L. REV. 97, 108-110 (2017).

[131] *Gissel*, 395 U.S. at 594 ("[T]he Board announced at oral argument that it had virtually abandoned the *Joy Silk* doctrine altogether. Under the Board's current practice, an employer's good faith doubt is largely irrelevant, and the key to the issuance of a bargaining order is the commission of serious unfair labor practices that interfere with the election processes and tend to preclude the holding of a fair election.").

[132] *Gissel*, above, 395 U.S. at 614-615.

[133] Id. at 614; see also *Seattle-First National Bank v. NLRB*, 892 F.2d 792, 796 (9th Cir. 1989) ("[A] long line of cases . . . stands for the proposition that the purpose of an order to bargain is not simply to effectuate majority rule in a particular case but also to deter wrongful refusals by employers to recognize majorities promptly.").

[134] *Linden Lumber Division, Summer & Co.*, 190 NLRB 718 (1971), revd. sub nom *Truck Drivers Union Local No. 413*, 487 F.2d 1099 (D.C. Cir. 1973), affd. 419 U.S. 301 (1974).

NLRB 138, 142 fn. 6 (1987), enfd. 857 F.2d 1474 (6th Cir. 1988) (per curiam).[135]

### C.  New standard

The General Counsel asks that the Board overturn *Linden Lumber* and reinstate the standard from *Joy Silk*,[136] under which an employer would violate Section 8(a)(5) and (1) by refusing to bargain upon request with a union that had majority support absent a showing that the employer had a good-faith doubt as to the union's majority status.  The Respondent opposes this request and argues that the *Joy Silk* standard could not, in any case, be properly applied to it.  In the latter respect, the Respondent argues that the Union never presented evidence of a card majority, as would be required under the *Joy Silk* framework, and that the Respondent accordingly could not be held liable for a refusal to bargain even if that framework applied.

We find merit in the General Counsel's argument on exception that the Board should overrule *Linden Lumber*.  The Supreme Court has held that the Board's authority to fashion remedies "is a broad discretionary one."  *NLRB v. J. H. Rutter-Rex Manufacturing*, 396 U.S. 258, 262–263 (1969) (quoting *Fiberboard Paper Products. v. NLRB*, 379 U.S. 203, 216 (1964)); see also *Fallbrook Hospital Corp. v. NLRB*, 785 F.3d 729, 738 (D.C. Cir. 2015) (the Board acts at the "zenith of its discretion" when fashioning remedies) (internal quotation marks omitted).[137]  Section 1 of the Act sets forth the central policies of the Act, including "encouraging the practice and procedure of collective bargaining" and "protecting the exercise by workers of full freedom of association,

self-organization, and designation of representatives of their own choosing[.]"  29 U.S.C. § 151.  Because we find that the current scheme for remedying unlawful failures to recognize and bargain with employees' designated bargaining representatives is inadequate to safeguard the fundamental right to organize and bargain collectively that our statute enshrines, we hereby overrule *Linden Lumber*, supra.[138]

Instead, "draw[ing] on enlightenment gained from experience," *NLRB v. Seven-Up Bottling Co. of Miami*, 344 U.S. at 346, we announce the following framework for determining when an employer has unlawfully refused to recognize and bargain with a designated majority representative of its employees.

Under the standard we adopt today, an employer violates Section 8(a)(5) and (1) by refusing to recognize, upon request, a union that has been designated as Section 9(a) representative by the majority of employees in an appropriate unit unless the employer promptly[139] files a petition pursuant to Section 9(c)(1)(B) of the Act (an RM petition) to test the union's majority status or the appropriateness of the unit, assuming that the union has not already filed a petition pursuant to Section 9(c)(1)(A).[140]  Section 9(c)(1)(B) of the Act grants employers an avenue for testing the union's majority through a representation election if the Board, upon an investigation and hearing, finds that a question of representation exists.  In order to reconcile the provisions of Section 8(a)(5) and Section 9(a), which require an employer to recognize and bargain with the "designated" majority representative of its employees, with the language of Section 9(c)(1)(B) granting

---

[135] Subsequent cases in other contexts continued the Board's retreat from the "good-faith doubt" formulation of the *Joy Silk Mills* standard. For example, in *Levitz Furniture Co. of the Pacific*, 333 NLRB 717, 717 (2001), the Board abandoned the *Celanese Corp.*, 95 NLRB 664 (1951), rule, under which an employer was permitted to withdraw recognition if it had "a good-faith doubt, based on objective considerations, of the union's continued majority status."

[136] *Joy Silk Mills, Inc.*, 85 NLRB 1263 (1949), enfd. in relevant part, 185 F.2d 732 (D.C. Cir. 1950), cert. denied 341 U.S. 914 (1951).

[137] Sec. 10(c) "charges the Board with the task of devising remedies to effectuate the policies of the Act" by "draw[ing] on enlightenment gained from experience."  *NLRB v. Seven-Up Bottling Co. of Miami*, 344 U.S. 344, 346 (1953).  The Board's remedial authority "will not be disturbed unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act."  *Fiberboard Paper Products*, 379 U.S. at 203 (quoting *Virginia Electric & Power Co. v. NLRB*, 319 U.S. 533, 539 (1943)) (internal quotations omitted).  Finally, the Board, with Supreme Court approval, has long issued remedial bargaining orders for violations of Sec. 8(a)(5) of the Act.  See, e.g., *Franks Bros. Co.*, 321 U.S. at 705 ("That the Board was within its statutory authority in adopting the [bargaining order] remedy which it has adopted to foreclose the probability of such frustrations of the Act seems too plain for anything but statement.").

[138] As noted above, and as discussed further in our response to the dissent, *Linden Lumber* represents a permissible, but not mandatory, construction of the Act.  See *Linden Lumber*, 419 U.S. at 309-310 ("In light of the statutory scheme and the practical administrative procedural questions involved, we cannot say that the Board's decision that the union should go forward and ask for an election on the employer's refusal to recognize the authorization cards was arbitrary and capricious or an abuse of discretion.").

[139] Allowing for unforeseen circumstances that may be presented in a particular case, we will normally interpret "promptly" to require an employer to file its RM petition within 2 weeks of the union's demand for recognition.

[140] Our framework does not limit an individual or labor organization's ability to file a petition seeking a Board-conducted representation election pursuant to Sec. 9(c)(1)(A).  Many unions may prefer pursuing certification following a Board election, as certification confers certain benefits on unions.  These include: Sec. 9(c)(3)'s 1-year nonrebuttable presumption of majority status; Sec. 8(b)(4)(C)'s prohibition against recognitional picketing by rival unions; Sec. 8(b)(4)(D)'s exception to restrictions on coercive action to protect work jurisdiction; and Sec. 8(b)(7)'s exception from restrictions on recognitional and organizational picketing.  See also *Gissel*, 395 U.S. at 598-599 & fn. 14 (1969) ("A certified union has the benefit of numerous special privileges which are not accorded unions recognized voluntarily or under a bargaining order[.]").

26                          DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

employers an election option, we conclude that an employer confronted with a demand for recognition may, instead of agreeing to recognize the union, and without committing an 8(a)(5) violation, promptly file a petition pursuant to Section 9(c)(1)(B) to test the union's majority support and/or challenge the appropriateness of the unit or may await the processing of a petition previously filed by the union.[141]

However, if the employer commits an unfair labor practice that requires setting aside the election, the petition (whether filed by the employer or the union) will be dismissed, and the employer will be subject to a remedial bargaining order.[142] Thus, this accommodation of the Section 9(c) election right with the Section 8(a)(5) duty to recognize and bargain with the designated majority representative will only be honored if, and as long as, the employer does not frustrate the election process by its unlawful conduct.[143] As the Supreme Court observed in

*Gissel*, Section 9(c)(1)(B) was not intended to confer on employers "an absolute right to an election at any time; rather, it was intended, as the legislative history indicates, to allow them, after being asked to bargain, to test out their doubts as to a union's majority in a secret election which they would then presumably not cause to be set aside by illegal antiunion activity." 395 U.S. at 599. If the employer commits unfair labor practices that invalidate the election, then the election necessarily fails to reflect the uncoerced choice of a majority of employees. In that situation, the Board will, instead, rely on the prior designation of a representative by the majority of employees by nonelection means, as expressly permitted by Section 9(a), and will issue an order requiring the employer to recognize and bargain with the union, from the date that the union demanded recognition from the employer.

Our focus, then, is on the unlawful conduct of the employer that prevents a free, fair, and *timely* representation election. Given the strong statutory policy in favor of the prompt resolution of questions concerning representation, which can trigger labor disputes, we do not believe that conducting a *new* election—after the employer's unfair labor practices have been litigated and fully adjudicated – can ever be a truly adequate remedy.[144] Nor is there a strong justification for such a delayed attempt at determining employees' free choice *again* where the Board has determined that employees had *already* properly designated the union as their majority representative, consistent with the language of the Act, before the employer's unfair labor practices frustrated the election process. Simply put, an employer cannot have it both ways. It may not insist on an election, by refusing to recognize and bargain with the designated majority representative, and then violate the Act in a way that prevents employees from exercising free choice in a timely way.

An employer that refuses to bargain without filing a petition under Section 9(c)(1)(B) may still challenge the basis for its bargaining obligation in a subsequently filed unfair labor practice case. However, its refusal to bargain, and any subsequent unilateral changes it makes without first providing the employees' designated bargaining representative with notice and an opportunity to bargain, is at its peril.[145]

---

[141] If the employer neither recognizes the union nor promptly files a petition, the union may file a Sec. 8(a)(5) charge against the employer, and, if majority support in an appropriate unit is proven, the Board will find that the employer violated Sec. 8(a)(5) by failing and refusing to recognize and bargain with the union as employees' designated collective-bargaining representative and issue a remedial bargaining order. As in other cases involving remedial bargaining orders, in such situations, the bargaining obligation attaches from the date of the union's demand for recognition. See, e.g., *Atlas Microfilming*, 267 NLRB 682, 685, 697 (1983) (finding, where the union made a majority-supported request for bargaining, the employer's bargaining obligation attached retroactively to date of that request), enfd. 753 F.2d 313 (3d Cir 1985).

[142] Under long-established Board law, an election will be set aside when an employer violates Sec. 8(a)(3) of the Act during the "critical period" between the filing of an election petition and the election. See, e.g., *Lucky Cab Co.*, 360 NLRB 271, 277 (2014) (citing *Baton Rouge Hospital*, 283 NLRB 192, 192 fn. 5 (1987)). An election will be set aside based on an employer's critical-period violation of Sec. 8(a)(1) unless the "violations . . . are so minimal or isolated that it is virtually impossible to conclude that the misconduct could have affected the election results.'" Id. at 277 (quoting *Longs Drug Stores California*, 347 NLRB 500, 502 (2006), and *Clark Equipment Co.*, 278 NLRB 498, 505 (1986)). In determining whether unlawful misconduct could affect the results of an election, the Board considers all relevant factors, including the number of violations, their severity, the extent of dissemination, the size of the unit, the closeness of the election (if one has been held), the proximity of the conduct to the election date, and the number of unit employees affected. See, e.g., *Bon Appetit*, above, 334 NLRB at 1044 (citing cases).

[143] The standard we announce today addresses only situations where an employer frustrates the election process by the commission of independent unfair labor practices—that is, unfair labor practices other than the refusal to recognize and bargain with employees' designated majority representative. We do not address other situations in which an employer may be deemed to have forfeited or waived its right under Sec. 9(c)(1)(B) to seek an election, and violated Sec. 8(a)(5) by refusing to recognize and bargain with the union, such as where an employer had previously agreed to recognize and bargain with the union based on the union's showing of majority support and then reneged on its agreement, see, e.g., *Snow & Sons*, 134 NLRB 709 (1961), enfd. 308 F.2d 687 (9th Cir. 1962), or where the employer refused to recognize and

bargain with a union despite having "independent knowledge" of the union's majority support. See, e.g., *Mitchell Concrete Products Co.*, 137 NLRB 505, 505 (1962).

[144] As discussed more fully below, employees who have chosen to be represented are harmed by delay even if they ultimately prevail in a rerun election.

[145] Under current law, an employer's obligation to bargain begins as of the date of a representation election in which the union prevails,

In overruling *Linden Lumber* and limiting the employer's ability to insist on an election as a preliminary threshold step to a duty to bargain, we will no longer look to *Gissel* bargaining orders—that is, bargaining orders imposed based on employer unfair labor practices only where the unlikelihood of holding a future fair election is proven. Decades of experience administering the *Gissel* standard have persuaded us that *Gissel* bargaining orders are insufficient to accomplish the twin aims of "effectuating ascertainable employee free choice" and "deterring employer misbehavior" that the Supreme Court identified in that case. 395 U.S. at 614. Specifically, the *Gissel* standard's focus upon the potential impact of an employer's unfair labor practices upon a *future* rerun election creates perverse incentives to delay, which we believe can be diminished by a modified standard.[146] Representation delayed is often representation denied. Our experience leads us to conclude that the application of the *Gissel* standard has resulted in persistent failures to enable employees to win timely representation despite having properly designated a union to represent them, and thereby satisfying the Act's requirement for recognition. In our view, the standard we announce today, by making remedial bargaining orders more readily available, will "deter[] employer misbehavior" in the period before a Board election. *Gissel*, 395 U.S. at 614. This approach has several important advantages over the current remedial framework.

First, as the facts of this case illustrate, employees are harmed by delay when they must wait for their chosen representative to be able to bargain on their behalf.[147] Under the standard we adopt, once a majority of employees has designated a union as their bargaining representative, the employer has a duty to bargain under Section 8(a)(5), subject to its right to file an election petition. Its refusal to immediately do so – while simultaneously committing unfair labor practices that frustrate the election process – contravenes both the fundamental purpose of the Act in "encouraging the practice and procedure of collective bargaining" and "protecting the exercise by workers of . . . designation of representatives of their own choosing." 29 U.S.C. § 151. This approach better ensures that employees enjoy the ability to bargain through their designated representative.[148]

Second, even when the employer responds to the union's bargaining demand by promptly filing a petition for an election, our standard places the Board's focus on the appropriate time period: the runup to an initial election. In *Gissel* cases, the Board focuses on "the extensiveness of an employer's unfair labor practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future." 395 U.S. at 614. Reviewing courts have sometimes disagreed with the Board's assessment of the likely continuing effects of an employer's unfair labor practices, particularly where the fair adjudication of unfair labor practice allegations has resulted in substantial delays.[149] However, the Board has

---

regardless of when the union is certified or when litigation over that certification concludes. Longstanding Board precedent holds that, as a general matter, an employer "acts at its peril in making changes in terms and conditions of employment" once its bargaining obligation matures. *Mike O'Connor Chevrolet Buick-GMC Co.*, 209 NLRB 701, 703 (1974), enf. denied on other grounds, 512 F.2d 684 (8th Cir. 1975). Under the standard we adopt today, if an employer does not promptly file a petition under Sec. 9(c)(1)(B) after receiving a union's demand for recognition based on majority support in an appropriate unit, the employer's bargaining obligation matures, and the employer's refusal to bargain and any subsequent unilateral changes will be found unlawful if the Board later finds that the employer was obligated to recognize and bargain with the designated bargaining representative. See, e.g., *Concrete Form Walls, Inc.*, 346 NLRB 831, 840 & 852 (2006) (issuing a *Gissel* bargaining order retroactive to the date of the union's majority-supported demand for recognition), enfd. 225 Fed. Appx. 837 (11th Cir. 2007); *Atlas Microfilming*, supra, 267 NLRB at 685 & 697 (employer's bargaining obligation attached retroactively to the date of the union's majority-supported request for bargaining and subsequent unilateral changes were unlawful).

[146] The passage of time between the underlying events and the Board's resolution of this case, while not atypical, illustrates this problem. As noted above, the Respondent here has consistently argued that time elapsed in litigating this case will ultimately preclude the Board's issuance of an enforceable bargaining order. The standard we announce today aims to eliminate such delays in effectuating employees' expressed free choice of bargaining representative.

[147] See, e.g., *Small v. Avanti Health Systems, LLC*, 661 F.3d 1180, 1191-1192 (9th Cir. 2011) (upholding preliminary injunction requiring a successor employer to bargain in good faith with the employees' union because "[w]ithout bargaining, employees are denied the opportunity to achieve the economic benefits that a [collectively-bargaining agreement] can secure for workers," noting that "a delay in bargaining weakens support for the union"); *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1573 (7th Cir. 1996) ("As time passes, the benefits of unionization are lost and the spark to organize is extinguished. The deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable.").

[148] Importantly, an affirmative bargaining order does not establish a permanent bargaining relationship, though it gives a bargaining relationship "a reasonable period in which it can be given a fair chance to succeed." *Franks Bros.*, 321 U.S. at 705.

While the Supreme Court explicitly validated the use of union-authorization cards that clearly state their purpose to uphold an enforceable statutory bargaining obligation in *Gissel*, 395 U.S. at 607, additional safeguards help ensure that cards are a reliable indicator of employee sentiment. Under Board law, if a union organizer misrepresents the nature or purpose of a union- authorization card, the card is invalid. See *Gissel*, above, 395 U.S. at 606; *Cumberland Shoe Corp.*, 144 NLRB 1268 (1963) (union-authorization card invalid if organizer misrepresents the card's nature or purpose), enfd. 351 F.2d 917 (6th Cir. 1965). Further, in some circumstances, these misrepresentations can also violate Sec. 8(b)(1)(A). See, e.g., *Clement Bros.*, 165 NLRB 698, 707 (1967).

[149] See, e.g., *Cogburn Health Center*, above, 437 F.3d at 1275.

28                          DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

unquestioned authority to protect the integrity of its election processes. See *NLRB v. A.J. Tower Co.*, 329 U.S. at 330 ("Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees."); *NLRB v. Waterman S.S. Corp.*, 309 U.S. 206, 226 (1940) ("The control of the election proceeding, and the determination of the steps necessary to conduct that election fairly were matters which Congress entrusted to the Board alone."). It is our considered view that our new standard will more effectively disincentivize employers from committing unfair labor practices prior to an election. It thus protects the interests of an employer that prefers an election while protecting the election's integrity by increasing the chance that employees can participate with less chance of unlawful employer interference. Because a Board-conducted election "can serve its true purpose only if the surrounding conditions enable employes to register a free and untrammeled choice for or against a bargaining representative," this standard will advance the Board's interest in "provid[ing] a laboratory in which an experiment may be conducted, under conditions as nearly ideal as possible, to determine the uninhibited desires of the employees." *General Shoe Corp.*, 77 NLRB 124, 126-127 (1948).[150] As the Supreme Court has recognized, it is "the duty of the Board . . . to establish the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." *NLRB v. Savair Mfg. Co.*, 414 U.S. 270, 276 (1973) (internal quotation omitted).

In contrast to current Board case law, requiring that employers who insist on an election do not frustrate a timely election by committing unfair labor practices addresses one of the greatest weaknesses of *Gissel*: under the new standard, we expect that employers seeking an election will be incentivized *not* to commit unfair labor practices in response to a union campaign, both before and after the filing of the election petition. It is our judgment that the risks to an employer of a *Gissel* bargaining order, with its emphasis on whether a future, often second (or even third) election can be fairly conducted, has not served as an adequate deterrent to employer unfair labor practices during the election period. Under current Board law, there is no effective remedy to deter an employer bent on defeating a union campaign by committing serious unfair labor practices that tend to make a free and fair election unlikely.[151] In particular, the remedies available for violations of Section 8(a)(3) and (1) of the Act, no matter how serious, are, in many cases, incapable of rectifying the harm that can be caused to the election process by the unlawful conduct of an employer intent upon delaying or altogether avoiding its bargaining obligations under the Act.[152] Under the new standard, by contrast, if the Board finds that an employer has committed unfair labor practices that frustrate a free, fair, and timely election, the Board will dismiss the election petition and issue a bargaining order, based on employees' prior, proper designation of a representative for the purpose of collective bargaining pursuant to Section

---

[150] See generally Petruska, supra, 57 SANTA CLARA L. REV. at 138 (arguing that a restored *Joy Silk* standard would have the effect of "increasing the number of elections overall, reducing ULPs committed during elections, and securing fairer elections consistent with the standard of laboratory conditions").

[151] Of course, an employer that does not commit serious unfair labor practices before an election may seek to persuade employees with lawful expressions of its views under Sec. 8(c) of the Act. 29 U.S.C. § 158(c).

[152] For example, nip-in-the-bud discharges of union supporters, which send the message that any employee engaging in union activity could be next, can irreparably harm the organizing process. Likewise, an employer's coercive statements or the unlawful granting or withholding of benefits, made just before the election, can erode employees' majority support for the union. The Supreme Court has recognized, and our experience has shown, that a bargaining order, however difficult to obtain and enforce under *Gissel*, is the most effective deterrent to this kind of misconduct, which must be highly disincentivized if the integrity of the election process is to be strengthened. See *Gissel*, above, 395 U.S. at 611 ("If the Board could enter only a cease-and-desist order and direct an election or a rerun [for employer interference with the election process], it would in effect be rewarding the employer and allowing him 'to profit from (his) own wrongful refusal to bargain,' while at the same time severely curtailing the employees' right freely to determine whether they desire a representative. The employer could continue to delay or disrupt the election processes and put off indefinitely his obligation to bargain.") (quoting *Franks Bros.*, above, 321 U.S. at 704) (footnote omitted).

Our dissenting colleague purports to clarify that our "real position" must be that traditional remedies can never ameliorate the effects of even just one 8(a)(3) or (1) violation so as to enable the possibility of a fair election or rerun election at some future date. Having so construed our position, he attacks it as inconsistent with *Gissel*, circuit court precedent, and empirical evidence that unions sometimes win rerun elections even where an employer has committed extensive and egregious unfair labor practices. We decline our colleague's offer to clarify our position in this fashion. Rather, as we have explained and explain further below, the analysis of whether a bargaining order is warranted under the standard we announce today does not turn—as under *Gissel*—on speculation about the impact of an employer's conduct on an election held at some future date, but rather on whether the employer has rendered a current election (normally the preferred method for ascertaining employees' representational preferences) less reliable than a current alternative nonelection showing. In contrast to the *Gissel* standard's focus on the future impact of past unlawful misconduct, which incentivizes delay because such impact may decline with the passage of time, the current standard's focus on the best present evidence of current employees' representational preference incentivizes employers not to engage in unlawful misconduct that would require setting aside the results of an election, thus better ensuring employees' ability to effectuate their statutory rights to bargain through a representative of their choosing.

9(a) of the Act. This standard disincentivizes unlawful employer conduct during an election campaign because such conduct would be counterproductive for the employer. The employer who commits unlawful conduct to dissipate support for a union that has already been designated by employees as their representative gains no ultimate advantage. Its misconduct ensures that it will be subject to a Board order requiring good-faith bargaining with the union.

Third, in response to the criticisms of reviewing courts and our recognition of relevant intervening changes in Board law, our standard does not rely on an employer's subjective "good-faith doubt" of a union's majority status.[153] In order to invoke the Board's election machinery in response to a union's demand for bargaining, an employer will not need to prove a good-faith doubt of the union's majority status, nor will the General Counsel have to prove a lack of good-faith doubt. Rather, the employer is free to seek a Board election in which the union's majority can be tested. However, in the event of employer unfair labor practices that make a fair election unlikely, the bargaining order imposed under the revised standard appropriately focuses on the best objective evidence of a union's majority support at the time of a request for recognition – before the employer's unfair labor practices were committed. The Board has similarly abandoned the good-faith doubt standard in cases involving alleged unlawful withdrawals of recognition. See *Levitz Furniture*, above, 333 NLRB at 717. And the Supreme Court has long recognized that an employer violates Section 8(a)(2) by recognizing a minority union and that such "prohibited conduct cannot be excused by a showing of good faith." *Bernhard-Altmann*, supra, 366 U.S. at 739. By declining to examine an employer's subjective belief about a union's majority status, the standard we announce today aligns our treatment of "good faith" in this context with current law in these related areas.

*D. Application and retroactivity*

Having announced our new approach to remedial bargaining orders, we apply that framework to this case.

Here, the General Counsel alleged that the Respondent violated Section 8(a)(5) and (1) by failing and refusing to bargain with the Union after the Union requested, by filing the December 3, 2018 petition,[154] that the Respondent recognize it as the exclusive bargaining representative of the employees. Further, as discussed above, the parties litigated the question of the Union's card majority, and we have affirmed the judge's conclusion that a majority of unit employees had designated the Union as their bargaining representative by the end of November 2018. In addition, the parties stipulated to the appropriateness of the unit at issue. Finally, the Respondent's extensive unfair labor practices detailed above required the election in this case to be set aside. Thus, we conclude, based upon the complaint allegations and record, that: (1) the Respondent refused the Union's request to bargain;[155] (2) at a time when the Union had in fact been designated representative by a majority of employees; (3) in a concededly appropriate unit; and then (4) committed unfair labor practices requiring the election to be set aside, violating Section 8(a)(5) under the standard we announce today.

The Board's usual practice is to apply new policies and standards retroactively 'to all pending cases in whatever stage,'" unless retroactive application would work a "manifest injustice." *SNE Enterprises*, 344 NLRB 673, 673 (2005) (quoting *Deluxe Metal Furniture Co.*, 121 NLRB 995, 1006-1007 (1958)). See, e.g., *Valley Hospital Medical Center, Inc.*, 371 NLRB No. 160, slip op. at 15-17 (2022). The Supreme Court has acknowledged the Board's authority to reconsider and change its law, characterizing the administrative process as a "constant process of trial and error."[156]

Under Supreme Court precedent, "the propriety of retroactive application is determined by balancing any ill effects of retroactivity against 'the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles.'" *SNE Enterprises*, supra at 673 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947)). In making that determination, the Board considers "the reliance of the parties on preexisting law, the effect of retroactivity on accomplishment of the purposes of the Act, and any particular injustice arising from retroactive application." Id.

---

[153] See, e.g., *NLRB v. River Togs, Inc.*, 382 F.2d at 206 (criticizing Board's reliance on employer's lack of good-faith doubt as basis for bargaining order).

[154] As noted above, the Respondent stipulated on December 13, 2018, that the Union claimed to represent the employees described in the petition, and that the Respondent declined to recognize the Union.

[155] As mentioned previously, the General Counsel amended the complaint to allege that "[a]bout December 3, 2018, the Union, by filing the petition in Case 28–RC–232059, requested that Respondent recognize it as the exclusive collective-bargaining representative of the Unit." The Respondent's December 13, 2018 stipulation confirmed that the Union claimed to represent the employees in the petitioned-for unit and that the Respondent refused the Union's demand. Cf., e.g., *Aldworth Co.*, 338 NLRB 137, 137, 152–153 (2002) (concluding an employer violated Sec. 8(a)(5) by refusing, since date of recognition-request refusal, to bargain with a union, while engaging in conduct undermining union support and preventing a fair rerun election), enfd. sub nom. *Dunkin Donuts Mid-Atlantic v. NLRB*, 363 F.3d 437 (D.C. Cir. 2004).

[156] *NLRB v. J. Weingarten, Inc.*, 420 U.S. at 266.

There can be no claim of manifest injustice here. First, while under our new standard the threshold for issuing a bargaining order as a remedy for a violation of Section 8(a)(5) is lower, the order we issue is premised on the Respondent's unfair labor practices in violation of Section 8(a)(1) and 8(a)(3) of the Act requiring the setting aside of an election, and the standard for finding *those* violations has not changed. The Respondent may not be heard to say that it only committed those violations because it did not believe that they would result in a bargaining order.[157]

Moreover, in any event, as explained, this case was litigated under the *Gissel* standard. Because we have found that the Respondent violated Section 8(a)(5) by refusing to recognize and bargain with the Union while engaging in unfair labor practices that would prevent a fair rerun election—warranting a remedial bargaining order under the *Gissel* standard—the application of the revised standard in this case results in neither finding any additional violation of the Act nor any additional remedial obligation. Because the same violation and remedy would lie under either the prior standard or the standard we announce today, we find that the application of the new standard in this case does not prejudice the Respondent.

Finally, any harm to the interest of employers who might have relied on the prior framework for imposing bargaining orders is outweighed by the clear harm to the achievement of the Act's policies by continuing to apply the prior standard in cases involving serious misconduct prior to a Board-conducted election. Applying today's holding retroactively will avoid the potential for inconsistency in pending cases, will restore judicially approved standards to this area of law, and will ensure that our decision serves its intended goal of adequately protecting employees' exercise of Section 7 rights.

### IV. RESPONSE TO THE PARTIAL DISSENT

Our dissenting colleague advances several reasons for declining to join Section III of the majority's decision. We address these each in turn.

As a threshold matter, our colleague contends that our decision to overrule *Linden Lumber* is without precedential effect because it does not change the result for the Respondent in this case. We respectfully disagree. Congress has delegated to the Board the authority to interpret the National Labor Relations Act and to set national la-

bor policy.[158] The Supreme Court has long recognized the Board's authority to change national labor policy through adjudication by adopting alternate permissible interpretations of the Act.[159] Historically, the Board has modified policies through adjudication, including in cases in which the change in standard has not changed the result for the respondent in the case.[160]

Here, as explained in detail above, the General Counsel's complaint allegations and the record squarely present the issue of the circumstances under which an employer's refusal to bargain with a representative designated or selected for the purposes of collective bargaining by the majority of its employees in an appropriate unit violates Section 8(a)(5) and warrants a remedial bargaining order. The Board clearly has authority to address this question in this case and put forward an alternative rationale in support of its finding that the Respondent violated Section 8(a)(5), even though, as we have found, the Respondent's refusal to bargain in this case violated Section 8(a)(5) and requires a remedial bargaining order under either the old or the new standard. The framework our colleague describes is not now, and never has been, the framework governing Board decision making.[161]

---

[157] Cf. *Kentucky River Medical Center*, 356 NLRB 6, 10 (2010) (applying new compound-interest remedy for backpay awards retroactively) ("We are deciding a remedial issue, not adopting a new standard concerning whether certain conduct is unlawful. No respondent, then, can fairly be said to have relied on the Board's prior rule of awarding only simple interest on backpay awards in deciding to take the unlawful action on which their liability is based.").

[158] See *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 500-501 (1978) ("It is the Board on which Congress conferred the authority to develop and apply fundamental national labor policy," and "to accomplish the task which Congress set for it, [the Board] necessarily must have authority to formulate rules to fill the interstices of the broad statutory provisions."); see also *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 786 (1990) ("[T]he NLRB has the primary responsibility for developing and applying national labor law policy . . . . [and t]his Court therefore has accorded Board rules considerable deference.").

[159] See *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 266-267 (1975) ("The responsibility to adapt the Act to changing patterns of industrial life is entrusted to the Board.").

[160] See, e.g., *Alstate Maintenance, LLC*, 367 NLRB No. 68, slip op. at 1 (2019) (stating "although we believe *WorldMark by Wyndham* is distinguishable, we conclude that *WorldMark* cannot be reconciled with *Meyers Industries* and must be overruled.).

[161] Additionally, as the Supreme Court has long recognized, all alternative rationales supporting a legal conclusion have precedential value, even if more than one rationale is relied upon. See *United States v. Title Insurance & Trust Co.*, 265 U.S. 472, 486 (1924) ("[W]here there are two grounds, upon either of which an appellate court may rest its decision, and it adopts both, 'the ruling on neither is *obiter* [*dictum*], but each is the judgment of the court and of equal validity with the other."); *Railroad Cos. v. Schutte*, 103 U.S. 118, 143 (1881) ("It cannot be said that a case is not authority on one point because, although that point was properly presented and decided in the regular course of the consideration of the cause, something else was found in the end which disposed of the whole matter."). See also *O'Gilvie v. United States*, 519 U.S. 79, 84, (1996) (an independent ground in support of a decision is not dictum); *United States Steel Corp. v. United States Environmental Protection Agency*, 444 U.S. 1035, 1038 (1980) ("[A]n independent, alternative basis" for a decision is "no more dicta than its companion holding[.]").

Our dissenting colleague insists that our new standard is dicta because the Respondent committed numerous unfair labor practices that

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC     31

Our dissenting colleague further contends that the Supreme Court's decision in *Linden Lumber*[162] precludes judicial enforcement of bargaining orders issued under the new standard, and that we have provided no reasoned justification for overruling the Board's decision in *Linden Lumber*.[163]  These assertions fundamentally misapprehend both the several decisions in *Linden Lumber* and our decision today.

To review, the Board initially held in *Linden Lumber* that an employer "should not be found guilty of a violation of Section 8(a)(5) solely upon the basis of its refusal to accept evidence of majority status other than the results of a Board election," but rather, when faced with a request for bargaining by a union that may, in fact, have been designated representative by a majority of employees in an appropriate unit, could lawfully refuse either to bargain or to petition the Board for an RM election.[164]  On review of the Board's decision, the United States Court of Appeals for the District of Columbia Circuit concluded, based upon the relevant statutory language and legislative history, that "[t]hese statutory provisions plainly contemplate employer duty of recognition even in the absence of election, and give a safeguard to the employer who has doubts about majority status by assuring him the right to file his own petition for an election."[165]  The court thus found that the Board was statutorily foreclosed from excusing an employer entirely from either petitioning for an RM election or bargaining, upon request, with a union that had been designated representative by a majority of its employees in an appropriate unit under Section 9(a).  The court remanded the matter for the Board to articulate a standard to govern the condi-

tions under which a bargaining obligation would attach absent an RM petition.[166]

A five-Justice majority of the Supreme Court subsequently reversed the District of Columbia Circuit and sustained the Board's holding based on the Court's conclusion that "[i]n light of the statutory scheme and the practical administrative procedural questions involved, we cannot say that the Board's decision that the union should go forward and ask for an election on the employer's refusal to recognize the authorization cards was arbitrary and capricious or an abuse of discretion."[167]  In other words, the Court held that in adopting the policy established in *Linden Lumber*, the Board acted within its discretion—not that the policy was mandated by the Act.  Significantly, a four-Justice minority concluded that the Board's policy at issue represented an *impermissible* interpretation of the Act, and would have affirmed the judgment of the court of appeals remanding the case to the Board.[168]  The dissenting Justices examined the plain language of the Act and the legislative history of the Taft-Hartley amendments and concluded, consistent with our decision today, that, where an employer refuses, upon request, to bargain with a majority-supported union without taking any other action, "the Act clearly provides that the union may charge the employer with an unfair labor practice under [Section] 8(a)(5) for refusing to bargain collectively with the representatives of his employees[, and i]f the General Counsel issues a complaint and the Board determines that the union in fact represents a majority of the employees the Board *must issue* an order directing the employer to bargain with the union."[169]

Given the similarity between our interpretation of the Act today and that of the dissenting Justices in *Linden Lumber*, had the Court majority there meant to foreclose our reading, it surely would have said so.  But it did not.  Instead, it held only that the Board's interpretation below was permissible.  For the policy reasons set forth extensively above, we select a different, permissible interpretation of the Act today.  We accordingly respectfully disagree with our colleague's contention that *Linden Lumber* in any way forecloses our decision.

Next our colleague contends that we present no reasoned justification for "overruling *Linden Lumber*, shifting the burden to file a representation petition from the union to the employer, and finding an 8(a)(5) violation and imposing a bargaining order if the employer fails to file that petition."  This contention misapprehends the import of our decision.  Contrary to our colleague, our

---

we find justify a *Gissel* order.  However, our colleague does not dispute the operative facts: here, the Union sought recognition on the basis of majority support, and the Respondent refused to recognize the Union.  Instead, he questions the Board's authority to put forward alternative rationales for finding that the Respondent's conduct violated Sec. 8(a)(5).  By contrast, in *American Steel Construction, Inc.*, 372 NLRB No. 23, slip op. at 13 fn. 89 (2022), cited by our colleague, the Board accurately labeled a portion of its decision in *PCC Structurals, Inc.*, 365 NLRB No. 160 (2017), that did not address the operative facts at issue in that case as nonbinding dicta.  In *PCC Structurals*, the Board purported to modify, without discussion, its standard for determining an appropriate bargaining unit in nonacute health care facilities such as nursing homes, even though that case involved an aerospace industry facility, not a healthcare facility.  Id., slip op. at 1 fn. 3.  Given that the footnote purporting to modify the standard for determining an appropriate bargaining unit in nonacute health care facilities dealt with facts not before the Board, it was unquestionably not an alternative rationale for the Board's decision.

[162] 419 U.S. 301 (1974).
[163] 190 NLRB 718 (1971).
[164] 190 NLRB at 720–721.
[165] *Truck Drivers Union Local No. 413 (Linden Lumber) v. NLRB*, 487 F.2d 1099, 1107 (D.C. Cir. 1973).

[166] Id. at 1111–1113.
[167] 419 U.S. at 309–310.
[168] 419 U.S. at 310–311 (Stewart, J. diss.).
[169] Id. at 312-313 (Stewart, J. diss.) (emphasis added).

decision places no burden on any employer beyond those imposed by the Act itself: to bargain collectively with a representative designated or selected by its employees pursuant to Sections 8(a)(5) and 9(a), and should it choose to petition for an election, to refrain from engaging in conduct that would interfere with that election.[170] As Justice Stewart explained in *Linden Lumber*, under the permissible alternative interpretation of the Act we adopt today, an employer is not in any way obliged to file an RM petition, but, if it neither files a petition nor voluntarily recognizes the union, it "must take the risk that [its] conduct will be found by the Board to constitute a violation of [its Section] 8(a)(5) duty to bargain. In short, petitioning for an election is not an employer obligation; it is a device created by Congress for the employer's self-protection, much as Congress gave unions the right to petition for elections to establish their majority status but deliberately chose not to require a union to seek an election before it could impose a bargaining obligation on an unwilling employer."[171]

Our colleague's suggestion that overruling *Linden Lumber* necessarily depends on reinstituting some version of a "good-faith doubt" standard misses the mark for similar reasons. Neither an employer's statutory option to file an RM petition nor its duty to bargain with a representative designated or selected for that purpose by a majority of its employees turns on the employer's subjective beliefs about a union's majority status. Thus, as we have explained above, an employer faced with a request for recognition may test the basis of a union's claim to majority support in an appropriate unit—without examination of the employer's beliefs about that claim—in a hearing pursuant to an RM petition. Alternatively, should the employer refuse to bargain without filing an RM petition, and should the union file a charge alleging that the employer's refusal violates Section 8(a)(5), the employer may test the basis of the union's claim to majority status in a subsequent unfair labor practice proceeding—again without inquiry into the employer's subjective beliefs about the union's majority status. However, as also explained above, an employer that chooses the latter route does so at its peril should the proceedings establish that the union was, in fact, the representative

designated by a majority of employees in an appropriate unit at the time of the employer's refusal to bargain.

The core of our dissenting colleague's disagreement with the merits of our decision to overrule *Linden Lumber* is his contention that, in all but the most extreme circumstances, requiring an employer to bargain with a "card-majority union" runs counter to the policies of the Act because it deprives employees of their "right to vote in a secret-ballot election" and predictably risks forcing unions upon nonconsenting majorities of unit employees. This contention cannot bear scrutiny in the light of the plain language of the Act and controlling Supreme Court precedent.

To begin at the heart of the Act, the plain language of Section 7 guarantees employees the "right . . . to bargain collectively through representatives of their own choosing." 29 U.S.C. § 157. Section 9(a), in turn, defines a collective-bargaining representative as one "designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes." Id. § 159(a). And Section 8(a)(5) provides that it is an unfair labor practice for an employer to refuse to bargain collectively with a representative its employees have designated or selected pursuant to Section 9(a). Id. § 158(a)(5). Accordingly, to the extent that the Act ensures, as our colleague asserts, a "right to vote in a secret-ballot election," this right derives from, and is exercised in the service of, the statutory right to bargain collectively through a representative designated or selected for that purpose by a majority of the employees in an appropriate unit. What our colleague calls a "card-majority union" is simply a representative "designated," within the plain meaning of the Act, by a majority of unit employees. Thus, any true statement about a "card-majority union" should also ring true if the phrase "card-majority union" is replaced by the statutory phrase "representative designated for the purposes of collective bargaining by a majority of employees in an appropriate unit." But our dissenting colleague's core contention cannot bear such a substitution: No one could seriously argue that a Board bargaining order entered as a remedy for an employer's refusal to bargain with the representative designated for that purpose by a majority of its employees in an appropriate unit frustrates the policies of the Act, deprives employees of a distinct "right to vote in a secret-ballot election," or risks forcing a union on a nonconsenting majority of unit employees.[172]

The key to this apparent contradiction is that, based on our colleague's partial dissent, he does not appear to ac-

---

[170] Cf. id. at 316 (Stewart, J. diss.) (agreeing with the Court majority that it would be improper to impose upon an employer the burden of obtaining a Board-supervised election but observing that "[t]he only employer obligation relevant to this case, apart from the requirement that the employer not commit independent unfair labor practices that would prejudice the holding of a fair election, is the one imposed by [Secs.] 8(a)(5) and 9(a) of the Act: an employer has a duty to bargain collectively with the representative designated or selected by his employees.").

[171] Id. (Stewart, J. diss.) (citing *Gissel*, above, 395 U.S. at 598-599).

[172] See, e.g., *Franks Bros. Co.*, above, 321 U.S. at 705 ("That the Board was within its statutory authority in adopting [a bargaining order] remedy . . . seems too plain for anything but statement.").

cept that a "card-majority union" *could be* a representative freely designated for the purposes of collective bargaining by a majority of employees. He expresses concern that workers who truly do not want to be represented may nevertheless sign cards designating a representative to avoid offending their coworkers, or because of "group pressures," or because their employer has not yet had the opportunity to fully inform them of its views on the question of representation. In these circumstances, he posits, employees' freedom to choose for themselves is not a real freedom.

Our experience of labor relations and the administration of the Act suggests that our dissenting colleague exaggerates the inevitable impact of these concerns on the reliability of a union's card-based showing of majority support. But both our colleague's instincts about this matter and our own are really beside the point, because, as extensively described in Section III of our decision above, the Supreme Court long ago authoritatively settled the issue as a matter of law. The *Gissel* Court addressed the specific question of whether authorization cards are such inherently unreliable indicators of employee desire that they may not establish a union's majority status and an enforceable bargaining obligation.[173] The Court expressly rejected the several contentions underlying our dissenting colleague's position, that:

> [A]s contrasted with the election procedure, the cards cannot accurately reflect an employee's wishes, either because an employer has not had a chance to present his views and thus a chance to insure that the employee choice was an informed one, or because the choice was the result of group pressures and not individual decision made in the privacy of a voting booth; and . . . that quite apart from the election comparison, the cards are too often obtained through misrepresentation and coercion which compound the cards' inherent inferiority to the election process.[174]

The Court noted that "[t]he Board itself has recognized, and continues to do so here, that secret elections are generally the most satisfactory—indeed the preferred—method of ascertaining whether a union has majority support," but concluded that "[t]he acknowledged superiority of the election process . . . does not mean that cards are thereby rendered totally invalid, for where an employer engages in conduct disruptive of the election process, cards may be the most effective—perhaps the only—way of assuring employee choice."[175] The Court went on to hold that "[a]s for misrepresentation, in any

specific case of alleged irregularity in the solicitation of the cards, the proper course is to apply the Board's customary standards . . . and rule that there was no majority if the standards were not satisfied. It does not follow that because there are some instances of irregularity, the cards can never be used; otherwise, an employer could put off his bargaining obligation indefinitely through continuing interference with elections."[176]

The standard that we announce today is fully consistent with the *Gissel* Court's recognition that a free and fair election is the preferred method of ascertaining whether a union has majority support, as well as with its recognition that, where an employer engages in conduct disruptive of the election process, authorization cards or other nonelection evidence of majority status "may be the most effective—perhaps the only—way of assuring employee choice."[177] Under this standard, an employer faced with a request for recognition is always free, without reference to its subjective belief about the validity of a union's claim of majority status, to test the union's claim by petitioning the Board for an RM election. Whether or not the employer chooses to petition for an election rather than recognizing the union, it is fully free, either after recognizing the union or prior to any election, consistent with Section 8(c), to express to its employees its views, arguments, or opinions on the question of representation, so long as such expressions contain no threat of reprisal or force or promise of benefit. The employer is also fully free to contest the union's claim by presenting evidence in a hearing conducted pursuant to Section 9(c)(1)(B) that the union's showing of majority support is deficient because of irregularities in the procurement of cards or otherwise, or that the unit claimed by the union is inappropriate.[178] In those circumstances, employ-

---

[173] *Gissel*, above, 395 U.S. at 601, 607.
[174] Id. at 602 (footnote omitted).
[175] Id.

---

[176] Id. at 602–603. To the extent that circuit court decisions cited by our dissenting colleague can be read to suggest that authorization cards are inherently unreliable indicators of a union's majority status, we are bound by the Supreme Court's contrary conclusion.
[177] Id. at 602. We are unpersuaded by our colleague's suggestion that our new standard incentivizes employers and unions to unlawfully collude at the expense of employees by entering into secret deals whereby employers would commit unfair labor practices in order to incur Board bargaining orders in exchange for union concessions at the bargaining table. In any case, of course, absent actual majority support for the union, such a collusive agreement would expose both the employer and the union to liability under Sec. 8(a)(2) and 8(b)(1)(A) of the Act.
[178] Because a bargaining order issued under today's standard is a remedy for an employer's violation of Sec. 8(a)(5) by refusal to bargain with a union that has been designated representative by a majority of employees in an appropriate unit, an employer faced with an unfair labor practice complaint may also contest the validity of a union's showing of majority support or the appropriateness of the claimed unit in an unfair labor practice proceeding, to the extent these issues have not previously been resolved in a representation proceeding.

34                      DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

ees will have a genuine opportunity "to register a free and untrammeled choice for or against a bargaining representative."[179]  What the employer is not free to do, however, is to "put off [its] bargaining obligation indefinitely through continuing interference with elections."[180]  If an employer, having petitioned for an election, proceeds to undermine the validity of that election as a showing of the true preferences of unit employees, the Board may, consistent with *Gissel*, rely on a prior nonelection showing such as authorization cards as "the most effective—perhaps the only—way of assuring employee choice."[181]  The authorities cited by our dissenting colleague affirming that elections are the "preferred" method of determining employees' preference are based on a fundamental premise: that an election will be untainted by the employer's unlawful misconduct.  As the Court in *Gissel* recognized, where that premise does not hold, elections may not adequately assure employee choice.

Because the new standard meets an employer's interference with a free and fair election by imposing a bargaining order based on its employees' objectively demonstrable current preferences, it properly focuses the analysis on the union's current majority status, rather

than depending—as under the prior standard—upon speculation about the impact of the employer's coercive conduct on the free choices of some future contingent of employees.  In this way, the new standard safeguards the freely expressed choice of a majority of current employees while minimizing the risk of imposing a union on a future majority whose support for the union has predictably eroded or been undermined during delays caused by the employer's unlawful conduct.[182]  By guarding against interference with employee free choice both at the time of card solicitation and in the runup to an election, the standard announced today thus preserves, rather than undermines employees' fundamental statutory right to bargain collectively through representatives of their own choosing.

Our dissenting colleague further contends that our decision today is unenforceable in the federal courts of appeals because it contemplates that bargaining orders may issue based on employer misconduct that the *Gissel* Court held would not sustain a bargaining order.  This is incorrect, because bargaining orders under the new standard rest upon a fundamentally different rationale than those under *Gissel*.

The Court in *Gissel* held that the Board should issue a bargaining order if it concluded (1) that a future reliable election could not be held because of an employer's "outrageous" and "pervasive" conduct whose impact could not be eliminated by the Board's traditional remedies; or (2) that the possibility of conducting a future reliable election was slight because of the continuing impact of an employer's "less pervasive" misconduct; but that a third category (3) of "minor or less extensive unfair labor practices," would not sustain a bargaining order because they would not prevent the Board's traditional remedies from assuring a free and fair election at some undefined future date.[183]  As discussed above, the Board and reviewing courts of appeals have regularly reached different conclusions about the likely impact of employers' unlawful conduct and the Board's traditional remedies upon employees' ability to exercise free choice in an election at an undefined future date—that is, whether particular misconduct supports a bargaining order under the *Gissel* framework's first or second categories, or falls

---

Nothing in today's decision changes the Board's ordinary procedures for evaluating an employer's claims that irregularities in the procurement of authorization cards have rendered a union's nonelection evidence of majority status invalid.  In addition, today's decision does not disturb Board precedent that helps ensure that union-authorization cards serve as a reliable indicator of employee sentiment.  See *Gissel*, above, 395 U.S. at 606; *Cumberland Shoe Corp.*, 144 NLRB 1268 (1963) (union-authorization card invalid if organizer misrepresents the card's nature or purpose), enfd. 351 F.2d 917 (6th Cir. 1965); see also, e.g., *Clement Bros.*, 165 NLRB 698, 699, 707 (1967) (union adherents' coercion or misrepresentation in card solicitation may violate Sec. 8(b)(1)(A) of the Act and invalidate majority showing).  As noted above, the Respondent in this case fully litigated such claims at the hearing in this matter, and we have affirmed the judge's conclusion that the Union established its majority support on the record before us.

[179] *General Shoe Corp.*, 77 NLRB 124, 126–127 (1948).  Similar concerns about the importance of "provid[ing] a laboratory in which an experiment may be conducted, under conditions as nearly ideal as possible, to determine the uninhibited desires of the employees," *General Shoe Corp.*, 77 NLRB at 126–127, prompted the Board to issue a notice of proposed rulemaking to solicit public input on the desirability of restoring its historical blocking charge policy.  See *Representation-Case Procedures: Election Bars; Proof of Majority Support in Construction Industry Collective-Bargaining Relationships*, 87 Fed. Reg. 66890, 66902–66903 (Nov. 4, 2022).  We are puzzled by our colleague's suggestion that today's decision stands in tension with this proposal.

[180] *Gissel*, above, 395 U.S. at 602.

[181] Id.  See also id. at 599 (Sec. 9(c)(1)(B) "was not added, as the employers assert, to give them an absolute right to an election at any time; rather, it was intended, as the legislative history indicates, to allow them, after being asked to bargain, to test out their doubts as to a union's majority in a secret election *which they would then presumably not cause to be set aside by illegal antiunion activity.*") (emphasis added).

[182] Our dissenting colleague points out that unions have on some occasions lost an election due to employer coercion and then been able to overcome the effects of that coercion and win – after a lengthy delay – a second election.  This does not negate the fact that on many other occasions employer coercion has chilled employees' willingness to continue pursuing representation.  More importantly, employees should not have to endure employer coercion and participate in multiple elections as a precondition to exercising their statutory rights to bargain through their chosen representative.

[183] Id. at 613–615.

short, in the third category. The inability of the Board and the courts to reach common ground on the line between conduct that will or will not sustain a bargaining order under the forward-looking *Gissel* framework has had the predictable, and unfortunate, result that Board bargaining orders in individual cases become increasingly less likely to issue or be enforced the longer litigation over unfair labor practices persists, creating obvious perverse incentives to prolong litigation, as discussed above.[184]

The standard we adopt today addresses this persistent problem by replacing the *Gissel* standard's necessary speculation about the likely continuing impact of an employer's misconduct over some unpredictable span of time with an appropriate focus on the best currently existing objective evidence of a union's current majority status. Thus, as described above, the Board may find a current bargaining obligation based on nonelection evidence where an employer's misconduct has rendered a recent or pending election a less reliable indicator of current employee sentiment.[185] Contrary to our dissenting colleague, then, a bargaining order under the new standard could not issue as a remedy for such "minor or less extensive unfair labor practices" as the Court found would not sustain a bargaining order under the *Gissel* rationale, but only as a remedy for an employer's violation of Section 8(a)(5) by refusal to bargain with a union whose status as a current majority-designated bargaining representative—within the plain meaning of Section 9(a)—has been established by the most reliable available means.

Our dissenting colleague relatedly contends that, under the standard announced today, in combination with the Board's recent revision to its framework for evaluating the lawfulness of employer work rules in *Stericycle, Inc.*, 372 NLRB No. 113 (2023), "it is virtually impossible for an employer *not* to commit a critical-period unfair labor practice that would require setting aside the results of an election, which means it is virtually impossible for an employer's RM petition *not* to be dismissed, for the employer *not* to be found to have violated Section 8(a)(5), and for a bargaining order *not* to issue." Again, we respectfully disagree. First, our colleague's conclusion depends upon an attenuated chain of speculative and exaggerated suppositions about how the Board will apply

this and other standards going forward. Our colleague's speculation is without basis in this or any other Board decision.[186] Unlike our colleague, we do not doubt employers' ability to refrain from unlawful conduct—most manage to do so most of the time. Moreover, while it is true that our standard provides for a bargaining order to remedy an employer's refusal to bargain with a union that has been designated representative by a majority of its employees in an appropriate unit while committing unfair labor practices that would require setting aside an election, it does not, contrary to our colleague, require a bargaining order as "the first and only option" whenever an employer commits any unfair labor practice during the critical period prior to an election, no matter how attenuated the impact of the employer's conduct upon the validity of the election.[187]

Rather, as we have explained, the new standard, consistent with *Gissel*, appropriately focuses on the question of whether an employer's unlawful coercive misconduct has so undermined the reliability of the election as an indicator of employees' free choice that a prior nonelection showing becomes the more reliable indicator. As also explained above, the applicable standard does not require concluding that any unfair-labor-practice conduct at all is disruptive of the election process, but rather requires consideration of all relevant factors, including the number of violations, their severity, the extent of dissemination, the size of the unit, the closeness of the election (if one is held), the proximity of the misconduct to the election date, and the number of unit employees affected.[188]

---

[184] See, e.g., *Stern Produce*, above; *Sysco Grand Rapids*, above.

[185] As discussed in detail above, the *Gissel* Court definitively established that the 1947 Taft-Hartley amendments did not, by providing employers with a right to petition for a Board election, impair the longstanding principle—upon which we rely today—that a union can establish an enforceable bargaining obligation by means other than a Board election, including by authorization cards. *Gissel*, above, 395 U.S. at 595–600.

[186] To the extent our colleague seizes on our description of the deterrent effect of remedial bargaining orders to suggest that today's decision strays beyond the permissible bounds of make-whole relief, his quarrel is with the Supreme Court. See *Gissel*, 395 U.S. at 614 (explaining that bargaining orders advance the dual goals of effectuating ascertainable employee free choice and deterring employer misbehavior). In any event, as noted in Sec. III of our decision, we will be guided by the requirements of Sec. 10(c) in fashioning bargaining orders in future cases.

[187] Nor will our decision minimize the need for Sec. 10(j) interim injunctive relief in appropriate cases. Under the framework we set forth today, interim injunctive relief will remain a vital tool for restoring the status quo ante following serious unfair labor practices and preventing the remedial failure of a subsequently issued Board Order.

[188] See, e.g., *Bon Appetit*, above, 334 NLRB at 1044 (citing cases). Our colleague correctly points out that the Board has found, under specific factual circumstances, that an employer's maintenance and dissemination to all employees of a generally applicable handbook confidentiality policy which impaired employees' ability to campaign for their preferred position by inhibiting their discussion of wages, hours, and working conditions required setting aside an election in which the union failed to establish majority support by a margin of 43 ballots cast for and 43 against representation. *Iris U.S.A., Inc.*, 336 NLRB 1013, 1013 & fn. 3, 1015 (2001).

36                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

Finally, our dissenting colleague contends that we err by applying our new standard retroactively to the Respondent in this case. We respectfully disagree. As discussed above, in considering the propriety of applying a new rule retroactively to the parties in the case in which it is announced and to parties in other cases pending at that time, the Board evaluates whether such application would cause a "manifest injustice" because of "the reliance of the parties on preexisting law, the effect of retroactivity on accomplishment of the purposes of the Act, and any particular injustice arising from retroactive application."[189]

Our dissenting colleague first contends that reliance interests overwhelmingly oppose retroactive application because under *Linden Lumber* and *Gissel*, employers could "confidently refuse demands for recognition" by representatives designated by a majority of their employees, and federal courts of appeals would hold the Board to a "demanding standard," before enforcing a Board-issued bargaining order. However, as we have discussed in detail above, the Respondent's conduct in this case fully supports our conclusion that its refusal to bargain, upon request, with the Union, in the context of its numerous other serious violations of the Act, violated Section 8(a)(5) and warrants a remedial bargaining order under either the old or the new standard. While our new standard would likely also result in finding a violation of Section 8(a)(5) based on a lesser volume and seriousness of accompanying violations of Section 8(a)(1) and (3), the standards governing our findings of those violations have not changed, and we cannot recognize any claim by the Respondent to a legitimate reliance interest under the old standard on an expectation of being able to engage in

some degree of unlawful conduct without triggering a bargaining order.

Our colleague next contends that retroactivity does not further the purposes of the Act because our new standard will predictably result in unions being imposed on nonconsenting majorities, which is inimical to the purposes of the Act. To the contrary, as we have explained in detail above, our new standard furthers the purposes of the Act by minimizing the risk of imposing representation on a nonconsenting majority of unit employees because it only permits the issuance of a bargaining order based on the best available evidence of a union's current majority support. In particular, as explained in detail above, we have concluded, after careful consideration of all of the circumstances of this case, that an affirmative bargaining order is warranted under the Act's purposes of safeguarding employees' Section 7 rights and encouraging the practice and procedure of collective bargaining under either the old or the new standard.

Finally, our colleague speculates that retroactive application may inflict particular injustice upon employers in other pending cases who, unlike the Respondent here, would not have been found to have violated Section 8(a)(5) under the old standard, but would be found to have done so under the new standard. This argument poses no impediment to the retroactive application of the new standard to the Respondent in this case, and we decline to speculate upon how the Board will resolve any specific claims of particular injustice that may arise in future cases.

AMENDED CONCLUSIONS OF LAW

1. Cemex Construction Materials Pacific, LLC (the Respondent) is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

2. International Brotherhood of Teamsters (the Union) is a labor organization within the meaning of Section 2(5) of the Act.

3. The Respondent violated Section 8(a)(1) of the Act by:

(a) Threatening employees, on multiple occasions, with discharge, replacement, loss of work hours, work opportunities, benefits, and training opportunities, discontinuation of past favors, and other unspecified reprisals if they select the Union as their bargaining representative or engage in union activities.

(b) Instructing employees not to speak with union representatives or otherwise not to engage in activities on behalf of the Union.

(c) Threatening employees with discharge by inviting them to quit if they wanted to be represented by the Union.

---

Unlike our colleague, we do not read *Iris U.S.A.* as invariably requiring that the Board set aside an election on the basis of an employer's unlawful maintenance of a handbook confidentiality policy—or any other particular violation of Sec. 8(a)(1)—under different circumstances. Cf., e.g., *Longs Drug Stores California*, 347 NLRB 500, 502–503 (2006) (finding it "virtually impossible" to conclude handbook confidentiality provisions could have affected the results of an election where there was limited evidence of dissemination and the union lost the election by a wide margin); *Bon Appetit*, above, 334 NLRB at 1044 (finding it "virtually impossible" to conclude 8(a)(1) violations affected result of election given isolated nature of misconduct, large unit size, lack of evidence of dissemination, and "sharply lopsided" vote).

As should be clear from what has been said, under the new standard, as under the old, there is no "per se rule that the commission of any unfair labor practice will automatically result in a [Sec.] 8(a)(5) violation and the issuance of an order to bargain." See *Gissel*, above, 395 U.S. at 615. However, to be clear, the new standard does *not* give employers a free pass to commit even a single violation of the Act if that single violation is one that interferes with employee free choice and undermines the reliability of an election as an indicator of employees' true preferences.

[189] *SNE Enterprises*, above, 344 NLRB at 673.

(d) Threatening employees by telling them that the Respondent would close plants or relocate operations if employees chose union representation.

(e) Interrogating employees on multiple occasions about their union membership, activities, and sympathies.

(f) Creating the impression that it was engaged in surveillance of its employees' union activities.

(g) Placing employees under surveillance while they engaged in union activities.

(h) Threatening employees with plant closure by telling them that, even if they unionized, the Respondent would retain the right to convert plants to "satellite" status at any time.

(i) Threatening employees with discharge for engaging in protected strike activity by misrepresenting striker reinstatement rights.

(j) Blaming the Union for delayed wage increases.

(k) Threatening employees by implying that wage increases would be delayed indefinitely if they selected union representation.

(l) Promulgating on overly broad directive not to talk with union representatives while on "company time" or "during working hours."

(m) Disciplining Diana Ornelas, pursuant to an overly broad directive not to talk with union representatives on "company time" or "during working hours," for talking with union representatives during nonworking time.

(n) Promising benefits to an employee if they opposed the Union or voted against representation.

(o) Hiring security guards to intimidate union supporters immediately before the election.

(p) Threatening to investigate an employee because of their union activity.

4. The Respondent violated Section 8(a)(3) and (1) of the Act by:

(a) Suspending Diana Ornelas on July 10, 2019, because of her union activity.

(b) Discharging Diana Ornelas on September 6, 2019, because of her union activity.

5. The Respondent violated Section 8(a)(5) and (1) of the Act by refusing to recognize and bargain collectively with the Union as the exclusive bargaining representative of the employees in the following appropriate unit, while engaging in the conduct described above that undermined the Union's support and prevented a fair rerun election:

INCLUDED: All full-time and regular part-time ready-mix drivers, plant operators II who regularly operate ready-mix trucks, and driver trainers employed by CEMEX Construction Materials Pacific, LLC at its ready-mix facilities in Southern California and South-ern Nevada, including its plants in Las Vegas, Nevada and Compton, Corona, Escondido, Fontana, Hollywood, Irvine, Inglewood, Los Angeles, Moorpark, Oceanside, Orange, Oxnard, Perris, Rialto, Redlands, San Diego, San Juan Capistrano, Santa Barbara, Santa Paula, Simi Valley, Temecula, and Walnut, California.

EXCLUDED: All plant foremen, batchmen, dispatchers, yardmen, senior driver trainers/safety champions, fleet mechanics (I and II), plant maintenance (I and II), quality control representatives, office clerical employees, professional employees, guards and supervisors as defined by the Act.

6. The above unfair labor practices affect commerce within the meaning of Section 2(6) and (7) of the Act.

AMENDED REMEDY

Having found that the Respondent engaged in certain unfair labor practices, we shall order it to cease and desist and to take certain affirmative action designed to effectuate the policies of the Act. Specifically, we amend the judge's remedy in the following respects.

In addition to the provisions set forth in the judge's recommended remedy, in accordance with our decision in *Thryv, Inc.*, 372 NLRB No. 22 (2022), the Respondent shall also compensate Diana Ornelas for any other direct or foreseeable pecuniary harms incurred as a result of the unlawful suspension and discharge, including reasonable search-for-work and interim employment expenses, if any, regardless of whether these expenses exceed interim earnings. Compensation for these harms shall be calculated separately from taxable net backpay, with interest at the rate prescribed in *New Horizons*, 283 NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River Medical Center*, 356 NLRB 6 (2010).

Having found that the Respondent violated Section 8(a)(5) and (1) of the Act by failing and refusing to recognize and bargain collectively with the Union as the exclusive bargaining representative of its employees in an appropriate bargaining unit, while engaging in the conduct described above that undermined the Union's support and prevented a fair rerun election, we shall order the Respondent to meet with the Union on request and bargain in good faith concerning the terms and conditions of employment of the bargaining unit employees, and, if an agreement is reached, embody such agreement in a signed contract.

The Board has held that where a union has not made a demand for recognition, a respondent will be ordered to bargain with the union retroactively as of the date on which the respondent initiated its campaign of unfair labor practices if, as of that date the union had obtained

38                        DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

majority status in the bargaining unit.[190] Alternatively, where a respondent has denied a union's majority-supported request for recognition, the Board has ordered the respondent to bargain with the union as of the date of the respondent's denial of recognition.[191] Here, as noted above, the Respondent stipulated on December 13, 2018, that it declined to recognize the Union's claim to represent its employees in an appropriate unit. While the Respondent's earliest unfair labor practices in this case began before the union had achieved majority status, the bulk of its misconduct took place after it had rejected the Union's claim to represent its employees. Accordingly, we find that, consistent with precedent, the Respondent's bargaining obligation should attach as of December 13, 2018, the date of the Respondent's denial of the Union's majority-supported claim to recognition.

Because we have determined that a bargaining order, rather than a second election, is warranted, we shall delete certain remedial provisions recommended by the judge (provisions (b), (c), (d), (e), and (f) of the judge's recommended remedy) designed to enhance the Union's access to unit employees prior to a second election.[192]

                                    ORDER

The Respondent, Cemex Construction Materials Pacific, LLC, Southern California and Las Vegas, Nevada, its officers, agents, successor, and assigns, shall

1. Cease and desist from

(a)  Threatening employees with discharge, replacement, loss of work hours, work opportunities, benefits, or training opportunities, discontinuation of past favors, or other reprisals if they select International Brotherhood of Teamsters (the Union) as their bargaining representative or engage in union activities.

---

[190] *Joy Recovery Technology*, 320 NLRB 356, 356 fn. 4 (1995), enfd. 134 F.3d 1307 (7th Cir. 1998); see also *Lapeer Foundry & Machine, Inc.*, 289 NLRB 952, 952 (1988).

[191] *Atlas Microfilming, Inc.*, 267 NLRB 682, 685, 696 (1983).

[192] Absent a bargaining order, we would affirm these recommended remedies as necessary and appropriate to effectuate the policies of the Act. See, e.g., *Haddon House Food Products*, 242 NLRB 1057, 1058–1059 (1979), enfd. in relevant part sub nom. *Teamsters Local 115 v. NLRB*, 640 F.2d 392, 399–400 (D.C. Cir. 1981).

As explained in his separate partial dissent, Member Kaplan would order certain special access remedies.

In connection with the notice-reading remedy recommended by the judge and adopted here by the Board, Member Prouty would order that the notice be distributed to employees at the start of the meetings at which it is read so that employees may follow along. He would make the reading aloud of the notice at a group meeting—in the employees' own language or languages, accompanied by the distribution of the notice to employees at the start of the meeting—part of the standard remedy for all unfair labor practices found by the Board. See *United Scrap Metal*, 372 NLRB No. 49, slip op. at 1 fn. 3 (2023); *CP Anchorage Hotel 2 d/b/a Hilton Anchorage*, 371 NLRB No. 151, slip op. at 9–10 (2022) (Member Prouty, concurring).

(b)  Instructing employees not to speak with union representatives or otherwise not to engage in activities on behalf of the Union.

(c)  Threatening employees with discharge by inviting them to quit if they want to be represented by the Union.

(d)  Threatening employees by telling them that the Respondent would close plants or relocate operations if employees choose union representation.

(e)  Interrogating employees about their union membership, activities, and sympathies.

(f)  Creating the impression that it is engaged in surveillance of its employees' union activities.

(g)  Placing employees under surveillance while they engage in union activities.

(h)  Threatening employees with plant closure by telling them that, even if they unionize, the Respondent will retain the right to convert plants to "satellite" status at any time.

(i)  Threatening employees with discharge for engaging in protected strike activity by misrepresenting striker reinstatement rights.

(j)  Blaming the Union for delayed wage increases.

(k)  Threatening employees by implying that wage increases will be delayed indefinitely if they select union representation.

(l)  Promulgating overly broad directives not to talk to union representatives while on "company time" or "during working hours."

(m)  Disciplining employees pursuant to an overly broad directive not to talk with union representatives on "company time" or "during working hours," or for talking with union representatives during nonworking time.

(n)  Promising benefits to employees if they oppose the Union or vote against representation.

(o)  Hiring security guards to intimidate union supporters.

(p)  Threatening to investigate employees because of their union activity.

(q)  Discharging, suspending, or otherwise disciplining or discriminating against employees because of their support for and activities on behalf of the Union or any other labor organization.

(r)  Failing and refusing to recognize to recognize and bargain with the Union as the exclusive collective-bargaining representative of the employees in the bargaining unit.

(s)  In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative actions necessary to effectuate the policies of the Act.

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC

(a)  Within 14 days from the date of this Order, offer Diana Ornelas full reinstatement to her former job, or, if that job no longer exists, to a substantially equivalent position, without prejudice to her seniority or any other rights or privileges previously enjoyed.

(b)  Make Diana Ornelas whole for any loss of earnings and other benefits, and for any other direct or foreseeable pecuniary harms suffered as a result of the discrimination against her, in the manner set forth in the remedy section of the judge's decision as amended in this decision.

(c)  Compensate Diana Ornelas for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and file with the Regional Director for Region 28, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar year.

(d)  File with the Regional Director for Region 28, within 21 days of the date the among of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of Diana Ornelas's corresponding W-2 form reflecting the backpay award.

(e)  Within 14 days of the date of this Order, remove from its files any reference to the unlawful discharge, suspension, and warning of Diana Ornelas and within 3 days thereafter, notify her that this has been done and that the discharge, suspension, and warning will not be used against her in any way.

(f)  On request, bargain with the Union as the exclusive collective-bargaining representative of the employees in the following appropriate unit concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement:

> INCLUDED:  All full-time and regular part-time ready-mix drivers, plant operators II who regularly operate ready-mix trucks, and driver trainers employed by CEMEX Construction Materials Pacific, LLC at its ready-mix facilities in Southern California and Southern Nevada, including its plants in Las Vegas, Nevada and Compton, Corona, Escondido, Fontana, Hollywood, Irvine, Inglewood, Los Angeles, Moorpark, Oceanside, Orange, Oxnard, Perris, Rialto, Redlands, San Diego, San Juan Capistrano, Santa Barbara, Santa Paula, Simi Valley, Temecula, and Walnut, California.

> EXCLUDED:  All plant foremen, batchmen, dispatchers, yardmen, senior driver trainers/safety champions, fleet mechanics (I and II), plant maintenance (I and II),

quality control representatives, office clerical employees, professional employees, guards and supervisors as defined by the Act.

(g)  Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(h)  Post at its Southern California and Las Vegas, Nevada, facilities copies of the attached notice marked "Appendix." Copies of the notice, on forms provided by the Regional Director for Region 28, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since August 2018.[193]

---

[193] If the facilities involved in these proceedings are open and staffed by a substantial complement of employees, the notice must be posted and read within 14 days after service by the Region. If the facilities involved in these proceedings are closed or not staffed by a substantial complement of employees due to the Coronavirus Disease 2019 (COVID-19) pandemic, the notice must be posted and read within 14 days after the facilities reopen and a substantial complement of employees have returned to work. If, while closed or not staffed by a substantial complement of employees due to the pandemic, the Respondent is communicating with its employees by electronic means, the notice must also be posted by such electronic means within 14 days after service by the Region. If the notice to be physically posted was posted electronically more than 60 days before physical posting of the notice, the notice shall state at the bottom that "This notice is the same notice previously [sent or posted] electronically on [date]." If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

40            DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

(i) Hold a meeting or meetings during worktime at its facilities in Southern California and Las Vegas, Nevada, scheduled to ensure the widest possible attendance of bargaining unit employees, at which the attached Notice to Employees marked "Appendix" will be read to employees by a high-ranking responsible management official of the Respondent in the presence of a Board Agent and, if the Union so desires, a Union representative, or, at the Respondent's option, by a Board agent in the presence of a high-ranking responsible management official of the Respondent and, if the Union so desires, a Union representative.

(j) Within 21 days after service by the Region, file with the Regional Director for Region 28 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

IT IS FURTHER ORDERED that the election in Case 28–RC–232059 is set aside.

Dated, Washington, D.C. August 25, 2023

_____
Lauren McFerran,          Chairman

_____
Marvin E. Kaplan,          Member

_____
Gwynne A. Wilcox,          Member

_____
David M. Prouty,          Member

(SEAL)          NATIONAL LABOR RELATIONS BOARD

MEMBER KAPLAN, dissenting in part.

Dicta is language in an opinion "that is unnecessary to the decision in the case and therefore not precedential."[1] Here, what would otherwise be the most consequential part of my colleagues' decision is unquestionably dicta; it concerns facts that are neither present in the case before us nor necessary in order to decide the case before us.

In Section III of their decision, the majority purports to hold that the commission of just one critical-period[2] violation of Section 8(a)(1) or (3) may result in an order requiring the employer to recognize and bargain with a card-majority union. Indeed, they would hold that an employer may be ordered to bargain with a card-majority union without having committed any violation of Section 8(a)(1) or (3) at all. But the Respondent in this case did not commit zero unfair labor practices or just one. My colleagues find that it committed no fewer than 28 unfair labor practices. More specifically, they find that the Respondent made thirteen unlawful threats, issued three coercive instructions, conducted three coercive interrogations, and committed one instance each of the following: surveilling employees' union activities, creating an impression that employees' union activities were under surveillance, blaming the Union for the withholding of a wage increase, promising an employee a benefit in exchange for his "no" vote in the election, posting security guards at its facilities in the runup to the election, promulgating an overly broad directive not to talk to union representatives on "company time," disciplining an employee for talking to union representatives on "company time," unlawfully suspending that employee, and unlawfully discharging that employee. Based on these unfair labor practice findings and their further finding that the Respondent "would likely meet a renewed union campaign with further misconduct," my colleagues issue, among other remedies, an affirmative bargaining order pursuant to *NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969).

As detailed above in my several footnote dissents, I disagree with some of the majority's unfair labor practice findings. And as I will explain below, I also disagree with their decision to issue a *Gissel* bargaining order because changed circumstances since the unfair labor practices were committed render a bargaining order inappropriate and unenforceable. But for present purposes, these differences between my position and my colleagues' are beside the point.

After finding that the Respondent committed 28 unfair labor practices, and after concluding that a bargaining order is warranted under *Gissel*, the majority adds a further section to their decision—Section III—in which they announce dramatic changes in Board law. They purport to overrule *Linden Lumber*, a decision upheld by the Supreme Court that has been the governing precedent for 52 years. That case holds that when a union requests

---

[1] *Black's Law Dictionary* 1100 (7th ed. 1999).

[2] The critical period "commences at the filing of the representation petition and extends through the election." *E.L.C. Electric, Inc.*, 344 NLRB 1200, 1201 fn. 6 (2005) (citing *Ideal Electric Mfg. Co.*, 134 NLRB 1275 (1961)).

voluntary recognition as the bargaining representative of a unit of employees, the employer may lawfully decline the request, and it is up to the union to take the next step by filing a petition for a Board-conducted election.[3] Instead of following that precedent, however, my colleagues declare that an employer presented with a request for recognition from a card-majority union must either grant the request or "promptly" file an election petition under Section 9(c)(1)(B), i.e., an RM petition, and that if the employer fails to do one or the other, its employees will lose the right to vote in a secret-ballot election, and the employer will be found to have violated Section 8(a)(5) and will be ordered to recognize and bargain with the union. They further say that even if the employer promptly files an RM petition, the petition will be dismissed, the employees will lose the right to vote in a secret-ballot election, and the employer will be found to have violated Section 8(a)(5) and ordered to recognize and bargain with the union if it commits a critical-period violation of Section 8(a)(1) or (3)—just one is all it takes—that would warrant setting aside the results of an election.[4]

None of these purported departures from long-standing precedent makes the slightest difference to any of the majority's unfair labor practice findings, and none of them affects the remedy and order in any way. Indeed, my colleagues concede as much. They acknowledge that "the application of the revised standard in this case results in neither finding any additional violation of the Act nor any additional remedial obligation," and they admit that "the same violation and remedy would lie under either the prior standard or the standard [they] announce today."

More importantly, none of the changes in Board law set forth in Section III of the majority's opinion is necessary to the decision in this case insofar as Section III attempts to address scenarios involving facts not present in this case.[5] Specifically, because this case involves a

Respondent that, as they have found, committed numerous unfair labor practices, the majority's musings regarding what the law should be in cases where respondents *have not* committed numerous unfair labor practices is unquestionably dicta, devoid of precedential effect.[6]

Nevertheless, my colleagues take the position that the standards they announce here are not dicta. As already discussed, I do not believe that there is any merit in that position.[7] Given the fact that my colleagues have chosen to reach beyond the parameters of this case to address these issues, however, I harbor little hope that they will acknowledge that Section III of their decision is dicta. Instead, the majority clearly believes that they *have* changed Board law, and it is equally clear that they intend to apply their new standards to pending and future cases that *do* present the issue of what standard should apply where the employer has committed no or only one unfair labor practice. For these reasons, and because the changes my colleagues are making are deeply flawed, I will address their purported changes in Board law as if they did have precedential effect. Treated as such, the

---

[3] *Linden Lumber Division, Summer & Co.*, 190 NLRB 718 (1971), revd. sub nom. *Truck Drivers Union Local No. 413 v. NLRB*, 487 F.2d 1099 (D.C. Cir. 1973), revd. 419 U.S. 301 (1974) (upholding Board's decision).

[4] As this case amply illustrates, Board members may, and often do, reasonably disagree whether conduct alleged to violate the Act in fact does so. Accordingly, under the majority's purported standard, employees' right to a secret-ballot election hinges on whether or not an employer successfully anticipates and avoids all actions that *could* be viewed as violations of the Act. An employee's right to a secret-ballot election should not be conditioned on employer perfection.

[5] As Justice Gorsuch observed in his dissent to *Torres v. Madrid*, 141 S. Ct. 989, 1005 (2021) (citing *Cohens v. Virginia*, 19 U.S. 264 (1821)), "whatever utility it may have, dicta cannot bind future courts. This ancient rule serves important purposes. A passage unnecessary to the outcome may not be fully considered. Parties with little at stake in

a hypothetical question may afford it little or no adversarial testing." Agreeing with this sentiment, my colleagues have recently recognized that dicta purportedly changing precedent should be disregarded when it concerns facts not before the Board. See *American Steel Construction, Inc.*, 372 NLRB No. 23, slip op. at 13 fn. 89 (2022) ("*PCC Structurals* did not involve a unit at a nonacute healthcare facility, and accordingly, we view *PCC Structurals'* reinstatement of *Park Manor* as dicta not binding on the Board.").

[6] Alternatively, Sec. III of the majority's decision is an advisory opinion regarding the legal consequences that would flow from facts this case does not present. Regarded as such, it is not just non-precedential, it is impermissible. See Board's Rules & Regulations Sec. 102.98 (providing for advisory opinions regarding the Board's jurisdiction when requested by an agency or court of any state or territory); *James M. Casida*, 152 NLRB 526, 527 (1965) (rejecting request for advisory opinion on the basis that it "[did] not fall within the intendment of the Board's Advisory Opinion Rules"); *Broward County Port Authority*, 144 NLRB 1539, 1540 (same).

[7] My colleagues assert that their decision is binding precedent as an "alternative rationale." However, because simple application of their alleged alternative rationale, without consideration of the Respondent's numerous unfair labor practices, would not be sufficient to support the majority's full result here, it cannot truly be considered an alternative rationale.

I further note that the Supreme Court cases cited by my colleagues do not stand for the proposition that the Board has the authority to change the law through case adjudication rather than rulemaking, as it pertains to facts that are not before the Board.

In addition, my colleagues state that "[h]istorically, the Board has regularly modified policies through adjudication, including in cases in which the change in standard has not changed the result for the respondent in the case." Again, my colleagues are missing my point. It is not a question of whether or not a violation is found under a different theory; it is a question of whether or not the different theory can be considered binding precedent in future cases that present entirely different factual scenarios.

42                 DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

standards my colleagues announce today are unsound as a matter of policy and unenforceable as a matter of law.

For all these reasons, I respectfully dissent from my colleagues' decision to engage in this exercise in futility.

*A. The majority's new standard undermines employees' statutory rights.*

The changes my colleagues either propose (my view) or implement (their view) will predictably result in many more card-based bargaining orders and far fewer representation elections. Indeed, under the majority's new standard, where the results of an election are set aside based on unfair labor practices, there is no longer any such thing as a rerun election. As I will show, the new standard conflicts with Supreme Court and circuit court precedent, and my colleagues fail to articulate a persuasive reasoned analysis—or, with respect to the first step of their standard, *any* reasoned analysis—in support of making these changes in Board law. First, however, it is important to remind ourselves that, whatever interests the majority seeks to advance in the instant case, it is the rights of employees that Congress placed at the heart of the Act, and those rights are better served by Board-conducted secret-ballot elections than by union-authorization cards.

"One of the principal protections of the NLRA is the right of employees to bargain collectively through representatives of their own choosing *or to refrain from such activity.*" *Skyline Distributors v. NLRB,* 99 F.3d 403, 411 (D.C. Cir. 1996). These rights are protected by Section 7 of the Act; Section 9, in turn, "guarantees employees freedom of choice and majority rule." *International Ladies' Garment Workers' Union v. NLRB (Bernhard-Altmann),* 366 U.S. 731, 737 (1961). Although it is not the exclusive means of ascertaining the will of the majority, the method that best protects employees' freedom of choice and best ensures majority rule is a Board-conducted, secret-ballot election. The Supreme Court recognized as much in *NLRB v. Gissel Packing.* See 395 U.S. at 602 ("[S]ecret elections are generally the most satisfactory—indeed the preferred—method of ascertaining whether a union has majority support."); id. at 603 (recognizing that union-authorization cards are "admittedly inferior to the election process"). Moreover, although Congress, in 1947, decided not to do away with card-based recognition altogether, it expressed a policy in favor of Board-conducted elections by incentivizing unions to choose that option by reserving certain benefits for unions that "survive[] the crucible of a secret ballot election." Id. at 598.[8]

One reason union-authorization cards are inferior to a secret-ballot election is that signing an authorization card is an observable and, often, an observed act, and employees may sign a union card not because they want the union as their bargaining representative but because they feel pressured by their coworkers to sign. Courts have cited the public nature of card signing as a reason why authorization cards provide a less reliable means of ascertaining the will of employees than a secret-ballot election. See *NLRB v. Village IX, Inc.,* 723 F.2d 1360, 1371 (7th Cir. 1983) ("Workers sometimes sign union authorization cards not because they intend to vote for the union in the election but to avoid offending the person who asks them to sign, often a fellow worker, or simply to get the person off their back, since signing commits the worker to nothing (except that if enough workers sign, the employer may decide to recognize the union without an election)."); *NLRB v. Cayuga Crushed Stone, Inc.,* 474 F.2d 1380, 1383 (2d Cir. 1973) ("There is no doubt but that an election supervised by the Board which is conducted secretly and presumably after the employees have had the opportunity for thoughtful consideration, provides a more reliable basis for determining employee sentiment than an informal card designation procedure where group pressures may induce an otherwise recalcitrant employee, to go along with his fellow workers.").

Relying on union-authorization cards rather than a Board-conducted election to ascertain the will of the majority also runs the risk that employees will make a less than fully informed choice. The Board has long recognized the importance of ensuring that employees have "an effective opportunity to hear the arguments concerning representation." *Excelsior Underwear Inc.,* 156 NLRB 1236, 1240 (1966). In *Excelsior,* the Board observed that among the factors "that prevent or impede a free and reasoned choice" is "a lack of information with respect to one of the choices available. . . . [A]n employee who has had an effective opportunity to hear the arguments concerning representation is in a better position to make a more fully informed and reasonable choice." Id. However, a card-signing campaign may be conducted outside an employer's awareness. Where that is the case, it is less likely that employees will have the opportunity to learn of, and consider, arguments against representation. Under those circumstances, employees' free-

---

12 months ([§ 9(c)(3)]), protection for a reasonable period, usually 1 year, against any disruption of the bargaining relationship because of claims that the union no longer represents a majority (see Brooks v. NLRB, 348 U.S. 96 (1954)), protection against recognitional picketing by rival unions ([§ 8(b)(4)(C)]), and freedom from the restrictions placed in work assignments disputes by [§ 8(b)(4)(D)], and on recognitional and organizational picketing by [§ 8(b)(7)]." Id. at 599.

---

[8] These benefits include "protection against the filing of new election petitions by rival unions or employees seeking decertification for

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC

43

dom to *choose for themselves* whether or not to be represented by a union will not be a real freedom, but rather a circumscribed freedom based on partial information.

Empirical studies further support the conclusion that union-authorization cards provide an inferior means of determining the will of the majority compared to Board-conducted secret-ballot elections. One study, cited by the Court of Appeals for the Seventh Circuit, found that "even where the union had authorization cards from between 50 and 70 percent of the employees, it won only 48 percent of the elections." *NLRB v. Village IX, Inc.*, 723 F.2d at 1371. Significantly, the circuit court also cited a second study finding that "18 percent of those signing authorization cards did not want union representation at the time they signed." Id.

For all these reasons, courts have emphasized that means other than a secret-ballot election for determining employees' wishes regarding representation carry a risk of forcing unionization on a nonconsenting majority. See, e.g., *Skyline Distributors v. NLRB*, 99 F.3d at 411 (observing that "courts have been strict in requiring the Board to justify *Gissel* bargaining orders . . . because employees lose the *final say* over whether to endorse or reject unionization with the issuance of a bargaining order," and that the right to have that final say by means of a secret-ballot election "is a core right under the NLRA"); *NLRB v. Marion Rohr Corp.*, 714 F.2d 228, 230 (2d Cir. 1983) ("This preference [for an election] reflects the important policy that employees not have union representation forced upon them when, by exercise of their free will, they might choose otherwise."); *Rapid Manufacturing Co. v. NLRB*, 612 F.2d 144, 150 (3d Cir. 1979) ("[T]he large scale disenfranchisement which would flow from the indiscriminate and ready imposition of bargaining orders would be in express contradiction to the preference for elections which inheres in our labor law.").

Because the right to vote by secret ballot in a representation election is at the very heart of workplace democracy, and a secret-ballot election is the best means of determining the will of the majority, the Board has emphasized, repeatedly and for decades, that when an employer's unfair labor practices require the results of an election to be set aside, the "preferred route is to provide traditional remedies for the unfair labor practices and to hold an election, once the atmosphere has been cleansed by those remedies." *Aqua Cool*, 332 NLRB 95, 97 (2000); accord *Intermet Stevensville*, 350 NLRB 1349, 1359 (2007); *Hialeah Hospital*, 343 NLRB 391, 395 (2004); see also *EMR Photoelectric*, 273 NLRB 256, 257 (1984) (Before issuing a bargaining order, the Board must consider "the principle that generally a secret-ballot

Board-conducted election is the preferred method of ascertaining employee choice."). The Board has consistently held that a bargaining order is "to be used only in circumstances where it is unlikely that the atmosphere can be cleansed by traditional remedies." *Aqua Cool*, 332 NLRB at 97. The courts agree. See, e.g., *Novelis Corp. v. NLRB*, 885 F.3d 100, 108 (2d Cir. 2018) ("We have recognized the superiority of, and our preference for, secret ballot elections over bargaining orders."); *St. Agnes Medical Center v. NLRB*, 871 F.2d 137, 147 (D.C. Cir. 1989) ("A bargaining order is an extreme remedy that is only appropriate . . . if a fair rerun election cannot be held."). In sum, the Board and the courts have long regarded the bargaining order as a disfavored and last option.

Under my colleagues' purported new standard, however, when a union has a card majority and the employer commits a critical-period unfair labor practice that would require the results of an election to be set aside, a bargaining order is the first and only option. If the election has not yet been held, it will not be held; if it has, there will be no rerun election. Instead, the Board will issue bargaining orders in all such cases, based on less reliable methods of ascertaining employees' wishes, depriving employees of a final say in a secret-ballot election and increasing the likelihood that union representation will be forced on employees against the will of the unit majority. The new standard will thus have "the primary effect of negating the rights of current employees rather than furthering them" and therefore "defeats, rather than effectuates, the policies of the [Act]." *NLRB v. Ship Shape Maintenance Co.*, 474 F.2d 434, 443 (D.C. Cir. 1972).[9]

---

[9] The majority mischaracterizes my position when they say that I do not accept that a card-majority union—a term my colleagues make a to-do over but that I use merely for the sake of convenience—could enjoy majority support. Neither do I say that union-authorization cards are "inherently unreliable" or "cannot accurately reflect an employee's wishes" regarding representation. My point is simply that there are good reasons to prefer secret-ballot elections, and every time the Board issues a *Gissel* bargaining order—or, after today, a *Cemex* bargaining order—the "most satisfactory" and "preferred" means (the Supreme Court's words, not mine) of ascertaining employees' wishes is sacrificed. In rare cases, it is appropriately sacrificed. With today's decision, it will always be sacrificed.

My colleagues fail to appreciate that the standard they have adopted is susceptible to exploitation. Since just one violation of Sec. 8(a)(1) that would warrant setting aside the results of an election is now sufficient to support the issuance of a bargaining order, a union and an employer might strike a secret deal, whereby the employer agrees to commit a critical-period 8(a)(1) violation in order to install a union that will return the favor by making certain concessions in collective bargaining. Board law should eliminate opportunities for employers and unions to collude at the expense of employees. Today's decision will create them. The majority notes that such a deal would expose both parties to unfair labor practice liability, but who would file the charge?

44                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

*B. Step one of the majority's new standard conflicts with the Supreme Court's decision in Linden Lumber v. NLRB.*

With these overarching principles in mind, I turn now to a more focused analysis of the specific changes the majority would make in Board law. At the first step of their new standard, they overrule *Linden Lumber* and require that an employer presented with a request for recognition from a card-majority union either grant the request or promptly file an RM petition. If it fails to do one or the other, it will be found to have violated Section 8(a)(5) of the Act and ordered to recognize and bargain.

In *Linden Lumber*, the Board held that an employer does not violate Section 8(a)(5) of the Act "solely upon the basis of its refusal to accept evidence of majority status other than the results of a Board election." 190 NLRB at 721. As the Supreme Court observed, implicit in this holding was the proposition that an employer that refuses to recognize a card-majority union has no duty to file an RM petition. See *Linden Lumber Division, Summer & Co. v. NLRB*, 419 U.S. 301, 310 (1974) (sustaining the Board's holding that "a union with authorization cards purporting to represent a majority of the employees, which is refused recognition, has the burden of taking the next step in invoking the Board's election procedure").

Obviously, *Linden Lumber* stands in the way of the changes in Board law my colleagues purport to announce in Section III of their opinion. To make those changes, then, the majority must overrule *Linden Lumber*. But any attempt to do so must confront the fact that the Supreme Court upheld the Board's decision. It did so over the contrary decision of the District of Columbia Circuit, in which the circuit court held—as my colleagues purport to hold today—that an employer that refuses a request for recognition from a card-majority union must file an RM petition. See *Truck Drivers Union Local No. 413 v. NLRB*, 487 F.2d 1099, 1111 (D.C. Cir. 1973) ("[W]hile . . . cards alone . . . do not necessarily provide such convincing evidence of majority support so as to require a bargaining order, they certainly create a sufficient probability of majority support as to require the employer . . . to resolve the possibility through a petition for an election . . . .") (internal quotation marks omitted). The Supreme Court considered the reasons the D.C. Circuit advanced for its holding and rejected them. See *Linden Lumber Division, Summer & Co. v. NLRB*, 419 U.S. at 307–309 (finding, contrary to the D.C. Circuit, that the

---

See *National Nurses Organizing Committee-Texas/National Nurses United*, 371 NLRB No. 132 (2022) (holding that union lawfully refused to give employee a copy of its secret neutrality agreement with employer).

legislative history of Taft-Hartley does not support putting the onus on the employer to file an RM petition, and disagreeing with the circuit court's belief that requiring the employer to file an election petition would promote efficiency by narrowing "the litigable issues").

My colleagues say that certain language in the Supreme Court's opinion demonstrates that the Board's decision in *Linden Lumber* "represents a permissible, but not mandatory, construction of the Act." I do not dispute the point, but that is not the end of the matter. Even if the holding of *Linden Lumber* is not statutorily compelled, the Supreme Court sustained that holding on its merits. Moreover, in doing so, the Court had before it the contrary holding of the D.C. Circuit, which was all but identical to the first step of the standard my colleagues announce today—i.e., that an employer violates Section 8(a)(5) if it refuses to recognize a card-majority union without filing an RM petition—and which the Supreme Court rejected. The Court majority also had before it the opinion of the justices in the minority that the Board's decision in *Linden Lumber* represented an impermissible interpretation of the Act, and the Court rejected that position as well. Accordingly, the first step of the majority's standard conflicts with Supreme Court precedent, and decisions and orders that rest on the application of that step must remain unenforceable unless and until the Supreme Court overrules its decision in *Linden Lumber v. NLRB*.[10]

*C. The majority fails to provide a reasoned explanation for step one of its new standard.*

Assuming arguendo that the Board's decision in *Linden Lumber* "represents a permissible, but not mandatory, construction of the Act," and even if the Supreme Court's decision in that case does not preclude step one of the new standard, the majority still must provide a reasoned explanation for overruling *Linden Lumber* and implementing that first step. See, e.g., *Auto Workers Local 1384 v. NLRB*, 756 F.2d 482, 492 (7th Cir. 1985) (stating that the Board is "free to change its mind on matters of law that are within its competence to determine, provided it gives a reasoned analysis in support of the change") (citing *Motor Vehicle Manufacturers Associa-*

---

[10] Disputing this point, the majority relies on the D.C. Circuit's decision and the opinion of the justices in the minority. I rely on the Court's decision.

Since reviewing courts will be constrained by contrary Supreme Court precedent to deny enforcement of bargaining orders that rest on the overruling of *Linden Lumber*, my colleagues should acknowledge as much (either here or in a future appropriate case) and declare their intention to ask the Solicitor General to petition for certiorari to the Supreme Court.

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC                    45

*tion v. State Farm Mutual Insurance Co.*, 463 U.S. 29 (1983)." The majority has not done so.

It is not merely that my colleagues provide an *unpersuasive* justification for step one of their new standard. Rather, they provide *no* reasoned justification for overruling *Linden Lumber*, shifting the burden to file a representation petition from the union to the employer, and finding an 8(a)(5) violation and imposing a bargaining order if the employer fails to file that petition and to do so "promptly."[11] They cite judicial decisions holding that the Board's remedial power "is a broad discretionary one," *NLRB v. J. H. Rutter-Rex Manufacturing*, 396 U.S. 258, 262–263 (1969), and that the Board acts at the "zenith of its discretion" when fashioning remedies, *Fallbrook Hospital Corp. v. NLRB*, 785 F.3d 729, 738 (D.C. Cir. 2015). As I explain below, my colleagues have mistaken the extent of the Board's remedial discretion. But even if they have not, simply invoking the Board's discretionary *power* to alter its remedial scheme fails to explain *why* the majority has decided to exercise this power by overruling *Linden Lumber* and adopting step one of their new standard. In addition, overruling *Linden Lumber* and implementing step one is not solely, or even primarily, a remedial matter. By doing so, the majority makes conduct that was lawful under *Linden Lumber*—refusing a request for recognition from a card-majority union without filing an RM petition—into a violation of Section 8(a)(5). Naturally, that violation has remedial consequences, but the Board's discretion in remedial matters has no bearing whatsoever on their decision to *create* the violation in the first place.

Aside from invoking the breadth of the Board's remedial discretion, the only so-called explanation the majority provides for overruling *Linden Lumber* is a conclusory finding that "the current scheme for remedying unlawful failures to recognize and bargain with employees' designated bargaining representatives is inadequate to safeguard the fundamental right to organize and bargain collectively that our statute enshrines." But the eloquence of this language cannot conceal the fact that the majority has not explained *why* the employer must file the petition rather than the union.

This is not surprising. Placing the burden on the employer to file the representation petition is logically linked to the "good-faith doubt" standard of *Joy Silk*,[12] which the majority does not reinstate. In *Joy Silk*, the Board simply took it for granted that when an employer refuses a request for recognition based on good-faith doubt of the union's majority status, it is incumbent on the employer to resolve its doubt by petitioning for an election under 9(c)(1)(B). Similarly, the *Linden Lumber* Board assumed that placing the onus on the employer to file the election petition only made sense in light of *Joy Silk*'s good-faith doubt standard. This is apparent from the fact that the only explanation the *Linden Lumber* Board gave for holding that employers incur no duty to file an RM petition by refusing a request for recognition was that it was declining "to reenter the 'good faith' thicket of *Joy Silk*." 190 NLRB at 721. The Court of Appeals for the District of Columbia Circuit also recognized the linkage between the good-faith doubt standard and the duty to file an RM petition. In reversing the Board's decision and order in *Linden Lumber*, the circuit court explained that

> [w]hile we have indicated that cards alone . . . do not necessarily provide such "convincing evidence of majority support" so as to require a bargaining order, they certainly create a sufficient probability of majority support as to require an employer *asserting a doubt of majority status* to resolve the possibility through a petition for an election, if he is to avoid both any duty to bargain and any inquiry into the actuality of his doubt.

*Truck Drivers Union v. NLRB*, 487 F.2d at 1111 (emphasis added).

My colleagues, however, do not reinstate the good-faith doubt standard of *Joy Silk*. They recognize, rightly, that doing so would be inconsistent with *Levitz*,[13] where the Board abandoned the good-faith doubt standard for determining whether an employer violates Section 8(a)(5) by withdrawing recognition. But without the good-faith doubt standard, there is no basis in law or logic for placing the burden on an employer that refuses a request for recognition to file an RM petition.[14]

As for the scope of the Board's remedial discretion, the cases my colleagues cite fail to establish that such

---

[11] My colleagues say that they "place[] no burden on any employer beyond those imposed by the Act itself." But there is no disputing that for the past 52 years, employers did not violate Sec. 8(a)(5) if they declined a request for recognition without filing an RM petition, and now they do (assuming the union has a card majority in an appropriate unit). And my colleagues do not contend that *Linden Lumber* is statutorily impermissible and that the standard they adopt here is statutorily compelled, so it is not the case that they place no burden on employers "beyond those imposed by the Act itself."

[12] *Joy Silk Mills, Inc.*, 85 NLRB 1263 (1949), enfd. in part 185 F.2d 732 (D.C. Cir. 1950), cert. denied 341 U.S. 914 (1951).

[13] *Levitz Furniture Company of the Pacific*, 333 NLRB 717 (2001).

[14] The majority says I "suggest[]" that overruling *Linden Lumber* "necessarily depends on reinstituting some version of a 'good-faith doubt' standard." That is not what I am saying. My point is that imposing a duty on employers to file an RM petition only makes sense in tandem with the good-faith doubt standard. My colleagues impose that duty without returning to *Joy Silk*'s good-faith doubt standard. Accordingly, their imposition of that duty lacks a supporting rationale, as I explain above.

46                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

discretion encompasses bargaining orders. In fact, court cases that do address that question establish that it does <u>not</u>. My colleagues cite *J. H. Rutter-Rex*, but the issue presented in that case was whether the Board acted within its remedial discretion when it refused to toll the running of the backpay period despite its own prolonged delay in issuing a compliance specification.[15] Similarly, my colleagues cite *Fallbrook Hospital*, where the issue presented was whether the Board acted within its remedial discretion in ordering the employer to reimburse the union for its bargaining expenses.[16]

In the case before us, however, the issue presented is whether the Board's remedial discretion privileges it to issue affirmative bargaining orders based solely on "evidence of majority status other than the results of a Board election." *Linden Lumber*, 190 NLRB at 721. Neither *J. H. Rutter-Rex* nor *Fallbrook Hospital* involved the question whether the Board's decision to issue an affirmative bargaining order was justified solely as a result of its broad remedial authority. By contrast, the courts have made clear that judicial deference to the Board's choice of remedies does *not* extend to such orders. For instance, in *Charlotte Amphitheater Corp. v. NLRB*, 82 F.3d 1074 (D.C. Cir. 1996), the court refused to enforce a bargaining order, despite acknowledging the deference it typically grants "to the Board's choice of remedy." Id. at 1077. In rejecting the bargaining order, the court noted that it had "emphasized and reemphasized that a bargaining order is an extraordinary remedy that is not automatically entitled to enforcement." Id.; accord *NLRB v. American Spring Bed Manufacturing Co.*, 670 F.2d 1236, 1247 (1st Cir. 1982) (denying enforcement of bargaining order despite being "fully aware of the deference accorded the Board's expertise in fashioning remedies"); *Rapid Manufacturing Co. v. NLRB*, 612 F.2d at 150-151 (acknowledging deference owed to Board but denying bargaining order because the court did "not think that the [Supreme] Court intended the Board to dispense casually with the election process which is by far the superior and preferred means of determining employee sentiment").

The majority also relies on the Supreme Court's statement in *NLRB v. A.J. Tower Co.*, 329 U.S. 324 (1946), that "Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." Id. at 330. The question presented in *A.J. Tower* was whether the Board has discretion to refuse to entertain post-election challenges to the eligibility of voters. In concluding that

it does, the Supreme Court held that the Board has the authority to "adopt policies and promulgate rules and regulations in order that employees' *votes* may be recorded accurately, efficiently and speedily." Id. at 331 (emphasis added). Therefore, my colleagues are attempting to rely on *A.J. Tower*, which held that the Board has discretion to adopt *election procedures* for determining whether or not employees are eligible to vote in a Board-conducted election, for the proposition that the Board has discretion to adopt measures that predictably will lead to a dramatic increase in bargaining orders issued *without a Board-conducted election*. To say that my colleagues' reliance on *A.J. Tower* to support their decision makes no sense is an understatement.

*D. Step two of the majority's new standard conflicts with NLRB v. Gissel Packing and decades of circuit court precedent applying that decision.*

In *NLRB v. Gissel Packing*, the Supreme Court approved the Board's use of bargaining orders in two categories of cases. The first category consists of "exceptional" cases marked by unfair labor practices so "outrageous" and "pervasive" that traditional remedies cannot erase their coercive effects, rendering a fair election impossible. 395 U.S. at 613–614. The second category consists of "less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes." Id. at 614. The Court approved the use of bargaining orders in cases coming within this second category *if* (a) the union had majority support at one time, and (b) the "possibility of erasing the effects of past practices and of ensuring a fair election . . . by the use of traditional remedies, though present, is slight," and "employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order." Id. In making this determination, the Court held that the Board must conduct a case-by-case analysis, "tak[ing] into consideration the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future." Id. at 614–615.

The *Gissel* Court left undecided "whether a bargaining order is ever appropriate in cases where there is no interference with the election processes"—i.e., "whether, absent election interference by an employer's unfair labor practices, [the employer] may obtain an election only if he petitions for one himself[, and] whether, if he does not, he must bargain with a card majority if the Union chooses not to seek an election." Id. at 594–595; 601 fn. 18. As discussed above, the Board answered those questions in the negative in *Linden Lumber*, and the Supreme Court sustained the Board's holding over the contrary

[15] 396 U.S. at 259.
[16] 785 F.3d at 732.

holding of the District of Columbia Circuit. But the *Gissel* Court did answer a different question: whether there is a threshold beneath which the commission of unfair labor practices that interfere with an election would fail to support the issuance of a bargaining order. The Court found that such a threshold exists. After discussing the two categories of cases in which unfair labor practices do warrant a bargaining order, the Court referred to a third category of cases, involving "minor or less extensive unfair labor practices, which, because of their minimal impact on the election machinery, *will not sustain a bargaining order*." Id. at 615 (emphasis added).

The circuit courts have long recognized that *Gissel* limits the circumstances under which the Board may issue a bargaining order on the basis that unfair labor practices interfered or would interfere with an election. The District of Columbia Circuit, which has plenary jurisdiction to review the Board's decisions and orders, observed that although the Supreme Court upheld the Board's authority to issue bargaining orders "based upon majority authorization card support . . . [in order] to remedy [S]ection 8(a)(5) violations which were accompanied by other independent unfair labor practices," it "expressly noted that bargaining orders would *not* be appropriate in *all* such cases, and it carefully delineated the factors which the Labor Board must consider in determining whether a bargaining order should issue in a particular case." *NLRB v. Ship Shape Maintenance Co.*, 474 F.2d at 441; see also *St. Francis Federation of Nurses & Health Professionals v. NLRB*, 729 F.2d 844, 854 (D.C. Cir. 1984) ("In *Gissel*, the Court made clear that it was the Board's responsibility to ascertain on a case-by-case basis whether in fact conditions were not conducive to a fair and reliable election.") (internal quotation marks omitted). And the D.C. Circuit has not hesitated to refuse to enforce bargaining orders where the Board fails to provide a sufficient justification. See, e.g., *Avecor, Inc. v. NLRB*, 931 F.2d 924, 938 (D.C. Cir. 1991) (remanding because the Board failed to explain "why the cloud created by the[] violations was likely to linger" or to "explore[] the possibility that other remedies might cleanse the environment enough to permit a fair election"); *St. Agnes Medical Center v. NLRB*, 871 F.2d at 148 (remanding because "the Board failed to provide the detailed analysis required . . . to justify [the] extreme remedy [of a bargaining order]"); *NLRB v. Ship Shape Maintenance Co.*, 474 F.2d at 444 (remanding because "the proposed bargaining order would not be remedial, but rather only punitive").

Consistent with *Gissel*, and in agreement with the D.C. Circuit, other federal courts of appeals also require that the Board provide specific justifications for each bargaining order, including by explaining why traditional remedies would fail to dissipate the effects of the employer's unfair labor practices so as to permit a fair election. See *J.L.M., Inc. v. NLRB*, 31 F.3d 79, 83 (2d Cir. 1994) (holding that "[t]he issuance of a bargaining order is a rare remedy warranted only when it is clearly established that traditional remedies cannot eliminate the effects of the employer's past unfair labor practices," and that "the Board must analyze not only the nature of the misconduct but 'the surrounding and succeeding events in each case'") (quoting *J.J. Newberry Co. v. NLRB*, 645 F.2d 148, 153 (2d Cir. 1981)); *NLRB v. Apple Tree Chevrolet, Inc.*, 671 F.2d 838, 840 (4th Cir. 1982) ("[T]o avoid the appointment of bargaining agents not desired by employees and to encourage reliance upon elections as the preferred method for determining bargaining agents, we emphasize once again that a bargaining order is appropriate only when the Board's findings and analysis under the *Gissel* standard are specific and detailed.") (internal quotation marks omitted); *NLRB v. American Spring Bed Manufacturing Co.*, 670 F.2d at 1247 (1st Cir. 1982) ("[W]e, like other circuits, have insisted that the Board articulate specific examples and precise reasons for concluding that: (1) the employer's unfair labor practices so undermined the Union's majority that conducting a fair election would be unlikely; (2) the employer's unlawful conduct was likely to continue; and (3) the ordinary remedies of back pay, reinstatement, and posting of notices would be inadequate to ensure a fair election."); *Hedstrom Co. v. NLRB*, 629 F.2d 305, 309 (3d Cir. 1980) ("[I]t is fitting for the [B]oard to 'explain with specificity the results of the unfair labor practices and, in particular, the unlikelihood of a fair election' before seeking enforcement of [a *Gissel* bargaining] order.") (quoting *NLRB v. Craw*, 565 F.2d 1267, 1272 (3d Cir. 1977)); *Peerless of America, Inc. v. NLRB*, 484 F.2d 1108, 1118 (7th Cir. 1973) ("We have consistently held that *Gissel* contemplates that the Board must make specific findings as to the immediate and residual impact of the unfair labor practices on the election process and that the Board must make a detailed analysis assessing the possibility of holding a fair election in terms of any continuing effect of misconduct, the likelihood of recurring misconduct, and the potential effectiveness of ordinary remedies.") (internal quotation marks omitted); *NLRB v. Kaiser Agricultural Chemicals*, 473 F.2d 374, 382 (5th Cir. 1973) (holding that under *Gissel*, "the [B]oard must consider [the] seriousness of the unfair labor practices, the likelihood of their recurrence, and the possibility of a fair rerun election").

The second step of the majority's announced standard cannot be reconciled with the Supreme Court's decision

48                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

in *NLRB v. Gissel Packing* or circuit court decisions applying it. My colleagues purport to hold that if an employer satisfies step one of their standard by filing an RM petition in response to a request for recognition from a card-majority union, the petition will be dismissed, employees will lose the right to vote in a secret-ballot election, and the employer will be found to have violated Section 8(a)(5) and ordered to recognize and bargain with the union, if it commits *a single violation* of Section 8(a)(1) or (3) after filing its petition. To warrant dismissal of the petition, the unfair labor practice must be such as would require the results of an election to be set aside, but this would amount to little more than a speed bump for the Board, if even that, given the state of Board law. The Board has recognized both that "[c]onduct violative of Section 8(a)(1) is, *a fortiori*, conduct which interferes with the exercise of a free and untrammeled choice in an election," *Dal-Tex Optical Co., Inc.*, 137 NLRB 1782, 1786–1787 (1962), and that an unfair labor practice committed during the critical period requires the setting aside of an election unless it is "virtually impossible to conclude that [the violation] could have affected the results of the election," *Super Thrift Markets, Inc.*, 233 NLRB 409, 409 (1977).[17]

Plainly, the second step of the majority's new standard will result in the issuance of bargaining orders in cases that come within the third category identified by the *Gissel* Court—cases in which the employer's "minor or less extensive unfair labor practices . . . will not sustain a bargaining order." *NLRB v. Gissel Packing*, 395 U.S. at 615. This is especially clear in light of the Board's work-rules precedent. The Board has held that the mere maintenance of an unlawful work rule during the critical period requires the results of an election to be set aside. *IRIS U.S.A., Inc.*, 336 NLRB 1013, 1013 (2001).[18] And my colleagues' recent decision in *Stericycle, Inc.*, 372 NLRB No. 113 (2023), made it extraordinarily easy for the General Counsel to establish that a work rule is unlawful. Under *Stericycle*, a work rule is presumptively unlawful if a "reasonable employee," as the majority defines that individual—i.e., a hypervigilant employee

poised to find references to protected concerted activity where none exists—*could* interpret (not reasonably *would* interpret) any isolated word or phrase in a work rule to restrict the exercise of Section 7 rights. As I explain in my *Stericycle* dissent, it is virtually impossible for employers *not* to maintain at least one unlawful rule under this standard. Accordingly, it is virtually impossible for an employer *not* to commit a critical-period unfair labor practice that would require setting aside the results of an election, which means that it is virtually impossible for an employer's RM petition *not* to be dismissed, for the employer *not* to be found to have violated Section 8(a)(5), and for a bargaining order *not* to issue, even though the mere unlawful maintenance of a work rule "[would] not sustain a bargaining order" under controlling Supreme Court precedent.

My colleagues contend that their new standard does not conflict with *Gissel* because, they say, bargaining orders under the new standard "rest upon a fundamentally different rationale than those under *Gissel*"—namely, that under the new standard, a bargaining order "could not issue as a remedy for . . . 'minor or less extensive unfair labor practices' . . . but only as a remedy for an employer's violation of Section 8(a)(5)." But bargaining orders under *Gissel* also are issued only to remedy a violation of Section 8(a)(5). They are *not* issued as a remedy for other unfair labor practices—i.e., violations of Section 8(a)(1) and (3)—whether those violations are minor, major, or off the charts. Violations of Section 8(a)(1) and (3) are remedied by the Board's traditional remedies—cease-and-desist orders, reinstatement, backpay, notice posting, and so forth—plus any extraordinary remedies deemed warranted (such as notice reading). But under the *Gissel* standard, the majority's new standard, or any other conceivable standard, a bargaining order issues and can only issue as a remedy for a failure or refusal to bargain in violation of Section 8(a)(5). And the fact of the matter is, should the Board use the new standard to issue bargaining orders under circumstances where they are precluded from issuing under *Gissel*, such orders will not be enforced by reviewing courts unless and until the Supreme Court overrules *Gissel*. Given that we have no reason to believe that the Supreme Court is going to overrule *Gissel*, my colleagues today are establishing a new standard that, in many cases, is going to result in lengthy litigation over an alleged violation that will never survive judicial review.

### E. The majority fails to provide an adequate justification for the second step of their new standard.

At the first step of their announced standard, my colleagues purport to hold that affirmative bargaining orders will issue against employers that have committed no vio-

---

[17] Precedent illustrates the difficulty of finding that the "virtually impossible" standard has been met. See, e.g., *Intertape Polymer Corp.*, 363 NLRB No. 187, slip op. at 1–2 (2016) (single violation based on removal of union literature from breakroom one month before election warranted setting aside election despite lopsided result of 97 for and 142 against representation); *Diamond Walnut Growers, Inc.*, 326 NLRB 28, 28–29 (1998) (setting aside election based on single unfair labor practice affecting one employee in unit of 1300 employees based on "implicit" dissemination).

[18] My colleagues suggest a limiting construction of *IRIS U.S.A.*, but nothing they say will preclude the Board, in future cases, from construing that decision more broadly.

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC

49

lation of Section 8(a)(1) or (3) but have merely declined a request for recognition without "promptly" filing an RM petition.  At the second step, they say that the same remedy will be ordered against any employer that does promptly file an RM petition but then commits an 8(a)(1) or (3) violation that would warrant setting aside an election under the "virtually impossible" standard.[19]  As explained above, this second step is precluded by the Supreme Court's decision in *Gissel* and numerous circuit court decisions applying it.  But it also represents a dramatic departure from the Board's own precedent.[20]  As such, if the majority's aim is the eventual overruling of *Gissel*, the majority must provide "a reasoned analysis in

support of the change."  *Auto Workers Local 1384 v. NLRB*, 756 F.2d at 492.[21]

My colleagues advance three reasons for the change.  They assert that "the remedies available for violations of Section 8(a)(3) and (1) of the Act . . . are, in many cases, incapable of rectifying the harm that can be caused to the election process by the unlawful conduct of an employer . . . ."  They say that conducting a rerun election cannot "ever be a truly adequate remedy" in light of "the strong statutory policy in favor of the prompt resolution of questions concerning representation."  And they argue that step two of their new standard will deter employers from committing unfair labor practices during the critical period.  None of these contentions is persuasive, and some of them are contrary to Supreme Court and circuit court precedent.

Before I address them, however, a clarification of the majority's position is in order.  My colleagues assert that traditional remedies for violations of Section 8(a)(1) and (3)—cease-and-desist orders, reinstatement, backpay, posting of a remedial notice—are incapable of rectifying the harm caused to the election process by those violations "in many cases."  If that were truly their position, it would follow that in *some* cases, that harm *may* be rectified by traditional remedies, and the majority would adopt a standard under which traditional remedies followed by an election would be ordered in *some* cases, and a bargaining order would issue in the rest—a standard, in other words, like the *Gissel* standard in form, but with fewer elections and more bargaining orders.  But my colleagues do not adopt such a standard.  They ordain issuance of bargaining orders in *all* cases where a critical-period 8(a)(1) or 8(a)(3) violation would warrant setting aside election results under the "virtually impossible" standard.  Accordingly, I can only conclude that although they say that traditional remedies are unavailing in "many" cases, their real position must be that traditional remedies are unavailing in all such cases.

This position encounters several difficulties.  It contradicts longstanding judicial precedent holding that the Board's traditional remedies are perfectly capable of dissipating the coercive effects of unfair labor practices so as to permit a free and fair election in all but extreme cases.  See, e.g., *Somerset Welding & Steel v. NLRB*, 987 F.2d 777, 779, 782 (D.C. Cir. 1993) (disapproving "the

---

[19] *Super Thrift Markets, Inc.*, 233 NLRB at 409.  Again, I note that the issue of whether a single unfair labor practice would be sufficient to warrant a bargaining order is not presented in the instant case, where the Respondent committed *numerous* unfair labor practices.  Accordingly, any suggestion by my colleagues that a single unfair labor practice would be sufficient is dicta.

[20] The Board has consistently recognized that it may only issue a bargaining order on the basis of election-interfering unfair labor practices where the extensiveness of the employer's violations and the likelihood of their recurrence make it unlikely that traditional remedies can make a fair election possible.  See, e.g., *North Texas Investment Group d/b/a Whitehawk Worldwide*, 371 NLRB No. 122, slip op. at 3-6 (2022) (finding traditional remedies would not "safeguard employee rights" and issuing bargaining order based on case-specific facts regarding the nature and extent of the violations, the size of the unit, and the likelihood of recurrence, among other factors); *Hialeah Hospital*, 343 NLRB at 395 (stating that "[the Board] must consider both the extensiveness of the employer's unfair labor practices and their likelihood of recurrence in determining whether a bargaining order is appropriate"); *Garney Morris, Inc.*, 313 NLRB 101, 103 (1993) (issuing bargaining order based on, inter alia, a "strong likelihood of a recurrence of unlawful conduct"), enfd. 47 F.3d 1161 (3d Cir. 1995); *Angelica Corp.*, 276 NLRB 617, 617 (1985) ("Consistent with the principles of *Gissel*, the Board must assess the question of appropriate remedy on a case-by-case basis.").  And the Board has found traditional remedies sufficient to permit the holding of a fair election where the employer committed numerous unfair labor practices.  See, e.g., *Intermet Stevensville*, 350 NLRB at 1359 (finding traditional remedies sufficient, and declining to issue bargaining order, where employer committed one violation of Sec. 8(a)(3) and thirteen violations of Sec. 8(a)(1)); *Aqua Cool*, 332 NLRB at 97 (finding "traditional remedies . . . adequate to cleanse the atmosphere of the effects of the [r]espondent's misconduct and permit the holding of a fair election" where employer committed seven violations of Sec. 8(a)(1)); *Burlington Times, Inc.*, 328 NLRB 750, 752 (1999) (declining to issue bargaining order where employer committed six violations of Sec. 8(a)(1) because "[a]lthough the [r]espondent's unfair labor practices were serious, they are not of a nature or number likely to have so lasting an effect that traditional remedies would be inadequate to ensure a fair election"); *Uarco, Inc.*, 286 NLRB 55, 59 (1987) (declining to issue bargaining order—despite finding that employer's violations of Sec. 8(a)(3), (2), and (1) demonstrated a proclivity to violate the Act and warranted a broad cease-and-desist order—because "they [were] not so pervasive, severe, or lingering in effect to render unlikely the holding of a fair second election").

[21] Again, because reviewing courts will be constrained by contrary Supreme Court precedent to deny enforcement of bargaining orders that rest on "minor or less extensive unfair labor practices," *NLRB v. Gissel Packing*, 395 U.S. at 615, my colleagues should acknowledge as much (either here or in a future appropriate case) and declare their intention to ask the Solicitor General to petition for certiorari to the Supreme Court.

50                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

Board's apparent partiality for bargaining orders" and holding that "'where a fair rerun election is possible, it must be held'" (quoting *Avecor, Inc. v. NLRB*, 931 F.2d at 934)); *M.P.C. Plating, Inc. v. NLRB*, 912 F.2d 883, 888 (6th Cir. 1990) (stating that "the election process is the preferred method" and a bargaining order is warranted only in "extreme cases"); *Rapid Manufacturing Co. v. NLRB*, 612 F.2d at 151 (denying enforcement of bargaining order where record failed to show that possibility of ensuring a fair election was slight); *NLRB v. Pilgrim Foods, Inc.*, 591 F.2d 110, 120 (1st Cir. 1978) (denying enforcement of bargaining order where record did not show that the company would ignore the Board's traditional cease-and-desist order); *First Lakewood Associates v. NLRB*, 582 F.2d 416, 424 (7th Cir. 1978) (denying enforcement of bargaining order because the impact of the employer's violations "will have dissipated prior to the next election, especially if the Board's ordinary remedies of a cease and desist order and a posted notice intervene"); *NLRB v. Ship Shape Maintenance Co.*, 474 F.2d at 442 (denying enforcement of bargaining order because even though the unfair labor practice "rendered the meaningful holding of *that particular election* impossible . . . . this does not mean that the effects of this unfair labor practice were sufficiently pervasive and lingering to warrant a determination that a subsequent election could not be held which would be reasonably free from the adverse influence of the Company's unlawful action").

Indeed, the majority's position that traditional remedies can *never* ameliorate the effects of even just one 8(a)(1) or (3) violation so as to enable a fair election is as inconsistent with *NLRB v. Gissel Packing* as the second step of the new standard itself. There, the Supreme Court held that the coercive effects of unfair labor practices cannot be eliminated by traditional remedies, and "a fair and reliable election cannot be had," only in so-called category one *Gissel* cases, i.e., "'exceptional' cases marked by 'outrageous' and 'pervasive' unfair labor practices." 395 U.S. at 613–614. In "category two" *Gissel* cases—"less extraordinary cases marked by less pervasive practices," id. at 614—there is still *some* possibility, although slight, of holding a fair election following the application of traditional remedies. My colleagues now hold, however, that an election will not be held, and a bargaining order will issue instead, where an employer commits just one critical-period violation of Section 8(a)(1) or (3) that would warrant setting an election aside under the "virtually impossible" standard.[22] This is, of

course, contrary to the Supreme Court's holding that a free and fair election cannot be had only in exceptional cases marked by outrageous and pervasive violations of the Act.

The majority's position is also contrary to empirical evidence. If traditional remedies are incapable of rectifying the harm caused to the election process by unfair labor practices, unions would invariably lose rerun elections. The facts are to the contrary.[23]

In defense of their holding that where an employer commits a critical-period violation that would warrant setting aside the results of an election, bargaining orders are always mandated, my colleagues say that nip-in-the-bud discharges "can irreparably harm the organizing process." Even if that were true, a nip-in-the-bud discharge is only one type of unfair labor practice (albeit an exceptionally serious one), so this rationale does not explain why traditional remedies are categorically inadequate to dissipate the coercive effect of *any and all* violations of Section 8(a)(1) or (3). Moreover, the Board already has in place a mechanism for addressing this concern: seeking interim reinstatement of the discharged employees under Section 10(j)—i.e., reinstatement through a temporary injunction pending issuance of the Board's decision. The purpose of court-ordered interim reinstatement under Section 10(j) is to prevent a nip-in-the-bud discharge from irreparably harming an *ongoing* organizing drive. The majority fails to explain why Board-ordered traditional remedies in the administrative proceeding—including reinstatement of, and backpay for, unlawfully discharged employees—can never produce conditions under which a *renewed* organizing drive has a fair chance of succeeding. The majority's unsupported assertion that nip-in-the-bud discharges cause harm that can *never* be repaired is just that, an unsupported assertion, not a reasoned explanation for changing the law.[24]

---

[22] It is worth noting that my colleagues fail to cite a single prior case where, under their new standard, a bargaining order would *not* have been warranted.

[23] In each of the following cases, the employer violated Sec. 8(a)(1) or Sec. 8(a)(3) and (1), the union lost the initial election, and records maintained in the Board's NxGen case-processing system reveal that the union won the second election: *Kumho Tires Georgia*, 370 NLRB No. 32 (2020); *Union Tank Car Co.*, 369 NLRB No. 120 (2020); *Pacific Coast Sightseeing Tours & Charters, Inc.*, 365 NLRB No. 131 (2017); *First Student, Inc.*, 359 NLRB 1090 (2013). The union did so even where the employer had committed extensive and egregious unfair labor practices. See *Kumho Tires Georgia* (finding that employer repeatedly interrogated employees, repeatedly threatened loss of customers, loss of jobs, and plant closure, and threatened loss of benefits, transfer of work, and that electing the union would be an exercise in futility).

[24] If my colleagues are taking the novel position that Sec. 10(j) interim injunctive relief is insufficient to ameliorate the "irreparable harm" of nip-in-the-bud discharges, then I assume they will stop their current practice of authorizing the General Counsel to seek this extraordinary relief as a matter of course. Otherwise, they will be continuing to authorize a significant expenditure of federal resources—both of our

My colleagues also say that certain Section 8(a)(1) violations "can erode employees' majority support for the union," but they do not explain why the Board's traditional remedies are intrinsically incapable of creating an atmosphere in which the erosion of that support may be reversed. And they certainly do not provide a reasoned explanation why the effects, if any, of the mere maintenance of a single unlawful work rule during the pre-election critical period—which, under the second step of their announced standard, could compel issuance of a bargaining order, even if the General Counsel fails to establish that any unit employee was aware of the rule—cannot be ameliorated by the traditional remedies of a cease-and-desist order, rescission of the offending rule, and the posting of a remedial notice.

As a further justification for the second step of their standard, my colleagues assert that conducting a new election cannot "ever be a truly adequate remedy" in light of "the strong statutory policy in favor of the prompt resolution of questions concerning representation." Putting aside the question whether directing a new election is a "remedy," it is without question that the primary policy of the Act is not to ensure that unions gain representational status as quickly as possible, but rather to guarantee employees "freedom of choice and majority rule." *International Ladies' Garment Workers' Union v. NLRB (Bernhard-Altmann)*, 366 U.S. at 737. The *Garment Workers* Court further held that "[t]here could be no clearer abridgment of [Section] 7 of the Act" than "grant[ing] exclusive bargaining status to an agency selected by a minority of its employees, thereby impressing that agent upon the nonconsenting majority." Id. The right of employees to choose their bargaining representative, or no bargaining representative at all, "is an inviolate right under the NLRA," *Skyline Distributors v. NLRB*, 99 F.3d at 411, yet my colleagues subordinate it to their preference for the speedy issuance of bargaining orders based on union-authorization cards, which do not protect employees' right to choose for themselves whether to be represented by a union as effectively as secret-ballot elections do. The "strong statutory preference" for speedy bargaining orders claimed by the majority does not override the explicit guarantees, already discussed, of Sections 7 and 9 of the Act.[25]

Finally, the majority argues that its new standard will deter employers from committing unfair labor practices during the critical period. But so would ordering that managers wear sandwich boards around the workplace that list employees' rights under the Act and prominently display the phone number of the local Board regional office. The fact that such an order would presumably deter employers from committing unfair labor practices hardly makes the order permissible.

For that matter, it is questionable to what extent my colleagues' new standard will actually deter employers. "The potential deterrent effect of a bargaining order is lessened in a case in which the initial violation was marginal and apparently committed in good faith." *Peoples Gas System, Inc. v. NLRB*, 629 F.2d 35, 50 (D.C. Cir. 1980). Under the majority's standard, however, a bargaining order would be warranted where employers are found to have violated the Act solely by continuing to maintain a facially neutral work rule implemented long before the critical period began. In such circumstances, it is hard to see how a bargaining order could possibly be justified as a "deterrent" to prevent employers from interfering with elections. Indeed, "[f]acts suggesting that a bargaining order would have little or no deterrent value have been heavy factors in prior decisions not to enforce proposed bargaining orders." Id. (citing *NLRB v. Ship Shape Maintenance Co.*, 474 F.2d at 434; *NLRB v. General Stencils, Inc.*, 472 F.2d 170 (2d Cir. 1972)).

Furthermore, by suggesting, in dicta, that even a single unfair labor practice will result in a bargaining order, the majority has effectively implemented a zero-tolerance standard. Such a standard will not withstand appellate scrutiny. The D.C. Circuit has found that a zero-tolerance standard to maximize deterrence regardless of the circumstances "cross[es] the line from a permissible remedy . . . to an impermissible punitive measure" beyond the Board's authority. *Peoples Gas System, Inc. v. NLRB*, 629 F.2d at 50. The Supreme Court has recognized that the Board's "authority to order affirmative action does not go so far as to confer a punitive jurisdiction enabling the Board to inflict upon the employer any

---

Agency as well as the courts—to pursue "relief" that serves no real purpose.

[25] At the same time that my colleagues are using this case to vindicate a "strong statutory preference" in favor of ensuring speedy issuance of bargaining orders, they have also issued a Notice of Proposed Rulemaking in which they propose, among other things, to reinstate the blocking-charge policy. See "Representation-Case Procedures: Election Bars; Proof of Majority Support in Construction Industry Collective-Bargaining Relationships," 87 FR 9796 (Nov. 4, 2022). My col-

leagues profess to be puzzled that I mention this NPRM, but the reason is obvious. Here, the emphasis is on speeding up processes to put unions in place. Reinstatement of the blocking-charge policy, on the other hand, will slow down the process for removing them, since blocking charges can delay decertification elections for months and years on end. See "Representation-Case Procedures: Election Bars; Proof of Majority Support in Construction Industry Collective-Bargaining Relationships," 85 FR 18366, 18377 (Apr. 1, 2020) (collecting cases in which blocking charges created substantial delay in decertification elections). It stands to reason that if the policies of the Act favor the speedy resolution of questions of representation, those policies should be equally promoted without regard to whether the installation or the removal of a bargaining representative is at issue.

52                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

penalty it may choose because he is engaged in unfair labor practices, even though the Board be of the opinion that the policies of the Act might be effectuated by such an order." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 235–236 (1938); see also *Republic Steel Corp. v. NLRB*, 311 U.S. 7, 11 (1940) ("[T]he power to command affirmative action is remedial, not punitive."). Deterrence is a justifiable reason, among others, for imposing bargaining orders on employers that engage in extensive pre-election campaigns of coercion,[26] but under the majority's decision, the same order will be imposed on employers that commit only a single violation of Section 8(a)(1).

### F. The majority further errs by applying their new standard retroactively.

The Board must not apply a new rule of decision retroactively—meaning in all pending cases in whatever stage—if doing so would work a manifest injustice. *SNE Enterprises*, 344 NLRB 673, 673 (2005). To determine whether retroactive application would cause manifest injustice, the Board considers "the reliance of the parties on preexisting law, the effect of retroactivity on accomplishment of the purposes of the Act, and any particular injustice arising from retroactive application." Id. Each of these considerations militates against retroactive application here.

First, reliance interests overwhelmingly oppose retroactive application. The Supreme Court issued the *Gissel* decision more than 50 years ago. Ever since, the federal courts of appeals have held the Board to a demanding standard, requiring the Board to justify the issuance of a bargaining order by demonstrating that on the specific facts of the particular case, traditional remedies would be inadequate to ensure a fair election. If my colleagues dicta today were to become binding law in the future, the commission of one critical-period unfair labor practice would render traditional remedies insufficient *as a matter of law in every case*. Worse still, under *Linden Lumber*, which my colleagues purport to overrule, an employer was entitled to refuse a union demand for recognition without filing an RM petition. This has been the law since 1971, and in reliance on it, employers could confidently refuse demands for recognition and wait for the union to make the next move. Reliance interests obviously militate against retroactive application where, as a result, parties in pending cases would be penalized for failing to take an action they had no duty to take under precedent in place *for over half a century*.

Next, retroactivity does not further the purposes of the Act because, for reasons already stated, the majority's decision, far from accomplishing the purposes of the Act, would predictably result in unions being imposed on nonconsenting majorities, which is inimical to the purposes of the Act.

Retroactive application may also inflict particular injustice upon employers in pending cases. There may well be employers in pending cases who, under the law in effect before today, would not have been found to have violated Section 8(a)(5) under *Gissel* but will now be found to have done so under *Cemex* applied retroactively to their cases. And they will be subjected to bargaining orders where, under prior law, any duty to bargain would have depended on the results of an election yet to be held. Where retroactive application will result in unfair labor practice findings and the imposition of remedial obligations that would not have been found and imposed under prior law, particular injustice is patently obvious.[27]

Each of the traditional factors under *SNE Enterprises* points to the same conclusion. Applying the majority's decision retroactively will cause manifest injustice. If my colleagues attempt to apply their dicta as binding law, they should at least apply it prospectively only.

### G.  A Gissel bargaining order is not warranted.

I would affirm the judge's decision not to issue a bargaining order in this case, due to changed circumstances. By taking into consideration changes such as turnover in the work force and the passage of time since unfair labor practices were committed, the Board avoids the "danger that a bargaining order that is intended to vindicate the rights of past employees will infringe upon the rights of the current ones to decide whether they wish to be represented by a union." *Charlotte Amphitheater Corp. v. NLRB*, 82 F.3d at 1078. Accordingly, consistent with the

---

[26] See *Gissel*, 395 U.S. at 612 (stating that "a bargaining order is designed as much to remedy past election damage as it is to deter future misconduct").

[27] With respect to the retroactive application of today's decision in pending cases, my colleagues engage in double talk. On one hand, they make it clear that the decision *will* apply retroactively in pending cases. "[A]ny harm to the interest of *employers* who might have relied on the prior framework for imposing bargaining orders," they say, "is outweighed by the clear harm to the achievement of the Act's policies by continuing to apply the prior standard in cases involving serious misconduct prior to a Board-conducted election. Applying today's holding retroactively will avoid the potential for inconsistency *in pending cases* . . . " (emphasis added). On the other, they "decline to speculate upon how the Board will resolve any specific claims of particular injustice that may arise in future cases." Although it is relieving to hear that employers in pending cases are not absolutely foreclosed from opposing retroactive application, my colleagues miss the point, which is that in *all* cases except those in which a bargaining order would have been warranted anyway under *Gissel*, retroactive application will be unjust.

views of most circuits,[28] the Board has declined to issue bargaining orders based on delays of about four years and employee turnover above 30 percent. See *Sysco Grand Rapids*, 367 NLRB No. 111, slip op. at 2 (2019) (no *Gissel* order where about four years had elapsed since unfair labor practices occurred and the unit had experienced 30 percent turnover), enfd. mem. in relevant part 825 Fed. Appx. 348 (6th Cir. 2020); see also *Stern Produce Co.*, 368 NLRB No. 31, slip op. at 4–5 (2019) (no *Gissel* bargaining order where more than three-and-a-half years had passed since unfair labor practices, and there was limited dissemination of "hallmark" unfair labor practices).

Here, nearly four years have elapsed since the most recent unfair labor practice, the discharge of employee Ornelas on September 6, 2019. According to the Respondent's motion to reopen the record, as of November 14, 2022, only 200 of the Respondent's 397 current employees had also been employed by the Respondent at the time of the election, making a turnover rate of approximately 50 percent.[29]   Additionally, Forgey and Dickson, two of the managers responsible for, and the face of, much of the misconduct on which a bargaining order would be based, no longer have contact with the unit employees and have not for a significant period of time. Accordingly, due to the passage of time, the extensive turnover in the unit, and the removal of key management officials, I would not issue a bargaining order. Indeed, even without more, the 50-percent turnover in the unit creates an unacceptable "danger that a bargaining order that is intended to vindicate the rights of past employees will infringe upon the rights of the current ones to decide whether they wish to be represented by a union." *Charlotte Amphitheater Corp. v. NLRB*, 82 F.3d at 1078.  Instead, I would order traditional remedies plus certain special remedies[30] to dissipate the effects of the

Respondent's unfair labor practices, and sever Case 28–RC–232059 and remand it to the Regional Director with instructions to direct a second election at a time he deems appropriate.[31]

CONCLUSION

It is broadly understood by the federal courts of appeals—and until today, it was also understood by the Board—that *Gissel* permits the Board to issue bargaining orders in limited circumstances where specific conditions are present. Such an order must be based on the facts of each case and supported by a detailed analysis to ensure that a bargaining order is warranted despite the risk that it will impose union representation on a nonconsenting majority.

The standard the majority purports to implement today disregards this established law, to its peril.  My colleagues conclude that whenever an employer commits a critical-period unfair labor practice that warrants setting aside the results of an election—and under the rule of *Super Thrift Markets*, 233 NLRB at 409, virtually any unfair labor practice will suffice—traditional remedies are insufficient to protect employee choice *as a matter of*

---

[28] As the D.C. Circuit observed in *Charlotte Amphitheater Corp.*, "all but one of [the circuits] that have considered the issue agree that changed circumstances, such as the passage of time or turnover in the work force, are relevant to the Board's decision to issue a bargaining order." Id. (citing *NLRB v. Cal Agricultural Mfg. Co.*, 41 F.3d 389, 398 (8th Cir. 1994), which in turn cited decisions by the First, Third, Fourth, Fifth, Seventh, Eleventh, and D.C. Circuits).

[29] I would grant the Respondent's motion to reopen the record because the evidence it contains only became available since the close of the hearing and would require a different result. See Sec. 102.48(c) of the Board's Rules and Regulations.

[30] In addition to the administrative law judge's recommended traditional remedies, I would order the recommended notice-reading remedy and the following special access remedies: (1) that the Respondent, upon request, grant the Union reasonable access to company bulletin boards and all places where notices to employees are customarily posted; (2) that the Respondent, upon request, supply the Union with the names and addresses of the Respondent's current unit employees; and (3) that the Respondent give notice of, and equal time and facilities for

the Union to respond to, any address made by the Respondent to its employees on the question of union representation. These remedies are consistent with those the Board has ordered in similar cases. See *Stern Produce Co.*, 368 NLRB No. 31, slip op. at 5 (ordering same access remedies "in light of the significant and pervasive nature of the Respondent's unfair labor practices" and in lieu of affirmative bargaining order); *Sysco Grand Rapids, LLC*, 367 NLRB No. 111, slip op. at 3 (same).

[31] My colleagues respond to my reliance on *Charlotte Amphitheater* by saying that the D.C. Circuit merely required the Board to explain why a bargaining order was necessary as of the time of its issuance and that they have provided that explanation here.  For the most part, however, the explanation they provide lacks specificity.  Regarding the extensive turnover in the unit, they say that it is "likely" that employees who were around when the unfair labor practices were committed have shared their experience with new employees.  This copy-and-paste justification could be invoked in any case.  Regarding the passage of time, they simply cite cases where courts have enforced bargaining orders notwithstanding a comparable lapse of time.  They acknowledge, however, that the D.C. Circuit has also *declined* to enforce bargaining orders in cases involving a comparable passage of time—see *Cogburn Health Center, Inc. v. NLRB*, 437 F.3d 1266 (D.C. Cir. 2006); *Flamingo Hilton-Laughlin v. NLRB*, 148 F.3d 1166 (D.C. Cir. 1998)—and they do not explain, with respect to *this* case, why a reviewing court should rely on the former cases and not the latter.  In addition, although my colleagues acknowledge that reviewing courts require the Board to explain its own role in contributing to delay, their explanation on this score omits salient facts.  They do not mention the fact that the General Counsel added to the delay by using this case to urge the Board to overrule *five* cases.  More importantly, they fail to mention their own substantial contribution to delay by their decision to use this case to adopt a new (and unenforceable) standard for determining when bargaining orders should issue, even though doing so was completely unnecessary because, as they admit, "the same . . . remedy would lie under either the prior standard [i.e., *Gissel*] or the standard [they] announce today."

54                     DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

*law*, and the Board will find a violation of Section 8(a)(5) and issue a bargaining order forthwith. In reaching this conclusion, the factors delineated by the Supreme Court and required by the circuit courts are conveniently ignored. In order to be enforceable, it is clear that any bargaining orders issued under my colleagues' new standard must be warranted under *Gissel*—and since they find that to be the case here, one may reasonably question the need for this new standard in the first place.

It was bad enough that, under *Iris U.S.A.*, the mere maintenance of a single work rule during the pre-election critical period was sufficient to set aside the results of a free and fair election. Before today, however, the consequence was simply that a second election would be directed by the Regional Director once he or she determined that the employer had remedied the work-rule violation. That second election was unnecessary, but at least the unit employees could vote again and, assuming they remained of the same mind as before, vote "no" again. Now, that second chance to vote "no" is gone. A bargaining order will issue, and the unit employees will be saddled with a union that a majority of the unit does not want.

The right of citizens to vote in a secret-ballot election is the very cornerstone of American democracy, and the right of employees to vote in a secret-ballot representation election is foundational to the system of workplace democracy created by the Act. Nevertheless, were my colleagues' decision to be treated as binding precedent, it would mean that if an employer is found to have committed a single violation of the Act during the critical period—regardless of whether that violation was intentional or not—that action by the employer is sufficient to rob employees of their right to a secret-ballot election. As the Supreme Court has recognized, employee rights under Section 7 and 9 of the Act are best protected by Board-conducted secret-ballot elections, "the most satisfactory—indeed the preferred—method of ascertaining whether a union has majority support," and union-authorization cards are "admittedly inferior to the election process." *NLRB v. Gissel Packing*, 395 U.S. at 602-603. Today, however, my colleagues implement measures the predictable effect of which will be to sharply limit secret-ballot elections while dramatically increasing card-based bargaining orders. These changes are unnecessary to their decision and therefore dicta, since by the majority's own admission "the application of the revised standard in this case results in neither finding any additional violation of the Act nor any additional remedial obligation." Nevertheless, as I have shown, my colleagues fail to provide a reasoned explanation for departing from decades of Board precedent. More importantly,

their "revised" standard conflicts with Supreme Court and circuit court precedent. Moreover, once the majority reinstates blocking charges, that action in combination with this case will embed a double standard in Board law, since it will be as difficult to terminate a union's representative status as today's decision—particularly in tandem with *Stericycle*—makes it easy for that status to be created.[32] Making bad even worse, the majority unfairly applies their decision retroactively. Accordingly, although I join my colleagues in finding that the Respondent committed numerous violations of the Act, I respectfully dissent from the sea change they purport to make in Board law.

Dated, Washington, D.C. August 25, 2023

_____

Marvin E. Kaplan,                          Member

NATIONAL LABOR RELATIONS BOARD

APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

    Form, join, or assist a union
    Choose representatives to bargain with us on your behalf
    Act together with other employees for your benefit and protection
    Choose not to engage in any of these protected activities.

WE WILL NOT threaten you with discharge, replacement, loss of work hours, work opportunities, benefits, or training opportunities, discontinuation of past favors, or

---

[32] I note as well that if the majority's dicta were to become binding precedent in a later case, it would create a double standard because it operates in only one direction. An unfair labor practice committed by an employer during the critical period preceding an RM or RC election installs a card-majority union as the unit employees' bargaining representative, but where a decertification petition is supported by a majority of unit employees, an unfair labor practice committed by a union during the critical period preceding an RD election does not *remove* the union as the unit employees' bargaining representative.

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC

55

other reprisals if you select the International Brotherhood of Teamsters (the Union) as your bargaining representative or if you engage in union activities.

WE WILL NOT instruct you not to speak with union representatives or otherwise not to engage in activities on behalf of the Union.

WE WILL NOT threaten you with discharge by inviting you to quit if you want to be represented by the Union.

WE WILL NOT threaten you by telling you that we will close plants or relocate operations if you choose union representation.

WE WILL NOT interrogate you about your union membership, activities, or sympathies.

WE WILL NOT create the impression that we are engaged in surveillance of your union activities.

WE WILL NOT place you under surveillance while you engage in union activities.

WE WILL NOT threaten you with plant closure by telling you that, even if you unionize, we will retain the right to convert plants to "satellite" status at any time.

WE WILL NOT threaten to discharge you for engaging in protected strike activity by misrepresenting your striker reinstatement rights.

WE WILL NOT blame the Union for delayed wage increases.

WE WILL NOT threaten you by implying that wage increases will be delayed indefinitely if you select union representation.

WE WILL NOT promulgate overly broad directives prohibiting you from talking to union representatives while on "company time" or "during working hours."

WE WILL NOT discipline you pursuant to an overly broad directive not to talk with union representatives on "company time" or "during working hours," or for talking with union representatives during nonworking time.

WE WILL NOT promise you benefits if you oppose the Union or vote against representation.

WE WILL NOT hire security guards to intimidate you.

WE WILL NOT threaten to investigate you because of your union activity.

WE WILL NOT discharge, suspend, or otherwise discipline or discriminate against you because of your support for or activities on behalf of the Union or any other labor organization.

WE WILL NOT fail and refuse to bargain with the Union as the exclusive collective-bargaining representative of our employees in the bargaining unit.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL, within 14 days from the date of the Board's Order, offer Diana Ornelas full reinstatement to her for-

mer job or, if that job no longer exists, to a substantially equivalent position, without prejudice to her seniority or any other rights or privileges previously enjoyed.

WE WILL make Diana Ornelas whole for any loss of earnings and other benefits resulting from the unlawful discrimination against her, less any net interim earnings, plus interest, and WE WILL also make her whole for any other direct or foreseeable pecuniary harms suffered as a result of the unlawful discrimination, including reasonable search-for-work and interim employment expenses, plus interest.

WE WILL compensate Diana Ornelas for the adverse tax consequences, if any, of receiving a lump-sum back-pay award, and WE WILL file with the Regional Director for Region 28, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of Diana Ornelas's corresponding W-2 form reflecting the backpay award.

WE WILL, within 14 days from the date of the Board's Order, remove from our files any reference to the unlawful discharge, suspension, and warning of Diana Ornelas, and WE WILL, within 3 days thereafter, notify her in writing that we have done so and that we will not use the unlawful disciplines against her in any way.

WE WILL, on request, bargain with the Union as the exclusive collective-bargaining representative of our employees in the following appropriate unit concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement:

> INCLUDED: All full-time and regular part-time ready-mix drivers, plant operators II who regularly operate ready-mix trucks, and driver trainers employed by CEMEX Construction Materials Pacific, LLC at its ready-mix facilities in Southern California and Southern Nevada, including its plants in Las Vegas, Nevada and Compton, Corona, Escondido, Fontana, Hollywood, Irvine, Inglewood, Los Angeles, Moorpark, Oceanside, Orange, Oxnard, Perris, Rialto, Redlands, San Diego, San Juan Capistrano, Santa Barbara, Santa Paula, Simi Valley, Temecula, and Walnut, California.

> EXCLUDED: All plant foremen, batchmen, dispatchers, yardmen, senior driver trainers/safety champions, fleet mechanics (I and II), plant maintenance (I and II), quality control representatives, office clerical employees, professional employees, guards and supervisors as defined by the Act.

56    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

WE WILL hold a meeting or meetings during worktime at our facilities in Southern California and Las Vegas, Nevada, scheduled to ensure the widest possible attendance of bargaining unit employees, at which this Notice to Employees marked "Appendix" will be read to employees by a high-ranking responsible management official in the presence of a Board Agent and, if the Union so desires, a Union representative, or, at our option, by a Board agent in the presence of a high-ranking responsible management official and, if the Union so desires, a Union representative.

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC

The Board's decision can be found at https://www.nlrb.gov/case/28-CA-230115 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



*Fernando J. Anzaldua, Esq., Winkfield F. Twyman, Esq.,* and *Kristina Robertson, Esq.,* for the General Counsel.
*Caren P. Sencer, Esq. (Weinberg, Roger & Rosenfeld),* for the Charging Party.
*Alan M. Bayless Feldman, Esq.,* and *Ross M. Gardner, Esq. (Jackson Lewis, PC),* for the Respondent.

DECISION

STATEMENT OF THE CASE

JOHN T. GIANNOPOULOS, Administrative Law Judge. The issues involved in this matter stem from an organizing drive among certain Southern California and Las Vegas, Nevada, based ready-mix drivers employed by Cemex Construction Materials Pacific, LLC (Respondent or Cemex) who sought to be represented in their workplace by the International Brotherhood of Teamsters (Teamsters or Union). An election was held on March 7, 2019, which the Union lost. The Teamsters filed multiple unfair labor practice charges relating to Respondent's conduct both before and after the election, along with objections to the election (Objections). Ultimately, a consolidated complaint and notice of hearing issued (complaint), which was subsequently amended, alleging that Cemex committed multiple unfair labor practices. As part of the remedy for the Complaint allegations, the General Counsel asserts that a bargaining order is necessary as set forth in *NLRB v. Gissel Packing Co.,*

395 U.S. 575 (1969), or in the alternative that certain additional remedies be ordered to ensure a fair second election can occur. On September 20, 2020, an Order issued consolidating the allegations contained in Union's Objections with those in the complaint for hearing. This case was tried before me over a 24-day period between November 2020 and February 2021. Because of the compelling circumstances presented by ongoing Covid-19 pandemic, pursuant to a stipulation by the parties, the trial occurred via videoconference.

Based upon the entire record, including my observation of witness demeanor, and after considering the briefs filed by the General Counsel, the Union, and Respondent, I make the following findings of fact and conclusions of law.[1]

I. JURISDICTION AND LABOR ORGANIZATION

Respondent is a Delaware corporation that produces cement, ready-mix concrete, and aggregates, with operations in Southern California and Las Vegas, Nevada. In conducting its business operations, each year Respondent purchases goods and materials valued in excess of $50,000 directly from points located outside of Nevada and California. Respondent admits, and I find, that it is an employer engaged in commerce within the meaning of Sections 2(2), (6), and (7) of the National Labor Relations Act (the Act or NLRA). Respondent also admits, and I find, that the Union is a labor organization within the meaning of Section 2(5) of the Act. Accordingly, I find that this dispute affects commerce and the National Labor Relations Board (NLRB or the Board) has jurisdiction pursuant to Section 10(a) of the Act.

II. FACTS

A. General Background

Respondent is a subsidiary of CEMEX, S.A.B. de CV, a multinational building materials company headquartered near Monterrey Mexico, whose stock is traded on the New York Stock Exchange under the symbol CX.[2] For the year ending December 31, 2019, CEMEX, S.A.B. de CV had revenues of just over $13 billion and a gross profit of over $4.3 billion. The company has operations in North America, Central America, South America, Europe, the Caribbean, Asia, the Middle East, and Africa.

The facilities at issue in this matter involve Cemex's ready-mix plants in Las Vegas, Nevada, and Southern California. Ready-mix concrete is a mixture of cement powder, stone, sand, and additives. See *Irving Ready-Mix, Inc.,* 357 NLRB 1272, 1275 (2011). The product is made on demand at batch

---

[1] Testimony contrary to my findings has been specifically considered and discredited. To the extent possible, and unless otherwise noted, witness demeanor was considered in making all credibility resolutions.

[2] See https://www.sec.gov/Archives/edgar/data/0001076378/000119312520126557/d863784d20f.htm (last accessed on December 10, 2021). For purposes of background information, I take administrative notice of form 20-F filed by CEMEX, S.A.B. de CV with the Securities and Exchange Commission on April 29, 2020. *Pacific Greyhound Lines,* 4 NLRB 520, 522 fn. 2 (1937) (Board takes judicial notice of facts stated in company's annual report filed with the Security and Exchange Commission); Fed. R. Evid. 201(b).

plants where the proper proportions of material are measured and loaded into large hoppers. Each plant has a batchman, also referred to as a plant foreman, who is responsible for ensuring that the accurate portion of aggregate, cement, and additives are mixed into the delivery truck's drum. The batchman works in an office, and based upon the specifications for each particular load, programs the information into a computer system which measure's the correct mixture. Ready-mix trucks pull underneath the hopper, sometimes referred to as the "plant," and the dry material is loaded into a large bubble-style drum on the back of the truck. The loaded truck then pulls out from underneath the plant, and the driver adds water to the load as specified in the customer's order. This process is referred to as slumping. The concrete slump measurement goes from 1 (very dry) to 10 (very wet) and gauges the moisture content in the concrete. Once the concrete is slumped, it needs to be delivered to the customer within 90 minutes.[3] (Tr. 105, 272, 282–283, 603, 1040, 1288, 2337, 2395, 2449; JX. 6)

On December 3, 2018, the Teamsters filed a petition to represent Cemex's Southern California and Las Vegas based ready-mix drivers. A hearing occurred in December 2018, and on February 20, 2019, the Regional Director for NLRB Region 28 ordered that an election be held on March 7, 2019, in the following unit of Respondent's employees (Unit):

> All full-time and regular part-time ready-mix drivers, plant operators II who regularly operate ready-mix trucks, and driver trainers employed by the Employer at its ready-mix facilities in Southern Nevada and Southern California, including its plants in Las Vegas, North Las Vegas, and Sloan, Nevada, and Compton, Corona, Escondido, Fontana, Highland, Hollywood, Irvine, Los Angeles, Moorpark, Oceanside, Orange, Oxnard, Perris, Rialto, San Diego, San Juan Capistrano, Santa Barbara, Santa Paula, Simi Valley, Temecula, and Walnut, California, excluding all other employees, batch men, yardmen, yardmen/laborers, plant maintenance employees, plant maintenance employees II, plant maintenance foremen, fleet mechanics, fleet mechanic foremen, mechanic foremen, senior driver trainers/safety champions, plant foremen, dispatchers, quality control representatives, office clerical employees, professional employees, guards and supervisors as defined in the Act.

In substance, the Unit constitutes all of Respondent's ready-mix drivers in Southern California and Las Vegas, Nevada, including a limited number of drivers who also sometimes work as second/assistant batchmen. The voter list provided to the NLRB by Respondent contained a total of 373 drivers, of which 40 were based in Las Vegas, Nevada, and 333 were assigned to the various Cemex plants in Southern California. The election was held as scheduled and the ballots were tallied. The Union

lost the election 166 to 179. (JX. 3, 9, 11)

On March 19, 2019, the Union filed its Objections to the election. Respondent filed a motion to dismiss which was denied by the Regional Director and the Board. The following Objections were consolidated by the Regional Director for a hearing with the complaint's unfair labor practice allegations: (1) During the critical period, area manager Ryan Turner approached multiple employees at various work locations, threatening them with a loss of protection and benefits from the Employer in the event that they voted for the union. Similar statements were made by manager Lorenzo Ponce; (2) Cemex threatened the employees with closing of batch plants or other adverse consequences if they supported the union; (3) Cemex, through its agents, threatened employees with changes of job shifts in the event that they voted yes for the Union; (4) Cemex provided more favorable treatment to employees taking a Vote No stance from those supporting a Demand Your Worth stance by requiring employees who were demanding their worth to take off safety vests and remove signage with union logos or "Vote Yes" messages while allowing those with Vote No messages to keep items in their vehicles or on display while on work time; (5) Cemex allowed employees expressing a Vote No message to campaign for their position while on work time, while denying that same benefit to employees with a "Vote Yes" message; (6) Cemex held captive audience meetings excluding employees who had taken prounion positions. This not only excluded alternative opinions, but required pro-Union employees to perform additional services while allowing anti-union employees to sit in Employer meetings while being provided refreshments on work time; (7) Cemex engaged in acts of surveillance of employees during the critical period; (8) Cemex increased the use of security at all locations during the critical period in attempts to intimidate employees; and (9) during the election, Cemex intimidated employees seeking to enter batch plants to vote by surrounding vehicles with eight to ten anti-union employees and managers before the employee could enter the polling area. With a few exceptions, the Union's objections correspond substantially with the unfair labor practice allegations contained in the complaint. (GC. 1(x))

Sixteen ballots were challenged during the election and the Regional Director's Order directed a hearing on these ballots. However, the parties reached a stipulation regarding three of the ballots which, in turn, resulted in the challenges no longer being determinative and the issue was not further litigated during the hearing. The parties also stipulated that, despite the voter list, the Unit has a maximum of 366 drivers. (JX. 1, 12; Tr. 12, 1550–1551, 1749, 1992–1993)

### B. Respondent's Operations

During the relevant time period, Bryan Forgey worked as Respondent's vice president and general manager overseeing the company's ready-mix business in Southern California and Southern Nevada. Forgey remained in this position until March 2020, when he transitioned into a larger role within the company, overseeing mining aggregates in California. Forgey resigned in July 2020 and no longer works for Cemex. (Tr. 78–80, 139, 2005)

Cemex's various Southern California facilities are divided

---

[3] Transcript citations are denoted by "Tr." with the appropriate page number. Citations to the General Counsel, Respondent, Union, Joint, and Administrative Law Judge exhibits are denoted by "GC," "R," "U," "JX," and "ALJ," respectively. Transcript and exhibit citations are intended as an aid only. Factual findings are based upon the entire record and may include parts of the record that are not specifically cited.

58                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

into five districts: Ventura County, Los Angeles County, In-
land Empire, Orange County, and San Diego County. At all
relevant times, each district was overseen by a plant superin-
tendent, who in turn reported to an area manager. Respond-
ent's chain of command ultimately funneled up to Forgey who
was in charge of the entire operation. Jason Faulkner served as
the plant superintendent for Ventura County, Andrew Burton
was the plant superintendent overseeing Los Angeles County,
Robert Nunez oversaw Orange County, Andrew Patino was the
plant superintendent for the Inland Empire, and Jason Glass
was in charge of San Diego County. Ryan Turner was the area
manager overseeing the Inland Empire and San Diego County
districts. The identities of the two other Southern California
area managers are unclear from the record. During this time
period Daryl Charlson also played a role in assisting the com-
pany's ready-mix business, particularly in Ventura County,
although he was not directly employed in the ready-mix deliv-
ery operations. Charlson was Respondent's director of plant
and fleet maintenance, overseeing the maintenance employees
and their supervisors who were responsible for maintaining
Respondent's plants and trucks in Southern California. Charl-
son reported directly to Forgey. Finally, human resources man-
ager Iris Plascencia was responsible for overseeing the human
resources functions for the Southern California ready-mix
plants. Forgey, Charlson, and Plascencia, all worked out of
Respondent's corporate office in Ontario, California. (Tr. 79–
80, 91, 94–95, 361, 366–367, 402–403, 2245–2246, 2543,
2576–2577, 2892–2893, 2975; GC. 4; R. 8)

In the Las Vegas area, Respondent operates two plants full-
time. The Sloan plant, located in the southern part of the city,
and the Losee plant located in northern Las Vegas. At the time
of the organizing drive and election, Estevan Dickson worked
as the plant foreman overseeing both the Sloan and Losee
plants; he was assisted by two other foreman, David Lockwood
and Keith Wendall. Dickson reported to Stewart "Stu" Mate,
the area operations manager. Mate, in turn, reported to Chris
Hill, the general manager overseeing Cemex's Las Vegas area
operations. Hill, who was the highest-ranking management
official in Las Vegas, reported directly to Bryan Forgey. The
various relevant supervisors and managers, including the full-
time plant foremen/batchmen, are all admitted Section 2(11)
supervisors. (Tr. 95–96, 312, 321, 562, 570–571, 2031, 2179,
2218, 2999, 3000, 3015–3016; GC. 1(s); R. 8; JX. 1)

### C. The Union's Organizing Drive

Sometime in about 2017 the Union started organizing the
ready-mix drivers working at Respondent's Las Vegas, Nevada
plants. In December 2017 Cemex ready-mix drivers in Ventura
County also reached out to the Teamsters about organizing their
workplaces. The Union then decided to try and organize all of
the Cemex ready-mix drivers in both Southern California and
Las Vegas, Nevada. Teamsters international organizer Scott
Williams was the Union's primary point man overseeing the
organizing drive. Williams became involved with the Cemex
campaign in about July 2017. Mike Hood worked on the or-
ganizing drive for the Union as a "lost time organizer," primar-
ily focusing on the Las Vegas plants. Hood had previously
worked for Cemex in Las Vegas as a ready-mix driver until

about February 2018. He then went to work for a unionized
ready-mix company and took a leave of absence to work on the
Cemex campaign. (Tr. 551–552, 560, 577–578, 918–921,
1793–1794)

As part of the organizing drive, the Union established a
committee of drivers at the various plants and held bi-monthly
conference calls to coordinate their organizing efforts. The
Union broke up the geographic area up into six different "turfs"
and had meetings with drivers at least once a month to address
issues and gather information as to what was happening on the
ground. The Union also started gathering authorization cards.
(Tr. 921–925)

Union organizers would periodically speak with drivers at
jobsites, after they had finished pouring out their concrete, and
would also gather outside the different plants, along with off
duty drivers, disseminating flyers, stickers, and other parapher-
nalia/information to workers. Also, the Teamsters had a com-
munications specialist assigned to oversee the social media
aspect of the campaign, which included a presence on YouTube
and Facebook. The Union posted multiple photos and videos of
various drivers who supported the union drive on these social
media accounts, which were open to the public. (Tr. 119, 290–
292, 321, 552, 569, 653, 664–665, 670, 827, 1100–1101, 1241,
1306, 1701–1702, 1907–1910; R. 4, 7, 14–18)

Sometime in about-mid October 2018 Respondent estab-
lished a "steering committee" to oversee the company's re-
sponse to the organizing drive. Members of the steering com-
mittee included Forgey, Tim Robertson (Cemex's national
labor relations manager/vice president), Zach Allie (an in-house
attorney for Cemex), Iris Plascencia, and an attorney from the
law firm of Jackson Lewis. Forgey said that the goal of the
steering committee was to understand why employees were
looking to organize and to ensure they were fully educated on
the facts and topics of what being union vs. remaining non-
union would mean for them. In short, Forgey said Respondent
did not understand why employees would need a union to rep-
resent them and one goal of the steering committee was to un-
derstand what concerns employees had that was leading them to
want to unionize. (Tr. 81–84, 137; JX. 2, GC. 1)

The steering committee also reviewed all disciplines issued
to employees during the organizing drive. Regarding disci-
pline, Forgey testified that Respondent traditionally followed a
formal progressive disciplinary process, with managers consult-
ing with human resources, as well as the legal department if
warranted. The steering committee became an additional step
in this process, with the committee reviewing all formal disci-
plines, including documented verbal warnings, before they
were issued. As of the date of the hearing in this matter, the
steering committee was still in place. (Tr. 125, 138, 141, 2984)

At one point, the steering committee decided to hire labor re-
lations consultants to assist the company. In October 2018
Respondent hired a company called Labor Relations Institute
(LRI) in order to help Cemex communicate its message to em-
ployees against unionization and assist the company in its re-
sponse to the organizing drive. The evidence shows that, be-
tween October 2018 and July 2019 Cemex paid LRI just over
$1,136,000 for its services. (Tr. 82–83; GC. 25)

LRI, in turn, hired a group of independent consultants to

work on the Cemex campaign, who were paid $3000 per day (plus travel expenses) for their services. The lead consultant hired by LRI was Amed Santana. The other primary consultants hired to work on the campaign included Michael Rosado and Johan Pena, and at one point as many as five consultants worked on the project. As the lead consultant, Santana said his role was to act as the liaison between Cemex and the other consultants to coordinate strategy. During the campaign the consultants held nightly conference calls to update each other on what was occurring, the material they were covering with drivers, and to manage their ongoing strategy. (Tr. 87–88, 1537, 2687, 2774–2775, 2809, 3046; GC. 25)

Soon after he was retained, Santana met with Forgey in October 2018 to discuss the campaign to keep Respondent's plants union-free. They also discussed the need to conduct training for supervisors and managers on the NLRA, and to make sure everyone understood what they could and could not do during the campaign. Cemex arranged for the consultants to conduct initial training with Respondent's supervisors and managers to teach them about the "do's and don'ts." The purpose of this training was to teach managers and supervisors that they cannot make threats, interrogate, or spy on employees, or make any promises to workers during the campaign. This was referred to by the acronym "TIPS." Cemex managers and supervisors were told, however, that they could discuss with employees facts, and express their opinions about unionization, along with discussing their personal experiences. This was referred to by the acronym "FOE."[4] (Tr. 2015–2016, 2389, 2764–2765, 3035–3037, 3061–3062)

After this training, Respondent asked the consultants to go into the field and meet with drivers at the different ready-mix plants. The consultants started meeting with employees at the various plants in late October 2018. The consultants held small group meetings with workers, either by themselves or with a company official, and also met with employees individually. At one point, Santana said that he was meeting with employees every day. A few days before the election, the consultants met with Cemex managers and supervisors at the Oxnard plant one last time to discuss the election process, how the officials should act during the election, and how to answer any employee questions about the election. Cemex safety champion Gus Aguilera also attended this meeting. (Tr. 82, 2110, 2016–2017, 2556–2557, 3047–3049, 3068–3069)

In addition to holding employee meetings, to combat the organizing drive the company also disseminated stickers, flyers, pamphlets, and letters to employees. Cemex also maintained its own social media/internet site to communicate with workers, and the company had a communications team monitoring the Union's social media pages. This team sent updates to Forgey and his superiors about what the Union was posting on social media. Forgey personally accessed the Union's Facebook page and watched at least one of their videos. (Tr. 118–121, 225–226, 363–364, 445, 2028–2029, 2032, 2059, 2091; R. 28)

In early March 2019, just before the election, Cemex showed all of its employees what was referred to as a "25th hour vid-

eo." The company had two such videos, one for Southern California drivers featuring Forgey and one for Las Vegas drivers with Hill appearing as the presenter. The video shown to Southern California employees is just over 11 minutes long, and shows Forgey standing in a shop area in front of a ready-mix truck with a large "Vote No" banner covering the truck's front grill. Throughout the video Forgey addresses employees, speaking into the camera; at various points the video cuts away from Forgey to PowerPoint slides that reinforce certain points made in the video. In Forgey's video, he tells employees, in part, that although the law does not allow him to make promises or discuss what may happen if the company wins the election, "I have heard you loud and clear throughout this process and you have my full attention," he also says that he "accept[s] responsibility for any challenges we may have experienced over the past few years" and highlights to employees the "strong track record of addressing the concerns you have brought to our attention" including a wage increase implemented in February 2018 that was "significantly higher than the market average." (Tr. 2040–2047) Forgey then asks employees to give him "a single year, just 12 months to earn your trust and show you what life at Cemex can be like without a union" and to further show employees how good the company can make the Southern California operation without a union. In the video, Forgey said that, if the company did not succeed, and employees decided life with the Teamsters would be better, they always have the right to bring the Union back in 12 months, but that he was confident that after a year the employees would be thankful they voted no and put their faith in the company instead of gambling with the Union. (Tr. 102–103, 140, 2034, 2040–2050, 2157–2158; R. 24–25)

Hill's video is substantially similar to Forgey's. Hill is shown standing in the same shop, with the same background, and he makes the same statements to employees as outlined above, except tailored to the Las Vegas drivers. However, in addition to highlighting the February 2018 wage increase that was significantly higher than the market average, Hill tells the Las Vegas drivers the company listened to employee concerns about the quality of their equipment, that it ordered new trucks, and made sure that additional new trucks were included in the budget for the upcoming years so that all of the drivers would eventually be driving new equipment. Hill further said that the company "listened to your feedback regarding the composition of our management team and we made the necessary changes to ensure we have effective and compassionate leadership in place at each plant."[5] (Tr. 2057)

---

[4] Respondent held refresher training on "TIPS" and "FOE" in December 2018. (R. 21; Tr. 2021)

[5] In its complaint, the government has not alleged that anything said in the videos constitute an unfair labor practice, nor has the Union alleged that the videos amounted to objectionable conduct. Compare *Desert Aggregates*, 340 NLRB 289, 290, 297–298 (2003), remedy and order modified 340 NLRB 1389 (2003) (Statement from employer's agent, who had spoken with employees to determine their concerns, that the union campaign had "rung bells all the way at the top" of the company and that workers should "give the company a year" and see what changes would be made constitutes a violation); *Lutheran Home of NW Indiana, Inc.*, 315 NLRB 103, 104 (1994) ("Objectionable conduct where employer said that he cannot make promises because that would be illegal but the company was "definitely looking into getting

60                     DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

Because of the uncertainty of the actual election date, the videos were recorded in December 2018, so they would be ready to show to employees just before the election. (Tr. 2034–2035, 2050, 2063)  They were filmed on the same day, in California at the Fontana plant.

After the March 7, 2019 election, the Union took a step back to regroup.  A few weeks later, the Teamsters once again started trying to talk with drivers on a regular basis and continued organizing.  The Union also filed unfair labor practice charges and objections to the election.  It is against this backdrop that the allegations contained in the General Counsel's Complaint and the Union's Objections unfold.  (Tr. 934; GC. 1)

III. 8(A)(1) ALLEGATIONS & THE UNION'S OBJECTIONS

### A. Dickson's alleged July 2018 threats (Complaint Paragraph 5(a))

#### 1. Background

##### a. Testimony of Ibrahim Rida

During the summer of 2018 Union flyers began circulating around the Sloan plant in Las Vegas explaining the benefits the Union was able to negotiate for employees at Nevada Ready Mix, a local company whose employees were unionized.  Ibrahim Rida, a Sloan based driver who worked for Cemex from March 2018 through April 2020, testified that he had a conversation with Estevan Dickson in late July 2018 about these flyers, which were found in company trucks.  Dickson was the Las Vegas plant foreman overseeing both the Sloan and Losee plants.  (Tr. 311, 805–807, 2662–2663)

According to Rida, sometime towards the end of July 2018 he was in the Sloan plant office one afternoon with a coworker named Rodney Coleman.  Along with being coworkers, Rida and Coleman were also friends.  Rida testified that while they were in the office Dickson walked in with a piece of paper, slammed it on the desk, and said that he found it in a company truck.  Dickson then started talking about the union, focused his attention on Rida, and said that "if the Company goes union, you will be fired," and that "if they don't fire you, they're just going to cut your hours and bring in guys from Florida."  (Tr. 807)  Rida asked Dickson why he was mad since the drivers only wanted to better themselves, and Dickson replied saying that he was just telling Rida what can happen.  At this point, Rida testified that Coleman interjected, saying that Dickson was violating Rida's rights and could not be saying those things, but Dickson said he disagreed.  The conversation then ended and Rida walked out.  (Tr. 806–807, 823–827, 3121, 3133)

##### b. Testimony of Estevan Dickson

During his testimony, Dickson denied ever having a conversation with Rida where Coleman was present and the union was discussed.  According to Dickson, he had two conversations with Rida where Coleman was present.  The first occurred in about May 2018 involving a discipline issued to Rida where Coleman served as a witness.  Regarding this conversation, Dickson said that an incident had occurred at a jobsite regarding a load of concrete Rida was delivering that the customer did not want to accept.  Dickson testified that he went to the jobsite, calmed Rida down, and when they returned to the plant he issued Rida a discipline.  Dickson said that Coleman served as a witness to the discipline and that during the meeting Coleman also explained to Rida about how to provide proper customer service.  (Tr. 2180–2188, 2224–2225)

Dickson testified the second conversation occurred around June 2018, involving a jobsite incident where Rida allegedly dumped his remaining concrete in the wash out area, which is a designated area used by drivers to wash out their trucks.  According to Dickson, in this meeting he explained to Rida what he had done wrong, along with Respondent's proper procedure for washing out and disposing of left over concrete.  He then issued Rida another written discipline.  Dickson said that Rida claimed he did not know the proper procedure, and during the meeting Coleman told Rida that he had learned about the procedure during training.  These were the only two meetings Dickson said that he held with Rida at the Sloan plant in which Coleman was present.  (Tr. 111, 329, 2185–2188)

##### c. Testimony of Rodney Coleman

As part of its defense, Respondent called Rodney Coleman as a witness.  Coleman worked for Cemex as ready-mix driver, and since about February 2018 he also served as a "driver-trainer" for the company.  Driver-trainers are paid an extra dollar per hour and train new drivers.  (Tr. 1703, 2643, 2646, 2671–2672; JX. 2, pp. 212–213, 235, 249, 428; JX. 6)

Coleman testified he had a good relationship with Rida, and that he trained Rida as a new employee.  According to Coleman, sometime around the beginning of May 2018 he was present for a disciplinary meeting between Rida and Dickson in the Sloan plant office.  Coleman said the meeting was about a "pump situation" between Rida "and the pump guy" who was working for a customer.  (Tr. 2648)  During the meeting Dickson accused Rida of arguing with the pump guy, asked Rida what had occurred, and told him that his actions could get him fired.  In reply, Rida explained that he was just trying to defend himself from the pump guy who had started yelling.  Eventually Dickson gave Rida a disciple, which he signed.  According to Coleman, the topic of the union was never discussed during this meeting.  (Tr. 2648–2653, 2666, 2670–2671)

Coleman said that he also served as a witness during a second disciplinary meeting between Dickson and Rida in June 2018, involving an incident where Cemex was pouring concrete for a housing development with two crews that were separated by a brick wall.  Rida was told that the customer no longer needed his concrete, and he washed out his truck.  However, the crew on the other side of the wall apparently needed more concrete.  Coleman said that, during this meeting Rida told

---

employees a pension."); and *Wake Electric Membership Corp.*, 338 NLRB 298, 306–307 (2002) (manager's statement that he was not making any promises "was mere verbiage, in light of his request that the employees give the Company 'another chance,' and his averment that the Company would 'work with' the employees.") with *Noah's New York Bagels, Inc.*, 324 NLRB 266, 267 (1997) (no violation where employer confessed it had neglected matters and asked for a second chance to make things better).

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC    61

Dickson he was being picked on, and that the customer had told him he was finished and did not need the concrete. Dickson told Rida that he was supposed to check with the other customer, on the other side of the brick wall, to make sure the other customer did not need any more concrete. According to Coleman, at one point during this meeting he told Dickson that he was "stepping on [Rida] as a person" because he was yelling while Rida was only trying to have a conversation with him regarding what occurred. (Tr. 2667) Coleman testified that the topic of the union was never discussed during this meeting and that Dickson ultimately suspended Rida for a few days. (Tr. 2653–2655, 2667)

According to Coleman, during the time period in question, he was not present during any conversations between Dickson and Rida in the Sloan office where the union was discussed. And Coleman could not recall any conversations with Dickson concerning union flyers. Coleman said that he did talk with Dickson about the union, but that these conversations were general in nature about the pros and cons of unionization, and that Dickson told him if the Union won the election, employees would not be able to come directly to management anymore but instead would need to have the Union speak for them if they had any issues. (Tr. 2655, 2665)

### 2. Analysis

#### a. Respondent's claim that the underlying charge was withdrawn

In its brief, Cemex argues that the Board does not need to address this matter because the underlying charge supporting the allegation was withdrawn. Specifically, Respondent asserts that "[t]his allegation relates to Charge 28-CA-230115" and is "no longer viable and should be dismissed" because on March 11, 2020, the Regional Director "approved the withdrawal of all allegations in that charge asserting that CEMEX . . . threatened its employees with termination because they engaged in union activities." (Cemex Br. at 23) (underline added). However, Respondent never introduce into evidence the Regional Director's letter, or any other evidence, supporting this claim. And the Board's files show that Cemex's brief misstates the content of the Regional Director's March 11, 2020 letter.[6] The letter reads as follows:

> This is to advise that I have approved the withdrawal of the Section 8(a)(3) allegations of the charge that the Employer has discriminated against its employees by implementing a policy prohibiting its employees from wearing Union insignia during its organizing campaign, and has threatened its employees with termination because they engaged in union activities.

> All other portions of the charge remain pending and subject to further proceedings

On its face, the letter states that the Regional Director approved the withdrawal of the "Section 8(a)(3) allegations of the charge" but did not approve the withdrawal of "all of the allegations" as asserted by Respondent. The charge in question alleges that Respondent violated both Section 8(a)(1) and 8(a)(3) of the Act by implementing a policy prohibiting employees from wearing union insignias and threatening employees with termination because of their union activities. (GC. 1(a)). Because the Regional Director's letter only approved withdrawal of the charge's 8(a)(3) allegations, and specifically states that "[a]ll other portions of the charge remain pending and subject to further proceedings," Respondent's assertion is erroneous. Complaint paragraph 5(a) alleges an 8(a)(1) violation occurred, and is properly based upon the 8(a)(1) charge in Case 28–CA–230115 which remained "pending and subject to further proceedings," after the Regional Director's March 11, 2020 letter.

#### b. The Complaint allegation

Both Dickson and Coleman denied being present in the Sloan office for a conversation with Rida about the union during the time period in question. And both testified about formal disciplinary meetings that occurred in May and June 2018. Rida, on the other hand, said the incident occurred in July 2018 and was unrelated to any of his disciplinary meetings.

In an effort to shed light on this discrepancy, and to detract from Coleman's credibility, Rida was recalled as a witness by the General Counsel on rebuttal and testified that Coleman was not present during the two disciplinary meetings. Rida claimed he had proof that Coleman was not at the second meeting saying he texted Coleman a copy of his discipline and spoke with him on the phone about what occurred immediately after the meeting. However, no phone records were introduced into evidence showing that such a call occurred, nor were copies of Rida's purported text messages introduced into the record. (Tr. 3127–3128, 3130–3132)

In a further effort to detract from Coleman's credibility, during his rebuttal testimony Rida denied that Coleman trained him when he was first hired, and further said that Coleman did not become a driver-trainer until after the March 2019 election. (Tr. 3122–3124) Even though the record shows that, whoever trains a new driver has to "sign-off" on the new driver's qualifications, no documentary evidence was introduced into evidence showing who actually trained Rida. Similarly, no records were introduced showing when Coleman became a driver-trainer, notwithstanding the fact his payroll records would have evidenced a $1 per hour pay increase because of the new assignment.

As more fully set forth in Section III(C)(2) below, I generally did not find Dickson to be a credible witness. That being said, based upon observing their respective testimonies, I have no reason to discredit Coleman or to somehow credit Rida over Coleman. Rida admitted that he and Coleman were friends,

---

[6] I take administrative notice of the Regional Director's March 11, 2020 letter in Case 28-CA-230115, which all parties received during the underlying investigation. See *Lord Jim's*, 264 NLRB 1098, 1098 fn.1 (1982) (The Board may take judicial notice of its own files); *Registry of Interpreters for the Deaf, Inc.*, 370 NLRB No. 18, slip op at 4 fn. 11 (2020) (Board may take administrative notice of the procedural history of a case); *American Electric Power*, 362 NLRB 803, 804 (2015) (Board takes administrative notice of Regional Director's partial dismissal letter).

62                                      DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

and there is no evidence to support a conclusion that Coleman was somehow hostile to Rida or the drivers' unionization efforts. In fact, Coleman signed a union authorization card. Because Coleman denied that the conversation occurred, I find the General Counsel has not shown that the statements attributed to Dickson were made, and I recommend this allegation be dismissed.

### B. Dickson's alleged August 2018 threats at I-215 & Revere jobsite (Complaint Paragraph 5(b))

#### 1. Background

##### a. Testimony of Ibrahim Rida

Rida testified that one day in August 2018 he was at a jobsite located near the cross streets of Revere and I-215 in North Las Vegas with a coworker named Chris Lauvao. While the two were parked waiting to deliver their respective loads, Rida walked to the back of his truck and was speaking with Lauvao. According to Rida, Dickson came up and started talking to them about the union stickers they were wearing on their hardhats and that were on their truck windows. Rida testified Dickson told them that, if they were caught with union stickers on their hardhats or on their trucks, they could get fired or written up. Rida said Dickson then started "going on" about the union saying, if the "company did go union, that a lot of us would get fired, hours would get cut, lose our vacations, and they're just going to bring guys from Florida." (Tr. 809) Rida further testified that the last thing Dickson said was "if you guys do get caught with the union stickers, you will be terminated." (Tr. 809) (Tr. 808–809, 813)

Later that day, Rida went to the washout area at the jobsite to clean his truck, and testified that he saw Dickson yelling at Mike Hood; Lauvao was also present. According to Rida, Dickson was yelling that Hood was not allowed on the jobsite, needed to leave, and he asked Hood "why are you doing this." Before Hood could respond Dickson said that Hood was only "doing this" because he had animosity towards the company. (810–813)

##### b. Testimony of Estevan Dickson

Dickson admitted having a conversation with a group of drivers, including Lauvao and Rida, about union stickers, but said it occurred sometime between the end of June and early August 2018 at a jobsite located at the intersection of "Blue Diamond and Valley View." Dickson said there were seven or eight trucks lined up and Mike Hood was also present talking to the Sloan plant drivers. One of the drivers told Dickson that Hood was asking them to put union stickers on their hardhats. Dickson said that he immediately called Stewart Mate, who said he would get back to Dickson about the matter. (Tr. 2188–2189, 2191, 2228)

Mate called Dickson back about 15 minutes later and said drivers were not allowed to wear stickers of any kind on their hardhats unless it was CEMEX approved. Dickson said that he then told the drivers present at the jobsite that they cannot wear stickers on their hardhats or have stickers on their trucks unless it was company approved. Out of the seven or eight drivers Dickson said were present, he could only remember the names of five specific drivers, which included Rida and Lauvao. Later

that night, Dickson testified that Mate called him and said he had spoken with "Chris" and the attorneys and "from here on out, they can wear their stickers." (Tr. 2193) Dickson said that the next morning at the jobsite, when he caught a few of the drivers coming in he told them they could go ahead and wear whatever kind of stickers they wanted. Dickson said that afterwards, a majority of drivers, including Rida, wore union stickers on their hardhats. (Tr. 2190–2195, 2238)

Dickson also admitted having a conversation with Lauvao and Rida in August 2018 at the I-215 and Revere jobsite, but denied the conversation had anything to do with union stickers. When initially asked what he recalled about this conversation, Dickson said that he is "usually going up to the guys and seeing how they're doing, if their slumps are good, ready to pour out, stuff like that, see how they're doing." (Tr. 2195)

Because he answered about what he "usually" does, even though the question was very specific, I asked Dickson whether he actually remembered the conversation in question. Upon further examination from Respondent's counsel, Dickson said that he did, in fact, remember what happened and testified that he saw Lauvao and Rida in the staging area getting ready to unload and said to them "[j]ust hello, how you guys doing, how's your slump look, you guys ready to go, and having their chute, you're going to back up here, you're going to back up there," and he asked whether they were ready and prepared to go. (Tr. 2196)

Dickson denied saying anything to Rida and Lauvao about union stickers at the jobsite, or saying that they would be fired if they had a union sticker on their hardhat. According to Dickson, "at this point everyone was allowed to wear anything they wanted on their hardhat." He also denied telling Lauvao and Rida that drivers would get fired if the company "went union." (2197–2198)

Dickson further testified that he also spoke with Rida and Lauvao later that day at the washout area, because he thought they were taking longer than usual to wash out their trucks. However, when asked by Respondent's counsel what he said to Rida and Lauvao at the washout area, Dickson did not answer. Instead, he said that Rida and Lauvao were talking to Mike Hood. Dickson further said that, at one point he was alone with Hood at the jobsite and had a cordial conversation with him. Dickson testified he told Hood that he could speak with the drivers while they were staging, but asked him to let the drivers do their jobs and not delay them because they had to get back to the plant and get loaded again. Dickson denied telling Hood that he was not allowed to be on the jobsite, asking Hood why he was "doing this," or saying that Hood had animosity towards the company. (Tr. 2196, 2199–2201)

#### 2. Analysis

Only two witnesses testified regarding this allegation, Rida and Dickson. As stated earlier, I did not find Dickson to be a credible witness and I do not believe that Dickson remembered what he specifically said to Rida and Lauvao in August 2018 at the I-215 and Revere jobsite. I find it significant that, when initially asked to describe the conversation, Dickson answered by saying what he "usually" says to drivers at jobsites. And, after I expressed skepticism about his answer, Dickson's recita-

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC

63

tion of what he allegedly said to Rida and Lauvao was almost verbatim the same thing he claimed that he told Lauvao and another driver, on a different occasion. (Tr. 2196, 2202) I do not find Dickson's testimony about either conversation credible.

Instead, I credit Rida's testimony that Dickson told Rida and Lauvao that if they were caught with union stickers on their hardhats or trucks they could get fired or written up. This statement is also consistent with what Dickson had been telling other drivers at different times regarding their ability to wear union stickers on their hats. Absent special circumstances, employees have the right to wear union buttons and insignia at work, and the curtailment of that right is a clear violation of the Act. *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 801-803, 802 fn. 7 (1945). This right includes wearing union stickers on hardhats. *Northeast Industries Service Co., Inc.*, 320 NLRB 977, 977 fn. 1 (1996) (violation where supervisor threatened employees with discipline if they did not remove union stickers from their hardhats). Here, there is no evidence of any special circumstances, nor does Respondent make such a claim. Instead, the credited evidence shows that before union stickers became an issue, employees were allowed to wear various types of stickers on their hardhats without prohibition, including stickers for sports teams and vendors. (Tr. 385, 629, 687) Accordingly, by telling employees they could be written up or fired for having union stickers on their hardhats Dickson violated Section 8(a)(1) of the Act.[7]

I also find that Dickson violated Section 8(a)(1) by making various threats to Rida and Lauvao, including threats of termination and reduced hours or benefits if employees unionized. *Valerie Manor, Inc.*, 351 NLRB 1306, 1313 (2007) (telling employees that they would lose benefits, including vacation, if the "Union comes in" a violation); *Bancroft Manufacturing Co., Inc.*, 210 NLRB 1019, 1021 (1974) (supervisor's statement that employees "would lose their jobs or have their hours cut if the Union were voted in" constituted unlawful threats). As for Respondent's claim that these allegations should be dismissed because the "Region approved the withdrawal of all allegations" in the underlying charge in Case 28-CA-230115 (Cemex Br. at 28), as noted earlier this claim is simply untrue. Only the 8(a)(3) allegations in the charge were withdrawn, the 8(a)(1) claims remained intact.

The General Counsel further alleges that Rida's testimony about what Dickson said to Hood about "doing this" because he had animosity towards the company constitutes a violation. However, despite the fact Hood was called as a witness by the General Counsel, he was never asked about this incident. Hood was working for the Union as a lost-time organizer at the time, and the evidence shows that he was, in essence, the Union's lead organizer in Las Vegas. In this capacity it is a reasonable to assume that Hood's testimony would have been favorable to the General Counsel and the Union. Thus, the fact that Hood testified about other statements made by Dickson, but did not testify about this particular incident, warrants an inference that his testimony would not have corroborated Rida's regarding

what Dickson said to Hood on the day in question. *Vista Del Sol Health Services, Inc.*, 363 NLRB No. 135, slip. op. at 14 (2016) (adverse inference is warranted by the unexpected failure of a favorable witness to testify regarding a factual question on which the witness is likely have knowledge) (citing *Martin Luther King, Sr., Nursing Center*, 231 NLRB 15, 15 fn. 1 (1977)). Under these circumstances, while I do not necessarily believe Dickson about what he told Hood that day, I cannot rely upon Rida's testimony about this matter and find that the General Counsel has not met his burden of proof to show a violation occurred. Therefore, I recommend that the allegation in Complaint paragraph 5(b)(2) be dismissed.

3. Respondent did not repudiate its prohibition on wearing stickers

Respondent asserts that Dickson repudiated his directive against wearing stickers in a timely and effective manner, citing *Passavant Memorial Hospital*, 237 NLRB 138 (1978). (Cemex. Br. at 29) The company asserts that it is therefore "illogical" to claim that, after repudiating his directive, Dickson would later tell employees they could not wear union stickers. Id. at 29, 37, 41.

However, as previously stated, I did not find Dickson to be credible. And I do not credit his testimony that, after telling drivers they could not wear stickers on their hardhats, he told a few unidentified drivers as they were coming in to the jobsite the next day that they could wear whatever stickers they wanted.

Moreover, even assuming that Dickson's testimony is true, and that he caught a few of the drivers coming in the next day and told them they could wear whatever stickers they wanted, this does not amount to a repudiation. There is no evidence that Dickson told the same seven or eight specific employees from the previous day that they were now allowed to wear stickers, or that those specific employees otherwise learned that Dickson's initial prohibition on stickers was wrong. "[T]here must be adequate publication of the repudiation to the employees involved." *Service Employees Local 399 (City of Hope)*, 333 NLRB 1399, 1401 (2001). Here there was not. *Fresh & Easy Neighborhood Market Inc.*, 356 NLRB 588, 588 fn. 2 (2011) (no repudiation where employer did not unambiguously inform the employees in question that the employer "had been wrong and employees were free to talk about the union while on the sales floor.").

Also, the fact that Respondent continued telling employees to remove stickers from their hardhats further undermines any claim of repudiation. Id. (no repudiation where employer repeated the unlawful directive and made no further attempt at disavowing the unlawful comments). Not only did Dickson himself tell other employees to remove stickers from their hardhats, but other Cemex supervisors/agents did so as well. The evidence shows that, in early 2019, plant superintendent Andrew Burton told Los Angeles area drivers during a meeting that they needed to remove all the stickers from their hardhats, including union stickers, as they posed a safety hazard because the company could not tell if the hats were cracked or damaged,

---

[7] The issue of Respondent's trucks with stickers/signs is discussed in Section III(L) below.

64                     DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

and employees might try to cover up the cracks with stickers.[8] (628–629, 661)  And some drivers actually removed the stickers from their hats in response to this directive. (Tr. 623–624, 628–629)  Burton also made the same directive to drivers via the CB radio. (Tr. 632–633).  This evidence, which I credit, was not refuted by Respondent.  Finally, the evidence shows that, during this same general time period, other Los Angeles area batchmen and assistant batchmen were telling drivers the same thing. (Tr. 634–635, 773–774, 1542–1549, 1554–1555, 1562)  And, although many employees continued wearing union stickers, the fact they did so is not proof that other employees were coerced into not wearing them. See *Athens Services*, 370 NLRB No. 111, slip. op. at 11 (2021);[9] see also *National Steel & Shipbuilding Co. v. NLRB*, 156 F.3d 1268, 1272 (D.C. Cir. 1998) enforcing 324 NLRB 499 (1997) (the fact some employees are indifferent to the company's videotaping of union activity does not mean that the videotaping did not tend to coerce other employees).  In sum, there was no effective repudiation by Respondent.

### C. Dickson's statements to employees on August 22, 2018 at Tanglewood jobsite (Complaint Paragraph 5(c) & Union Objection #4)

#### 1. Background

##### a. Testimony of Mike Hood

Mike Hood testified that on August 22, 2018 he heard from a driver that Cemex was working at a jobsite in North Las Vegas, involving a large housing subdivision called Tanglewood that was being built by the developer KB Homes.  Sometime around mid-morning, Hood said that he positioned himself near the washout area of the jobsite where two Cemex ready-mix trucks were present, one belonging to Oscar Orozco and another belonging to Chris Lauvao.  Orozco and Lauvao were standing across the other side of the washout area, about 10 to 20 feet away from Hood, spraying down their trucks which were running.  Hood and the drivers started discussing the organizing campaign.  Shortly thereafter, Estevan Dickson arrived in a pickup truck, walked up to Hood, and the pair started talking.  Hood said their conversation started with friendly small talk, but then Dickson started asking particulars about the organizing drive:  how it was going; whether they were getting close to an election; and how many drivers were supporting the union.  Hood did not reply to Dickson's questions.  Dickson became frustrated at the lack of a response, and turned his attention towards Orozco and Lauvao.  Hood testified that Dickson started speaking loudly and pointing his finger at the drivers telling them to not to speak to "these union guys" and to "take those damn stickers off your hat or you will be . . . written up or

fired."[10]  (Tr. 556–557)  The drivers did not say anything in reply, but just stood there with their mouths open staring at Hood and Dickson.  Because of their reactions, Hood believed the drivers wanted him to intervene, so he told Dickson "you can't say that." (Tr.. 557)  Dickson then stormed off into the housing tract.  After Dickson left, Hood told Orozco and Lauvao that Dickson was not allowed to say those things.  Meanwhile, Hood said that he heard Dickson yelling again, this time from about 75 to 100 feet away, saying "don't talk to these union guys", "take that sticker off your hardhat" and that "if you vote for the Union, you're going to lose hours."[11]  (Tr. 558–559) (Tr. 553–559, 601)

##### b. Testimony of Estevan Dickson

Dickson testified that Respondent was at the Tanglewood jobsite on a daily basis during this time frame, as it was a lengthy job.  Anywhere from 5 to 10 Cemex trucks could be on the site at any one time, with two trucks pouring simultaneously if needed.  Dickson said that he had multiple conversations with Hood throughout the campaign, that he and Hood were friends, and their conversations were cordial.  According to Dickson, they did not talk about the union, but "it was more like how's your family doing, did you get a job, how are you doing, stuff like that." (Tr. 346)  When asked what he talked to Hood about at the Tanglewood jobsite, Dickson said "same thing, how's your family doing, you know stuff like that, just certain things . . . . did you watch the game over the weekend and stuff like that." (Tr. 346–347) (327–328, 337)

During his initial testimony, Dickson admitted that he had a conversation with Hood at the Tanglewood jobsite in the presence of Cemex employees.  However, when asked which specific employees were present, Dickson said "[w]hatever drivers were on the jobsite that day." (Tr. 337)  Three months later, when called as a witness during Respondent's defense, Dickson testified that he remembered having a specific conversation with Lauvao and Orozco at the Tanglewood jobsite on August 22 in Hood's presence.  Dickson said that both of the drivers were wearing union stickers at the time, and that when he arrived at the location they were both speaking with Hood.  While Hood was standing nearby, Dickson testified that he had a short conversation with Lauvao and Orozco.  Regarding the conversation, Dickson testifying as follows:

> Q. Tell us about that conversation.
> A. So the same thing, how are you guys doing, how's your slump going, you guys are prepared to go, you're going to stage here, you're going to stage there and unload here and there.
> Q. What did they say in return?
> A. Nothing.  All right, yeah, we're ready to go.  Slumps look good and stuff like that on our daily basis. [Tr. 2202]

---

[8] Any claim that Cemex had a legitimate safety concern is without any basis, as the evidence shows that during this same time period the company made available to employees large "Vote No" stickers for them to wear and company officials were wearing these, and other, stickers on their own hardhats. (Tr. 363–365; 1290–1294; U. 13–14, 16)

[9] Although this issue was not before the Board on exceptions, I find the Judge's analysis regarding this topic in *Athens Services*, 370 NLRB No. 111 (2021) as persuasive.

[10] In Hood's opinion, Dickson was speaking loud enough for the drivers to hear what was being said. (557–558)

[11] Hood said that it was a calm morning at the housing tract.  That there was construction going on at the other end of the housing tract, but at his area it was wide open.  Hood said that he did not have trouble hearing Dickson. (559)

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC    65

Dickson denied telling Lauvao and Orozco that they should not be talking to the Union, and further denied telling them to remove stickers from their hats or they would be fired or written up. (Tr. 336–337, 2201–2205)

Dickson also denied asking Hood any questions about the organizing drive that day. When asked what he said to Hood, Dickson testified he said "[h]ey Mike, how you doing, you know, how are things going, how's the family?" (Tr. 2202) Dickson said that he also told Hood to "try not to keep the drivers from doing their job, let them do the job, you can talk to them whenever, but just not while they're working." (Tr. 2204) According to Dickson, Hood said he understood, and then walked away. (Tr. 2202–2206)

### 2. Analysis

No party called either Orozco or Lauvao to testify, even though they were still employed by Respondent at the time of the hearing.[12] Therefore, I am left with the testimonies of Hood and Dickson to determine what happened that day at the Tanglewood jobsite. Because I did not find Dickson to be a credible witness, I credit Hood as to what occurred.

Regarding Dickson, I found his testimony inconsistent and contradictory and believe he tried to tailor his testimony to what he thought best supported Respondent's position at any given time. For example, Dickson was initially called to testify by the General Counsel who, along with the Union, cross examined him as an adverse witness; Dickson's initial testimony occurred before Hood testified about the events in question. During his initial testimony, Dickson admitted to having a conversation with Hood at the Tanglewood jobsite in the presence of Cemex employees. But when asked which specific employees were present, Dickson did not identify Orozco and Lauvao, or anyone else. Instead he answered "[w]hatever employees were on the jobsite that day." (Tr. 337) Three months later, when called as a witness as part of Respondent's defense, well after Hood had testified, Dickson somehow not only recalled that it was Orozco and Lauvao that were present, but also remembered the date of the conversation and the specifics of what occurred. I do not believe that somehow Dickson regained his memory about what happened.

Dickson also contradicted himself on other matters regarding the Union or employee union activity. For example, he initially testified that he learned about the union organizing drive during the summer of 2018 when Hood, who had left Cemex and was working as a Union organizer, told him that the company was "going to go union." (Tr. 313–315) Three months later, when he testified as part of Respondent's defense, Dickson changed his answer and said that he learned about the Union's organizing drive from Stewart Mate, who told him in April 2018 that "the Union was trying to get into Cemex." (Tr. 2230) Dickson

also testified that in around August 2018 Lauvao was wearing union stickers on his hardhat and continued to wear them until the March 7 election. (Tr. 2203–2205) However, Dickson had earlier testified that, after August 2018, he did not recall seeing Lauvao wearing any union stickers on his hardhat. (Tr. 2195–2197)

Dickson could not even consistently testify about when he moved from being the Las Vegas plant foreman, overseeing both the Losee and Sloan plants, to becoming a batchman in Phoenix, Arizona. During his initial testimony on November 10, 2020, Dickson said that he had been working as a batchman in Phoenix for "a year and a half" and that he was the Las Vegas plant foreman for "about 4 years" from April or March 2016 through sometime in 2019. (Tr. 311) This timeline would have put Dickson's departure from Las Vegas as occurring soon after March 2019, potentially raising the specter that his exit was somehow tied to the union election. However, when he testified again on January 21, 2021, Dickson changed his testimony, saying that he was the Las Vegas plant foreman from March 2015 "[u]ntil maybe 6 months ago," thereby removing any potential correlation between his departure and the election. (Tr. 2178–2179) In sum, I did not find Dickson to be a credible witness, and I do not credit any of his testimony in this matter unless it was independently corroborated by other credited evidence.

Therefore, the credited evidence shows that, while Dickson was speaking with Hood at the Tanglewood jobsite, he became frustrated that Hood would not answer his questions about the organizing drive. Dickson then turned to Orozco and Lauvao, who were both wearing union stickers on their hardhats. Dickson pointed his finger at the two drivers and started speaking loudly to them saying that they were not to speak to "these union guys" and to "take those damn stickers" off their hats or they would be written up or fired. Hood then told Dickson that he "can't say that."

The credited evidence also shows that Orozco and Lauvao were close enough to hear Dickson's comments. Immediately before Dickson's statements, Hood had been having an ongoing conversation with the two drivers, who were standing in the same location, across the washout area, hosing down their trucks. And Hood's testimony that, although construction was occurring at the other end of the housing tract, the area where the conversation took place was "wide open" and that it was a "calm morning" was unrebutted. (Tr. 559) Accordingly, by telling Orozco and Lauvao to remove the union stickers from their hardhats, Dickson violated Section 8(a)(1) of the Act. *Northeast Industries Service Co., Inc.*, 320 NLRB at 977 fn. 1; see also *Pacific Bell Telephone Co.*, 362 NLRB 885, 910 (2015) (telling employees they could not wear union insignia violated Section 8(a)(1) of the Act).

Dickson's instruction to Orozco and Lauvao that they were not to speak to "these union guys" is similarly a violation. The evidence shows that, when Respondent's employees were at customer jobsites, either waiting in line to pour, or during the 10–15 minutes it takes to spray off their truck in the washout area, Cemex did not have any rules as to what drivers could, or could not, do during this time other than the obligation to be

---

[12] In its posthearing brief, Respondent admits that both Lauvao and Orozco are still employed with Cemex, and faults the General Counsel and the Union for not calling either as witnesses. (Cemex Br., at pp. 30. 38, Attachment A pp. 4, 6). Because current employees cannot be considered predisposed to testify in one manner or another, and are equally available to all parties, taking an adverse inference because a particular party failed to call either Lauvao or Orozco as a witness is not warranted. *Schuff Steel*, 367 NLRB No. 76, slip op. at 6 (2019).

66                          DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

responsible for the safety of the truck. Drivers were allowed to talk with other individuals during these times, including the consultants, so long as it was not affecting their work. (Tr. 110–112, 341–342, 1383–1384, 2502) Here, there is no credible evidence that Hood's discussions with Orozco and Lauvao in any way affected their work. Instead, the evidence shows that Hood spoke with the drivers while they were actively spraying down their trucks. Accordingly, Dickson's admonition that the drivers were not to speak to "these union guys" violated Section 8(a)(1) of the Act. *Evolution Mechanical Services., Inc.*, 360 NLRB 164, 173 (2014) (telling employees not to talk with union organizers if they came to the jobsite a violation); *Manon Electric, Inc.*, 321 NLRB 278, 290 (1996), enfd. 127 F.3d 34 (5th Cir. 1997) (table) (supervisor's statement that employees were not to talk to union organizers between 7:00 a.m. and 3:30 p.m. and anyone caught doing so would be fired a violation).

*D. Dickson's conversation with Gary Collins in January 2019 (Complaint Paragraphs 5(d), 5(e) & Union Objections #2, #4)*

1. Conversation at the Hydro Arch jobsite

*a. Testimony of Gary Collins*

Gary Collins worked as ready-mix driver assigned out of the Losee plant in Las Vegas. At the time of his testimony Collins had worked for Cemex for close to 4 years, and worked in the ready-mix industry for 31 years. Collins testified that on January 5, 2019, he was working at a jobsite called Hydro Arch in North Las Vegas when he had an interaction with Dickson about the union. According to Collins, he was pouring out his load of concrete when Dickson walked up to him and asked why he was wearing a Teamsters sticker that said "Demand Your Worth" on his hardhat. Dickson then said, "if you want the Union, why don't you just go to work at Nevada Ready-Mix." (Tr. 685) Collins replied asking why he should go to work somewhere else when he already had a job at Cemex. Dickson then asked Collins what the Union was going to offer. Collins said a lot, like benefits including medical and a pension. Dickson asked Collins "if I offer you $100, would you believe it?" In reply Collins said that it was up to Dickson if he wanted to offer him $100. Collins testified that during this conversation Dickson also told him that if the Union came in, Cemex "is just going to close their doors and take all their trucks to another state, because they don't want the Union." (Tr. 685–686) (Tr. 681–686, 699–700; GC. 8)

During cross-examination, Respondent questioned Collins about a hand-written note he made regarding his conversation with Dickson. Collins said that he drafted the note when he returned to the plant about 45 minutes after the conversation occurred. Respondent's counsel read Collins' written statement into the record and a photograph of the document was also introduced into evidence. Collins's written statement reads as follows:

> On January 5th 2019 aprox. 9 am in the morning on a Hydro Arch job at Grand Teton & Alliante in North Las Vegas at a Shotcrete job Ast. Manager Estivan Dickson confronted me about having a Demand Your Worth Sticker (Union) whats

the Union going to offer you I told him a lot pension, medical benefits he said if you want union go to Nevada Ready mix if I offered you $100 would you believe it I said that's up to you. I won't turn it down. He said they might just close they're doors. (GC. 31)

Collins signed the document, and at the bottom also wrote "Given to Mike Hood on 2/5/2019." Collins said he drafted the statement in a notebook he kept, and that he took notes on several occasions regarding conversations with management officials during the organizing drive. Collins further stated that he turned this note over to Hood when he saw him on February 5, 2019. (Tr. 697–698, 3106–3119; GC. 31)

*b. Testimony of Estevan Dickson*

Dickson testified about his January 5, 2019 conversation with Collins at the Hydro Arch jobsite, and denied Collins' version of events. Dickson denied saying anything about Cemex closing its doors or taking their trucks to another state if the Union won the election. He also denied saying anything about giving Collins $100. (Tr. 2211, 2214–2216)

According to Dickson, Collins was pouring out his load of concrete at the jobsite and was not wearing his hardhat or his glasses. Dickson said that he told Collins "Gary, grab your hardhat and your glasses, bud, you know better than that." (Tr. 2221–2222) Collins replied my bad, my bad, and then grabbed his glasses and put his hardhat on. Dickson testified that he then left to speak with the customer and when he returned Collins was wearing his hardhat on the back of his head, with the face shield pointing straight out instead of covering his face. Dickson said that he then told Collins "you can't do that, bud, you got to wear your hardhat properly and cover your face." (Tr. 2212) Collins again said my bad, my bad. According to Dickson, Collins put his hardhat on properly and complained that he could not see out of the company's new face shield. Dickson told Collins that everyone had to wear the new face shield because it was company policy. (Tr. 2211–2212)

Dickson admitted that the pair discussed Nevada Ready-Mix, but said that Collins had commented about a couple of former Cemex drivers who had gone to work at Nevada Ready-Mix, saying there doing really well, had good benefits, and did not have to pay for insurance. Dickson said that Collins told him he was going to vote for the Union because he hoped Cemex drivers could get the same deal and that was why employees were supporting the union drive. In reply, Dickson testified that he told Collins to do his homework and study, that there were no guarantees or promises unless it was in writing, and to make sure what the Union was offering him was in writing. Dickson said that Collins told him he could not afford the company's insurance as it was too expensive to cover himself and his family. In reply, Dickson claims he told Collins that he also has children, has the same insurance plan as the drivers, that "it's pretty good, works out pretty well," and that it was not too expensive. (Tr. 2214 , 2217)

2. Conversation at the Losee yard

Collins testified that he had another interaction with Dickson regarding the Union sometime in early January 2019 while he was at the Losee plant fueling his truck. At the time, Collins

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC    67

had two Teamsters "Demand Your Worth" stickers on his hat. He testified that Dickson drove up in a loader and started yelling at him to take the union stickers off his hardhat. Collins said that Dickson then drove off, but a few minutes later came back and again told Collins to remove his union stickers. According to Collins, he continued fueling his truck and when he finished he sat in his mixer truck waiting to be loaded. Collins said that he had been waiting between 5 to 10 minutes when Dickson drove up a third time. This time Dickson got off of the loader; Collins, in turn, got out of his truck. Collins testified that, at this point Dickson started yelling, saying that he was serious and to "[t]ake them union stickers off your hardhat." (Tr. 684) Collins said that he took his hardhat off, peeled/scratched the stickers off of his hat, and threw them in the trash. Eventually Collins said that once again started wearing prounion stickers on his hardhat, as the Union came around and passed out more stickers to the drivers. (Tr. 683–684; GC. 8)

As for his conversation with Collins at the Losee plant, Dickson testified that it involved the manner in which Collins wore his personal protective equipment, specifically his hardhat and glasses, and had nothing to do with the union. According to Dickson, he and Collins were at the fueling station and Collins was not wearing his hardhat. Dickson told Collins "you got to wear your PPE, bud. You know better than that, you got to wear your hardhat and your glasses." (Tr. 2208) Collins replied saying "I know, but I'm just getting fuel." (Tr. 2208) Dickson then said that employees were required to wear their PPE at all times, that the company had a big project coming up building a new casino/hotel called Circa, it was a zero-tolerance jobsite, and a job the company could not afford to lose. Dickson claimed this was a recurring issue with Collins, and he had spoken to him numerous times about properly wearing his PPE. Dickson denied telling Collins to remove stickers from his hardhat, denied leaving and then coming back to speak with Collins on different occasions, and further testified that he never saw Collins peel union stickers off his hat. (Tr. 2208–2211, 2220, 2237)

Regarding this hardhat, Collins admitted that he sometimes wore his hardhat tilted back. Collins said that that one time, but it is unclear when or where, Dickson told him that he had to wear his hardhat properly, grabbed his hat, moved it around on his head, said that he had to wear his hardhat "like this." He then told Collins that if he did not wear his hardhat "right" Dickson was going to get him kicked off the Hotel Circa job when it "starts up all the way." (Tr. 688)

### 3. Analysis

I credit Collins as to what occurred at the Losee yard and at the Hydro Arch jobsite. Collins was forthright in his testimony and I believe he strived to testify honestly as to what occurred. The same cannot be said about Dickson. Moreover, Collins was a current employee when he testified and was therefore testifying against his pecuniary interest. This further enhances Collins's credibility. *Flexsteel Industries*, 316 NLRB 745, 745 (1995).

Accordingly, I find that, at the Hydro Arts jobsite, Dickson asked Collins why he was wearing a union sticker on his

hardhat then questioned why Collins just did not go to work at Nevada Ready-Mix if he wanted the union. When Collins asked why he should go to work elsewhere when he had a job at Cemex, Dickson asked Collins what the union was going to offer. In reply, Collins said that the union offered "a lot" like medical and pension benefits. Dickson said that, if the employees unionized, Cemex was going to close their doors, take their trucks, and go to another state because they don't want the union. Finally, in relationship to their discussion of what the union had to offer, Dickson said "if I offer you $100, would you believe it?" Collins replied saying that it was up to Dickson as to whether he wanted to offer him $100.

Dickson's statement to Collins asking him why he just did not go to work at Nevada Ready-Mix if he wanted the union was an unlawful invitation to quit, as it came in response to the fact Collins was wearing union stickers on his hardhat. *McDaniel Ford, Inc.*, 322 NLRB 956, 956 fn.1 (1997) (telling employees that they should look for jobs someplace else if they are unhappy a violation); *Bell Burglar Alarms, Inc.*, 245 NLRB 990, 990 (1979) (asking employee why he did not quit if he was not happy a violation); *Jupiter Medical Center Pavilion*, 346 NLRB 650, 651 (2006) (telling employee "maybe this isn't the place for you . . . there are a lot of jobs out there" a violation).

Dickson's statement that Cemex was going to close their doors and take their trucks to another state if employees unionized because they do not want the union also constitutes a violation.[13] *Gibson Distributors*, 238 NLRB 491, 493 (1978) (telling employees that if they selected the union the company would close its doors and employees would lose their jobs a violation); *Ace Heating & Air Conditioning Co., Inc.*, 364 NLRB No. 22, slip op. at 2 -3 (2016) (statement from supervisor/agent that the owner wanted him to inform workers that the company would close its doors if they voted for the union a violation); *Reeves Southeastern Corp.*, 256 NLRB 574, 578 (1981) (violation where foreman threatened that the company would close the plant and move to another state of the union came in).[14]

---

[13] Whether Dickson said Cemex "might just close the[ir] doors" as set forth in Collins's written statement, or said that Cemex was "just going to close their doors" as Collins testified, is immaterial as Dickson never provided any objective facts to support a probable conclusion beyond Respondent's control that a union election victory would cause the company to close. *Kmart Corp.*, 316 NLRB 1175, 1178 (1995) (telling employees that the company would have to think about closing the warehouse if company expenses went up because of a union victory was an unlawful threat as the statement was not based on any objective facts); *Metfab, Inc.*, 344 NLRB 215, 218 (2005) (shop foreman's statement that company "might have to shut its doors if the union prevailed in the election" a violation as it was not based on any objective facts).

[14] Regarding all of the 8(a)(1) allegations in this matter, I have considered the fact that Respondent provided "TIPS" and "FOE" campaign training to its supervisors and managers. However, simply providing training does not negate the finding of a violation based upon credible witnesses testimony of what occurred. *Goodyear Tire & Rubber Co.*, 273 NLRB 36, 40 (1984) (Respondent committed multiple violations, including threats to close the plant, despite manager's testimony that employer's supervision received extensive "TIPS" campaign training that they could not engage in treats, interrogation, promises, or spying).

68                DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

Finally, I find that Dickson's questioning Collins about what the union has to offer constitutes an unlawful interrogation as the statement was accompanied by Dickson's other coercive threats. *Christie Electric Corp.*, 284 NLRB 740, 741 (1987). In *Christie Electric Corp.* the Board found an unlawful interrogation where a foreman showed a piece of campaign material to an open union supporter and asked, "what he wanted from the union." Id. When the worker replied that employees might want higher wages, the foreman said that the company would not go for that, that the company president would do anything to keep the Union out and would not sign a contract. Id. In this context, the Board found an unlawful interrogation because the foreman's questions were accompanied by coercive threats. Id. I find that Dickson's conduct here is comparable to the foreman's conduct in *Christie Electric Corp.* and similarly find that an unlawful interrogation occurred.

In its posthearing brief, the General Counsel asserts that Dickson offered Collins a bribe to quell his interest in the union when he asked whether Collins would believe him if he offered Collins $100. (GC. Br. at 63–64) However, this was no attempted bribe. It is clear from the context of the conversation that Dickson was trying to convey to Collins that he should not necessarily believe that employees would get better pension or medical benefits if they unionized. Therefore, I do not believe this statement constitutes a violation.

Regarding what occurred at the Losee yard, I credit Collins' testimony that Dickson told him to remove the union stickers on his hardhat three times, and that after the third time Collins peeled the stickers off his hat and threw them in the trash. Dickson's demand that Collins remove the stickers from his hardhat constitutes violation of Section 8(a)(1). *Pacific Bell Telephone Co.*, 362 NLRB at 910.

### E. Alleged interrogation by Ryan Turner in January 2019 (Complaint Paragraph 5(f))

#### 1. Background

##### a. Testimony of Richard Daunch

Richard Daunch is a Cemex ready-mix driver assigned to the Corona plant. At the time of his testimony Daunch had worked in this position, at the same location, for nearly 16 years. Daunch testified that on January 23, 2019, he was assigned to deadhead from Corona to the Perris plant. Deadheading is a term used in the industry to describe picking up an empty truck from one plant, and driving it to another plant where it will be loaded with product for delivery. (Tr. 156, 271–274, 282, 392)

Daunch picked up his truck at the Corona plant around 2:25 a.m. and arrived at the Perris plant about an hour later. When he arrived at the Perris plant, Daunch said that he pulled under the loading bay, loaded his truck with concrete, went to the washout area to slump his load, and then walked into the office to get his delivery ticket. At the time, Daunch was not wearing any stickers on his hardhat. Present in the office was Ryan Turner, the batch plant foreman named Daniel Becerra,[15] and a

quality control employee who greeted Daunch by saying good morning. Turner then looked at Daunch and said "where's your 'Vote No' sticker? How come I don't see a 'Vote No' sticker on your hardhat?" (Tr. 275) Daunch paused, took his hat off, looked at both sides, and replied "that's because I don't have one on there." (Tr. 275) Daunch then told Turner that he was not putting any stickers on his hardhat. In reply, Turner told Daunch "well, I can get you one, if you like," and that Daunch said "no, thank you." (Tr. 274–275, 294–295)

According to Daunch, sometime in January 2019, after this incident, he attended an employee meeting at the Corona plant with one of the labor consultants, and he asked him whether it was illegal for someone to ask where your Vote No sticker was. The consultant told Daunch that it was not legal, and asked for the name of the person who asked this question. Daunch did not want to raise any issues, so he just said that it was not a big deal. (Tr. 279–280, 296–297)

##### b. Testimony of Ryan Turner

Ryan Turner testified that, as a member of management his stance was in line with the company's position: employees should vote no in the election. Turner assisted in the company's efforts to encourage employees to vote against the union, and as part of this effort the company obtained Vote No stickers and handed them out to the drivers "if they asked." (Tr. 363–364) Respondent's Vote No stickers were approximately 3 to 4 inches in diameter, said "VOTE NO" in bold black letters, with a red, white, and blue background and white stars. Turner, as directed by Bryan Forgey, picked up the stickers at the Ontario office and put a stack of stickers on the counters at each batch plant he supervised. (Tr. 363–364, 370–371, 885, 1290; U. 5, 13, 21)

Regarding the Perris plant, Turner said that he worked out of Perris batch plant office 1 or 2 days a week, and that it was not uncommon for drivers to come into the office and speak with him. Drivers need to enter the Perris batch office to get their delivery ticket, because the plant does not have pneumatic tube system like other facilities. Turner denied having any conversation with Daunch at the Perris plant about Vote No or Vote Yes stickers, and further said that he did not have any conversations with Daunch about stickers. Turner also testified that he never asked any drivers if they wanted a Vote No sticker, but said that if drivers wanted one they could ask him for a sticker. He said that he only handed out one sticker to a driver during the campaign. (Tr. 364–365, 374–376, 2251–2252)

#### 2. Analysis

As to what occurred that day at the Perris plant office, I credit Daunch. I believe that Daunch, who had worked for Respondent for multiple years without any record of discipline, was straightforward with his testimony throughout the hearing and had no reason to fabricate what occurred. Moreover, as a current employee, Daunch was testifying against his pecuniary interest, which further bolsters his credibility. *Flexsteel Industries*, 316 NLRB at 745.

I didn't find Turner's denials credible. Turner was in control

---

[15] During his testimony, Daunch could not remember Becerra's last name, and called him "Daniel the batch plant foreman." (Tr. 274) It was clear that Daunch was referring to Becerra, as Respondent's organizational charts shows that Becerra was the plant foreman for the Perris

plant, and Turner testified that Becerra was one of the plant foremen he supervised. (Tr. 2250; GC. 4, 5; R. 8)

of the Vote No stickers for his area and was disseminating them to the plants he oversaw. At the time, there is no evidence that Turner knew Daunch was an active union supporter, and Daunch was not wearing any union stickers on his hardhat when he walked into the office that day. I believe that Turner was simply trying to be coy in attempting to uncover the level of Daunch's union support, when he asked why Daunch was not wearing a Vote No sticker and informing Daunch that he had Vote No stickers with him if he wanted one.

I also note that Respondent never called Becerra as a witness. As a Cemex plant foreman, and admitted Section 2(11) supervisor, Becerra's testimony was within Respondent's control, and Cemex offered no explanation as to why Becerra did not testify. As such, I find that had Becerra been called to testify, he would have testified adversely to Respondent's interests on this issue. *Martin Luther King, Sr., Nursing Center*, 231 NLRB 15, 15 fn. 1 (1977) (Adverse inference against Respondent and crediting the General Counsel's witnesses was proper where Respondent offered no explanation as to why its supervisors did not testify at the hearing). *CSH Holdings, LLC*, 365 NLRB No. 68, slip op. at 5 fn. 15 (2017) (where employer failed to present testimony from managers it may be inferred that their testimony would have been adverse to the employer's interests on that issue, and the judge properly drew an adverse inference accordingly).

Under the circumstances presented, I find that Turner's actions constituted an unlawful interrogation. Turner was a high-level official asking why Daunch was not wearing a sticker supporting the company's position against unionization. The two had not been engaged in any discussions or small talk about the election before Turner's statements, there was no legitimate purpose for his questions other than to see what Daunch would say or find out whether he would take a Vote No sticker, and there were no assurances against reprisals. The Board has found violations arising from the manner in which anti-union paraphernalia is distributed when the employer puts a worker in a position to declare whether or not the employee has allegiance to the union. *Catalina Yachts*, 250 NLRB 283, 288 (1980), enfd. 679 F.2d 180 (9th Cir. 1982); *Kurz-Kasch, Inc.*, 239 NLRB 1044, 1044 (1978). This is what Turner was attempting to do with Daunch. Accordingly, I find that Turner's actions violated Section 8(a)(1) of the Act. *Teksid Aluminum Foundry*, 311 NLRB 711, 715 (1993) (the act of tendering an antiunion button to an employee, who neither asked for one nor gave any indication of where he stood relative to the election campaign, constituted an unlawful interrogation).

### 3. Evidentiary Issue

The General Counsel's brief asks that I reconsider a ruling made at trial and admit into evidence a document prepared by Daunch outlining this and other events; he drafted the document after the March 2019 election to present to the NLRB during the underlying investigation of this matter. Respondent objected to the hearsay nature of the document, which was placed in the rejected exhibit file. (GC. 32–Rejected; Tr. 3138–3139) The General Counsel asserts the document is admissible as a prior consistent statement, pursuant to Section

801(d)(1)(B) of the Federal Rules of Evidence. (GC. Br. at 7) However, a "prior consistent statement is admissible only if it was made before the witness had a motive to fabricate." *Breneman v. Kennecott Corp.*, 799 F.2d 470, 473 (9th Cir. 1986); *Tome v. United States*, 513 U.S. 150, 158–161, 167 (1995); *Walker v. MacFrugal's Bargains Closeouts*, No. CIV. A. 93-4135, 1995 WL 396315, at *2 (E.D. LA. 1995) (EEOC affidavit not admissible as a prior consistent statement as the EEOC complaint and supporting affidavit were a necessary predicate to have the case proceed to trial). "The Rule speaks of a party rebutting an alleged motive, not bolstering the veracity of the story told." *Tome*, 513 U.S. at 157–58.

Here, the General Counsel has not shown that Daunch's statement was made before he had any motive to fabricate, which presumably would have predated the filing of charges and/or objections to the election in this matter. If Daunch "had a motive to fabricate at trial, the [NLRB investigation] setting would have engendered the same motive." *MacFrugal's Bargains Closeouts*, 1995 WL 396315, at *2. Moreover, during Respondent's cross examination, the company did not imply that Daunch's trial testimony was a result of a recent fabrication. "[I]mpeaching a witness by pointing to omissions in [his] prior accounts of a material fact is a far cry from charging [him] with 'recently fabricating' the facts." Id; *Thomas v. United States*, 41 F.3d 1109, 1119–20 (7th Cir. 1994) ("a charge of recent fabrication is a narrow subset of impeachment for credibility. One may impeach for lack of credibility without going so far as to charge recent fabrication."). And here there is no claim that Daunch's trial testimony was due to any "recent improper influence or motive." Fed. R. Evid. 801 (d)(1)(B)(i). I therefore reaffirm my ruling. Notwithstanding, as noted above, I have credited Daunch's testimony without relying upon the document.

### F. Alleged surveillance of employees in January 2019 (Complaint paragraph 5(g) & Union Objection #7)

#### 1. Background

Respondent's Inglewood plant has one gate that drivers use to enter and exit the plant. About two to three car lengths away from the gate is a set of railroad tracks; the tracks intersect a public road leading into the plant. In the weeks preceding the election Union organizers were outside the Inglewood plant, standing on the side of the road between the railroad tracks and the plant entrance talking to drivers or passing out flyers and other union information. On January 28, 2019, union organizer Scott Williams was outside the plant with Cemex employee Luis Hernandez. At some point during the day Cemex plant superintendent Robert Nunez and plant foreman Larry Ponce drove up to the gate and got out of their vehicles. Luis Hernandez and Robert Nunez testified as to what occurred that day. (Tr. 191, 1335; U. 12, R. 47)

##### a. Testimony of Luis Hernandez

At the time of the incident, Hernandez worked as a driver at the Inglewood plant, but was out on medical leave, and would

70                         DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

assist the Union with the organizing drive.[16] Hernandez testified that he was at the Inglewood plant on January 28, 2018, with Williams, standing off to one side of the road, between the railroad tracks and the gate, which had a large "Vote No" sign affixed to one side of the fencing. Hernandez and Williams had with them a large poster board showing a comparison between the wages and benefits of the company's unionized Northern California drivers and Cemex's non-union Southern California drivers. As employees drove by the gate, they held up the poster showing the comparison to the drivers. Hernandez said that any conversations they had with drivers that day were short, lasting just a few seconds. (Tr. 1259–1260, 1334–1335; GC. 20)

At some point Robert Nunez drove by in his company truck. Nunez drove into the plant, turned around, parked his truck, got out and stood there watching Hernandez and Williams. Hernandez said that Nunez stood there by himself for about 20–30 minutes, waving to the ready-mix trucks as they were coming in and out of the plant. It appeared to Hernandez that, by waving to the drivers, Nunez was letting them know that he was standing there. According to Hernandez, after Nunez' arrival the ready-mix trucks no longer slowed down to look at the poster, but instead just drove past with the driver maybe giving Hernandez a nod. At some point, while Nunez was standing there, Lorenzo Ponce pulled up in his personal car, parked to one side, and stood next to Nunez. After a little while, Hernandez testified that he walked up to the gate and started having a conversation with Ponce and Nunez about the benefits of unionization. Hernandez said that, as they were going back and forth debating the topic, Ponce said "just remember, the Company took care of you when you wanted to transfer to Vegas." (Tr. 1261) Hernandez asked what that had to do with anything, and Ponce replied "I'm just saying, you know, the Company took care of you. No questions asked."[17] (Tr. 1262) Hernandez said that this conversation lasted about 5 minutes. Then, Hernandez walked back to where Williams was standing, and Ponce and Nunez walked back towards Nunez's truck. Nunez and Ponce continued standing there waving at the trucks that were coming in and out of the plant, as they talked and watched what Williams and Hernandez were doing. (Tr. 1260–1263; GC. 20)

Hernandez, who had worked at the Inglewood plant for over 4 years, testified that it was not normal for Ponce and Nunez to stand by the gate for such a prolonged period of a time. Usually, if they needed to go to the gate for work reasons, it was just to see if any maintenance was needed. Hernandez testified that there were other occasions where he had conversations with Nunez near the gate entrance while he was helping the Union organizers between January 1, 2019, and the election, and that sometimes Nunez would ask him to not stop the trucks while they were loaded. However, Hernandez said that this was the only time that Nunez stood there and observed him for such a prolonged period of a time. And, while Hernandez was assist-

ing with the organizing drive, this was the only time he saw Ponce stand at the front gate in that fashion. (Tr. 1258, 1263, 1356–1357)

Photographs of this incident taken by the Union were introduced into evidence which show Ponce and Nunez standing around, just inside the entrance/exit gate of the Inglewood plant, off to one side near Nunez's truck, while Ponce's car is at the other side of the gate. To enter/exit the plant drivers needed to drive between Nunez's truck on one side and Ponce's car on the other. While Ponce, Nunez, Williams, and Hernandez, were all standing in their respective positions, a Cemex driver who was on his way home pulled out of the plant, stopped, got out of his car to learn more about what was on the poster board, and also appears in the pictures. (Tr. 1265–1269; 2701–2702; GC. 20, U. 12, R. 47)

*b. Nunez's Testimony*

Nunez was the plant superintendent overseeing the Inglewood and Compton batch plants. Regarding the Inglewood plant, Nunez testified that in the runup to the election, Union organizers would stand outside the plant almost every day in an area between the plant gate and the railroad tracks. (191, 216) Nunez said that he had between 15–20 conversations with the Union organizers who were outside the plant during this period and that sometimes Ponce was with him. However, Nunez did not remember having any specific conversations with Hernandez. (Tr. 185, 189–193, 204, 216)

Nunez confirmed that both he and Ponce were in the pictures taken on January 28, and that they were both standing next to Nunez's work truck which was parked right next to the front gate. When asked whether he was coming from somewhere else, drove through the entrance, and then parked at the gate, or was already inside the Inglewood plant and then up drove up to the gate, Nunez said that he could not remember. That being said, Nunez insisted that every time he responded to the gate it was because he received a call to go there, and that the only time he spoke with Union organizers was "when I was called for safety issues." (Tr. 214) Nunez said that whenever he had to go out to the front gate, instead of walking he would drive his truck to the gate and park it there. When asked why he would drive his truck to the gate, as opposed to walk there from the office which was 150 yards away, Nunez said that sometimes when he was done, he would leave and go elsewhere. Because he travels between plants and goes to different jobsites, Nunez testified that he drives in and out of Inglewood gate multiple times throughout the day. (Tr. 194, 214, Tr. 2700–2705; GC. 20)

Notwithstanding his testimony that the only time he went to the Inglewood front gate was when he received a call to go there, Nunez also testified that one of the reasons he would go to the front gate was because he saw Union organizers trying to block trucks or climb up on the truck steps to talk with drivers or hand them materials, and to "stop" them. (Tr. 213) Whenever he was at the front gate, Nunez testified that he would stay there between 10 to 20 minutes. Because Inglewood is a busy plant, Nunez said that whenever he was at the front gate speaking with the Union organizers, trucks would be passing, and that every time he sees a truck he waves to the driver. (Tr. 204,

_____

[16] In June 2019 Hernandez left Cemex and went to work for the Union as an organizer on the Cemex campaign. (Tr. 1305, 1357)

[17] Hernandez had transferred to Las Vegas in 2017, and then after about 10 months, he transferred back to the Inglewood plant. (Tr. 1262)

213, 2700)

## 2. Analysis

Regarding Hernandez and Nunez, I believe that both were prone to exaggeration at times and provided testimony that was later contradicted by other testimony or evidence. For example, when asked if he would climb on the step of a ready-mix truck to talk to a driver, Hernandez answered "no. We're not allowed to climb up on the steps." (Tr. 1307) Yet a picture of him posing on the steps of a ready-mix truck while talking to a driver was introduced into evidence. (Tr. 1336–1337; RX. 14) As for Nunez, during points in his testimony he insisted that the only time he responded to the front gate was when he received a "call" to go there for some type of complaint or issue. (Tr. 214, 2700–2701) However, he then testified that he responded to the front gate because he personally witnessed Union organizers doing various things, such as blocking trucks or climbing up truck steps, and he would go over there to stop them, notwithstanding the fact the fact that the front gate was not visible from the batch plant office which was 150 yards away. (Tr. 213, 2733; U. 12)

On the whole, I believe that Hernandez's testimony was more credible that Nunez' at to what occurred that day. Along with the matters mentioned above, Nunez at times seemed nervous when testifying, particularly after he was shown the pictures that were taken that day by the Union. (Tr. 2703) Also, sometimes his answers went beyond the specific questions asked, as if he had memorized a story he wanted to tell, leading me to strike one of his answers from the record as being non-responsive. (Tr. 2703, 2699, 2711, 2754–2755) *Random Acquisitions, LLC*, 357 NLRB 303, 305 fn. 14 318 (2011) (answers that go far beyond counsel's questions and become a moving narrative detract from a witnesses credibility). Moreover, Nunez testified repeatedly that he did not remember what happened on the date in question, or why he was at the front gate. Therefore his sweeping statements that he never went to the front gate unless he was responding to a complaint, or witnessed some sort of improper or unsafe acts, are not credible, as he admitted he had no idea why he responded to the front gate that day.

Accordingly, I find that the credible evidence, along with the inferences derived therefrom, show that on January 28 Hernandez and Williams were standing outside the Inglewood plant gate with a poster board comparing the wages and benefits of the union vs. non-union drivers, showing the board to drivers as they drove by, and briefly talking with drivers if they had any questions. At some point Nunez drove into the plant in his work truck, saw what was occurring, turned his truck around, parking at the front gate and stood there watching the Union organizers for a prolonged period of time. As drivers drove in and out of the plant, Nunez waved to them, to ensure the drivers saw him positioned at the gate.[18] At some point, Ponce pulled up in his personal car and parked it across from Nunez'

truck; drivers had to drive between Ponce's car and Nunez' truck to enter the plant. Ponce joined Nunez in watching the Union organizers while Nunez waved to the drivers. Because of the slow speed of the trucks going in and out of the plant, and the proximity of Ponce and Nunez to the front gate, it would be easy to identify the employees driving in and out of the plant that day. Eventually Hernandez had a conversation with Ponce and Nunez that lasted about 5 minutes. During this conversation Ponce told Hernandez to remember that the company took care of him when he wanted to transfer to Las Vegas. In all Ponce and/or Nunez stood at the front gate watching and waving for about 20–30 minutes, which included the five-minute conversation with Hernandez. I also find that, while Nunez had responded to the front gate in the past, and spoken to the Union organizers before, he had never stood there for such a long period of time, and certainly not for 20–30 minutes just watching and waving with Ponce at this side.

It is well established that management officials may observe open and public union activity on or near the employer's premises, so long as such officials do not engage in behavior that is "out of the ordinary." *Arrow Automotive Industries*, 258 NLRB 860 (1981), enfd. 679 F2d 875 (4th Cir. 1982). The question here is whether the conduct of Nunez and Ponce, standing at the gate for between 20–30 minutes, watching and waving at the trucks as they drove by the union organizers, was out of the ordinary.

In support of its case, the General Counsel cites *Partylite Worldwide, Inc.*, 344 NLRB 1342, 1343 (2005) where the Board found that the employer engaged in surveillance when, on three separate occasions, no less than eight high-ranking managers and supervisors stood at entrances to the employee parking lot watching the union give literature to employees as they entered and exited the parking lot during shift changes. In making its finding, the Board noted that the conduct of the company officials was surprising, and an unusual occurrence. Id. The Board also noted that the handbilling was occurring on a public roadway adjacent to the parking lot entrance, the management officials stood as close as possible to the handbilling, while still remaining on company property, and could identify the employees who passed by or took a handbill. Id. at 1343–1344. In support of its defense, Respondent cites *WestPac Electric, Inc.*, 321 NLRB 1322 (1996). In *WestPac Electric*, without comment the Board affirmed the judge who dismissed a surveillance allegation where the union agent met with employees openly and in plain view of a supervisor. Id. at 1380. On one occasion the union agent met with employees right outside the supervisor's job trailer, and the supervisor walked into the group and demanded that the union agent leave. On another occasion, the union agent met with employees just outside the perimeter of the job site, sitting in an employee's car. The supervisor "paused more than once and briefly stood with hands on hips and looked in the direction of the group." Id. Based upon these facts, the judge dismissed the allegation, finding nothing that was "suspicious" or "untoward" that might suggest the supervisor was spying. Id.

Here, I find that the conduct of Nunez and Ponce is closer that which was found improper in *Partylite Worldwide, Inc.*, than what occurred in *WestPac Electric*, where the supervisor

---

[18] Any claim by Respondent that Hernandez and Williams were interrupting the drivers' work are simply not credible. Because of the plant's layout, drivers needed to slow down, if not stop, to cross the railroad tracks. There is no credible evidence that either Hernandez or Williams interrupted the work of the drivers that day.

72                              DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

had only brief and passing encounters with the union organizers. Also, the Board considers a number of factors in determining whether an employer's observation of union activity occurring on or near an employer's premises is unlawful, including the duration of the observation, its frequency and timing, the employer's proximity to employees while observing them, the likelihood or actuality of trespass by nonemployees, whether there is a reasonable threat to the safety of employees or customers, the existence of demonstrated animus toward the protected conduct, and whether the employer has engaged in other coercive behavior during its observation or otherwise departed from its usual practice. See *Brown Transport Corp.*, 294 NLRB 969, 972 (1989). Considering these factors, I find that Ponce and Nunez engaged in unlawful surveillance. Both were stationed as close to the union organizers as possible, while still remaining on company property. They stayed there for an inordinately long period of time, which was a departure from their usual practice, while waving to the drivers to ensure they did not slow down or talk to the organizers. Based upon where they were standing, Ponce and Nunez could easily identify the employees driving by the organizers. There was no likelihood of trespass by the organizers, who were standing outside the plant on a public street, and there was no reasonable threat to the safety of anyone that day. Finally, as shown herein, the company has demonstrated an existence of animus to employee protected activity. Ultimately, Respondent's conduct had a clear and obvious tendency to interfere with the drivers' ability to view the union posterboard or interact with the organizers that day. "It is the tendency of Respondent's conduct to be coercive which determines the violation and not the actual effect." *Gainesville Manufacturing Co.*, 271 NLRB 1186, 1188 (1984). Accordingly, I find that the Respondent violated Section 8(a)(1) by engaging in unlawful surveillance as alleged.

Respondent's citation to *Metal Industries*, 251 NLRB 1523 (1980) is unavailing. (Cemex Br. at 61) There, the Board found management officials regularly stationed themselves in the parking lot at the end of the day to say goodbye to employees and answer questions. There is no such evidence here. Also unpersuasive is Respondent's citation to *Porta Systems Corp.*, 238 NLRB 192, 192 (1978), where no surveillance violation was found as the union organizers were talking to employees and passing out leaflets on company property. Here, the Union organizers were on public property. And, Respondent cannot rely on *Contempora Fabrics, Inc.*, because the surveillance allegation was not before the Board on exceptions. 344 NLRB 851, fn. 2 (2005). Even if it was, the facts in *Contempora Fabrics* were not analogous to what happened here. Id. at 865 (judge dismisses surveillance allegation where supervisors were not doing anything, or located somewhere, that was inconsistent with their normal responsibilities and where there was no evidence of employees engaged in lawful union activities at the time).

Finally, by waving to the drivers as they drove past the Teamster organizers, I find that Respondent also created an impression of surveillance. *Durham School Services, LP.*, 361 NLRB 393, 408, 410 (2014) (impression of surveillance where supervisor, whose conduct was out of the ordinary, stood by gate of facility for an extended period of time in front of the

union table). *Peck, Inc.*, 269 NLRB 451, 459 (1984) (conduct of company president, who twice stared at union activist for 15–20 minutes "constituted actual surveillance/or creating the impression of surveillance.").

### G. Alleged threats by Michael Rosado in Simi Valley meeting (Complaint Paragraph 5(h) & Union Objection #2)

In late January/early February 2019, Bryan Forgey and Michael Rosado held a series of meetings with Ventura County drivers at the Simi Valley and Oxnard plants. The meetings were designed to have Forgey speak directly with employees, as Rosado perceived that Forgey had a personal relationship with many of the workers. According to Respondent, the same information was presented at all of the meetings, but the flow differed depending upon the questions received from employees. (Tr. 2063, 2065, 2780–2781)

#### 1. Facts

Complaint paragraph 5(h) alleges that consultant Michael Rosado threatened employees with the loss of benefits while speaking at the Simi Valley plant by saying that Cemex could close plants or move elsewhere and that voting for the union would damage employees' futures and the future of their families. In support of this allegation, the General Counsel relies solely upon the testimony of William Lucero, who worked as a ready-mix driver for Cemex from June 2017 through July 2020. According to Lucero, over the course of the organizing drive, he attended between five to seven meetings that Respondent had called to discuss the union drive with employees, including one that occurred on January 28, 2019. (Tr. 885)

Lucero testified that on January 28, he attended a meeting at the Simi Valley plant with about ten other drivers from both Moorpark and Simi Valley. Rosado and Forgey were present for Cemex. Lucero said that, during this meeting, and before Forgey entered the room, Rosado spoke to employees about the union. (Tr. 885–886) The government relies upon the following testimony from Lucero to support this allegation:

Q: [By the General Counsel]: What do you recall Mr. Rosado telling you guys at the meeting?

A. Well, every time we had a meeting and he was there, it was always just to talk down about the Union and why we should not vote for the Union, and how they were going to take our monies, and that, you know, all they -- that the Company can -- if we were to decide to go on strike, the Company can, you know, pick and choose who they wanted to come back, and who they didn't want, and -- but yeah, it was basically, they didn't -- it was always to talk down, for the Union.

Q. So, you mentioned a strike, and them picking and choosing who to come back. Did he mention anything else during that meeting?

A. Yeah, that if -- the Company can close down the plants, and open new ones, and -- yeah. I mean, like I said, this was a year back. And that it could really damage our future and our family, if we voted yes. (Tr. 887–888)

According to Lucero, at some point after Rosado made these comments, Lucero's brother asked Rosado why they "couldn't go union" since the Northern California employees were unionized. At this point, Rosado said "oh you can ask Brian Forgey." (Tr. 888) He then opened the door and Forgey stepped inside. Lucero said that, during the meeting, Forgey talked about his personal experience with a union, saying that when he was a union member he lost work hours which caused him to lose money. (Tr. 887–888, 906) (GC. Br., at 34–35):

On cross-examination, Lucero agreed with the leading questions posed to him by Respondent's counsel saying that, during the meeting Rosado told employees that if a strike occurs, the company has the ability to replace drivers who go on strike, when the strike ends anyone who has been replaced would go to a preferential recall list, and this means they would only be recalled back to work when their job opened back up. He further testified as follows:

> JUDGE GIANNOPOULOS: Did you know what that means? I mean, did he say that, or are you just, in your mind that's what you're thinking?
>
> THE WITNESS: No, well he said that it was basically whoever didn't want to cross, I guess, the line, they were sent home and just on a waiting call, to see if they can come back to work or not. (Tr. 907)

For his part, Rosado testified he held two meetings with Forgey and Ventura County employees before the election, sometime in late January or early February, one in Oxnard and one in Simi Valley. According to Rosado, during these meetings he never said Cemex could pick and choose who to rehire after a strike, never discussed plant closures, never said Cemex could close plants or open new plants if the union won the election, and never said that voting for the union would damage the future for employees or their families. (Tr. 2781–2782, 2802)

2. Analysis

Regarding the allegation in paragraph 5(h) I find Lucero's testimony was not sufficient to establish that Rosado threatened employees as alleged. While testifying, it appeared that Lucero had a hard time remembering what was specifically said during this meeting, and his testimony lacks context regarding the alleged statements. For example, when the General Counsel asked what Rosado said in the meeting, instead of limiting his answer to what occurred that day at Simi Valley, Lucero gave a generalized answer about what was being said "every time we had a meeting and he was there." (Tr. 887) And then, when he testified about the topic of the company opening/closing plants, and the damage to people's futures, Lucero appeared to qualify his answer by saying "I mean, like I said, this was a year back," and he provided no further context or background. (Tr. 887–888) Although multiple other employees were also present, none were called to testify as to what was said at this meeting. While I believe Lucero heard somebody, somewhere, mention

these topics,[19] I find that his testimony is too attenuated to establish by a preponderance of the evidence that Rosado made these statements at the Simi Valley plant as alleged. Accordingly, I recommend that this allegation be dismissed.

The testimony elicited by Respondent's counsel, through Lucero's cross examination, does show that during the meeting Rosado told employees that if a strike occurs, Cemex has the ability to replace drivers who go on strike, and when the strike ends, anyone who has been replaced would go on a preferential recall list. Of course, such a statement, without differentiating between an economic or an unfair labor practice strike is a misstatement of the law; unfair labor practice strikers who unconditionally offer to return to work are entitled to immediate reinstatement. *George Banta Co., Banta Div. v. NLRB*, 686 F.2d 10, 21 (D.C. Cir. 1982), amended sub nom. *George Banta Co. v. NLRB* (D.C. Cir. Aug. 13, 1982). Such statements have been found to violate Section 8(a)(1) of the Act. *NLRB v. Kentucky Tennessee Clay Co.*, 179 Fed. Appx. 153, 161 (4th Cir. 2006) enforcing 343 NLRB 931, 936 (2004) (without differentiating between economic and unfair labor practice strike, it is a violation to tell employees that, in the event of a strike, they would be replaced if needed in order to meet the company's obligations to its customers). That being said, this matter was never raised by either the Union or the General Counsel.

*H. Allegations involving statements made by Brian Forgey at Oxnard (Complaint Paragraph 5(i) & Objection #2)*

When Forgey spoke to the Ventura County employees in late January/early February 2019, he did so without a script, and discussed various topics including his experiences with unions, employee rights under the NLRA, and material that Cemex had previously discussed with drivers. Complaint paragraph 5(i) involves what was said by Forgey during the Oxnard meeting. (Tr. 2782)

1. Testimony of Diana Ornelas

Diana Ornelas worked as a ready-mix driver for Cemex from April 23, 2018 until September 6, 2019, assigned to the Oxnard plant. Ornelas testified that, prior to the election, she attended a meeting that occurred on January 29, 2019 in the conference room at the Oxnard plant.[20] Ornelas, along with about five of her corkers, were present for the meeting which was conducted by Forgey and Rosado. (Tr. 970, 975)

According to Ornelas, the meeting started with just Rosado present for Cemex. Rosado introduced himself, said that he was hired by Cemex and was completely neutral. He told the drivers about his background working at a construction job in a union shop, said he had a good experience, and that he understood some of the workers had worked in a union setting before

---

[19] The issue of strikes and the specter that the union election could affect employees and their families for years was a theme that appeared in Respondent's campaign literature. (R. 23, 26, 30, 31) And, during at least one meeting, Forgey admitted talking to employees about the company's right to turn existing plants into satellites even if they unionized. (Tr. 2073–2074)

[20] Transcript page 970, line 12 should read "ready-mix driver" instead of "administrator" and transcript page 975, line 10 should read "2019" instead of "2018."

74                     DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

and wanted to vote "yes" which was fine. Ornelas said that Rosado showed the drivers a PowerPoint presentation highlighting facts the company wanted them to know about the Union, and said that whatever he and Forgey were going to tell them was true, because they legally cannot lie to the drivers. After Rosado spoke about his background and showed the PowerPoint, he let Forgey into the room. (Tr. 976)

Ornelas testified that Forgey entered, introduced himself as the vice president, and then discussed his background, having grown up in the Los Angeles area in a blue-collar neighborhood. According to Ornelas, at some point Forgey started talking about his past experiences having worked in a unionized setting and how it impacted him personally. Forgey told the group that, when he was a union member, the contract he worked under did not allow him to work outside his classification. Because of this, Forgey said that he lost a lot of hours and a lot of work because he had a job description and could not perform work outside of this job description. Forgey told the drivers that, if they unionized, the same thing would apply to them as well. They would get a job description and would not be able to perform any work outside the parameters of the job description. Forgey said that he can currently send drivers to work at other plants sometimes, or move trucks from one plant to another, but with a union those extra things would become part of a job description and they would not be able to do that anymore. Similarly, with a union, he said that if drivers asked him to go home early, or asked for a raise, he would not be able to do anything, because if he did that for one person he would have to do it for everyone. (Tr. 977–979, 1181–1182)

At one point during the meeting, according to Ornelas, Forgey referenced a wage increase that drivers were supposed to have already received. He told the drivers that they could not receive the raises they were supposed to get earlier that month "because of the Union, because of the process," and that he could not do anything for them because "his hands are legally tied until all this is over." (Tr. 977)

Ornelas further testified that during the meeting Forgey discussed the process of negotiations if employees unionized. She said Forgey told the drivers that he was always fighting for them, trying to get them new trucks and extra hours. However, he said that if the Union came in then all those things are up for negotiations. Forgey said negotiations could take days, weeks, months, or even a few years, and that Cemex did not have to agree to anything because they are a business so if the Union wanted to negotiate with him, was going to say no every time. Because Cemex is a business, Ornelas said Forgey told the drivers the company could close the plant down any time, for any reason. (Tr. 977–978, 1181)

Ornelas testified that during the meeting Forgey also discussed strikes, and gave an example of when he worked in a unionized setting in the 90's and the union called a strike. Forgey said that, instead of going on strike with his coworkers, he crossed the picket line and was able to work throughout the plant, fixing different things, and develop his skills. Forgey told the drivers that, when the strike ended, not all of his coworkers got to come back to work. And later, his coworkers went through an election process and kicked the union out after being unionized for 3 years. According to Ornelas, Forgey said

that the same thing would happen if they unionized and went on strike. Cemex could pick and choose who could come back to work and production continued as the company would find other people to get the job done. (Tr. 978)

Finally, Ornelas said Forgey told them that if they unionized the drivers were risking their relationship with their supervisor Jason Faulkner and the batchmen. And with a union in place, Forgey would not be able to do anything for the drivers. Forgey said three things could happen with a union: 1) things could get slightly better but the drivers would now be paying dues; 2) things remain the same but now the drivers would be paying dues; or 3) things get worse and the drivers would be paying dues. He said the only thing the drivers would be obligated to is the call to strike and paying dues. (Tr. 980–981; 1181)

Towards the end of the meeting, in the context of their discussion about the union organizing drive, Ornelas testified that she asked Forgey "what does Cemex have to lose?" Forgey did not answer. Instead, Forgey told Ornelas "well, Diana, you know, I ask you, what do you have to lose?" (Tr. 982) Ornelas said that Forgey seemed agitated by her question, and that his face turned red. (Tr. 982)

### 2. Testimony of Bryan Forgey

Regarding the meeting he and Rosado held at the Oxnard plant, Forgey said there were two meetings; half of the drivers were in one meeting and half in the other. Forgey said the plant superintendent Jason Faulkner may also have been in attendance. (Tr. 91–93)

Forgey testified that the issue of wage increases were discussed at the Oxnard meeting. For fiscal year 2018, workers were awarded wage increases in February 2018. The company had also budgeted employee wage increases for fiscal year 2019, but as of the date of the Oxnard meeting they had yet to be issued. Forgey originally testified that, during the meeting he said Cemex traditionally gave employees their annual cost of living increases in the first part of the year, but due to the election coming up in March, they "were in a status quo position" and the company was not "able to give out raises at that point for that reason." (Tr. 153) Two months after he originally testified, Forgey was called as a witness as part of Respondent's defense. This time, Forgey claimed that, during the Oxnard meeting, he told employees that Cemex typically gives increases in April each year, and that because of the election campaign they were in a status quo pending the election. (Tr. 153, 2065–2067)

Forgey said the topic of collective bargaining was also discussed during the Oxnard meeting. He denied telling employees he would not bargain with the Union, or that he would say no to everything. According to Forgey, he discussed with employees the collective-bargaining process, how it worked, and said that both sides had to agree in order for a contract to be reached. Forgey said he told employees that, with negotiations there are no guarantees, you could get more, you could get less, or it could stay the same. (Tr. 151–152, 2078)

Forgey also denied telling employees during the meeting that Cemex could legally close the Oxnard plant for any reason. (Tr. 2073) Instead, Forgey testified he discussed with employ-

ees management rights and told them that, even if they union-ized, the company would still maintain the right to operate its businesses as it traditionally does and that some plants would become satellites depending upon market demands. Regarding satellite plants, Forgey testified that "you turn plants on and off" depending upon the location of any particular job, moving work to plants that are closest to any specific job, and that plants that are "turned on and off like that" are referred to as satellite plants. (Tr. 2073–2074)

Forgey also denied telling employees that they would never be allowed to work outside their job classifications if Cemex unionized. Forgey testified that during the meeting he dis-cussed his personal experiences with job classifications and the limitations he faced working under a union contract. Forgey told employees about being classified as a maintenance worker and volunteering for as many hours as he could receive. When the company he worked for was non-union, Forgey said he could work across all parts of the plant, wherever they needed hours and people. However, he told the workers that, once the company was under a union contract, if a job was available on the weekend but was not within the maintenance classification, he could not work that job. So, Forgey explained to employees that this was a challenge for him personally because he could not move around the plant and work in other classifications. (Tr. 2071–2072)

Forgey further testified that during his discussion with Oxnard employees he also discussed strikes. He denied saying that the company could pick and choose who to bring back after a strike. Instead, he said that strikes were discussed in a gen-eral sense and that he shared his personal experience in the industry, having crossed the picket line when he worked in a unionized setting, and then having to work with his union coworkers after the strike ended. As for returning to work after a strike, Forgey said he told the employees that, upon his expe-rience, if a strike was called and employees went out on strike, after the strike was resolved, depending upon the level of op-erations, employees would be returned to work based upon "where they sat on the seniority list." (Tr. 2075–2077)

Finally, Forgey said that in the meeting they discussed the potential change that unionization would have on employees' relationship with management. Forgey testified that he dis-cussed with employees the fact that, once they were under a collective-bargaining agreement, "their voice is now through the Union," and it is not going directly to the company. (Tr. 2072) Therefore, if the workers had things they needed, they would have to work through the CBA "or work through their delegate . . . on the Union side" which he said would be "an example of a change in our relationship." (2073)

### 3. Testimony of Michael Rosado

Rosado testified that during the Ventura County meetings, the topic of plant closures never came up. According to Ro-sado, during these meetings Forgey talked to employees about his past experience with unions, and talked about the NLRA so the drivers understood that "management has a play in this also." (Tr. 2782) Rosado said that the topic of negotiations was discussed, and that Forgey gave drivers "the overview on management" and "kind of piggybacking on" the obligation to

bargain in good faith. (Tr. 2782) He said Forgey told employ-ee that there are no guarantees, and that employees could receive more, less, or things could stay the same. (2782–2783)

Rosado denied that Forgey told employees during these meetings that they risked damaging their relationship with su-pervisors and managers if they voted for the union. Instead, Rosado said Forgey discussed how the relationship between employees and management could be impacted if the Union won the election. According to Rosado, Forgey told employees that, "when you have a union shop . . . you have a shop stew-ard" and there are certain protocols that have to take place. (Tr. 2802) Employees lose their ability to deal directly with their supervisor, one on one, without a shop steward involved. (Tr. 2803) And if things are not settled, employees have to call their union representatives to come in and they may have to file a grievance. (Tr. 2802–2803)

### 4. Analysis

Based upon the testimony I have credited, along with the reasonable inferences drawn therefrom, I find that during the Oxnard meeting Forgey described his personal experiences when he had previously worked under a union contract, but that he also linked those experiences with what would happen if the Cemex employees unionized. Therefore, I find that Forgey discussed having previously worked under a job description, telling employees that, before his old employer was unionized he could work all over the plant and develop his skills, but once the union came in he could no longer work outside his job clas-sification, and as a result he lost work and hours. I find that Forgey then said that if the Cemex employees unionized they would be working under a job description which would define the types of jobs they could perform, and that extra things that drivers do now they would no longer be able to perform be-cause they would be working under a job description. By tell-ing employees that they would be working under a job descrip-tion that limits their work opportunities, I find that Respondent violated Section 8(a)(1) of the Act. *National Micronetics, Inc.*, 277 NLRB 993, 1005–06 (1985) (violation where supervisors said there would be strict job classifications if the union came in and employees would not be able to switch from department to department a violation).

Forgey admitted he told the Oxnard workers that Cemex tra-ditionally gives employees their annual cost of living increases during the first part of the year, but due to the election coming up in March, they "were in a status quo position" and were not "able to give out raises at that point for that reason."[21] (Tr. 153) By blaming the Union and the upcoming election for the fact that Cemex had not been able to give out raises, Respond-ent violated Section 8(a)(1) of the Act. *Pacific FM, Inc.*, 332 NLRB 771, 792 (2000); *Aluminum Casting & Engineering Co.*, 328 NLRB 8, 1–9 (1999), enfd. in pert. part 230 F.3d 286, 293 (7th Cir. 2000); *Federated Logistics & Operations*, 340 NLRB

---

[21] I credit Forgey's original testimony as to what he told employees about wage increases, as it was given spontaneously and without hesita-tion. As such, I find that Forgey did not say anything to drivers about raises typically being given in April. This was something he added to his testimony later in an effort to aid Respondent's defense, which I do not credit.

255, 271 (2003). Any claim by Respondent that there can be no violation because Forgey was simply saying the raises would be deferred to avoid an appearance of election interference is without merit. There is no evidence Forgey told employees that the raises were being deferred to avoid an appearance of interference, nor did he tell employees that the delayed raises would be awarded regardless of whether employees voted for or against the union. See *NLRB v. Aluminum Casting & Engineering Co.*, 230 F.3d 286, 293 (7th Cir. 2000) (where employer advises employees that an expected raise is deferred pending the election to avoid the appearance of interference it must also convey the message that the raise will be awarded whether or not employees vote for the union).

I further find that, during the meeting Forgey described the collective bargaining process, said that everything was negotiable, told employees the company was not required to agree to any of the Union's demands, and that for a contract to be reached both Cemex and the Union had to agree. He also told employees that bargaining could take days, weeks, months, or years, that nothing was guaranteed in negotiations, and that three things could happen: things could get better, worse, or stay the same, but under all three scenarios the drivers will be paying dues and run the risk of being called out on strike.[22] Under these circumstances, where Forgey told employees that wage increases were "in a status quo position" due to the election, did not say that the company would issue the raises after the vote, and further said that in the event the union won the election that bargaining could take years, I find that Respondent also violated Section 8(a)(1) of the Act as these statements taken as a whole constitute an unlawful threat that wage increases would be frozen for possibly years if employees unionized. Compare *W. E. Carlson Corp.*, 346 NLRB 431, 440 (2006) (where employer had a practice of granting an annual wage increase, company's memorandum saying that if the union prevailed bargaining could last for months or years and during negotiations wages would be frozen constitutes a violation), with *Mantrose-Haeuser Co.*, 306 NLRB 377, 377– 78 (1992) (no violation where employer said wages and benefits are "typically" frozen during bargaining which can go on for months or years, where there was no statement benefits would be lost, and the company continued its practice of granting predetermined wage increases during the union election campaign); see also *Teksid Aluminum Foundry*, 311 NLRB 711, 711 fn. 2, 717 (1993) (telling employees that, should the union win, everything is frozen until an agreement is reached which could take years to negotiate constitutes a violation).

During the meeting, while discussing management rights, Forgey told employees that, even if they unionized, the company had management rights and would still maintain the right to turn plants into "satellites," meaning that Cemex could shift work from one plant to another, based upon the location of any particular job, thereby turning plants on and off as needed. I find that this statement conveyed the unmistakable impression that union representation would be a futility, and violated of

Section 8(a)(1).[23] Cf. *Little Rock Downtowner, Inc.*, 143 NLRB 887, 890 (1963) (telling employees that management reserves the right to make decision as to what was best for workers and the union decision would have no impact on the company's policy on wages and job changes a violation).

Forgey admitted that during the meeting he discussed the issue of strikes with Oxnard employees. The credible evidence shows that Forgey discussed strikes in a general sense and spoke about his personal experience having crossed a picket line. He also told employees that, if they participated in a strike called by the union, after the strike was resolved, based upon the company's level of operations, striking employees would be returned to work according to their seniority because the collective bargaining agreement would have "a seniority status."[24] (Tr. 2077) By telling employees that, after a strike, they would return to work based upon the company's operations and their level of seniority, Forgey implied that employees with less seniority, such as Ornelas, would have to wait for an undefined period of time until they returned to work. I find this statement to be coercive and a violation of Section 8(a)(1). "It is settled law that unfair labor practice strikers are entitled to immediate reinstatement upon making an unconditional offer to return to work." *Amersig Graphics, Inc.*, 334 NLRB 880, 881 (2001). And economic strikers who unconditionally offer to return to work are entitled to immediate reinstatement unless the employer is able to show a legitimate and substantial business justification for not doing so. *Dino & Sons Realty Corp.*, 330 NLRB 680, 683 (2000), enfd. 37 Fed. Appx. 566 (2d Cir. 2002). Here, I find that during the meeting Forgey linked what he experienced in the past, to what Cemex employees would experience if they went on strike. By doing so he implied that, regardless of what was occurring at any particular time in the future, and notwithstanding the type of strike, less senior employees who went on strike would have to wait an indefinite period until they could return to work when the strike ended. Cf. *Teleflex Industrial Products, Inc.*, 166 NLRB 71, 78 (1967) (foreman's statements, which were based in part upon his past experiences elsewhere, implied unlawful reprisals in violation of Section 8(a)(1)).

Finally, the credited evidence shows Forgey told employees that unionization would change the relationship they had with management. He told employees that, once they were under a

---

[22] All of these talking points also appear in various other presentations that Respondent made to employees about bargaining. (R. 24, 25, 30, 31, 49, 51, 52, 61; Tr. 2039– 2047, 2051–2058)

[23] Forgey's description of satellite plants, turning plants on and off as needed and shifting work, implicates a transfer of work and does not involve a change in the scope or direction of the enterprise that would exempt the company from a bargaining obligation if unionized. See *Geiger Ready-Mix Co. of Kansas City, Inc.*, 315 NLRB 1021, 1023 (1994), enfd. in pert. part 87 F.3d 1363 (DC. Cir. 1996). Moreover, even if there would be no obligation to bargain over the decision itself, a unionized employer would be obligated to bargain over the effects of such a decision. *Comau, Inc.*, 364 NLRB No. 48, slip op. at 1–2 (2016).

[24] I believe Ornelas misunderstood Forgey's muddled attempt to explain striker reinstatement rights when she testified Forgey said the company could pick and choose who would return to work when the strike ended. I also find that her testimony about Forgey telling drivers that Cemex was a business and could close down plants at any time for any reason was a summary of what Forgey said during the meeting about satellite plants.

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC

77

collective-bargaining agreement, they had to go through the Union instead of coming directly to management.  Forgey said employees would lose their ability to deal directly with their supervisors.  Instead, if drivers needed anything, they would have to work through the union contract/union representatives and could not come to directly to him as he would not be able to do anything for them.  Therefore, Forgey said that if employees unionize, they were putting at risk the relationship they have with their supervisors and batchmen.  In the context presented, and considering the other statements Forgey made during the meeting, I find that these statements also violate Section 8(a)(1) of the Act.  *Economy Fire & Casualty Co.*, 264 NLRB 16, 20 (1982) (telling employees that, if they selected the union, they could not present their grievances or discuss their problems with management a violation).  Here, because the drivers work closely with their respective batchmen and supervisors, and rely upon them for their job assignments, Forgey's statement about drivers risking their relationship with the supervisors and batchmen by working under a union contract, places "a Damoclean sword or cloud of threat over the employees for doing no more than the Act guarantees them the right to do free from such a sword of threat or cloud seeded with such employer interference, restraint, and coercion." *Storktowne Products, Inc.*, 169 NLRB 974, 979 (1968); see also *Tipton Electric Co.*, 242 NLRB 202, 206 (1979), enfd. 621 F.2d 890 (8th Cir. 1980) (telling employees if the union won they would lose their right to deal directly with management and their harmonious working conditions and personal relationships with management would be lost are violations of Section 8(a)(1)).

*I. Allegations involving alleged threats made by Juan Torres in February 2019 (Complaint Paragraph 5(k))*[25]

1. Facts

Diana Ornelas testified that on February 21, 2019 she had a conversation with Juan Torres, the Oxnard plant foreman, in the batch office.  Three other drivers were present.  According to Ornelas, Torres called the four drivers into the office and had some pamphlets in his hand.  She testified that Torres gave the pamphlets to everyone and said, "this was just something the Company wants you guys to have so you can hear both sides" and told them he was there to answer any of their questions. (Tr. 983)  He then told the drivers that if a union "comes in, the Company could start sending people to Las Vegas to keep us busy if there's no work."[26]  (983–984)  Ornelas said that one of her coworkers asked if they could permanently relocate the drivers, and Torres replied "well, it's up to them." (Tr. 984)  Ornelas then said that Torres told the workers "this is it" the meeting was over, it involved "just these pamphlets," and the four drivers could go home and would be paid for "show up time." (Tr. 984)  When asked whether she had done any work that day before the meeting, Ornelas said she did not remember, and then speculated it might have been slow that day.  Ornelas said that the conversation with Torres lasted "probably less than

10 minutes."  (Tr. 983–985)

For his part, Torres admitted that he spoke with drivers about the election or the union in general, saying that sometimes they would bring up the topic of the union or the election and sometimes he would.  When asked if there were instances when he would approach a driver and hand out a flyer or pamphlet about the election or the Union, Torres testified that "basically, we would just hand out flyers" to the drivers about their rights, how the union works, and the law.  (Tr. 226)  When asked how many flyers he handed out to drivers, Torres then testified the handouts were in the plant, that everyone had access to them, and he did not recall any instances of being in the Oxnard plant handing out flyers to drivers as it was Rosado who was handling the flyers.  When asked if he could recall any conversations with drivers about any of the flyers, Torres answered that he would just post them in the office and tell the drivers there was a new flyer in the office and to make sure they read it.  Torres testified that he could not recall if there was in instance in February 2019 where employees showed up, there was no work, and instead he brought them into the office and gave them a pamphlet.  Torres denied discussing the topic of working in Las Vegas with any of the drivers.  (Tr. 225–228, 254)

2. Analysis

The General Counsel alleges that, during this conversation, Respondent threatened employees with reprisals if they unionized.  However, under the circumstances presented, I find that the General Counsel has failed to meet his burden of proof to show that a violation occurred.

It is undisputed that Respondent produced flyers and gave them to drivers about various topics involving the union organizing drive.  These pamphlets were placed in plant offices and break rooms, or disseminated amongst employees at the various facilities.  Indeed, Faulkner himself admitted handing these pamphlets out to drivers.  (Tr. 445–446)  As discussed below in Section IV(B)(1), I generally did not find Torres to be a credible witness.  I therefore find that he had a conversation with Ornelas and three other drivers sometime in February 2019, gave them flyers that the company had produced about the union organizing drive, and mentioned that if there was no work the company could start sending people to Las Vegas to keep them busy.  However, I believe there was more to this conversation than just the short statement the General Counsel elicited from Ornelas during her testimony.

Ornelas said the conversation with Torres was "probably less than 10 minutes" which implies the interaction between Torres and the drivers that was longer than the few words Ornelas attributed to Torres.  The lack of context in this instance is important.  In some cases a statement can constitute an illegal threat, based upon the context, while in other instances the statement, in a different context, is lawful.  *Bandag, Inc.*, 225 NLRB 72, 83 (1976).  Here, the statement attributed to Torres could have different interpretations, depending upon the specific context in which it was spoken.  Torres could be reassuring drivers that the company would do anything in its power to make sure everyone was employed, and would even send them to Las Vegas if necessary, in the event there was no work in Southern California.  On the other hand, Torres could be trying

---

[25] In its brief, the General Counsel withdrew Complaint paragraphs 5(j) and 5(o).  (GC. Br. at 6)  Complaint paragraph 6(c) was withdrawn by the General Counsel at the hearing.  (Tr. 1991)

[26] Transcript page 983, line 25 should read "union" instead of "unit."

78                     DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

to frighten the drivers by saying a union would cause work to dry up and they would have to send people to Las Vegas if they wanted to work. Because of the lack of context and the ambiguous nature of the words attributed to Torres given the circumstances, I find the General Counsel has not met his burden of proof to show a violation occurred, and recommend the allegation in Complaint paragraph 5(k) be dismissed.

### J. Allegations involving statements made by Jason Faulkner in February 2019 (Complaint Paragraph 5(l))

#### 1. Diana Ornelas Testimony

After her interaction with Torres in the batch office on February 21, Ornelas testified that she walked outside with her coworkers. One of them left, and Ornelas stood there with the other two, Renee and Mario, talking about the pamphlet they had just received from Torres and "flipping through the pages." (Tr. 985) At this point, Ornelas said Faulkner appeared from around the corner and walked up to the drivers. According to Ornelas, the drivers told Faulkner they were talking about the pamphlet, and Mario asked Faulkner why they were not paid more, saying the drivers in San Diego received higher pay than the Oxnard drivers. Faulkner said, considering their education level, "you get paid pretty damn well" and the different pay scales made sense in light of the different costs associated with operating each plant. (Tr. 985–986) He then said that everyone has their place, and started giving examples of what different types of workers get paid, saying CEOs are needed, as are people who dig holes and scrub toilets, and they should all be proud of their jobs, notwithstanding what others might think. Faulkner went on to say that workers in Mexico make a dollar per day, but when they come to the United States and start working at McDonalds, that is an opportunity for them and they are content because it is an opportunity they could be proud of, even though others might dismiss having a job working at McDonalds. (Tr. 984–986)

Ornelas further testified that during this conversation Faulkner said he had big plans for Ventura County, that he currently had lot of influence, and did not need the Union to find jobs.[27] Faulkner told the group that he had previously been involved with the Teamsters, and shared his experiences about how representation by the Teamster had impacted him. Ornelas said that Faulkner told the drivers he could currently take them to Moorpark and teach them to batch or teach them to drive a loader, but if the Union comes in it may strip him of that power. Ornelas also testified that Faulkner spoke about one employee who wanted to learn and grow with the company, and that Faulkner said he wanted to teach this employee, but with a union he was going to lose that power. At the end of the conversation Ornelas said that she put her hand out to shake Faulkner's hand. However, Faulkner would not shake Ornelas's hand and told her "when it starts digging into your pickets, it becomes personal." (Tr. 988) (Tr. 987–988, 1184)

#### 2. Faulkner Testimony

As the Ventura County plant superintendent, Jason Faulkner

---

[27] Transcript page 987, lines 1-2 should read "Ventura County" instead of "Ventura economy."

oversaw all the batch pants in the area and supervised the individual plant foreman at each plant. Faulkner was a 10-year Cemex employee and before working at Cemex he worked at a unionized company called Vulcan Materials. (Tr. 442–443, 2381)

Regarding his conversation with Ornelas and her two coworkers, Faulkner testified that the three employees were in the parking lot when he approached them and asked if they had any questions. According to Faulkner, one of the drivers said they could not lose any pay or benefits if they unionized, and Faulkner replied saying that they could get less, the same, or more if it goes to negotiations. Faulkner also said that, during this conversation, one of the drivers asked him what would happen if they went on strike. Faulkner testified he said, "my past experience is the only thing that I can go off of," and explained to the drivers "what I recall is when there were strikes . . . the business continued . . . but I don't know exactly how that would look if a Union came in." (Tr. 451) Under cross examination by the Union's counsel, Faulkner admitted that when he had previously worked at Vulcan they did not have any strikes, and there is no evidence that Faulkner experienced any strikes when he was working at Cemex or anywhere else. (Tr. 450, 2419, 2488)

Faulkner admitted that he spoke to the three drivers about the opportunity for growth within the company in the context of the organizing drive, but denied saying that he might be stripped of the power to teach drivers how to batch or how to load if the Union won. Instead, Faulkner said that he discussed his experience at Vulcan. According to Faulkner, he told the drivers that at Vulcan, the job classification was "driver" and for someone to "to do a different task," it would be out of their job classification, or "something like that." (Tr. 2420) Faulkner denied telling the drivers they would never be able to work outside their classification if the Union won. Instead, what Faulkner said he told them was that, in a union environment, it is a classification system and to work a different position it would have to be within the union contract, laws, and rules. Finally, when asked how long his conversation with the three workers lasted, Faulkner answered "[n]ot even a minute, I believe, I think, it was shorter. I think the whole conversation was about three hours—less than probably five minutes." (Tr. 451) (Tr. 445, 449–451, 2420–2421)

#### 3. Analysis

As to what occurred during the conversation between Faulkner and the three drivers in February 2019, I did not find Faulkner's recitation of events to be credible. His claim that what he told the drivers about strikes was based upon his past experience was not believable, as there is no evidence that he had any experiences with strikes. He also seemed unsure about the conversation itself, saying it lasted not even a minute, then said it was shorter than that, then said the whole conversation was about three hours, then said it was less than five minutes. Finally, Faulkner said that he took notes of this conversation, and that they were still in his possession, but no such notes were ever introduced into evidence. (Tr. 451–452) *UAW v. NLRB*, 459 F.2d 1329, 1336 (D.C. Cir. 1972) ("when a party has relevant evidence within his control which he fails to produce, that

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC

79

failure gives rise to an inference that the evidence is unfavorable to him"). Accordingly, I credit Ornelas's testimony over that of Faulkner's where the testimonies conflict.

As such, I find that the credible evidence, along with the reasonable inferences derived therefrom, shows that Faulkner walked up on Ornelas and her coworkers as they were talking about the pamphlet they received from Torres and asked if they had any questions. The four then engaged in a dialogue, discussing others' pay, pay in general for various types of workers in different industries, and strikes. Faulkner then told the employees that he had big plans for Ventura County, that he currently had a lot of influence, and did not need a union to find jobs. Faulkner told the drivers that he had previously been involved with the Teamsters and that when he worked at Vulcan the drivers had a specific job classification and could not perform tasks that were in other job classifications. Faulkner said that now, he could take the three drivers to Moorpark and teach them to batch or drive a loader, but if the Union came in it may strip him of that power because the union has a classification system. Faulkner then spoke about how he wanted to teach an employee who was eager to learn and grow with the company, and said he was going to lose that power if they unionized. At the end of the conversation, when Ornelas tried to shake Faulkner's hand, he would not shake it, and told her that it becomes personal when it starts digging into your pockets.

I find that Respondent violated Section 8(a)(1) of the Act when Faulkner told the drivers that: (1) if the Union comes in it might strip him of the ability to teach drivers to batch or drive a loader because the union has a classification system; and (2) he would lose the power to teach employees who want to learn and grow with the company if the drivers unionized. *National Micronetics, Inc.*, 277 NLRB 993, 1005–1006 (1985) (supervisors statement that there would be strict job classifications if the union came in and employees would not be able to switch from department to department a violation). The fact that Faulkner couched one of these comments as saying it "may" happen does not negate the finding of a violation. *Daikichi Sushi*, 335 NLRB 622, 623-624 (2001), enfd. 56 Fed. Appx. 516 (D.C. Cir. 2003). (that the employer's prediction of plant closure was couched as a possibility instead of a certainty was not a defense). Faulkner's prediction of what "may" happen was not based upon any objective facts. Indeed, the bargaining unit found appropriate in the Regional Director's Decision and Direction of Election that issued on February 20, the day before this conversation occurred, included in the Unit drivers who occasionally drive loaders, and who sometimes work as secondary batchmen. (JX. 6). Id. (threat of plant closure a violation as it was not based on any objective facts); see also *Exelon Generation Co., LLC*, 347 NLRB 815, 830 (2006) (statement that, if the employees unionized, they would lose rotating schedules, flextime, and the ability to accept/reject overtime were not based on any objective facts and therefore constituted unlawful threats).

*K. Prohibiting employees from talking to the union while on company time (Complaint Paragraph 5(m)) & Union Objections #5, #7)*

### 1. Testimony of Diana Ornelas

Diana Ornelas testified that, on February 25, 2019, she had a conversation with Jason Faulkner and Daryl Charlson in the Oxnard plant conference room where she was told that she could not speak to union organizers on company time. Fabian Leon was also present. (Tr. 1030–1031)

According to Ornelas, earlier that day she had returned to the Oxnard plant from a jobsite and parked her truck in line to reload with concrete. There were two trucks in front of her, so while she was waiting, Ornelas walked over to say hello to the two Teamsters organizers who were standing on the sidewalk outside the Oxnard plant. While she was speaking with the organizers, Juan Torres came out and told Ornelas she needed to wash and then park her truck. Ornelas said okay and walked back towards her truck. Torres walked with her and said that Ornelas cannot be "talking to those guys." (Tr. 1032) Ornelas said okay, and that she did not know. In response Torres again told her that she cannot be talking to them and that everybody knows it. Ornelas again said she did not know that she was not supposed to be speaking with the organizers, and testified that Torres told her "everybody saw you already." (Tr. 1032) Ornelas asked who Torres was referring to as everybody. Torres said himself, Charlson, Faulkner, as well as maybe Gus Aguilera and further said that they might want to speak with her. Ornelas asked if she was in trouble, and Torres replied, "I don't know, maybe." (Tr. 1032, 1177–1178)

Ornelas was washing out her truck, standing next to Fabian Leon, when Faulkner approached and asked to see her in the office when she was done. Ornelas went to the office with Leon, where Faulkner and Charlson were waiting. During the meeting Charlson said they were going to be very clear about this, that Ornelas cannot be talking to people and the Union on company time. Ornelas responded by saying she did not know, that nobody had told her this before, and if she knew she would not have walked over to speak with the organizers. Ornelas apologized, and said that she would not do this again. Faulkner then told Ornelas that this was just a verbal warning. (Tr. 1031–1034, 1178–1179)

Prior to this conversation, Ornelas said her understanding was that drivers were allowed to eat lunch, get some water, go to the bathroom, talk to coworkers, or take a phone call, while waiting to be loaded. She said the company had never previously told her what a driver could not do while on standby. (Tr. 1060–1061)

### 2. Testimony of Daryl Charlson

Regarding this meeting Daryl Charlson testified he remembered the conversation vaguely. Charlson said that Faulkner was having a disciplinary meeting with Ornelas and he was asked to assist as a witness. According to Charlson he did not speak during the meeting, and it was Faulkner who spoke to Ornelas. (Tr. 404, 407–408, 2548)

Charlson said that he drove to the Oxnard plant that day from his office in Ontario for the meeting with Ornelas. According to Charlson, during the meeting Faulkner told Ornelas that the

80    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

company knew she had been talking to union representatives and she should not be talking to them on "working time." (Tr. 405–406) Faulkner then told Ornelas if her truck was loaded with product, which was perishable, she should not stop at the gate and let someone step on her truck while it was running but instead should be delivering her load. Charlson said that Faulkner also repeated these instructions to Leon. According to Charlson, Ornelas responded by saying that she did not know what she did was wrong, as nobody had told her this before. Faulkner said that drivers had been informed about this in prior meetings, including the meetings with the consultants. Faulkner then told Ornelas that this was just a verbal warning. Charlson testified that he had never previously been involved in a discipline involving a driver speaking with non-employees during either company time or working time, and does not know of any other driver disciplined for these reasons. (Tr. 408) Charlson further said that, it was his understanding drivers were allowed to speak with union representatives during non-working time, meaning before work, during breaks, lunchtime, and after work. (Tr. 404–408, 2548–2549)

3. Testimony of Jason Faulkner

Regarding this incident, Faulkner testified that he was in his office when Gus Aguilera and Juan Torres reported to him that Ornelas had stopped and was talking to union representatives at the plant gate. Faulkner said he walked out the back door and saw Ornelas's truck parked while she was speaking to the union organizers by the driveway. According to Faulkner, Ornelas's truck was empty at the time, as she was returning back to the plant. (Tr. 2400, 2499–2500)

Faulkner said he spoke to Ornelas, with both Charlson and Leon present, and told her she should not stop and talk to union representatives during working time. Faulkner denied telling Ornelas that she could not speak to union representatives at any time while she was at work. When asked whether the company had rules as to what a driver could or could not do while waiting to load at the plant, or waiting to discharge at a jobsite, the only thing Faulkner noted was that drivers were responsible for the safety of their vehicles. (Tr. 455, 2400, 2402, 2502)

Immediately after the meeting, Faulkner drafted a memo of what occurred during his discussion with Ornelas. The document reads as follows:

Approx. 2:15 Diana was driving 5957 at the staging point in front of the Oxnard plant. Diana was reported by Safety Champion (Gus Aguilera) and Oxnard Plant Foreman (Juan Torres) sitting, talking to Union Organizer at the Oxnard location while on the company's time. I told Diana her that I needed to speak with her before she leaves, as she was washing out her mixer. She had finished washing out and at 2:41 she texts me asking if she could have a witness. Before I had read the text message she arrived at the Oxnard Office with Fabian Leon requesting him to be a witness. She asked if Fabian or Rudy could be a witness. I stated that this was a personnel matter and a witness was not needed, but Fabian could stay. I also had Daryl Charleston as a witness, which he stated "if I am being recorded I do not give consent.["] Which I Jason Faulkner also said I do not give consent to being recorded. I asked Diana that if she was informed that talking to a

Union Organizer on Company time was prohibited. Diana stated that she was not told that its against company policy. I stated to Diana that I know that I have personally told her that its against company policy to speak with Union Organizers during work hours and that she was informed during meetings with the consultant. She stated again that she was not told. I then told her this is a Verbal Warning that she is not speak with Union Organizers and the Union Organizers cannot interfere with our operation conducting our business. I asked her if she understood and her reply was I do understand and wouldn't do anything that I wasn't supposed to if I knew it was wrong. I then turned to her requested witness Fabian Leon and asked do you understand as well. Fabian looking right at me replied yes, I do know that. I then stated once again this is a verbal warning. That was all the discussion.

Faulkner shared the memo with Cemex's human resources department and with Charlson. The document was also placed into Ornelas's personnel file. (GC. 9, Tr. 456–457, 2403, 2406)

During its defense, Respondent's counsel asked Faulkner about the portion of the memo which said "company time" and Faulkner claimed that what he actually meant was "working time." (Tr. 2400) Faulkner said that the point of the conversation was to make Ornelas aware that she could speak to union representatives before her shift, on breaks, or after work, and that he explained this to her during their discussion. (Tr. 2401) During this same examination, Faulkner also testified that the memo was not considered a formal discipline, but instead was just a "coaching moment" and that the document itself was "just notes and a statement of what happened that was just put in her file." (Tr. 2403) Notwithstanding, during examination by the General Counsel, Faulkner admitted that during the meeting he gave Ornelas a verbal waring for talking to the union representatives. Finally, Faulkner said that he was not aware of any other drivers being disciplined for speaking with union representatives, or non-employees, on company time. (Tr. 455–457, 2400–2401, 2477)

4. Analysis

Prohibiting employees from conducting union related activities during "company time" while allowing them to do other non-work activities constitutes disparate treatment that interferes with employee Section 7 rights. Cf. *Industrial Wire Products, Inc.*, 317 NLRB 190, 190 (1995) (prohibiting employees from talking about the union on company time while allowing other discussions a violation). Also, admonishing employees against speaking to union representatives during "company time" violates Section 8(a)(1) because it is ambiguous and may confuse employees into believing that they cannot engage in union activity or solicitation from the time they come to work until the time they leave." *W.D. Manor Mechanical Contractors, Inc.*, 357 NLRB 1526, 1541 (2011). Likewise, an employer violations Section 8(a)(1) by telling employees they should not talk to union organizers. *Evolution Mechanical Services, Inc.*, 360 NLRB 164, 173 (2014). Finally, rules prohibiting employee solicitation during "working hours" are presumptively invalid as the term connotes periods from the beginning to the end of work shifts, which include the employee's

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC

81

own time. *Our Way, Inc.*, 268 NLRB 394–395 (1983).

Regarding what happened during the February 25 meeting, and the testimony by Charlson and Faulkner claiming that Faulkner told Ornelas that she could not speak to the Union during "working time," I do not find this testimony credible as it is contradicted by the written memo Faulkner drafted just minutes after the meeting ended. In the memo Faulkner states that he asked Ornelas if she knew that talking to union organizers on company time was prohibited, and then said that he had told her that it was against company policy to speak with union organizers during work hours. Also, a disciplinary chart from Respondent's records that includes this incident was introduced into evidence. This chart states Ornelas was informed in group meetings that talking to union representatives on "company time" was prohibited and was told this incident constituted a verbal warning. (GC. 17) The chart also says there was a "Memo to File" regarding this incident, showing that it was placed in Ornelas's personnel file. (GC. 17)

As such, faced with the admissions as to what occurred as set forth in Faulkner's memo and the disciplinary chart, I find that the testimonies of Charlson and Faulkner were manufactured, after the fact, in an effort aid Respondent's case. The same is true regarding Faulkner's claim that he told Ornelas during the meeting that she could speak with Union representatives before her shift, on breaks, or after work. None of this is included in the memo; it is not worthy of belief, and I find that it did not occur. Faulkner was simply trying to remanufacture what occurred, in order to try and meet the strictures of the law.

Accordingly, the credited evidence shows that, during the February 25 meeting, Faulkner asked Ornelas if she was informed that talking to union organizers on company time was prohibited. When Ornelas said that she did not know this was against company policy, Faulkner said that he had personally told her it was against company policy to speak with union organizers during work hours, and that she was also told this by the consultants. Faulkner told Ornelas that the meeting constituted a verbal warning, and that she was not to speak with the union organizers. He also asked if Leon understood the admonition, and when Leon confirmed that he understood, Faulkner again staid that this was a verbal warning.

By asking Ornelas if she knew that talking to union organizers on company time was prohibited, Respondent violated Section 8(a)(1) of the Act, as the term "company time" is ambiguous and leaves the impression that employees cannot engage in union activity from the time they come to work until they leave. *W.D. Manor Mechanical Contractors, Inc.*, 357 NLRB 1526, 1541 (2011); *BJ's Wholesale Club*, 297 NLRB 611, 612 (1990) (where a statement prohibiting employee solicitation during working hours is confusing or ambiguous, it is incumbent on the employer to show that it would permit solicitation during breaktime or other periods when employees are not actively at work). Moreover, there is ample evidence throughout the record that, while waiting to load at a plant or unload at a jobsite, drivers are allowed to talk to other people in the area, make phone calls, get coffee, go to the bathroom, or do anything, so long as they are ready when it is their turn to load/unload. This was specifically confirmed by Brian Forgey and Ryan Turner. (Tr. 110–112, 377) And, during this same time period, Re-

spondent was allowing the consultants to walk around the plants and jobsites to speak with drivers about the union when they had downtime. (Tr. 341–342, 2016) Therefore, Faulkner's prohibition about taking with union organizers on "company time" constituted disparate treatment that interfered with employee Section 7 rights. Cf. *Industrial Wire Products, Inc.*, 317 NLRB at 190.

In its brief, Respondent asserts that the allegations in paragraph 5(m)(2) and 5(m)(3) must be dismissed because there is no charge referencing unlawful directives prohibiting employees from speaking to the union or claiming that such directive were enforced. (Cemex Br., at 94) However, the charge in Case 31–CA–238240, filed on March 19, 2019, alleges, in part, that Cemex violated employee Section 7 rights by discriminating against employees for engaging in pro union activities. (GC. 1(m)) That is exactly what happened here. Faulkner's prohibition about taking with union organizers on "company time" constitutes disparate treatment that interferes with employee Section 7 rights, as employees were allowed to talk to other people, and about other subjects, during company time. And the prohibition was enforced against Ornelas by giving her a verbal warning. As such, the Complaint paragraphs in question are closely related to the allegations set forth in the March 19 charge, and are properly before me.

Further in violation of Section 8(a)(1) is Faulkner's statement that it was against company policy to speak with union organizers during work hours. *Our Way, Inc.*, 268 NLRB 394, 395 (1983), and his telling Ornelas that she was not to speak with the union organizers at all. *Evolution Mechanical Services, Inc.*, 360 NLRB 164, 173 (2014). Finally, Respondent's enforcement of the no talking rule against Ornelas also violated Section 8(a)(1) of the Act. *J.P. Stevens & Co., Inc.*, 240 NLRB 579 (1979) (enforcement of no talking rule against two union proponents to inhibit and harass them a violation of Section 8(a)(1)).

Citing *United Charter Service*, 306 NLRB 150 (1992) the General Counsel also claims that during the events of February 25 Respondent unlawfully created the impression that Ornelas's union activities were under surveillance. (GC. Br. at 82–83) However, the facts of *United Charter Service* do not support such a finding. In *United Charter Service* employees met at a local restaurant to discuss their workplace complaints and agreed to draft a petition setting forth various workplace demands and seeking recognition of a "Drivers Association" by their employer. The Board found the company's operations manager created the impression of surveillance when he told various employees that he had lots of friends, he knew about the meetings, knew about the petition, had already received the petition, and named some of the items that were in the petition. In finding a violation, the Board noted that the employees did not engage in their organizing activities openly on the company's premises, but instead met at a restaurant. Id. at 151. Moreover, the Board noted that even if it was common knowledge that employees were organizing, the manager's comments went beyond permissible limits, as he not only told workers that he knew they were organizing, but also went into detail about the extent of the activities and the specific topics they discussed at their meetings. Id. Here, there was nothing

82                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

secret about Ornelas speaking with the union organizers, as it occurred in the open, just outside the front gate of the Oxnard plant, in plain view of everybody. And there is no evidence that anybody from Cemex commented to Ornelas about the specific topic of her conversation with the union organizers that day. Accordingly, I recommend that the allegation in Complaint paragraph 5(m)(1) be dismissed.

*L. Requiring drivers to remove "Vote Yes" signs in their trucks (Complaint Paragraph 5(n) & Union Objection #4)*

### 1. Facts

Gilbert Deavila testified that, on February 25, 2019, he was sitting in his truck at the Hollywood plant when he heard plant foreman Steve Ronan tell him over the company radio to "take the sign down." (Tr. 840) Deavila had a 2-foot by 2-foot square sign that said "Vote Yes" in the rear window of his truck cab. The radio system broadcasts to all employees in the Los Angeles County area, so all the drivers monitoring that particular frequency would have heard this discussion. (Tr. 840, 859; U. 4)

Deavila testified that he saw another truck at the Hollywood plant that day with a "Vote No" sign, and said nobody ever radioed that particular driver to remove his "Vote No" sign. He also testified that he saw one truck with about six "Vote No" stickers, which were about three inches round, affixed to various parts of the truck. (Tr. 843–844, 872; R. 4)

Steve Ronan testified that he did not remember what type of sign Deavila had in the back of his truck, but said that he told Deavila to remove it because it was blocking his vision. Also, various Cemex officials testified that company policy prohibits having personal signs on/in the mixer trucks, regardless of the content. For example, Bryan Forgey testified that signs were not allowed, as they could affect the company's branding. And Robert Nunez testified the company always had a rule that personal stickers or signs were not allowed on company trucks. (Tr. 101, 103, 140, 164–167, 2707–2708)

Driver Paul Payan testified that his area manager, Andrew Burton, radioed everyone on the Los Angeles channel telling them to remove all sings that might be blocking a drivers' ability to look out their rear or side windows. Burton also told Payan personally to remove a "Vote Yes" sign in his truck as it was blocking his view and constituted a hazard. According to Payan, after Burton made the announcement, some employees complied and removed their signs, but some did not. Payan said that his supervisor Robert Rocho also radioed employees telling them to remove all banners from their rear windows because they posed a safety hazard. According to Payan, before the Union campaign, drivers did not put signs or banners in their back windows. Finally, driver and second batchman Garemy Jones testified that he displayed a "Vote No" sign in the back window of his mixer truck until Robert Nunez told him that it needed to be removed. Jones complied and removed the sign. (Tr. 637–639, 662–663, 2847–2850, 2867; U. 15)

### 2. Analysis

The credited evidence shows that, while Respondent generally had a policy frowning upon employees displaying personal stickers or signs on their trucks, or in their truck windows, it was not really an issue before the Union organizing drive. After the petition was filed, drivers started posting large "Vote Yes" and "Vote No" signs in their truck windows. These signs were 2-foot square and blocked anywhere from 1/3 to 1/4 of a truck's back window. They clearly obstructed a driver's view. (U. 4, U. 15; R. 7) In response, Respondent's managers and supervisors told drivers to remove all signs and stickers from their trucks because they posed a safety hazard. Given the multiple plants involved, and the number of drivers at each plant, it is not surprising that occasionally a truck appeared with a sign or sticker still in a window, even after management officials made generalized announcements to drivers that they needed to be removed. Because of the hazard posed by having signs and stickers in the windows, I believe that Respondent made a good faith effort to prohibit all signs and stickers which obstructed a driver's view and constituted a safety hazard, and not just those that supported the Union. Accordingly, I recommend the allegations in paragraph 5(n) be dismissed.

*M. Alleged threats by Ryan Turner in February 2019 (Complaint Paragraph 5(p) & Union Objections #1, #2)*

### 1. Testimony of Bernard Molina

Bernard Molina started working for Cemex as a driver in 1997. In about 2013 Molina was off for a year because he was sick and needed an organ transplant. After recovering, he returned to work with the assistance of Ryan Turner and the Cemex human resources office. During the Union's organizing drive and the election, Molina was working out of the Corona plant. At the time of his testimony, Molina was still employed by the company but was on disability leave. (Tr. 713–715)

Molina testified that sometime around the last week of February 2019 he was called into a "mini-meeting" early one morning before work; in the runup to the vote, Molina said the company held many of these types of meetings. According to Molina, about seven drivers were present that day along with the plant foreman Mike Carmody, plant superintendent Andrew Patino, manager Ryan Turner, and the consultant who was conducting at the meeting. During the meeting the consultant presented information to discourage employees from supporting the union. (Tr. 715–716, 743)

After the meeting ended, Molina said he went to the batch office to pick up his work schedule. Inside the batch office multiple people were talking amongst themselves as they were getting their schedules ready for the day. Specifically, Molina testified that Turner, Patino, Carmody, along with drivers Allen, Alex, Richard (Rick), and Chris were in the batch office. Molina said that a driver named Daryl was in the original meeting, but was not in the batch office as he was loading his truck. Molina described the batch office as being the size of a bedroom, with a counter separating the office area from another portion of the room that contained a refrigerator, coffee machine, water, and a bathroom. (Tr. 719–720, 745, 750)

Molina testified that after he entered the batch office Turner was standing a couple feet away from him and said that he did Molina a favor by letting him return to work after his medical leave. Turner then told Molina that he was now released from his "medical" and said he wanted Molina to vote against the Union because Turner would not be able to help him anymore

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC

if they "went Union." (Tr. 718) Molina testified that he did not know whether any of the other drivers heard Turner's comments. Neither Carmody nor any of the other drivers present that day testified about what occurred. (Tr. 719–720, 745–746)

Molina further testified that, about five minutes later, as Turner was walking out of the room, he turned around and addressed the drivers. Molina could not remember Turner's exact words, but said that Turner let everybody know "that the favoritism and help he could give us would all stop . . . if we go union." (Tr. 721)

### 2. Testimony of Ryan Turner

Ryan Turner testified that, during the last week of February 2019 there was a 4 a.m. safety meeting at the Corona plant training room to let the drivers know where they were scheduled to vote, and how everybody was supposed to act on the day of the election. According to Turner, this meeting was focused on the safety aspect of what was going to happen on election day. Turner said that Molina was present during this meeting, along with drivers named Al, Daryl, Richard (Rick), Alejandro, and Hector. After the meeting, Turner testified that a group, including Molina, went to the office, where the drivers were asking about their assignments. Turner said that Carmody was getting the job assignment information for the drivers from the computer, and everyone was having generalized conversations or discussing their job assignments. Turner denied having a conversation with Molina that day regarding medical leave and denied telling Molina that he did him a favor by letting Molina return to work after his medical leave. He also denied telling Molina that, if he voted for the Union, Turner could not help him anymore and further denied saying that favors would stop if the company unionized. Turner admitted that he helped Molina return to work after his medical leave by serving as an intermediary between Molina and human resources. (Tr. 2253–2257)

### 3. Testimony of Andrew Patino

Patino testified that he remembered being present for a conversation at the Corona plant office between Molina and Turner sometime during the last week of February 2019, relating to Molina's medical leave, where Carmody was also present. That being said, Patino's subsequent testimony about what occurred during this meeting did not involve Molina's medical leave. (Tr. 2596)

Patino said that the conversation occurred after a meeting that took place at the plant. Regarding the meeting, Patino denied it was a safety meeting, but instead said the consultant was present and the meeting was scheduled by human resources. After the meeting, Patino said Molina came into the office where Patino, Turner, and Carmody were present along with drivers Alan, Alejandro, Daryl, and George. According to Patino, Molina asked what his schedule was going to be, and "we said we didn't have one." (Tr. 2596) Patino said Turner then looked at Molina and asked him how he was doing. Thereafter, Turner and Molina had a "friendly back-and-forth banter of everything: I'm doing good, thank you for asking, have a good day, that type of deal." (Tr. 2596) After their conversation, Molina asked Carmody for his schedule, but the drivers did not have a work schedule that day and they were only there for the meeting, so Carmody told Molina he could go home. At that point, Patino said that all the drivers left the office. Patino testified that he was standing about six feet away from Turner and Molina and could hear their entire conversation. Patino denied that Turner said anything about doing Molina a favor by letting him return to work. (Tr. 2596–2597, 2609–2611)

### 4. Analysis

In reviewing the testimonies of Molina, Turner, and Patino, as to what occurred, it appears that the witnesses were discussing three separate incidents, as opposed to the same event. For example, Molina testified that his discussion with Turner occurred after a mini-meeting in late February where one of the consultants presented information to discourage employees from supporting the Union. Later, in the batch office where the conversation occurred, Molina said that along with Turner, Patino, and Carmody, drivers Allen, Alex, Richard (Rick) and Chris were present, while another driver named Daryl was outside loading his truck for delivery.

Turner on the other hand testified about interacting with drivers in the batch office after a safety-meeting where they discussed the safety aspects of what was going to happen on election day and the drivers were informed about the voting schedule. According to Turner, the drivers present in the meeting were Molina, Al, Daryl, Richard (Rick), Alejandro, and Hector, and that a bunch of them then went to the batch office where Carmody was getting the job assignments for the drivers from the computer, they discussed their job assignments, and had generalized conversations. In his testimony, Turner does not place Patino as being in the batch office after the safety meeting.

Patino discussed a conversation between Molina and Turner where Turner asked Molina how he was doing, and they simply had some friendly banter back and forth. According to Patino, Molina along with drivers Alan, Alejandro, Daryl and George were present. During the batch office discussions, Patino said Molina asked Carmody about his work schedule for the day, but there was no work for the drivers, and they were only called into the plant for the meeting so the drivers left as they did not have any work scheduled for the day.

During their testimony about the batch office discussion, Molina, Turner, and Patino each have a different set of drivers present in the batch office during the discussion. Also, Patino testified about a discussion in the batch office on a day where the drivers were not scheduled to work, but immediately went home after the meeting, which conflicts with the testimony of both Molina and Turner. Finally, Molina testified his discussion with Turner occurred after a consultant meeting discouraging unionization, while Turner's discussion happened after a safety meeting involving the safety aspects of what was to occur on election day. I believe the evidence shows that Molina, Turner, and Patino, were testifying about three separate incidents that occurred in the batch office. Patino's testimony does not corroborate Turner's, as it was clear they were discussing two different events: Turner about a day where the drivers were given their job schedules by Carmody; and Patino about a day where there was no work scheduled for the drivers and they

84                              DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

all went home after the initial meeting. While Respondent criticizes the General Counsel for failing to call any of the other drivers present in the batch office to support Molina's testimony (Cemex. Br. at 110), Respondent had access to, and could have called the drivers as witnesses as well, but chose not to. The failure to call any of the other rank-and-file employees that were present that day does not warrant an adverse inference, as employee witnesses cannot be reasonably expected to favor one party over the other, and are equally available to all the parties in the proceeding. *Torbitt & Castleman, Inc.*, 320 NLRB 907, 910 fn. 6 (1996), enfd. in pert. part 123 F.3d 899, 907 (6th Cir. 1997). The same cannot be said however of the fact that Respondent did not call Carmody as a witness as he is an admitted supervisor and everyone testified that he was present during the conversation. *Martin Luther King, Sr., Nursing Center*, 231 NLRB 15, 15 fn. 1 (1977); *CSH Holdings, LLC*, 365 NLRB No. 68, slip op. at 5 fn. 15 (2017). Accordingly, I find that, had Carmody been called to testify, he would have testified adversely to Respondent's interests on this issue.

Therefore, under the circumstances presented, I find that sometime in late February 2019, after a meeting led by one of the consultants, Turner told Molina that he did him a favor by letting Molina return to work after his medical leave, and now that Molina was released from his "medical" he wanted Molina to vote against the Union because Turner would not be able to help him anymore if they "went Union." I find that Turner's comments to Molina violated Section 8(a)(1) of the Act. *Abouris, Inc.*, 244 NLRB 980, 982–983 (1979) (supervisor's statement that, if the union won the election she "couldn't help" the employees any further in meeting their production requirements was a violation of Section 8(a)(1)); *Steve Aloi Ford, Inc.*, 179 NLRB 229, 233 (1969) (employer's statement that the employees had it good, that the union would sever the relationship and there would be no more favors for employees violated Section 8(a)(1)). Cf. *Evergreen America Corp.*, 348 NLRB 178, 203 (2006), enfd. 531 F.3d 321 (2008) (supervisor's statement to employee that "he couldn't help [her] anymore" because of her role in leading the union campaign was an implied threat of reprisal); *Gulf States Manufacturers, Inc.*, 230 NLRB 558, 561 (1977) (even where the comments were not corroborated by the other employees present, supervisor's statement shortly after union election that he could not help employees anymore, and they had to go through their stewards and the union, interfered with employee Section 7 rights as the supervisor was withdrawing whatever assistance he provided in the past because employees had chosen to unionize).

Regarding the allegation in complaint paragraph 5(p)(2), I recommend that it be dismissed. Molina admitted he could not remember what Turner actually said to the drivers as he was leaving, but instead was paraphrasing his impression of what Turner was saying. Therefore I find that the General Counsel has not met his burden to show a violation occurred.

### N. Alleged threats made to Donald Shipp by Ryan Turner (Complaint Paragraphs 5(q), 5(r))

1. February 2019 Conversation in the Temecula Plant office

#### a. Testimony of Donald Shipp

Donald Shipp started working for Cemex in 2017 and was assigned to the Temecula plant. At the time of the organizing drive, Steven Latimer was the Temecula plant foreman and was Shipp's direct supervisor. Shipp testified that sometime in about early 2019 he requested a transfer from Temecula to the Perris plant. According to Shipp, he texted Ryan Turner asking for a transfer and Turner replied saying he would see about getting him one. Afterwards, Shipp submitted paperwork to Latimer requesting a transfer and then had a conversation with Turner about the matter during the last week of February 2019. According to Shipp, he was in the Temecula plant office waiting for his truck to get loaded for a job. Present in the office were Shipp, Turner, and Latimer. Shipp testified that Turner said he heard Shipp had submitted a transfer request to the Perris plant and asked if he still wanted the transfer. Shipp said yes. Turner told Shipp he knew what to do, to vote against the Union, and Turner would give him the request. Shipp said okay. Turner then walked out of the office and Shipp went to work. (Tr. 756–760, 777)

Ship also testified that his request to transfer to the Perris plant was initially denied because the company did not have any vacancies for drivers. Later, Shipp was transferred to the Corona plant when Temecula shut down for a period of time due to an unknown reason. When the Temecula plant reopened, Shipp was given the opportunity to transfer back to Temecula and did so. (Tr. 791, 800–801)

#### b. Testimony of Ryan Turner

Regarding this conversation, Turner testified that a couple months earlier Shipp had asked to transfer to Perris and Turner told him to get a transfer slip from Latimer and then send the completed form to Turner. On the day in question, Turner said they were in the Temecula office, and Shipp asked if there was a chance he could get the transfer "right now." (Tr. 2257) Turner said there was no room to park any more trucks in the Perris yard at the time, so he could not transfer. At some unknown time after this conversation, Turner testified that he offered Shipp an opportunity to transfer to Perris, but that Shipp said he was happy in Temecula. Turner denied telling Shipp to vote against the Union if he wanted a transfer, and further denied discussing voting in the election with Shipp at any time. Turner said that Latimer was present in the office, but was not part of the conversation, as he was running the computer system loading Shipp's truck. Latimer did not testify, and at the time of the hearing was no longer working for Cemex as he had been laid off. (Tr. 2257–2259)

#### c. Analysis

I generally found Shipp to be a credible witness. I also note that, at the time of his testimony, Shipp was still employed by Cemex as a driver and was therefore testifying against his pecuniary interests; this further enhances his credibility. *Flexsteel Industries*, 316 NLRB at 745. Accordingly, I find that some-

time in February 2019, Shipp was in the Temecula batch plant office and asked Turner about his transfer request to the Perris plant. Turner told Shipp that he could not transfer because there were currently no vacancies for drivers at Perris, but said that Shipp knew what to do, to vote against the Union and he would get the transfer request. Turner's statement connected a vote against the Union with granting Shipp's transfer request and therefore violated Section 8(a)(1). Cf. *Graham-Windham Services*, 312 NLRB 1199, 1207 (1993) (violation to connect a vote against the union with better conditions).

### 2. March 2019 conversation in the Perris yard

#### a. Testimony of Donald Shipp

Shipp testified that in early March 2019 he was at the Perris plant waiting to load. Shipp's truck was parked and he was standing in the yard. When questioned by the General Counsel, Shipp testified that Turner walked up to him and asked how things were going. Shipp said everything was going "pretty good" and asked Turner if it would be possible to get a new truck and a raise. Turner told Shipp to vote no "for the good of the Company" and said "we'll see what we can do as far as like getting a new truck and a raise." (Tr. 761) After the conversation ended, Shipp said that he saw Turner speaking to two other drivers who were ahead of him in line. During his testimony, Shipp said the conversation with Turner lasted about 10 minutes. However, in a pre-hearing affidavit he provided during the underlying investigation of this matter, Shipp said that the conversation lasted about 1 or 2 minutes. On cross examination by Respondent, Shipp testified that the process of awarding new trucks within Cemex is based upon plant seniority. He said that, typically a plant gets new trucks when one of the existing trucks has to be replaced because it falls out of compliance with California law. Then, the new truck is awarded to the most senior driver. (Tr. 760–762, 795, 798–799)

#### b. Testimony of Ryan Turner

Turner testified he was at the Perris plant in early March 2019 helping direct traffic for a large job the company had that day. Turner said about 20 drivers were in line, and that he spoke with the drivers, starting his conversation by inquiring as to how they were doing. (Tr. 2259–2260)

Turner said he asked Shipp how he was doing that day, and Shipp said that he felt great, was awake and was not having any issues. According to Turner, Shipp then asked about getting a new truck and Turner told him that he was a newer driver and to remember that trucks were distributed by seniority, after old trucks were taken out of service by the company. Turner said that Shipp also asked about getting a raise, and he told him the company follows a matrix and Shipp would get a raise on his anniversary date. According to Turner, that was all they talked about; he estimated their conversation could not have been longer than 5 to 10 minutes. Turner denied saying the words attributed to him by Shipp, and further denied talking to any of the other drivers in line about the union organizing campaign that day. (Tr. 2261–2262)

#### c. Analysis

Regarding the March 2019 conversation at the Perris plant, I

credit Shipp that Turner told him to vote no for the good of the company. And, at one point during their conversation, Turner said that "we'll see what we can do" regarding a new truck and a raise. However, I also believe there was more to this conversation than what was elicited from Shipp during his examination from the General Counsel, as Ship testified that his conversation with Turner lasted about 10 minutes. While his pre-trial affidavit said that it only lasted 1 or 2 minutes, either way it was clearly a discussion that lasted longer than a few words.

I do not credit Turner's testimony that he did not speak to Shipp, or any of the other drivers that day, about the union organizing drive. The record shows that Cemex wanted employees to vote against the union, and Turner admitted that, as a member of management, he helped advance this position by encouraging employees to vote no. The evidence shows that Cemex had placed large signs at various plants encouraging drivers to Vote No, and Turner himself admitted distributing Vote No stickers to various plants for the workers to wear. Turner also admitted that, after Cemex found out about the organizing drive, he wanted to know what concerns drivers had so he could remedy them. (Tr. 362–363, 378–379; U. 13)

Turner's conversation with Shipp occurred less than a week before the election, and I simply do not believe that, given the opportunity to speak with multiple drivers just days before the election, Turner would not further advance the company's position and encourage drivers to vote against the union. Therefore, I find that the credited evidence, along with the reasonable inferences derived therefrom, show that Turner was at the Perris plant that day talking to the drivers while they were in line waiting to load, and that he asked Shipp to vote against the union for the good of the company. At some point during his conversation, after Shipp asked if it would be possible to get a new truck and a raise, Turner said "we'll see what we can do" but explained to Shipp that new trucks were distributed based on seniority, after old trucks are removed from the system, and told Shipp that he would get a raise on his anniversary date pursuant to the company's matrix. Accordingly, I find that the evidence does not support a finding that Turner connected his request that Shipp vote against the union for the good of the company with the potential of getting a new truck and/or a raise and recommend that this allegation be dismissed.

### O. Alleged threats by Ryan Turner in March 2019 (Complaint Paragraph 5(s) & Union Objections #1, #3)

#### 1. Testimony of Richard Daunch

On March 5, 2020, Richard Daunch was working at the Corona plant delivering concrete to various jobsites; his shift started at 4 a.m. At one point he parked his mixer truck under the batch plant to get a load of cement and walked into the office to pick up his delivery ticket. Present in the office was plant foreman Mike Carmody, area manager Andrew Patino, and Ryan Turner. Daunch testified that he and Carmody started talking about the job at hand when Turner started pounding on the desktop saying "hey, hey, hey." (Tr. 276–278) During a pause in his conversation with Carmody, Daunch said that he turned to Turner and told him "I have a name. My name is Rick. You should know my name by now; I've been working here for 15 years." (Tr. 277) According to Daunch, Turner

said "I know your name; it's here on my phone." (Tr. 277) Daunch asked to see the phone, and Turner showed it to him and said, "I have your name here with all these messages and paragraphs." (Tr. 277) Daunch told Turner that he hardly ever responded to his messages. Turner then told Daunch "don't forget to Vote No; remember all those favors I did for you, favors for getting you off early for gigs . . . do you remember . . . don't forget." (Tr. 277) Daunch, who said he was caught off guard by Turner's comments about gigs, did not respond. Instead, he got his delivery ticket and left. (Tr. 275–278)

Daunch testified that he plays in a band and needs to get off early a few weekends a month to attend his performances. Daunch said that, at times he has asked Turner for the time off, and sometimes he asks other company officials instead. According to Daunch, sometimes his time off requests are granted and sometimes they are not. (Tr. 277, 304–307)

### 2. Testimony of Ryan Turner

Turner admitted having a conversation with Daunch on March 5, but denied telling him to remember the favors Turner did by getting him off early for gigs and to vote no in the election. He further denied pounding on the desk to get Daunch's attention. When asked what he remembered telling Daunch that day, Turner said "[a]lways the same–same answer to every driver in the mornings, how are you doing, I ask them how everything's going at home. Sometimes I get replies from them and sometimes I don't." (Tr. 2263) Turner said that Patino and Carmody were present during his conversation with Daunch. (396, 2263, 2265, 2268)

Regarding Daunch's gigs, Turner said that Daunch occasionally played at a local club on Saturday nights and would request time off for his performances. According to Turner, Patino was the one who handled these time off requests. Turner said Daunch would always wait until Thursday or Friday to request leave, and sometimes the requests would be denied by Patino because they needed to be submitted 48 hours in advance. After Patino denied a request, Turner testified that Daunch would come to him and that he always granted the time off. Turner said that he had a good relationship with Daunch and had worked with him for about 16 years. (Tr. 2264–2266)

### 3. Testimony of Andrew Patino

Andrew Patino testified that he usually starts his day at the Corona plant, and therefore he would have been at the plant during the early morning of March 5 along with Carmody. Patino also testified that Turner was generally at the Corona office only once or twice a month, as he has a large area to cover. Patino was asked by Respondent's counsel whether he recalled the conversation on March 5 with Daunch being any different than a typical conversation with Daunch in the mornings, and Patino said no. Patino was then asked whether, during any conversation with Daunch on March 5, Turner pounded the desktop and said "hey" multiple times, and Patino said no. Patino denied that Turner said the words attributed to him by Daunch and testified that the conversation between the two was "just back-and-forth, normal discussion. How are you doing, that kind of small talk." (Tr. 2602) Patino said that in his experience working with Turner and Daunch over the years, he has seen them interact, and that Turner had always been friend-

ly and professional towards Daunch, saying, "[t]hat's how a manger speaks to an employee." (Tr. 2602–2603) Notwithstanding, Patino said that he could not recall, and did not know, how frequently he saw Turner interacting with Daunch in the past. In fact, prior to March 5, Patino admitted that he only saw the two talking once or twice. Patino knew that Daunch was a musician and knew Daunch requested time off for gigs. However, Patino denied he was the person that Daunch would approach to request time off and said that he was not involved in the process whatsoever. Instead, Patino testified that Daunch would submit his time off request forms to Carmody who would then email them to dispatch. If the request was rejected, then Daunch could appeal to Turner. Patino said that it was Turner who explained the time off request process to him, and he was not aware of Daunch ever having a time off request rejected and subsequently appealed to Turner. (Tr. 2599–2603, 2610–2612)

### 4. Analysis

As noted earlier in Section III (E), I found Daunch to be a credible witness. And the fact he was a current employee, and testifying against his pecuniary interest, bolsters his credibility. *Flexsteel Industries*, 316 NLRB at 745.

Watching Turner testify I was left with the impression that he really did not remember what he said to Daunch that day, and he was trying to adjust his testimony to support Respondent's defense. (Tr. 2263) For example, he denied making the statements attributed to him by Daunch, but when asked what he remembered saying to Daunch that day, Turner gave a generalized answer regarding what he purportedly says to every driver in the morning.

I similarly did not believe that Patino specifically remember what occurred on March 5, and note that when asked how he knew he was in the office that day, Patino said it was because he "usually" starts his day in the Corona office. I also believe Patino tried to tailor his answers to fit what he believed would assist Respondent's case. For example, when questioned by Respondent's counsel, Patino said that in his experience working with Turner and Daunch, he had seen them interact over the years and that their relationship was "friendly" and "professional," leaving the impression that he had seen the two speaking with each other on multiple occasions over their many years at the company. However, when pressed by the Union about how frequently he had actually seen Turner and Daunch interact with one another, Patino said he could not recall, and did not know, before finally admitting that, before March 5, he had only seen the two talking with each other "once or twice." I did not find Patino to be credible.

I also find the fact that Turner and Patino contradicted each other as to the process in which Daunch's leave requests were approved detracted from their credibility regarding this matter. Turner said that Daunch's leave requests were handled by Patino, and that he would get involved if Patino denied the request. Patino denied having anything to do with approving the leave requests whatsoever, said the requests were submitted to Carmody, who then forwarded them to dispatch, and further said this was the process that was explained to him by Turner.

As for Carmody, he did not testify, even though everyone

admitted he was present. As a Cemex plant foreman, and admitted Section 2(11) supervisor, Carmody's testimony was within Respondent's control, and Cemex offered no explanation as to why he did not testify. As such, I find that, had Carmody been called to testify, he would have testified adversely to Respondent's interests on this issue. *Martin Luther King, Sr., Nursing Center*, 231 NLRB at 15 fn. 1.

Therefore, I credit Daunch's testimony as to what occurred on March 5 in the Corona batch plant office, and find that Turner violated Section 8(a)(1) of the Act by telling Daunch not to forget to vote no and to remember all the favors Turner did for Daunch in the past by approving his leave request to get off early for gigs. Turner's statement implied that these favors would end if the union was elected, and was therefore coercive. *Walker Color Graphics*, 227 NLRB 455, 465 (1976) (manager's admonishment to employee to "vote right" and telling him to remember the help that was extended to him when his wife had been sick was a violation).

### P. Security guards and Cemex officials blocking or intimidating voters (Complaint Paragraphs 5(t), 5(u) & Union Objections #7, #8, #9)

#### 1. Background

In the buildup to the election, Cemex hired security guards which were dispatched to the various plants. Security guards were also deployed on March 7, 2019 to the specific plants that served as polling locations. Bryan Forgey testified that the steering committee was involved in the decision to hire and deploy the guards. The evidence shows that, before the union drive, the majority of batch plants at issue in this case did not have security guards present on a regular basis. While sometimes guards would be hired to patrol a certain plant if theft was occurring, it was not normal for security guards to be present at each of Respondent's batch plants.[28] The one plant that did have a regular security presence was Lytle Creek/Rialto, because the plant also had a large rock quarry on the property. But even there, the security guards were only present in the evening, and not during the day when the facility was operational. (Tr. 126–128, 1684)

The security guards hired during the organizing drive were dispatched to the various Cemex plants about two weeks before the election. Forgey testified the guards were hired to "protect our people, protect all the employees . . . and to protect the facilities." (Tr. 129) According to Forgey, Cemex was receiving "feedback from a lot of employees at the sites that they were becoming uncomfortable." (Tr. 129) Forgey said the company needed to create a safe environment for employees, because the management team had received complaints from employees "that they were uncomfortable as they were walking to their vehicles and other things." (Tr. 2103) That being said, the was a dearth of direct evidence that any of the drivers actually complained to management about these issues. And, when it was pointed out during cross-examination that all of the batch plants have employee parking lots located within the gates of the facilities, Forgey changed his testimony and denied that he

[28] Transcript page 128, line 3 should read "organizing drive started" instead of "organizing strike started."

ever said the company brought the security guards so employees could get to their cars. (Tr. 129, 144, 2103, 2156)

Regarding the guards, Forgey testified that they were flown in from out of state and were hired via a written agreement with a security company that specializes in providing security services for union campaigns, union elections, and "things of that nature." (Tr. 2104) The guards generally worked in teams of two and had vehicles they used to travel from plant to plant. They were unarmed but wore security uniforms and their cars had some sort of logo on the side. (Tr. 130–131, 596, 647, 1806, 1839, 2104)

According to Forgey, the guards were hired for each market area in both Las Vegas and Southern California, and they travelled to, and patrolled, the various plants depending upon which facility was "having a lot of action or activity" that "were making people feel uncomfortable" based on employee feedback. (Tr. 130–132) When asked what type of activity would make workers feel uncomfortable that would necessitate the dispatching of security guards to a particular plant, Forgey referred to employee concerns that union organizers were bothering them, and safety concerns about the union organizers, including their stopping Cemex trucks from going in and out of the plant. Forgey said that Cemex did not get involved in the guards' individual assignments, unless the company received a phone call that there was "a large group creating . . . challenges for us at a site." (Tr. 132) If the company received such a report, Forgey said that Cemex would call the senior leader for the security guards who would dispatch the guard teams accordingly. (Tr. 130–133)

On March 7, 2019, the day of the election, security guards were present at each facility that served as a polling location. Forgey testified that the guards were not given any special instructions on how to behave on election day. It appears the security guards stayed one more day, and by March 9 all the security guards were gone. Invoices from the security company were introduced into evidence for eight of the guards that were assigned to work on March 7, which state: "Security Coverage for Union Strike." (U. 22) The same security company that provided the guards on election day also installed a new security camera system at Respondent's Fontana plant about a year earlier. (Tr. 144, 133, 467, 1276, 2626–2627; R. 45, 46)

#### a. Testimony about what occurred at the Inglewood plant

As discussed earlier, the Inglewood plant has one gate employees use to enter and exit the facility. A set of railroad tracks, which are about two or three car lengths away from the gate, intersect the public road leading up to the entrance. In the weeks before the election, union organizers were outside the Inglewood plant standing between the railroad tracks and the plant entrance. On March 7, Respondent parked four ready-mix trucks outside the gate of the Inglewood plant. The trucks were parked in such a way that they blocked the area organizers had been using to pass out flyers, and they further blocked the ability of anyone to park on the side of the road leading up to the plant. However, the roadway itself was left unobstructed. (Tr. 198, 1271–1273, 1335, 2721, 2725; U. 12; R. 47)

There were two security guards on duty at the Inglewood plant on March 7. Robert Nunez was the highest-ranking man-

88                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

agement official present at Inglewood on election day and stationed himself under a tree just outside the plant, to the left of the gate entrance. He waved to employees as they entered the plant to vote. The two security guards were posted on the right side of the gate, just inside the entrance. To enter the plant on election day employees had to drive past the mixer trucks and between the security guards on one side of the gate and Nunez on the other.[29] Prior to the election, the Inglewood facility did not have security guards stationed at the plant. (Tr. 198, 202–203, 1276, 2706, 2727, 2748)

Driver Luis Hernandez served as an election observer at Inglewood and arrived to work that day at about 3:30 a.m. to prepare for the election that started at 4 a.m. When he arrived, Hernandez said he saw one security guard and was not allowed to enter the plant to park his car because as he was not on the clock. Because of the location of the mixer trucks outside the gate, Hernandez had to park down the road on a side street. He eventually was escorted into the plant by the NLRB agent running the election, along with Cemex management officials, a little before 4 a.m. (Tr. 1270–1275)

*b. Testimony about what occurred at the Santa Paula plant*

Jason Faulkner was at the Santa Paula plant on election day along with Robert Resendez, the Moorpark plant foreman/batchman, and Craig Thomas, who the drivers identified as a Cemex human resources manager. There were two security guards stationed at the gates of the Santa Paula plant on March 7. Prior to the election, the Santa Paula facility did not have security guards at the plant. (Tr. 459–466, 1222–1229, 1475, 1477, 1763, 1767, 1771)

Employees were not loading out of the Santa Paula plant on election day. Instead, drivers who were scheduled to vote there received instructions to start their day at the Santa Paula plant at 4 a.m., and after voting, the drivers were given individualized assignments which consisted of deadheading to other plants for their first load. (Tr. 1492, 1768–1769, 2427–2428, 2319, 2344)

The Santa Paula facility sits on a roughly rectangular piece of property, and there are two gates used to enter the facility, a west gate and an east gate, that are adjacent to a public street and located at the north end of the property. The batch plant, where ready-mix trucks are loaded with material, sits in the middle of the facility. Directly west of the batch plant, along the western property line, is the batch office where the voting occurred. The facility has two areas that are generally used for employee parking. One area is adjacent to the western fence line running from the batch plant office to just below the west gate. The other area is located near the east gate. In all, it appears that about 20 cars can fit in these parking areas. The ready-mix trucks assigned to the plant are normally parked in the southwest corner of the facility. (Tr. 1224–1225, 1483, 1488, 1767; U, 8; R. 38)

On election day, instead of being parked in the southwest corner of the facility, the plant's ready-mix trucks were parked single file along the west property line, running from the batch

office to the west gate, taking up one of the areas employees use for parking. Also, on the morning of March 7, Faulkner used yellow caution-tape to rope off parts of the facility, creating a pathway for drivers to follow once they entered the plant. The caution-tape trail took drivers from the entrance to a newly created parking area, located in the middle of the facility just north of the batch plant. The pathway then steered employees to the batch office where the voting occurred. Faulkner said that he made this pathway so drivers knew exactly where to go. According to Faulkner, he was concerned because there was some aggregate and equipment in the area and also because people were pulling into the plant with their personal vehicles. That being said, employees pull into the plant every day with their personal vehicles, and it does not appear the aggregate or equipment present on March 7 was any different than what was located at the plant on any other day. Once an employee entered the gate, they had to follow the caution-tape pathway, which eventually led them to the polling area. (Tr. 462–466, 516–518, 1477–1478, 1482–1483, 1766–1767)

Faulkner testified that, before the polls opened, he instructed the security guards to only let employees into the facility one at a time, "one person in, one person out," saying he did not want congestion in the area. (Tr. 462, 2431) According to Faulkner, he changed these instructions after the pre-election conference, telling the guards they would not be doing "the one-in/one-out thing." (Tr. 2431) He then assigned one guard to each gate, telling them to watch the traffic flow so it did not get congested. (Tr. 462, 2431)

The morning of the election, Faulkner, Resendez, and Thomas parked their personal pickup trucks on the street, just outside the plant's north fence line, between the west and east gates. Throughout the three remained in this area, usually sitting in one of the pickup trucks. Trees running along the fence line partially obscure the view from the street into the facility. (Tr. 1222, 1476, 1518–1519, 1768, 2319–2320, 2437–2439; R. 39)

At 3:30 a.m. on March 7, Cemex driver Jose Lira arrived and tried to pull into the facility to park, as he would on any normal workday. Lira usually arrives for work before his scheduled start time and had never previously had a problem entering the plant before his scheduled shift. However, when he tried to drive into the plant on March 7, one of the security guards told him that he could not enter the facility until 4 a.m. After being refused entry into the plant, Lira drove about a quarter mile down the street to an area the Union had set up with coffee, where some of his coworkers were also waiting. (Tr. 1221–1223, 1248)

At 4:00 a.m. a group of employees, which included Lira and his brother Jesus, drove back to the plant. When they arrived, one of the security guards told them that they could not enter the plant as a group, but had to enter one at a time. Lira said this was the first-time employees were ever told they could not enter the facility as a group. Notwithstanding, the employees ignored the guard's instructions and entered the facility as a group. Once inside the plant, Lira got in line and voted. After voting, the Lira brothers were standing with a group of about four or five other drivers when one of the security guards told them that they had to leave the facility. The drivers explained that they worked at the plant, and the guard left them alone. A

---

[29] Transcript page 2748, line 13 should read "drive between" instead of "decide between."

little while after they voted, the drivers received instructions from the batchman for their first load of the day. Both Lira brothers were instructed to deadhead to Santa Barbara and they left the facility accordingly. (Tr. 1224–1226, 1250, 1252, 1764, 1769–1771, 1776)

### c. Testimony about other facilities

Forgey testified that, on the day of the election, security guards were present at each facility that served as a polling location. This was confirmed by various other witnesses, as well as the invoices introduced into evidence. For example, Daryl Charlson, who was present at Oxnard on March 7, testified there were two security guards stationed at the facility that day. According to Charlson, he wanted to make sure only authorized people entered the plant, so he told the security guards to ask everyone whether they were a Cemex employee. Ornelas corroborated that there were two security guards at Oxnard on election day, said the plant does not regularly have security guards at the facility, and confirmed the guards were gone after the election. Other witnesses testified about seeing security guards on March 7 at the Corona plant, the Sloan plant, the Los Angeles plant, and at the Walnut plant. Other than the instances where employees were not allowed to enter the facilities before the polls opened at 4:00 a.m., there is no evidence that any employee was blocked or otherwise prevented from voting by the security guards, or anyone else, after the polls opened. (Tr. 144, 282, 597, 647, 728, 852, 1057, 1374–1375, 1589, 2559, 2587–2591)

Henry Hernandez, who voted at Lytle Creek/Rialto, testified that he had a conversation with one of the security guards present on March 7, as he was petting the guard's Doberman puppy. When he learned that Hernandez was regularly assigned out of the Fontana plant, the guard told Hernandez he had installed cameras at Fontana and that, along with video, "they can hear everything" the employees were saying. (Tr. 1686) The same guard told Hernandez "thank you for being good on the strike." (Tr. 1686) When Hernandez explained that employees were not on strike, but were voting on whether to unionize, the guard said that he would take it was for a strike. (Tr. 1686) Although Respondent disputed that the Fontana plant's camera system recorded audio, the statement made by the guard to Hernandez was unrebutted and I credit his testimony as to what was said.

### 2. Analysis

#### a. Complaint paragraph 5(t) and the Union's Objection #8

Complaint paragraph 5(t) alleges that on election day at the Inglewood plant, Respondent blocked and/or intimidated employees from using the plant entrance and voting area. The Union's Objection asserts that Respondent generally engaged in objectionable conduct on March 7 by increasing the use of security at the different locations during the critical period in order to intimidate employees.

As for the claim Respondent blocked employees at the Inglewood plant, I recommend the allegation be dismissed. The evidence shows that, although Luis Hernandez was originally told he could not enter the plant, he was eventually allowed to enter before the election started, and there is no evidence that

this delay affected his ability to either vote or serve as an observer. Furthermore, there is no evidence that any other employee was blocked or prohibited from voting at the Inglewood plant or anywhere else for that matter.

Regarding the placement of ready-mix trucks outside the Inglewood plant, it is true that on the day of the election, Respondent parked it's trucks in what appears to be public areas that had generally been used by the Union to electioneer and distribute information during the campaign. However, there is no evidence that the trucks were unlawfully parked. Nor is there evidence that, despite the appearance of the trucks, the Union was prohibited from campaigning that day. Therefore, I find there is no violation regarding the parking of the mixer trucks. Cf. *Sea Breeze Health Care Ctr., Inc.*, 331 NLRB 1131, 1145 (2000) (employer did not engage in objectionable conduct by parking a truck on its property to block the view of a pro-union sign across the street and to reduce the noise from union supporters as any damage to the union's campaign was difficult to discern).

As for Nunez's presence just outside the gate of the plant, even though every employee had to drive past Nunez to enter the facility and vote, the polling location was inside the batch office, which was between 100 to 150 yards away from the gate, and Nunez was not within the line of site of employees as they entered the polling area. (Tr. 2705, 2732–2733, 2727–2728; U. 12; R. 47) This was not a situation where a management official had stationed himself just feet outside the door of a polling location. See *Performance Measurements Co., Inc.*, 149 NLRB 1451, 1453 (1964) (the presence of the employer's president just outside a door that employees needed to pass in order to enter into the polling place constituted objectionable conduct). Accordingly, I find that Nunez' sitting outside the plant gate and waving to employees as they entered was not a violation. *J.P. Mascaro & Sons*, 345 NLRB 637, 638–639 (2005) (employer's president did not engage in objectionable conduct by standing outside the facility, saying good morning and shaking the hand of anyone who engaged with him, as he was not in a designated no electioneering zone, did not violate any of the Board Agent's instructions, had no direct view of the polling place, and there was no evidence the union complained to the Board Agent at a time when the agent may have been able to stop the activity).

Citing *Austal USA, LLC*, 349 NLRB 561 (2007) and *Beverly California Corp.*, 326 NLRB 232 (1998) the General Counsel asserts that Respondent's posting of guards at the plants, without a demonstrated need, constitutes unlawful intimidation. (GC. Br. 85–86) I believe both cases support the General Counsel's position.[30]

In *Austal USA*, on election day employees arrived at the fa-

---

[30] The facts fully support a finding that the security guards were Respondent's agents under Section 2(13) of the Act, as the guards were performing their duties under apparent authority to act on behalf of Cemex, and stopped people from entering the property before certain specified times on election day. *Poly-America Inc. v. NLRB*, 260 F.3d 465, 483 (5th Cir. 2001) (security guards who were authorized to exclude people from property were the employer's agents regardless of whether they were specifically authorized to engage in any section 8(a)(1) prohibited activity).

90        DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

cility to find a manager present at the gate with two uniform security guards wearing military style uniforms with sidearms. 349 NLRB 561, 561 fn. 2, 576 (2007). Guards had never previously been present at the facility to control access, and there was no evidence presented by the employer that there had been any prior problem with unauthorized persons coming onto the property. The Board found that the unprecedented posting of guards and the requirement that employees identify themselves before entering had no purpose other than intimidation and constituted objectionable conduct. Id.

In *Beverly California Corp*, 26 NLRB 232 (1998), on the day of the election "the company posted guards at the facility entrances closest to the voting areas and required employees to show identification to use those entrances." *Beverly California Corp. v. NLRB*, 227 F.3d 817, 843 (7th Cir. 2000). The previous day the company held a mandatory employee meeting to discuss the Union and had guards posted at the facility entrances during the meeting. The employer tried to suggest that extra guards were needed, for the sake of the facility's patients, because the staff was away during these times. But it produced no evidence that it had any such concerns during times "when the union element was missing." Id. The Board found that the posting of guards, without justification for the show of force, served only to disparage the Union and its supporters.

Here, I believe that the evidence supports a finding that Respondent violated Section 8(a)(1) when, in an unprecedented move, it assigned security guards to patrol the various plants in the two weeks before the election, and further assigned guards to every polling location, including Inglewood and Santa Paula, on election day. Respondent had never previously assigned guards to patrol these facilities on a regular basis, had never before posted guards at the gates to control access to the plants, and did not show that there was any type of demonstrated need to do so. And at some of the facilities, the guards prevented employees from entering the plant early and were told to make sure everyone who entered was a Cemex employee, which was a departure from the company's normal practice.

When asked why the security guards were posted at the plants, Forgey said the company needed to create a safe environment for employees because they were receiving feedback that workers were uncomfortable as they were walking to their vehicles, among other things. However, when it was pointed out that the employees parked within the facilities, Forgey changed his testimony and denied saying that employees walking to their cars was a reason for having the guards. Forgey's testimony about why the company hired security guards is simply not credible. Similarly not credible were the far-fetched claims by Nunez that the union was threatening drivers and that one driver "got a death threat at his house." (Tr. 201) Nunez was not involved in the decision-making process to hire the security guards, and no such claims were ever raised by Forgey, or anyone else, who was actually involved in the decision to hire the guards.

I find it significant that, of the roughly 370 drivers eligible to vote in the election, not one employee testified that they were threatened or that their physical safety was otherwise put at risk by the union organizers/supporters. Indeed, the only driver who testified about an incident with the union organizers that

was then reported to management was Garemy Jones. According to Jones, who also served as a second batchman, as he was leaving the Inglewood plant 1 day and saw through his rear-view mirror a union organizer giving him the middle-finger. However, even in that instance, it was Jones himself who further escalated the situation by confronting the organizer when he returned to the plant. (Tr. 2840–2844, 2874–2875, 2884, 3086–3090) Surely one instance of a reported middle-finger does not justify a roving patrol of security guards at all the plants two weeks before the election, and the posting of guards at each polling location on election day.

I also note the fact there was no documentary evidence introduced substantiating the company's purported reasons for hiring the security guards; this further detracts from Respondent's claims. *UAW*, 459 F.2d at 1336. Indeed, the only documents introduced into evidence were the invoices from the security company for some of the guards hired to patrol on March 7 which says, "Security Coverage for Union Strike." (U. 22) Clearly Respondent wanted the guards present at the facility as a show of force and to deter employees and the union organizers from engaging in union activities. Accordingly, where there was no evidence of a threat, or that employees were at risk, Respondent's unprecedented hiring of security guards to patrol the facilities in the 2 weeks leading up to the election, and the posting of guards at each polling location, had no purpose other than to intimidate the Union and its supports in violation Section 8(a)(1) of the Act. *Beverly California Corp*, 326 NLRB 232 (1998); *Austal USA, LLC,* 349 NLRB 561 (2007).

*b. Complaint paragraph 5(u) and the Union's Objection #7*

Complaint paragraph 5(u) alleges that on election day at the Santa Paula plant, Respondent blocked or prevented employee from entering the plant and the voting area, instructed employees to enter the plant one at a time, and told them to leave when they finished voting. The Union also points to this incident in support of Objection #7 which claims Respondent engaged in unlawful surveillance. I recommend these allegations be dismissed as I do not believe Respondent's conduct constituted a violation or rises to the level of objectionable conduct.

As for the presence of Faulkner, Resendez, and Thomas outside the plant on election day, all three were stationed far away from the batch plant office where the voting occurred. They did not have a direct line of site to the polling place, did not engage in electioneering, and did not violate any of the Board Agent's instructions. Their presence was neither objectionable nor did it constitute a violation of Section 8(a)(1). *J.P. Mascaro & Sons*, 345 NLRB at 638–639. While the positioning of the Santa Paula trucks, along with Faulkner's caution-tape pathway, was certainly strange, there is no evidence that either the trucks or the pathway prohibited employees from voting or otherwise inhibited their ability to engage in conduct protected by Section 7 of the Act. Id. at 639 (even though the employer's president was stationed outside the front door to the facility he had no way of knowing who was entering to vote and who was entering to perform job related duties or to get a snack and therefore did not engage in unlawful surveillance).

Regarding the allegation that employees were blocked or

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC

prevented from entering the voting area, there is no evidence that anyone was precluded from entering the batch plant office where the vote was occurring. While the security guards did tell some employees that they could only enter the plant one at a time, the evidence shows that the employees ignored these instructions, and entered the plant as a group without any repercussions. Similarly, even though a guard told some drivers that they needed to leave the facility after voting, when the drivers said they worked at the plant the guard left them alone and the drivers continued going about their business. Under these circumstances I recommend the allegations in complaint paragraph 5(u), and the related Objections to the election, be dismissed.

### Q. Alleged surveillance at the Oxnard plant on election day (Complaint Paragraph 5(v) & Union Objections #7, #8)

#### 1. Facts

At Oxnard, the main gate is located on the west side of the facility towards the southern edge of the plant. There is a large rectangular covered structure, referred to as the production building, that is directly parallel to the main gate, running east to west. The production building takes up the bottom third of the property. The batch plant office is located inside the production building, as are large bins that store the sand, rock and other materials used in production. The batch plant, where the ready-mix trucks are loaded, is located outside the south wall of the production building. Conveyers move the production material from inside the production building to the batch plant. A road goes around the entire production building, which drivers use to access the batch plant after entering from the main gate. (Tr. 409, 2565–2566)

Approximately 150 feet directly north of the production building is the main office building that is used by sales representatives, managers, and clerical staff. Faulkner has his office in this building, which also contains a conference room, bathrooms, and a place where drivers can get coffee. On March 7, the election occurred in a conference room inside this building. Above the northwest corner of the production building, and diagonal to the main office, is a parking area for employees. This parking lot can be accessed by turning left after entering the main gate, and it abuts the road circling the production building. From the parking lot, it is a short walk to the main office where the voting occurred. Directly to the east of the employee parking lot, between the main office and the production building, is a parking area for the company's the ready-mix trucks. (Tr. 405, 409, 412–413, 1188; R. 44; U. 6)

East of the production building, and across the northeast corner of the road circling the building, is a small rectangular stockpile of sand that is used for production. This sand stockpile is about 150 feet from the main office. Someone standing in the area of the sand stockpile could see what was occurring in the employee parking lot. However, there is not a direct line of site from the sand stockpile to the main office entrance. (Tr. 991, 1188, 2564–2565; R. 44)

On election day, Charlson participated in the pre-election conference held in the main office, along with representatives from the Union. Prior to the pre-election conference Charlson stationed the two security guards on opposing ends of the main office, one on the north side of the building and one on the south side. After the pre-election conference, Charlson told the guards to move over towards their car, which was parked near the main gate, to monitor who was entering the facility. Charlson told the guards to direct people in and out of the plant and to ask everyone entering whether they were Cemex employees to ensure that only company employees were voting. Charlson testified he also told the guards to stay in that area, and away from the main office, until notified otherwise. (Tr. 2557, 2569, 2586–2591)

During the election, the Union set up tents outside the facility, about 15 feet away from the main gate and 30 feet away from the security guards. Drivers had to pass both the Union tents and the security guards as they entered the plant. (Tr. 2567–2568)

The Oxnard plant was open on election day and drivers were delivering cement from the plant. After the pre-election conference, Charlson worked from inside the production building throughout the day. Charlson testified that he only left the building twice that day while voting was in session. Between 6:30–6:45 a.m. Charlson said that he walked around the production building with safety champion Gus Aguilera. At about halfway through the afternoon voting session Charlson said that he did another walk around the production building. Charlson said that he did these walks because the plant was in full production and he wanted to be sure that everything was running properly. Because he was inside the building most of the day, Charlson could not see what the security guards were actually doing while voting was taking place, other than the times when he walked around the facility. (Tr. 2560–2563, 2571–2572)

On the day of the election the polls opened at 4 a.m. Diana Ornelas testified that she arrived at Oxnard that day and saw the two security guards stationed in the employee parking lot. At some point after she voted, Ornelas saw one of the security guards with a coffee cup in his hand walking into the main office building. Ornelas immediately told a coworker what she saw, and asked if that was okay; the coworker did not know. Also that day, Ornelas was driving her ready-mix truck on the road that circles the production building and saw Charlson and Aguilera during one of their walks standing by the sand stockpile. (Tr. 988–989, 991, 1188, 1191; JX. 6)

#### 2. Analysis

The General Counsel and Union assert that the security guard walking into the main office building, along with Charlson and Aguilera standing near the sand stockpile, support the allegation that Respondent engaged in unlawful surveillance as set forth in paragraph 5(v) of the complaint, and the Union's Objection #7. However, because neither incident constitutes surveillance, I recommend these allegations be dismissed.

While Charlson and Aguilera could see who was walking towards, or even into, the main office building during their walk around the production building, they could not see into the actual polling location. Also, if they did see a driver entering the main office building, they had no way of knowing whether the driver was entering the building to vote, to use the restroom, or to get coffee. Under these circumstances, Charlson's conduct did not amount to unlawful surveillance. *J.P. Mascaro &*

92                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

*Sons*, 345 NLRB at 638–639.

Similarly with the security guard, while he entered the main building, there is no evidence the guard entered the actual voting area. There is also no evidence that he entered an area designated as off limits by the Board Agent conducting the election, or that he even had a view of the conference room where the voting was taking place when he entered the building. And no evidence was presented that any voters were present inside the building when he entered. Accordingly, I recommend that this allegation also be dismissed. Id.; see also *Sea Breeze Health Care Center, Inc.*, 331 NLRB 1131, 1144–1145 (2000) (supervisors who accidently entered the voting area did not engage in objectionable conduct where they left immediately when asked to do so, and there were no voters present in the area when they entered).

*R. Excluding pro-union employees from captive audience meetings (Union Objection #6)*

1. Witness Testimony

Multiple witnesses testified about employees being excluded from Respondent's captive audience campaign meetings leading up to the election. Ryan Turner testified that certain drivers were not invited to these meetings because the company believed they were 100 percent for the union and did not want them interrupting the meetings. According to Turner, employees were paid to attend these meetings, which occurred during normal work hours, and the company served refreshments, like danishes or fruit. Turner said the pro-union employees who were not invited to these meetings were assigned to their normal work duties instead. (Tr. 2304–2306)

Bryan Forgey acknowledged that certain employees were not invited to these meetings or were asked to leave if they showed up. Forgey said the company did not want these drivers to attend because they were disruptive by not allowing Cemex to get its message out to other employees. When asked specifically how some of the excluded drivers were disruptive, Forgey said they tried "to stop the discussions from happening appropriately, allowing other employees to have their voices heard and their questions asked" and they were excluded so "other employees could get their questions asked and have an opportunity to participate." (Tr. 2114) Forgey identified Fabian Leon and Henry Hernandez as two of the drivers that were excluded from these meetings, and acknowledged that all of the excluded drivers were union supporters. In fact, Forgey said he personally asked Leon to leave one of the meetings at Oxnard, telling Leon that he would be happy to meet with him personally instead. Forgey said the decision to exclude certain drivers from meetings was made by the steering committee. He also said the excluded drivers were assigned to perform other tasks instead of attending the meetings. (Tr. 150–152, 2114, 2132, 2146, 2153)

Consultant Michael Rosado testified that some of the drivers were excluded from meetings because they were disrespectful to him and intimidating other employees by not allowing them to "get any of the education." (2798–2799) Rosado claimed that some drivers were "basically holding the meeting hostage and wouldn't let me continue" or were loud and disruptive so he reported this back to management and they were excluded

from future meetings. Rosado identified the Lira brothers and Leon as drivers who were specifically excluded from these meetings. Amed Santana testified that some drivers were excluded during the initial round of meetings because they were disruptive and rude, even after he told everyone to be respectful towards him and during the meetings. (Tr. 2798–2799, 2814, 2818–2820, 3056–3057)

Eric Najolia, a driver who was assigned to the Santa Paula plant, testified multiple meetings occurred where he was neither invited nor scheduled to attend, but which his coworkers attended. Najolia said sometimes these meetings occurred when he was not scheduled to work, or happened at a time when he was assigned to go to another plant. (Tr. 1463–1467)

Ibrahim Rida testified that he went to one company meeting about the union in Las Vegas and after he complained about the meeting he was not allowed to attend any other ones until the very last one. Rida testified that he lost money because of these meetings, claiming that they occurred before work and his coworkers were allowed to start work early to attend. Rida also said that sometimes he would be "washed out" earlier than some of his coworkers that were allowed to attend the meetings. (Tr. 811–813, 831–833)

Los Angeles driver Paul Payan testified about one meeting that occurred but he was not scheduled to attend. According to Payan, he asked Andrew Burton why he was not invited, and Burton told him that the consultants did not want him in the meetings. (Tr. 620–623)

Javier Luna, a driver at the Walnut plant, testified about one meeting he was unable to attend because the company had scheduled him to work out of the Fontana plant that day. Luna also testified about another time when he was scheduled to work at Fontana, and when he returned his truck to the Walnut facility he saw a table out with chips, sodas, and a barbecue grill, leading him to believe that food had been served at the Walnut plant that day. However, Luna testified that he could not recall if a barbecue actually took place. (Tr. 1597, 1603–1604)

Fabian Leon testified that he walked into one of the meetings at the Oxnard plant but was stopped by Forgey who told him he was not supposed to be in the meeting, and that Forgey would deal with him personally. Leon also testified about another time where a meeting occurred at Oxnard but Respondent scheduled him to work in Santa Barbara instead. (Tr. 1801–1804)

Fontana driver Henry Hernandez testified he was excluded from meetings at the Fontana plant, and when he tried to attend one meeting, batchman Charlie Mattes said he could not attend because upper management did not want him in the meeting. Other drivers who also testified about being excluded from campaign meetings included Diana Ornelas, Bernard Molina, Donald Shipp, William Lucero, Jesus Lira, and Jose Lira. (726–728, 771, 893–894, 1052–1057, 1231, 1246, 1678–1680, 1760)

2. The Credited Evidence

The credited evidence shows that, as the Union organizing drive progressed, Respondent created a list of certain employees that it perceived to be ardently pro-union, which included at least the following employees: Henry Hernandez, Leon, the Lira brothers, Lucero, Luna, Molina, Najolia, Ornelas, Payan,

Rida, and Shipp. These, and perhaps other employees, were purposely excluded from Respondent's campaign meetings where Cemex presented its message to employees to vote against the union while serving them refreshments including pastries and fruit.

I do not credit the testimony from the consultants, or from Forgey, that drivers were excluded because they had been disruptive in any way. While Forgey and the consultants used the term "disruptive" to describe the actions of certain of the excluded drivers, this testimony was conclusory, self-serving, and unworthy of belief; no employee was ever disciplined for engaging in allegedly disruptive behavior during any of these meetings. Instead, I credit the testimony of Turner that certain employees were not invited to these meetings because the company believed that they were 100 percent for the union and therefore did not want them interrupting the meetings. Here, the "disruptive" behavior noted by Forgey and the consultants was simply a euphemism for the drivers' strong union support, and the company did not want these workers in the campaign meetings to counter Respondent's arguments that employees should vote against unionization. Cf. *Boddy Construction Co.*, 338 NLRB 1083 (2003) (Company believed employee was a "disruptive influence" because of his union activities and referring to him as an "instigator" was a euphemism for worker's pro-union sentiments).

I also believe that the credited evidence shows that employees who were excluded from the campaign meetings were either assigned to perform other work while the meetings occurred, or had their scheduled altered; nonetheless they were all assigned a full day's work. The credited evidence does not support a finding that the excluded employees lost work hours because they did not attend the campaign meetings.

While Rida, testified that his coworkers were allowed to start work earlier than he was, in order to attend these meetings, and that he sometimes was "washed out" earlier than his coworkers, his testimony was general in nature, and lacked specificity as to the dates of the meetings from which he was excluded. His testimony was also speculative as to how many hours his coworkers actually worked on the days in question, in comparison to his own work hours, as Rida did not testify that he actually reviewed the timecards of his coworkers or otherwise saw their paystubs. Moreover, nobody who actually attended any of Respondent's campaign meetings testified that they were given the benefit of working extra hours over and above their regular work schedule because of the meetings. And no payroll records were introduced to show that employees who attended the campaign meetings worked more hours than Rida on the dates in question.

The Union asserts that Najolia's testimony shows that he lost work hours by being excluded from these meetings. (Union Br. at 51) However, a closer look at Najolia's testimony does not support this claim. When asked about how he determined that he was being excluded from Respondent's campaign meetings, Najolia testified about three different scenarios which led him to believe this was occurring: (1) he would be scheduled to work at a different plant while his coworkers were scheduled to attend a meeting; (2) a meeting would be scheduled for his coworkers at 5 a.m., while he would not be scheduled to start

work until later in the day; or (3) a meeting would be scheduled for late in the day, while he was scheduled to work early in the day. While I credit Najolia that all three scenarios occurred, his testimony does not show that, on any given day, he was paid for fewer work hours than his colleagues who attended the campaign meetings. It only shows that Respondent scheduled him to work at different places, or at different times, on those dates. And, as with Rida, no documentary evidence was introduced to show that Najolia lost pay because he did not attend the campaign meetings. Therefore, I do not believe the credited evidence shows that employees who were excluded from Respondent's campaign meetings were denied work hours, in comparison to the employees who attended these meetings. (Tr. 1464–1467)

Finally, the evidence shows that Respondent served refreshments during these meetings, including fruit and pastries. While Javier Luna testified about a time when he returned to the Walnut plant and saw a table with chips, soda, and a barbeque grill, he could not recall whether a barbecue actually occurred that day. And nobody who attended any of Respondent's campaign meetings testified that they were provided with a free lunch or a barbecue as part of these meetings.

### 3. Analysis

The Board allows employers to exclude union supporters from meetings held during working time at which the employer expresses its opposition to unionization. *Delchamps, Inc.*, 244 NLRB 366, 367 (1979), enfd. 653 F.2d 225 (5th Cir. 1981) (collecting cases). However, in those situations, an employer may not deny pay and benefits to employees that were not invited to the meeting. Id. (violation where active and vocal pro-union employees were excluded from campaign meetings where free meals were served while other employees who were not on duty were allowed to clock in and get paid to attend these meetings); see also *Wimpey Minerals USA, Inc.*, 316 NLRB 803, 803 fn. 1, 806 (1995) (violation where employees were paid to attend campaign meetings, but certain employees were excluded from these meetings and were not paid). *Saisa Motor Freight*, 333 NLRB 929, 931 (2001) (violation where employees lost pay because they were excluded from campaign meeting, but no violation regarding another group of employees who were also excluded but suffered no loss of income).

Here, I do not believe the credited evidence shows that the drivers who were excluded from the campaign meetings received any less work hours or otherwise received less pay. Thus, the fact Respondent merely excluded them from the meetings does not amount to objectionable conduct. *Saisa Motor Freight*, 333 NLRB at 931.

The employees who did attend the campaign meetings were served refreshments, such as fruit and pastries. Thus the question remains as to whether this constituted objectionable conduct, since the excluded employees were not served these refreshments while they were working. In support of its Objection, the Union cites *Desert Inn Country Club*, 282 NLRB 667 (1987), which involved a party given by a company to 168 nonstriking employees about 3 months after a long and bitter strike had ended. Only employees who either did not strike, or who abandoned the strike, were invited to the party which included

94                              DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

food, liquor, a live band, and dancing; the party cost the employer about $4000. The Board found the party constituted a term and condition of employment and that by holding the party the employer independently violated both 8(a)(1) and 8(a)(3) of the Act. In defense of its actions, Cemex points to cases that support an employer's right to exclude known union supporters from campaign meetings and to another line of cases where the Board found no objectionable conduct had occurred were the employer provided all employees access to food or meals either just before, or during, the election. (Cemex Br. at 213–214)

Here, I do not find the refreshments served to employees attending the campaign meetings as comparable to the party described in *Desert Inn Country Club*, where food and liquor was served, employees danced to live music, and the party cost the employer $4000. While there is no evidence as to the actual cost of the pastries and fruit served to Cemex drivers, it seems the associated cost would be minimal at best. As for Respondent's defense, I am cognizant that the Board in *Delchamps, Inc.*, found the judge erred by conflating two separate lines of cases, one allowing an employer to exclude union supporters from campaign meetings held during work time, and the other finding it is not per se objectionable conduct to provide free meals to employees at campaign meetings held during non-working hours. 344 NLRB at 367. This is basically the argument advanced by Respondent. However, in *Delchamps, Inc.* the Board also noted that the judge "erred in failing to evaluate the fact that Respondent, as part of its policy regarding its luncheon and dinner meetings, permitted employees who were scheduled for off-days to clock in for the sole purpose of attending those meetings" which "granted employees attending the meetings an opportunity to be paid above their normal working hours, thereby affording a clear benefit to those employees." Id. Because the evidence here does not support a finding that employees attending the campaign meetings were paid above their normal working hours, or conversely that employees who did not attend the meetings received less pay, I recommend that the Union's Objection be dismissed.

*S. Union Objection #2 involving threats*

Objection #2 alleges that Respondent threatened employees with closing plants or other adverse consequences if they supported the Union. In further support of this Objection, the Union points to the following two incidents which are not alleged as unfair labor practices: (1) a meeting with employees at the Parris plant involving consultant Amed Santana; and (2) a discussion Forgey had with employees at the Temecula plant. (Union Br. at 11, 21)

1. Amed Santana threat of plant closure

*a. Witness testimony*

Alejandro Flores worked as a ready-mix driver at Cemex's Temecula plant from 2017 through mid-2019. Flores testified that he was in a meeting conducted at the Perris plant with Amed Santana and a number of other drivers on January 28, 2019. According to Flores, during the meeting Santana told employees that they were not going to be able to get anything done because they were just 400 drivers and Cemex was a multibillion-dollar company; Santana also said that even if they

got a contract Cemex was just going to fight it. Because Cemex was so big and powerful, Santana asked the drivers "what are you guys going to do" saying that the drivers could lose everything in negotiations. (Tr. 1369–1370) Flores further said that Santana told the drivers that Cemex was much more than just a ready-mix operation, that it also sold aggregates and cement, and if they unionized Cemex can just stop doing ready-mix; Santana said that "if you push enough . . . they don't need that ready-mix part of the company." (Tr. 1370–1371) (Tr. 1364–1365; 1369–1371; 1414–1415)

During cross examination by Respondent, Flores testified that Santana discussed the collective bargaining process and told employees that, as a result of negotiations they could get more than they have now, less, or end up with the same. Flores further said that Santana used a PowerPoint during the meeting, and would usually follow the presentation unless there was a question asked that was not on the PowerPoint. According to Flores, it was in reply to a question from a driver that Santana referenced closing down the ready-mix operation if employees unionized. (Tr. 1406–1407, 1414–1415)

Amed Santana testified he was assigned to the Inland Empire during the campaign, which included the Perris plant among others, and that he conducted various trainings at these facilities, including training on the NLRA and collective bargaining. Santana said that he used PowerPoint presentations during these meetings, which he followed. According to Santana, he could not change the presentations themselves, which were created by LRI, but he did add verbal content to them based upon the questions asked by employees. (Tr. 3038, 3041, 3048, 3052–3054, 3065–3066; R. 49, R. 51)

On direct examination by Respondent's counsel, Santana denied ever discussing the relationship between Cemex's ready-mix division and the rest of the company's businesses. He denied saying that Cemex would close its ready-mix division if the Union won the election or saying that Cemex did not need the ready-mix division. He also denied saying that Cemex might close down the plants if the union won the election. When asked if anyone affiliated with Cemex ever told him that the company would consider getting out of the ready-mix business if the Union won, Santana answered "No, not to me." (Tr. 3057) As for what he told employees about wage increases if the union won the election, Santana said he told employees that they could end up with more pay, the same, or less. (Tr. 3057–3058)

Santana admitted that he discussed with employees the fact Cemex was a multibillion-dollar company, but denied he discussed this "in the context of negotiations." (Tr. 3058) At trial, Santana said he was surprised when he learned that Cemex was in sixty-nine countries, but during his testimony he never explained the context in which he discussed the financial size of Cemex with the drivers. Instead, he just denied telling employees that, even if the union won the election, because Cemex was a multibillion-dollar company the drivers could lose everything they had during the negotiation process. He also denied saying anything about the size of Cemex impacting what would happen during negotiations. (Tr. 3058–3059)

During cross-examination, Santana testified that, while he had a general idea about where these meetings occurred, he was

not 100 percent sure about their locations. He admitted that he could not testify about the dates the meetings happened, about the number of employees who attended, or the questions they asked. Santana also admitted that he was not exactly sure as to what was actually said during his NLRA and collective bargaining trainings. Notwithstanding these specific admissions, during redirect examination by Respondent's counsel, Santana changed his testimony and said that he did, in fact, remember what he communicated during these meetings and it was exactly what he testified to on direct examination. Despite the specific nature of the questions asked him during cross examination, upon his redirect by Respondent's counsel, Santana claimed that he was referring meetings held by other consultants when he testified on cross-examination that he was not exactly sure what was said during his NLRA and collective bargaining trainings. (Tr. 3062–3063, 3072)

*b. Analysis*

Regarding this incident, I generally credit Flores over Santana as to what was said. At times I found that Santana was evasive, wanting to speak in generalities rather than specifics, sometimes going beyond the question posed and/or answering specific questions by giving long narratives. His flip-flopping as to whether he actually remembered what was said during his NLRA and collective bargaining training sessions specifically undermined his credibility. During cross examination, when discussing the training he personally conducted, Santana said that he did not actually know specifically what was said in each training session. However, after prompting by Respondent on redirect, Santana changed his testimony. Santana was not credible.

I also find it significant that, regarding the topic of Cemex being a multibillion-dollar company, Santana never explained why, or in what context, he discussed this subject while meeting with the drivers. Other than using Cemex's size and financial strength to coerce and intimidate the employees, there is simply no explanation as to why this matter would even be a topic of conversation during meetings that were supposed to involve the NLRA and/or collective bargaining, particularly if Santana was supposed to be following the PowerPoint presentations. The financial size and strength Cemex is not included in either PowerPoint. (R. 49, R. 51)

Accordingly, I find that the credited evidence, along with the reasonable inferences derived therefrom, show that during a meeting at the Perris plant that was attended by Flores, Santana told employees that Cemex was a multibillion-dollar company and that if employees pushed enough and unionized, the company can close the ready-mix operation, as it did not need ready-mix part of its business mix. He also told employees that, because of Cemex's size, the drivers would not be able to achieve anything, in reference to the union. I find that this constitutes an unlawful threat to close the facility along with a threat of futility. Cf. *Alvin Metals Co.*, 212 NLRB 707, 710 (1974) (telling employees the plant would close and employees would be fired if they did not stop pushing for the union a violation); *Jo-Del, Inc.*, 326 NLRB 296, 299 (1998) (indicating to employees that their support of the union in upcoming election would be futile and they would never achieve anything through

collective-bargaining a violation). Accordingly, the Union's Objection #2 is sustained regarding this incident.

2. Bryan Forgey's comments to employees about boots

Cemex employees are required to wear six-inch lace up steel toe boots. The company has a contract with Red Wing Shoes and will pay for one pair of work boots per year. Employees can choose from six different style of boots that Red Wing offers. The Union alleges that Forgey engaged in objectionable conduct when he told employees during meetings that boots and uniforms would be up for negotiations if the Teamsters won the election because California regulations require Cemex to provide boots to their workers, as they are considered personal protective equipment. (Tr. 2308–2309)

Forgey testified that, during a meeting with about 4 to 5 Temecula employees, he explained to them that boots and uniforms were economic benefits that would be up for bargaining as part of an economic package during negotiations if the Union won the election. Temecula employee Donald Shipp was present during the meeting, which he said occurred in January 2019, and testified that seven other drivers were also present when Forgey made these comments. Forgey admitted saying the same thing to drivers in other meetings at other locations. Amed Santana testified that he was present at two or three meetings where Forgey spoke to drivers at the Inland Empire plants. Santana said that, during these Inland Empire campaign meetings, Forgey discussed the topics of boots, uniforms, and coffee that was available at the plants, telling employees that everything would be part of negotiations, including boots and coffee, and the outcome was unpredictable. (Tr. 763, 2065, 2078–2080, 2128, 3048–3051)

California Labor Code Sections 6401 and 6403 require an employer to provide safety devices and safeguards to protect the life, safety, and health of employees. Cal. Lab. Code §6401, §6403 (West 2021). These sections have been interpreted to mean that an employer must pay for safety equipment required to protect employees from hazards they are exposed to at work. *Bendix Forest Prod. Corp. v. Div. of Occupational Saf. & Health*, 25 Cal. 3d 465, 470, 600 P.2d 1339, 1342 (1979) (Cal OSHA did not err in interpreting the law and standards to require the employer to bear the expense of providing protective gloves/mittens to workers). In a unionized setting, The Occupational Safety & Health Appeals Board of the California Department of Industrial Relations, has rejected an employer's argument that payment for appropriate footwear is subject to collective bargaining, finding instead that the employer was required to pay for the appropriate footwear protection for its employees. *In re Appeal of UPS Ground Freight Inc.*, 2017 WL 4585321. Therefore, by saying that the issue of safety boots would be subject to negotiations, when Cemex requires employees to wear safety boots for protection against workplace hazards, and where California regulations require that an employer like Cemex pay for appropriate footwear protection for its employees, I find that Respondent engaged in objectionable conduct as alleged in Objection #2.

96                            DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

IV. THE SUSPENSION OF DIANA ORNELAS

*A. Facts*

1. July 9 incident at the Hallin & Herrera jobsite

On July 10, 2019, Diana Ornelas was suspended pending investigation regarding an event that occurred the previous day. On July 9, Ornelas was assigned to deliver a load of concrete to a customer named Hallin & Herrera at a jobsite in Camarillo, California. According to Ornelas's testimony, along with a written statement she made that day, Ornelas had been at the Hallin & Herrera jobsite for about an hour when a tall man walked up to her in the washout area and asked if she was a driver; Ornelas says yes. The man said he was in charge of safety and asked Ornelas to put her truck into reverse so he could check the truck's backup lights and alarm. The man was wearing a generic hardhat and safety vest, without any badges, logos, or identification. He did not show Ornelas any kind of credentials. (Tr. 991–992, 996–997; GC. 18)

Ornelas had never before encountered such a request at a jobsite, and knew from her training that only a Cemex official or the California Highway Patrol was allowed to inspect her truck. Ornelas did not know who the individual was and told the man "okay, but excuse me who are you?" (GC. 18) The man said that he was in charge of safety at the site, but refused to give Ornelas his name or show her a badge or identification. Ornelas told the man she was uncomfortable and confused, as she had never previously encountered such a request, nor had she witnessed this happen to other drivers. Therefore, Ornelas asked to call her supervisor first, and she went into her truck and called Juan Torres. Ornelas told Torres what had occurred and Torres was similarly confused. He told Ornelas that he did not know what was going on, and said if the man came back and hassled her, Ornelas was to call him back. While Ornelas was in her truck she noticed that the man had walked away and told this to Torres. (Tr. 992–993, 1140–1142; GC. 18)

After Ornelas finished speaking with Torres, she exited her truck and continued washing out her chute, as she had finished pouring out her load of concrete. Soon after, the tall man returned along with another man who Ornelas assumed may have been the jobsite foreman. However, she did not know this for sure as the other man similarly did not have any type of identification and was only wearing generic clothing. The men asked Ornelas to put her truck in reverse so they could check the backup lights and alarm. Ornelas felt that she was being harassed and told them she had just finished speaking with her supervisor and that only the California Highway Patrol or a Cemex representative could inspect her truck, and she asked to see a badge or some sort of credentials. According to Ornelas both men got upset and became argumentative, with one of them saying, "don't tell me how to do my job."[31] (Tr. 994; GC. 18) Ornelas asked if they were harassing her because she was the only woman at the jobsite. One of the men denied this, and questioned whether Ornelas's backup alarm actually worked. Ornelas told them she had completed a pre-trip inspection before leaving the plant, and that her alarm did, in fact,

work properly. She also told them that she had spoken to her supervisor who did not "even know who you guys are." (GC. 18) One of the men replied saying that he "rebuked" Ornelas in "Jesus's name." (GC. 18; Tr. 994) Ornelas told the man that she had rights, that he never explained who he was, and that she felt uncomfortable. The men left, with one of them walking towards some other workers and complaining to them about what had just occurred. Ornelas went back to washing out her chute. (Tr. 993–997, 1143; GC. 18)

Fabian Leon was working as a Teamsters organizer on July 9. Earlier that day he had communicated with Ornelas and learned that she was on her way to a job; Leon followed her to the Hallin & Herrera jobsite in his car. Leon parked his car and waited for Ornelas outside the gate as he wanted to speak with her. At some point, while she was still at the jobsite, Ornelas spoke with Leon by phone and told him what had happened. After she spoke with Leon, Ornelas saw him speaking with the two men that had asked to inspect her backup lights and alarm. (Tr. 998, 1149–1150, 1808, 1843, 1896–1898)

According to Leon, while he was outside the jobsite waiting for Ornelas, at some point he spoke with a man who wanted to know what Leon was doing there. Leon told the person that he was with the Teamsters and was waiting to speak with one of the Cemex drivers, meaning Ornelas. (Tr. 1808–1809, 1840–1841, 1845–1846)

While Ornelas was still washing out her chute, two concrete workers who were nearby walked up to see if she was okay. They told Ornelas "we've had to deal with him all day," referring to the tall man who had originally asked to inspect her truck. (GC. 18) When Ornelas finished she returned to the Oxnard plant and spoke with Torres. Torres told Ornelas to write a statement about what occurred. Ornelas did so, and handed it to Torres. (Tr. 999–1000; GC. 18)

Juan Torres testified about his telephone conversation with Ornelas while she was at the Hallin & Herrera jobsite, saying Ornelas told him that somebody wanted to inspect her truck. Torres initially said that, during the call, neither he nor Ornelas knew the identity of the person, so he told her to try and find out who the man was and to call Torres back. However, Torres later testified that during the phone call, he told Ornelas to try and find out who the person was and to just comply with whatever the person asked her to do. Torres claimed during his testimony that, if a Cemex driver was working with someone at a jobsite, whoever that person is, the driver is supposed to "just comply with the guy's request" even if the driver did not know the identity of the person. (Tr. 232) He also said that he told Ornelas during the call that, if the man asking to inspect her truck needed any assistance, that she had Torres's phone number and the person could call Torres directly. When Ornelas returned to the plant, according to Torres's testimony, he told her that if she is working with someone who asks her to turn on the lights, there might be a safety reason why they are asking, "so just comply with it" and don't get into arguments with customers when it is a simple task like turning on your lights. (Tr. 233) (Tr. 229–234, 243)

Parts of Torres's trial testimony do not necessarily comport a written statement he made after the incident. (GC.7, 237–238) Torres's written statement, which is dated July 9, 2019, reads as

---

[31] At various points when describing this incident, the transcript reads "she" when it should read "he." (Tr. 994)

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC

follows:

> On July 9th 2019 Diana was at a jobsite for Hallin Herrera. She called me on my cellphone at 9:16 a.m. When I was talking to her she told me that one guy asked her if she could put her truck on reverse so he could check her reverse lights. Diana did not know who the guy was. When I asked her where the guy was she said that he had left saying he was going to talk to his supervisor. She mentioned that when she was talking to the guy she told him that he was not a CHP officer so he couldn't randomly inspect her truck and that he was also not a Cemex employee. At the moment I did not know who the guy was as Diana didn't know either I told her that if the guy showed up again to please call me to find out what the guy wanted. She never called me back again. When she was done pouring and washing out she called me on the radio where to repeat and told me that she was going to fuel up. When she arrived at the plant we had a brief talk about what happened at the job site. That's when she mentioned that the guy told her that he had something to do with safety. She told me that the guy got mad after Diana told him that he had no right to inspect her truck as he was not a CHP officer or work for Cemex.
> When she told him that the guy made an expression of madness and replied "yes I am," she then told him that she needed to see a badge or something that stated he was qualified to inspect trucks. She said that she told the guy that why he didn't inspect other trucks or it's just because she was a female driver and she didn't know what she was doing? Based on what Diana said the guy walked away and was telling stuff to the people tha[t] were there. She mentioned that some guy approached her and asked her if she was ok. That's all she said and I asked her if she could do a written statement which she did after she continued working.

It is unclear from the record why Torres drafted this statement, whether he did this on his own accord or someone asked him to do so. It is also unclear what, if anything, he did with this statement; although somehow it was eventually reviewed by Plascencia. Also, Torres testified that after this incident he was coached by Respondent on how to handle a situation if a driver called him with a similar matter. According to Torres, he was told by the company that, in the future, if someone approaches a driver with any kind of request, before denying the request, they are supposed to find out who the person is. (Tr. 231–232)

2. Respondent investigates the July 9 incident

During the week of July 9, Robert Resendez was filling in for Jason Faulkner, who was on vacation. Resendez testified that he first became aware of the incident involving Ornelas at the Hallin & Herrera jobsite when he received a phone call from Daryl Charlson telling him that one of his drivers was not following safety protocols. (Tr. 506–507, 532, 2321–2322)

According to the testimony provided by Charlson, he learned about the incident from Faulkner, who called him saying a safety manager for a company that had ordered concrete had asked Ornelas to put her truck in reverse so they could see her backup lights and alarm, but she refused to do so. Charlson also testi-

fied Faulkner told him that, after Ornelas left the jobsite, Faulkner received a call from Hallin & Herrera saying a union representative was at the jobsite saying he was representing Ornelas on behalf of the Union, and that the representative was Fabian Leon. According to Charlson, he told Faulkner "that's not the case" (Tr. 417), referring to the Union being able to represent Ornelas, and further said the drivers were not under a collective-bargaining agreement and the company needed to make sure the workers, including Ornelas, knew that. Charlson said Faulkner then spoke with Iris Plascencia in Human Resources about the matter. (Tr. 414–417, 430)

Faulkner, on the other hand, testified that he first learned about the incident from Charlson, who either called him while he was on vacation or told him about it in person after he returned. Faulkner said that he reviewed the incident only after he returned from his vacation, and that it was either Charlson or Gus Aguilera who told him that there was a union organizer on site at the time of the incident. Faulkner testified that he did not personally investigate the incident, and that when he ultimately discussed the matter with human resources, he was relying upon the investigation that was already conducted by Aguilera, Resendez, and Charlson. (Tr. 469–470, 506–507, 529)

After learning about the incident, Resendez testified that he went to the Hallin & Herrera jobsite on July 9 to try and investigate "what was going on;" he took safety champion Gus Aguilera with him. (Tr. 2321) According to Resendez's testimony, when he arrived at the jobsite he spoke to a Hallin & Herrera employee who was in charge of telling drivers where to pour out their concrete, referring to him as a "chute man." (Tr. 2349–2350) Resendez said he learned from the chute man that Hallin & Herrera had a few mishaps that morning with backup alarms, so as a safety protocol they had a safety "checking our equipment," specifically the backup lights and alarms. (Tr. 2322–2323) According to Resendez, the chute man told him that when the safety officer asked Ornelas to put her truck in reverse, she asked to see a badge, questioned whether the individual was really a safety officer, and refused the request. After speaking with the chute man, Resendez spoke with two Hallin & Herrera job superintendents who told him that they had a random safety checkup that day, checking everyone's equipment on the jobsite for backup alarms and safety features, and that Ornelas did not follow what the safety officer told her to do. They also told Resendez that Ornelas said that she believed she was being singled out and harassed because she was a woman, so they did not want to "push it" anymore. (Tr. 2371) (Tr. 2321–2323, 2349–2350, 2368–2371)

When asked about the demeanor of the job superintendents, Resendez testified that they were upset, referencing safety. Resendez also said that the Hallin & Herrera representatives told him that there was a Union agent at the jobsite representing the Cemex drivers at the time of the incident. Resendez told them that Cemex was union free in Ventura County, but said the superintendents were unsure whether Resendez actually worked from Cemex so they asked him for identification. Resendez, who was wearing his company uniform, did not have any Cemex identification with him. (Tr. 2325–2327, 2343–2344, 2348)

Resendez further testified that, as soon as he waked off the

98          DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

jobsite, he went to his truck and started typing out a written statement of what occurred on his cell phone. When Resendez returned to the plant he added additional content to his statement. (R. 35) Resendez said it took him about 30-45 minutes to complete the statement as English is his second language and he is slow at typing. Resendez's written statement, which is dated July 9 and was placed into Ornelas's personnel file, reads as follows:

> When I arrived at job #3378 Halling Herrera, Gus Aguilera and I talked to a guy named Ramiro Real. He stated that our Cemex driver arrived on the job and placed out two chutes. Halling Herrera EE Ramiro said that chutes would not be needed. That Cemex EE would be unloading into to a loader bucket. Safety personal arrived in the job side to do a random inspection on the equipment. Safety personal asked our Cemex EE to put the truck in to reverse because he wanted to check the back up alarm. Cemex EE then asked Hailing Herrera safety personal if he was "CHP" safety personal responded that he was not "CHP." Then Cemex EE did not compline with safety personals request. Safety Personal then proceeded to talk to the job superintended about Cemex EE not implying his request and that she would have to be asked to leave the job site. Then the safety personal proceeded to explain to her the situation and the job sites safety. He also reminded her that everyone's safety is his main priority including here's. Then Gus and I walked to the office where we meet two job superintendents who looked pretty upset at the situation. Once we let them know that we were CEMEX EE they asked for our business cards. I told them that at that moment I did not have a business card. One of the superintendents told use that they had already spoken to a Teamster representative who was there on a driver's behave. Gus replayed to them that Cemex is a UNION free company. I then said that I was sorry on what had just happen and like Gus has said we are a UNION free company, and the only reason why we are there was because we care about our customers and the service our EE provide to them, and to resolve the issue for it won't happen in the future. I then apologized again for not having a business card and our driver's behavior. Then Gus asked if by any chance the Teamster Representative had a gray metallic blue Nissan car. Bothe replayed at the same time "YES", Gus then told them that he was an old EE of Cemex and that he has nothing to do with Cemex. By that time both superintendents understood that we are a UNION free company and started to talk to us about the accident. Both Job superintendents had the same story as Ramiro Real. With the exception that when the job superintendents went up to the Cemex EE and started to talk to her about safety, her first response was that he singled her out because she was a female and that she was feeling harassed. Then the job superintendent did not want any issues and walked away to talk to the other job superintendents. Meanwhile the second job superintendent went up to the teamster representative Fabian Leon and asking who he was and why was he at the job site. Fabian Leon responded with, "I'm a Teamster Representative and I'm here on a driver behave". At that moment the second superintendents saw the first superintendents walked up to him. Then the second su-

perintendents replayed to Fabian that he was going to be right back and proceeded to walk towards the first superintendents. when they both meet up he informed first superintendents that the guy was a teamster representative. Then they turned around too look at Fabian, by that point Fabian was driving out of the jobsite. Then I asked both job superintendents if I can get a written statement about what just happened from them. They both agreed to email them to Gus and I. they confirmed by saying we will get them to you in 2-3 hrs. After waiting for more then 3 hrs. for the email I contacted the first job superintendents and he told me that he had contacted his superiors in Chicago and they had instructed him not to write anything until they get back to him because once they wright anything that becomes a legal document and they did not want to be involved in any Union conflicts. I then said that we are a union free company and the only reason I was asking for it was to improve our costumer service and to make sure this will never happen again to a costumer. Then he said as soon as he gets information from he's superiors he will send an email letting us know about the decision they have made. I thanked him for his corporation and apologized for what had happened with our driver.

After completing his statement, Resendez testified that he waited about 3 hours and then sent it to Charlson and Faulkner. There is no evidence that the Hallin & Herrera job superintendents ever submitted a written statement to Cemex as requested, nor is there evidence that they filed any type of formal complaint with Respondent about Ornelas. (Tr. 2330–2333, 2919)

While he was at the Hallin & Herrera jobsite, Resendez did not speak to the purported safety officer, whose name he did not know, and who apparently was no longer at the jobsite when he arrived. Resendez also did not know whether the person actually worked for Hallin & Herrera. As to how he knew that Fabian Leon was the Union agent at the jobsite, Resendez said his knowledge was based upon the description of Leon and his car that was provided to him by the Hallin & Herrera employees he spoke with. When asked why he wanted to know the identity of the Union representative, Resendez testified that "[t]he guys were upset, that Cemex is a union-free company then why is a union representative representing a driver?" (Tr. 2343) (Tr. 2341–2343, 2348, 2373)

A statement that Respondent says was written by safety champion Gus Aguilera about what occurred that day was also placed in Ornelas's personnel file. (Tr. 2922; GC. 58) The statement reads as follows:

> I Gus Aguilera spoke with foreman on job for Halling Herrera Order #3368. Foreman's name is Ramiro Real. He states that driver Diana truck 4156 arrived on job and placed out two chutes. Foreman Ramiro says the chutes are not going to be needed that she would be unloading into a loader bucket. Safety personnel arrived on job site to do random inspections on equipment. Safety officer had asked Diana to shift her truck into "reverse" so he can be able to hear back-up alarm. Diana then asked safety officer if he was "CHP." Safety officer said no. Diana did not comply with safety officer's request. Safety officer then informed superintendent that mixer

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC

99

driver did not want to comply and that she would be asked to leave the job site. Job site superintendent had gone over to talk to her about the situation and the safety of the entire job site. Superintendent Manny stated that it is his responsibility to assure the safety of all equipment and his workers. At this point Diana claims she was being harassed and singled out because she was a female. Union representation was on site according to superintendent Manny. The individual introduced himself as a Teamsters rep and stated that he was there on the drivers behalf. A few moments later he left. I Gus and Robert have talked to both superintendents to resolve this issue.

Although the statement was placed in Ornelas's personnel file, and was considered by Respondent in its decision to discipline Ornelas, the statement is undated. Aguilera did not testify in this matter, and no evidence was presented as to when this statement was written or that it was actually written by Aguilera.

3. Daryl Charlson meets with Diana Ornelas on July 10

*a. Testimony of Diana Ornelas*

Ornelas testified that on July 10 she arrived at work and went directly to the batch office where Daryl Charlson was present along with Juan Torres. According to Ornelas, she said hello to Charlson, and in reply Charlson asked whether Ornelas had called someone to represent her on July 9.[32] Ornelas said no, and inquired as to why Charlson was asking. He told her that somebody from Hallin & Herrera called saying that Ornelas had telephoned someone to represent her; Charlson then said he had to explain to Hallin & Herrera that the Cemex drivers were not represented by a union and do not have a contract. Charlson told Ornelas "because of that, we have to do an investigation now, so you need to park your truck . . . and go home." (Tr. 1002) Charlson told Ornelas that she was suspended pending investigation into the events that occurred the previous day. (Tr. 1001–1004, 1008, 1151)

Ornelas asked Charlson what Respondent was planning to investigate, saying that she had already submitted a written statement about the matter to the company. Charlson told her they needed to investigate how Ornelas handled the incident and how Resendez and Aguilera handled the matter. Ornelas told him that Resendez and Aguilera were not even at the jobsite, and Charlson said "yeah, but we had to send Gus [Aguilera] to the jobsite after they called in yesterday." (Tr. 1002)

At one point, Charlson told her that he did not understand why she did not just "show them your lights," and Ornelas said she did not do so "because I have rights." (Tr. 1002–1003) Charlson told her a second time that Ornelas should have just shown her lights, and Ornelas again said that she had rights. At this point, Ornelas testified that Charlson started yelling at her profusely saying that she should have just complied. Ornelas thought that Charlson was trying to intimidate her and told him that she felt he was the type of "boss whose

only concern is to just bring the hammer down." (Tr. 1003) Ornelas told Charlson she had rights, and that because of the way Cemex had been treating her, she believed the company was just asking to get sued. Charlson told Ornelas that she had the legal right to pursue whatever action she wanted and accused Ornelas of threatening him. Ornelas responded by saying she was not threatening Charlson personally, but that "you'll hear from my legal help." (Tr. 1003) (Tr. 1152)

Charlson told Ornelas not to get personal with him. She told Charlson that he had made things personal back in February when Ornelas's car was being repossessed at the jobsite in front of everyone. Ornelas said she was distressed that day, and told Charlson that he used the occasion to talk to her about his views regarding the union and to ask her to give the company another chance.[33] During their conversation on July 10 Ornelas also told Charlson that she was new to the construction industry, and if it was normal for different people at jobsites to have the ability to require Cemex drivers perform certain commands, then it was the company's responsibility to have informed her of this. Charlson told Ornelas "we did show you that," but Ornelas denied having ever received such training. (Tr. 1004) (Tr. 1004–1007)

At some point during their back-and-forth that day, Ornelas testified that Charlson told her he was going to call human resources and the police if she did not leave the plant. She asked Charlson when she would return to work and he said that he did not know. Ornelas said that she eventually walked out of the office, because she was tired of Charlson yelling at her. According to Ornelas, Juan Torres was present for the meeting but did not say anything. (Tr. 1003–1004, 1008, 1150–1153)

*b. Testimony of Daryl Charlson*

Charlson testified that, because Faulkner was on vacation he spoke with human resources who asked him to go to the Oxnard plant and handle Ornelas's suspension. On July 10, Charlson met with Ornelas in the batch office sometime between 8:00–8:15 a.m. Charlson said Juan Torres was present for the entire meeting. (Tr. 415–418, 2549, 2554)

Charlson testified that during the meeting he told Ornelas to park her truck and go home and that because of the incident at the Hallin & Herrera jobsite he was going to have to perform an investigation. About halfway through the meeting, Charlson said that he asked Ornelas whether she had contacted the union while she was at the jobsite on July 9, and Ornelas denied doing so. According to Charlson, he asked Ornelas this question because Hallin & Herrera was upset and said there was a union representative at the jobsite saying he was representing a Cemex employee. Charlson told Ornelas that the customer had called saying somebody was at the jobsite representing her, and he asked Ornelas whether she understood that the company was not under a collective-bargaining agreement. He then told Ornelas she needed to call her supervisor if there was a problem and said he had to explain to the customer that the drivers were not represented by the Teamsters. (Tr. 418–420, 2550–2551)

Charlson also testified that during the meeting he and Or-

---

[32] Transcript page 1001, line 23 should read "Daryl Charlson" instead of "Dell Tovin (ph.)," and transcript page 1002, line 4 should read "Hallin & Herrera" instead of "Colin Hethera."

[33] Transcript page 1005, line 9 should read "with the union" instead of "with the unit."

100                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

nelas got into an argument, and Ornelas said he was the type of boss that would bring the hammer down on drivers. She also brought up a time when Charlson asked Ornelas about a "Vote Yes" sign in her car, which was parked at the plant, while it was about to be repossessed. During the meeting Ornelas said she was going to get legal help and Charlson told her it was within her legal right to do so if she wanted. (Tr. 421)

Charlson further testified that, at one point during the meeting, after he told Ornelas she was suspended pending investigation, he asked her to leave the facility but she did not comply and instead asked what he was going to do if she did not leave. Charlson said he asked Ornelas a second time to leave, but that she again did not comply with his request. Instead, Ornelas said that she was going to sue the company. Charlson described Ornelas's demeanor at this point as upset and angry. Charlson said he had to ask Ornelas two more times to leave before she finally complied. According to Charlson, it took approximately 3 minutes from the time he first asked Ornelas to leave, until she finally left the plant. (Tr. 2552–2555)

At 9:43 a.m. that day Charlson drafted an email to Iris Plascencia about the meeting. The email reads as follows:

> I spoke to Diana Ornelas concerning the incident that happened on the Hallin/Herrera job with Juan Torres present. I let Diana know she was off work while we did a thorough investigation. My exact language was, she was off pending investigation. I reiterated this was part of the process. She became very upset and said it was the company's fault for not training her that someone other than a CEMEX employee could look at safety items on the truck. She became nasty and said I was the type of manager that wanted to lay the hammer down and that I do not care about employees. Diana really made it personal when she brought up the repossession of her car and all I cared about was her vote yes sticker in the window. I said it was a lie because I was very compassionate and asked her if she wanted me to call the sheriff and try and stop the repo and she said no. I asked if she needed a ride home and she said no. I asked why she did not call your supervisor for direction when a person asked to see if your back up alarm and rear working lights were operational and she said she did. Juan said he told her to find out who the people were that wanted to inspect the truck and call him back. Juan asked why she didn't call back once she knew who the inspector was? I asked if she called him a second time to clear up who was asking and she said they approached her again but she couldn't get to her phone. Her phone was in the cab. I asked her if she call the union and she responded no. I reminded her, we were not under an collective bargaining agreement and she needed to call her supervisor with any issues. She was going to update Juan in when she got back to the yard. She asked if I was trying to get the company sued and she was going to seek legal help. I told her that was her right but I would not argue with her. I told her she needed to get her personal things out of the truck and go home. She asked what are you going to do if I don't leave? I told her I would call H/R and the sheriff. She said this is ridicules and again said she will be suing. I had to ask her to leave three or four times. She parked her car and let at approximately 8:20AM. The conversation lasted approximately five minutes. I also asked Juan Torres to write a statement of

the conversation. (R. 43)

Charlson testified that he was not involved in the investigation of Ornelas regarding the Hallin & Herrera incident or in the decision to issue her a suspension. Notwithstanding, he still asked Ornelas if she called the union on July 10. When asked by the General Counsel during cross examination why Ornelas would not be allowed to call a union representative if she had an issue on a jobsite, Charlson answered that he did not know why, saying "I was waiting for–no, I have no–I don't know." (Tr. 2571) (421–422, 429, 2570–2571)

#### c. Testimony of Juan Torres

Regarding the July 10 meeting between Ornelas and Charlson, Torres testified that he was only present for part of the meeting. Torres said that when he walked into his office that day, Charlson and Ornelas were already talking. According to Torres, he did not participate in, or say anything during, the meeting. Instead, he just went about his batching duties, loading trucks. During his testimony, Torres said that he did not hear Charlson ask Ornelas if she contacted a union representative while she was at the jobsite and he further denied that the topic of the union came up at all while he was present. (Tr. 229, 235–236)

At 10:43 a.m. on July 10, Torres sent an email to Iris Plascencia and Charlson about the meeting. The email, which was ultimately placed in Ornelas's personnel file, reads as follows:

> On July 10th 2019 Daryl Charlson came into the batching office. The purpose of his visit was because he was going to refresh the yard guy on how to safely operate the loader. At 8:10 Diana Ornelas walked into the office after washing her truck. Daryl knew about the confrontation that happened on July 9th 2019 between Diana and a safety guy from Hallin & Herrera. The safety guy from that job site wanted to check if her truck's backup alarm and lights were working properly and she denied to show him because the guy wasn't a CHP officer so he did not had a right to inspect her truck. Daryl talked to Diana and he notified her that she was going to get suspended because their was an open investigation that needed to be resolved. She disagreed with the decision that was taken and she started questioning why she was getting suspended. Daryl told her that if someone at a jobsite asks her if they can check her truck she should comply because Cemex is a company with good safety standards and she did not dealt with the situation in a good way because she denied and did not try to comply with the guy at all. She got mad and told Daryl that he was the type of boss that just puts the hammer on the drivers. Daryl told her that when she called the plant I instructed her to call me back in case the guy showed up again to see what we could do to help him. She started raising her voice and lied at Daryl and told him that I never told her to call me back in case the guy showed up again to see what he wanted. I confronted her in front of Daryl and refreshed her memory about the conversation we had over the phone. After that she admitted to Daryl that I did tell her to call me back if the guy showed up again to see what we could do to help him

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC

101

but she never called me back because she was off the truck and her phone was inside the truck. She was really mad and told Daryl that she was going to sue him and the company. Daryl calmly replied to her that she was in her right to do so. Daryl instructed Diana get all her personal belongings and clock out. That's when Diana got more mad and asked Daryl "what if I don't do it?" Daryl replied "if you don't do it we'll call HR and law enforcement if necessary". Daryl instructed Diana to just get her personal belongings and leave the truck where it was. She got out of the office and did not listen and still got the truck and parked it herself. When she parked the truck she got on her car and just drove out she never stopped to clock out. She left the plant at 8:20am.

Torres did not testify about why he drafted this email or why he sent a copy of it to Plascencia and Charlson. (Tr. 2925–2926; R. 59)

### 4. Respondent's investigation after July 10

As part of the steering committee that was implemented during the organizing drive to investigate disciplinary actions, Iris Plascencia participated in the investigation of this incident and was also involved in the ultimate decision to suspend Ornelas. According to Plascencia, the investigation consisted of collecting and reviewing statements submitted by various individuals about what occurred. Plascencia testified that she reviewed the following written statements from Respondent's employees as part of the investigation: Resendez' July 9 written statement; the written statement from Gus Aguilera; Charlson's July 10 email; Juan Torres's July 10 email; and Ornelas's July 9 written statement. (Tr. 2912, 2219, 2922–2927, 2986; GC. 18; R. 35, 43, 58, 59; R. 58)

Plascencia also reviewed a hand written statement from Ramino Real. Real is mentioned in the statements submitted by Resendez and Aguilera as someone they spoke with at the jobsite, and is the "chute man" for Hallin & Herrera that Resendez referred to during his testimony.[34] Real did not testify at trial, nor did anybody from Cemex testify that they personally solicited a statement from Real, or received one from him. According to Plascencia, Real's statement was sent to her by Faulkner, notwithstanding the fact Faulkner was on vacation at the time and testified that he did not personally participate in the investigation, but instead relied upon the investigation conducted by Aguilera, Resendez, and Charlson. The written statement was considered during Respondent's investigation and placed in Ornelas's personal file. The statement reads as follows:

> 4156 arrived to job site. Put on 2 chutes. The chutes were not needed and workers helped put chutes back in place. Safety personnel for "Premier" asked driver "Diana" to see if her reverse lights worked and the back up alarm were working. Diana then replied "Are you a CHP." Safety personnel–replied "no." Diana refused to show operating lights and alarm. (R. 57)

---
[34] Respondent's brief confirms that Ramino Real was the "chute man" referred to by Resendez. (Cemex. Br. at 152).

Plascencia said "4156" referred to Ornelas's truck number. She did not know why "Premier" was in quotes or what it referred to. (Tr. 529, 2913, 2915–2916, 2349–2350; R. 35, 57)

Although Plascencia said she reviewed Ornelas's July 9 statement, she never contacted Ornelas to ask what occurred during her meeting on July 10. Ornelas specifically emailed Plascencia on July 12, and copied union organizer Scott Williams on the email, asking to speak with her about what happened, and offering to answer whatever questions Plascencia might have. (GC. 19) Plascencia never replied to Ornelas. Instead, Plascencia relied solely upon the written statements from Torres and Charlson about what occurred on July 10. (Tr. 1013–1014, 2987; GC. 19)

### 5. Respondent's decides to suspend Ornelas without pay

Respondent ultimately decided to suspend Ornelas from July 10 to July 17 without pay. Plascencia testified the reason for Ornelas's suspension was because she: (1) failed to cooperate with the safety inspector at the Hallin & Herrera jobsite; and (2) became loud and argumentative when called into the office on July 10 and refused to leave when told she was being sent home pending investigation into the incident. (Tr. 2927–2928)

Plascencia drafted Ornelas's suspension notice on Respondent's standard Disciplinary Action Form, and a meeting was arranged on July 18 to present the suspension to Ornelas. The Disciplinary Action Form states that Ornelas was suspended without pay from July 10 to July 17 because of her conduct. There is a box on the form that states, "please indicate all prior warnings below." This box is supposed to contain all of the employee's prior disciplinary incidents. On Ornelas's form it only includes the suspension for this incident. In the section on the form that states, "describe the performance problem or inappropriate behavior" Plascencia wrote the following:

> On July 9, 2019 you delivered a load of concrete to order 3368 for Hallin & Herrera in which you were asked to shift your truck in reverse to demonstrate backup alarm and lights were functional. You contacted plant foreman, Juan Torrez, upon your encounter with the jobsite safety officer asking for guidance, however, failed to call Juan back as he asked you to do so if the inspector returned. On July 10th, you were informed by Daryl Charlson of our investigation process and mentioned we would get back to you with our findings of the investigation. It was during this meeting that you became loud and argumentative with management. You were asked to go home several times and you refused to do so.

The form also contains a section that says, "describe the plan for corrective action, including expected improvement and timeframe." Here, Plascencia wrote:

> The use of abusive or threatening language toward fellow employees, supervisors, department heads, customers, third party contractors or Company officials shall not occur. Acting in an insubordinate manner towards any member of the management team, or refusing to cooperate with jobsite safety representatives or customers will not be tolerated.

The Disciplinary Action Form was provided to Faulkner, who signed the document. He then met with Ornelas on July 18 to issue her the discipline. Present during this meeting was Faulkner, Ornelas, and an individual from human resources

102                          DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

named Zach Wise who also signed the discipline. Ornelas was presented with the document and signed the form but wrote on the document "I did nothing wrong. I'm signing under protest & duress." (GC. 10) (Tr. 471, 531, 1009–1010, 1156, 2908–2909, 2927)

### B. Analysis

#### 1. Witness credibility about what occurred.

I specifically credit Ornelas and Leon as to what happened at the Hallin & Herrera jobsite on July 9 regarding their interactions with the various individuals present that day. Their respective testimonies were unrebutted as neither the purported safety person, nor any Hallin & Herrera representatives testified.

To the extent there are conflicts between the testimonies of Torres, Charlson and Ornelas as to what occurred regarding this matter, I credit Ornelas. Torres simply was not a credible witness. His trial testimony conflicted with the various written statements he made about this incident on multiple occasions. And when pressed on at least one of those conflicts, he incredulously claimed that his memory was better when he testified (a year and 5 months later) as opposed to when he wrote his statement on the day of the incident. (Tr. 238–239)

Regarding Charlson, I found his testimony to be suspect in many respects, particularly regarding this event, including his testimony about how Cemex learned of the incident, and the ensuing investigation and suspension. For example, when questioned by the General Counsel, Charlson claimed that he first learned about the incident from Faulkner, who telephoned him on July 9 saying a customer's safety manager called saying Ornelas was asked to put her truck in reverse to see her backup lights and alarm but she refused, and that a union representative, who happened to be former Cemex employee Fabian Leon, was at the jobsite claiming to be representing Ornelas on behalf of the Union. Faulkner, on the other hand, also during questioning by General Counsel, testified that he first learned of the incident from Charlson, who either called while Faulkner was on vacation, or told him about it when Faulkner returned to work afterwards. Between the two, I do not believe Charlson; instead I credit Faulkner that he learned about the incident from Charlson. Faulkner was on vacation when the incident occurred, and I believe that Charlson was trying to disguise his involvement in the matter by claiming that he first heard about the incident from Faulkner.[35]

I also found Plascencia's testimony about this matter questionable in many respects. It appeared at times that Plascencia was more focused on making general statements regarding how Respondent's process was supposed to work, instead of what actually occurred. For example, when asked if she requested safety champion Gus Aguilera to write a statement about this incident, she testified "[t]ypically yes." (Tr. 2923) When pressed, she answered "yes." But then when asked if she specifically remembered asking Aguilera to write a statement, Plascencia said that she remembered asking Faulkner to speak with Aguilera about providing a statement. (Tr. 2923) That said, Faulkner testified that he was not involved in the investigation and that when he discussed the matter with human resources he relied upon the investigation already conducted by Aguilera, Resendez, and Charlson. Faulkner never testified that he asked Aguilera to provide a written statement to Plascencia. And, although Respondent was relying in part upon Aguilera's written statement about what happened, he was never called as a witness.

#### 2. The 8(a)(1) allegations regarding this incident

At the start of the July 10 meeting, after Ornelas walked into the batch office and said hello, Charlson asked Ornelas whether she called the union on July 9. Ornelas denied doing so, and asked Charlson why he was asking. Charlson told her that somebody from Hallin & Herrera called saying that Ornelas had telephoned someone to represent her and that he had to explain to the customer that Cemex drivers were not represented by the Union and do not have a union contract. Charlson then told Ornelas "because of that, we have to do an investigation now, so you need to park your truck . . . and go home." (Tr. 1002) In Complaint paragraph 5(w) The General Counsel alleges that Charlson's statements constitute an unlawful interrogation and threat. I agree.

The Board reviews a variety of factors to determine whether an unlawful interrogation occurred including: the general background; the nature of the information sought; the identity of the questioner; the place and method of the interrogation; the truthfulness of the reply; whether the employer had, or conveyed, a legitimate purpose for the questions; and whether assurances against reprisals were provided. See *Rossmore House*, 269 NLRB 1176 (1984), affd. sub nom. *Hotel & Restaurant Employees Local 11 v. NLRB*, 760 F.2d 1006 (9th Cir. 1985); *Bourne v. NLRB*, 332 F.2d 47 (2d Cir. 1964); *RHCG Safety Corp.*, 365 NLRB No. 88 slip op. at 1-2 (2017). These factors, which are not mechanically applied, are "useful indicia that serve as a starting point for assessing the totality of the circumstances" to determine whether the questioning would "reasonably tend to coerce the employee at whom it is directed so that he or she would feel restrained from exercising rights protected by Section 7 of the Act." *Westwood Health Care Center*, 330 NLRB 935, 939–940 (2000).

Here, during the July 10 meeting Charlson asked Ornelas whether she had called the union the previous day, and applying these factors, I find that his question constituted an unlawful interrogation. Charlson was a high-level management employee and wanted to know specifically if Ornelas had contacted the union which, as set forth further below in Section IV(B)(4), I find to be conduct protected by Section 7 of the Act. Although Ornelas had, in fact, called a union representative that day, she denied doing so when asked by Charlson. And, while the conversation occurred in the batch office, which was an area that drivers visit daily, having Charlson present in the office was not normal. He and Ornelas were not friends and he

---

[35] Charlson also denied being present at the September 6 meeting when Ornelas was fired, when both Faulkner and Ornelas testified that he was, in fact, there. (Tr. 423, 472, 1023) And the evidence shows that Charlson signed the September 6 disciplines of other employees who were disciplined along with Ornelas for the same incident. (GC. 12; Tr. 484–485) Along with detracting from his credibility generally, Charlson's denial further supports a finding that he was trying to hide his involvement in the disciplines issued to Ornelas.

was in the batch office to place Ornelas on suspension pending investigation. Finally, Charlson conveyed no valid reason for the question. Accordingly, under the totality of the circumstances, I find that Charlson's question constituted a coercive interrogation in violation of Section 8(a)(1) of the Act. *Soltech, Inc.*, 306 NLRB 269, 269 fn. 1, 273 (1992) (asking known union adherent if he knew who called the union was an unlawful interrogation); *Valley Slurry Seal Co.*, 343 NLRB 233, 244 (2004) (project superintendent's interrogated employee by asking if he had contacted the union or if the union had they contacted him).

I also find that Charlson's telling Ornelas the company now had to do an investigation because Hallin & Herrera called saying that Ornelas telephoned someone to represent her, and he had to explain to them that Cemex drivers were not unionized, constituted an unlawful threat. Ornelas was suspended pending investigation into the incident, and Charlson directly tied the investigation into Ornelas calling the Union on July 9. Under these circumstances I find the statement would reasonably tend to coerce an employee who would think twice about call a union for assistance knowing they would be investigated for doing so. Cf. *Eastman Kodak Co.*, 194 NLRB 220, 223 (1971) (after attempting to ascertain who instigated the union movement, supervisor's statement that there would be a thorough investigation of employees' union activities and those involved would be fired constituted an unlawful threat).

### 3. Legal Standard involving the 8(a)(3) allegation

The Board applies the burden shifting analysis set forth in *Wright Line*, 251 NLRB 1083 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982), approved in *NLRB v. Transportation Management Corp.*, 462 U.S. 393 (1983), whenever an employer's motivation is at issue involving alleged violations of the Act. Under this framework, the General Counsel must prove by a preponderance of the evidence that employee protected activity was a motivating factor for the employer's actions. The elements required to support such a showing are union or other protected activity, knowledge of that activity, and animus on the part of the employer. See, e.g., *Consolidated Bus Transit*, 350 NLRB 1064, 1065 (2007), enfd. 577 F.3d 467 (2d Cir. 2009). The evidence of animus must be sufficient to establish a causal relationship between the employee's protected activity and the employer's action against the employee. *Tschiggfrie Properties, Ltd.*, 368 NLRB No. 120, slip op. at 8 (2019).

If the General Counsel makes this initial showing, the burden of persuasion shifts to the employer to prove, as an affirmative defense, that it would have taken the same action even if the employee had not engaged in protected activity. *Consolidated Bus Transit*, 350 NLRB at 1066; see also *Ready Mixed Concrete Co. v. NLRB*, 81 F.3d 1546, 1550 (10th Cir. 1996) (by shifting the burden the employer's justification becomes an affirmative defense). An employer cannot simply present a legitimate reason for its action but must persuade by a preponderance of the evidence that the same action would have taken place even in the absence of the protected activity. *Rhino Northwest, LLC*, 369 NLRB No. 25, slip op. at 3 (2020). (internal quotations and citations omitted). "In other words, a re-

spondent must show that it *would* have taken the challenged adverse action in the absence of protected activity, not just that it *could* have done so." Id. (italics in the original) Where an employer's explanation is "pretextual, that determination constitutes a finding that the reasons advanced by the employer either did not exist or were not in fact relied upon." *Limestone Apparel Corp.*, 255 NLRB 722, 722 (1981), enfd. 705 F.2d 799 (6th Cir. 1982). And, where the "proffered non-discriminatory motivational explanation is false even in the absence of direct motivation the trier of fact may infer unlawful motivation." *Roadway Express*, 327 NLRB 25, 26 (1998). Finally, the Board has found that employee misconduct discovered during an investigation undertaken because of an employee's protected activity does not render an unlawful action lawful. *Kiddie, Inc.*, 294 NLRB 840, 840 fn. 3 (1989).

### 4. The General Counsel's prima facie case

The evidence shows that Ornelas was a known union activist from June 2018 until her discharge. Ornelas was a member of the Union's organizing committee, she wore union bracelets on her wrist, a union sticker on her hardhat, kept a union sign in her car that was parked inside the plant, spoke with union organizers outside the plant, and participated in meetings and conference calls with the Union. (Tr. 971–972)

The evidence further shows that, after taking a two-to-three-week break following the March 2019 election, the Union continued organizing Respondent's employees throughout the summer of 2019. For example, in May 2019 the Teamsters hired Leon as a full-time organizer and assigned him to the Cemex campaign. The Union continued having conference calls with workers, they tried talking to employees on a regular basis, and attempted to get them to testify during the investigation of the unfair labor practice charges. (Tr. 934–936, 941–942, 1343, 1413, 1524, 1781, 1792, 1843) Accordingly, I find that Leon's appearance outside of the Hallin & Herrera jobsite on July 9, because he wanted to speak with Ornelas, and his telling this to the Hallin & Herrera representatives, was in furtherance of the Union's organizing objectives. And, by telephoning Leon while she was still at the jobsite on July 9, Ornelas was engaged in activities protected by Section 7 of the Act. Cf. *Evolution Mechanical Services, Inc.*, 360 NLRB 164, 164 (2014) (Board comments that, under normal circumstances, a worker's providing information about an employer's operations to outsiders in the course of a union campaign is protected, as is disclosing the location of the employer's jobsites to aid the union's organizing campaign); *Stericycle, Inc.*, 357 NLRB 582, 583 (2011) (noting that union assistance in the form of education about legal rights "lies at the core of the union and other concerted activity" protected by the Act and "such protected forms of education and assistance . . . are often provided during an organizing drive" as "[u]nions are rarely in a position to identify violations of law or provide assistance until they are called into the workplace by employees seeking representation for purposes of collective bargaining."); *Charles H. Mccauley Assocs., Inc.*, 248 NLRB 346, 350 (1980) (Single employee who threatened to seek union assistance was engaged in protected conduct as "[a] threat to bring in a union must, itself, be deemed union activity.").

As for Respondent's knowledge of Ornelas's union activities, the company admits she was vocal union supporter. (Cemex. Br. 153)  And the evidence shows company officials, at all levels, knew Ornelas was an avid union activist.  (Tr. 118–119, 1131, 1169)  Forgey himself testified that he knew Ornelas was a union supporter because he saw her appear in one of the video's on the Union's Facebook page. (Tr. 118–121)  The evidence also shows that, by July 9, Respondent suspected that Ornelas had called the Union to the Hallin & Herrera jobsite.  *Respond First Aid*, 299 NLRB 167, 169 fn. 13 (1990), enfd. mem. 940 F.2d 661 (6th Cir. 1991) ("The Board and the courts have long held that when the General Counsel proves an employer suspects alleged discriminatees of union activities, the knowledge requirement is satisfied.").  Respondent's knowledge of Ornelas's union activities has been firmly established.

The record is replete with evidence of Respondent's anti-union animus, as shown by the numerous 8(a)(1) violations found herein.  *Dynasteel Corp.*, 346 NLRB 86, 88 (2005) ("The Respondent's numerous 8(a)(1) violations provide evidence of its anti-union animus").  The evidence also shows that Respondent harbored animus against Ornelas's protected activity specifically.  For example, In February 2019, during a meeting involving Charlson and Faulkner, Respondent violated Section 8(a)(1) of the Act by giving Ornelas a verbal warning for speaking with union organizers on company time and telling her that she was not to speak with them.  Also, during the early 2019 meeting at the Oxnard plant where Brian Forgey told employees their annual wage increase could not be given due to the upcoming union election, when Ornelas asked Forgey what Cemex had to lose regarding unionization, he replied saying "Diana, you know, I ask you, what do you have to lose?"  In the context of the meeting, where various other threats were made to employees, I find this statement, made directly to Ornelas, evidences Respondent's animus against Ornelas's union activities.  Finally, in the July 10 meeting, Charlson threatened and interrogated Ornelas.

Accordingly, I find the General Counsel has established a prima facie case that Ornelas's suspension was unlawfully motivated.  Therefore, the burden of persuasion shifts to Respondent to show, by a preponderance of the evidence, that Ornelas would have been suspended notwithstanding her union activities.

### 5. Respondent has not rebutted the General Counsel's case

Based on the record evidence, I find that Respondent has not rebutted the General Counsel's prima facie case.  The evidence does not show that Respondent would have suspended Ornelas absent her activities protected by Section 7 of the Act.

#### a. Decision to investigate Ornelas

Plascencia testified that, one of the reasons for Ornelas's suspension was because she failed to comply with the jobsite safety officer, and in its brief Respondent argues this created a "significant customer service dispute."  (Cemex. Br. at 17)  However, I find it noteworthy that, before Charlson ordered Resendez to the jobsite on July 9 to investigate what was going on, there is no credited evidence that anyone from Hallin & Herrera contacted Respondent to complain that Ornelas somehow provided bad customer service by refusing to put her truck

in reverse.  No Cemex representative testified that Hallin & Herrera contacted them directly to complain about Ornelas's conduct, and there was no documented complaint filed by them.  Indeed, after Resendez asked the Hallin & Herrera job superintendents to submit written statements to Cemex about what occurred, they never did so.  *Gates & Sons Barbeque of Missouri, Inc.*, 361 NLRB 563, 566 (2014) (Lack of documentary evidence showing any actual customer complaints support finding that employer's action was for discriminatory reasons, and not because of customer complaints).  Moreover, the two Hallin & Herrera superintendents told Resendez that, once Ornelas said she was being singled out and harassed because she was a woman, they did not want to "push it" anymore.  (Tr. 2371)  Notwithstanding, Cemex kept pushing the matter.

The credited evidence, along with the reasonable inferences derived therefrom, show that Respondent launched its investigation into Ornelas primarily because it suspected she had called the union on July 9, the fact Leon was present at the jobsite that day speaking with Hallin & Herrera saying he was there to represent a driver, and that Hallin & Herrera was distressed that the union was at the jobsite.  Charlson was clearly upset when he learned that the union was at the jobsite, saying that the company needed to make sure employees, including Ornelas, knew they were not covered by a union contract.  Charlson was the one who told Resendez to go to the jobsite, and while at the jobsite, both Resendez and Aguilera kept telling the Hallin & Herrera superintendents that Cemex was "UNION free." (R. 35) They also seemed focused on trying to uncover the identity of the union agent that was at the jobsite, asking about the make and model of his car, and finally deducing that it was Leon, based upon the descriptions provided to them.  And, when asked why he wanted to know the identity of the union agent, Resendez testified that "[t]he guys were upset, that Cemex is a union-free company then why is a union representative representing a driver."[36]  (Tr. 2343)

Also supporting a finding that the investigation into Ornelas's conduct on July 9 was motivated by Respondent's anti-union animus is the fact that, the first question Charlson asked Ornelas on July 10 was whether she had called the union the previous day.  And when she denied doing so, he told her that somebody from Hallin & Herrera called saying Ornelas had telephoned someone to represent her, that he had to explain to them Cemex drivers were not represented by the Union nor did they have a union contract, and "because of that, we have to now do an investigation." (Tr. 1002)  Employee "misconduct discovered during an investigation undertaken because of an employee's protected activity does not render a [discipline] lawful."  *Kidde, Inc.*, 294 NLRB at 840 fn. 3.  "Such bad faith by an employer cannot create good cause for the [discipline] of an employee."  *Supershuttle of Orange County, Inc.*, 339 NLRB 1 (2003).  Such is the case here regarding Ornelas's suspension.

#### b. Respondent's investigation

Along with the decision to investigate Ornelas, the investiga-

---

[36] I credit Resendez' original answer that this is why he wanted to know the identity of the union agent.  (Tr. 2343)

tion into the matters advanced by Respondent as the reasons for her suspension also evidences pretext. Plascencia testified that Ornelas was suspended for two reasons: (1) she failed to cooperate with jobsite safety inspector; and (2) she became loud and argumentative with Charlson and refused to leave the office when told she was being suspended pending investigation into the incident. (Tr. 2927–2928, 2987) Regarding Ornelas's conduct in the office on July 10, Plascencia reviewed the written statements provided by Charlson and Torres. However, Respondent never asked Ornelas about what occurred in the office on July 10; the company did not even ask her to submit a written statement about what happened. "A one sided investigation into employee misconduct supplies evidence that the disciplinary action was triggered by unlawful motive." *NLRB v. Esco Elevators, Inc.*, 736 F.2d 295, 299 fn. 5 (5th Cir. 1984). See also *Lucky Cab Co.*, 360 NLRB 271, 274 fn. 13 (2014) (denying discharged employees the opportunity to explain their alleged misconduct is evidence of pretext); *Alstyle Apparel*, 351 NLRB 1287, 1288 (2007) (decision to discharge employees before giving them an opportunity to explain the allegations against them supports a finding the discharges were discriminatorily motivated and not based upon a reasonable belief of misconduct). I find that especially true here. Ornelas emailed Plascencia on July 12, asking to speak with her and answer any questions she might have, but Plascencia ignored the request.[37] The fact Plascencia never followed-up with Ornelas after receiving her July 12 email leads me to the conclusion that Respondent was not interested in whether Ornelas was at fault for what occurred at the jobsite on July 9 or in the office on July 10, but instead was looking for a reason to discipline Ornelas because of her protected activities and the fact that Leon was at the jobsite speaking with Hallin & Herrera employees and claiming to represent Ornelas.

Also, the evidence shows that Plascencia did not know the identity of one of the people who had submitted a written statement to Cemex. Plascencia testified that, as part of her investigation, she collected and reviewed the written statements from Aguilera, "the management group," Ornelas, and "the safety inspector at the jobsite." (Tr. 2912) However, there is no evidence that the jobsite safety inspector ever provided a written statement, or that anyone from Cemex even spoke with him. Plascencia did review the statement provided by Ramino Real, however he was only the "chute man" whose job it was to direct the drivers as to where to pour out their concrete that day. And, all Rivera said in his statement was that "safety personnel" for an entity called "Premier" asked to see if Ornelas's backup alarm and reverse lights worked; she asked the person if

he was with the California Highway Patrol ("CHP") and after the Premier safety personnel said no—Ornelas refused to comply with the request. Plascencia did not know what organization "Premier" represented, nor is there any evidence as to why someone from "Premier" would have authority to inspect Ornelas's backup alarm/lights. I believe the fact that, when assessing whether Ornelas was at fault for what occurred, Plascencia did nothing to determine whether Ornelas was correct when she said the individuals at the jobsite never identified themselves as safety representatives, along with her ignorance as to the identity of the Premier employee who asked to inspect Ornelas's truck, and her claim that she reviewed a written statement from the "safety inspector at the jobsite" when no such statement exists, further supports a finding that the true reason for the discipline was for discriminatory purposes, specifically the fact that the Union was at the jobsite that day and Respondent suspected that Ornelas had called them.

### c. Shifting reasons for the suspension

I also find that Respondent provided different reasons for Ornelas's suspension, which further supports a finding of pretext. As noted above, at trial Plascencia said Ornelas was suspended for two reasons: (1) failing to comply with the jobsite safety inspector; and (2) because of her conduct during the July 10 meeting with Charlson. However, in the written discipline presented to Ornelas on July 18, in the section of the document that asks for the company to "describe the performance problem or inappropriate behavior," the fact that Ornelas failed to comply with the "jobsite safety inspector" is not mentioned. Instead the two reasons for Ornelas's suspension set forth in the disciplinary document are: (1) failing to call Juan Torres "back as he asked you to do so if the inspector returned," and (2) her conduct during the July 10 meeting. (GC. 10) During her trial testimony Plascencia never mentioned Ornelas's failing to call Torres back as a reason for her discipline; neither did Faulkner. I find this inconsistency further supports a finding of pretext. See *NLRB vs. RELCO Locomotives*, 734 F.3d 764, 782 (8th Cir. 2013) (employer's shifting explanations for why it discharged an employee evinced unlawful motivation); *MCPc Inc.*, 367 NLRB No. 137, slip op. at 4 (2019) (shifting reasons for discharge are evidence of pretext).

Based upon the foregoing, I find that Respondent has not rebutted the General Counsel's prima facie case. Accordingly, by suspending Ornelas because she engaged in Section 7 protected union activities, Respondent violated Section 8(a)(1) and (3) of the Act.

### V. THE DISCHARGE OF DIANA ORNELAS

#### A. Facts

##### 1. Oxnard drivers deadhead to Moorpark

On Saturday August 31, 2019 a group of six Oxnard based drivers were scheduled to start their day at the Moorpark plant, instead of at Oxnard. Their starting times were staggered between 5:20 a.m. to 6:29 a.m. The six drivers included Diana Ornelas, Vladimir Ambriz, Agapito Rivera, Rene Vasquez, Daniel Gonzalez, and Oscar Guardado. Depending upon the circumstances, sometimes Cemex will ask a driver to deadhead to another plant to start their workday. However, on this day

---

[37] I credit Ornelas's testimony that she never received a response from Plascencia regarding her July 12 email. (Tr. 1013–1014) I do not credit Plascencia's testimony that she "believe[d]" she "briefly" discussed the Hallin & Herrera incident with Ornelas over the phone, as I find her testimony was simply an afterthought in an attempt to bolster Respondent's case. (Tr. 2994) There were no notes or other documentary evidence that this conversation occurred, and when originally asked what she did during her investigation into the matter, Plascencia did not mention speaking with Ornelas over the telephone. Instead Plascencia said that she only collected and reviewed written statements. (Tr. 2912)

the six drivers were scheduled to report to the Moorpark plant directly in their personal cars, instead of deadheading there in their work trucks. (Tr. 487, 511, 1015–1018, 1096–1098, 1164–1165, 1198–1199) (GC. 27; R. 13)

The drivers were upset and thought that it was unfair they had to use their personal vehicles, and pay for their own gas, to drive to Moorpark, instead of deadheading to Moorpark from Oxnard in their assigned trucks. Depending upon traffic, it takes between 40 minutes to an hour to drive from Oxnard to Moorpark. Therefore, on August 31 five of the drivers, everyone except Guardado, decided to meet at the Oxnard plant and deadhead to Moorpark in their work trucks. The five drivers met at Oxnard early in the morning, before their scheduled clock-in times, discussed their plan, clocked-in, and then drove their Oxnard ready-mix trucks to the Moorpark plant one-by-one in order of seniority. Guardado did not participate in the plan, and drove his personal car to Moorpark as per his schedule. (Tr. 483–484, 510, 1016–1019, 1095, 1167–1168)

The road that leads to the Moorpark plant is restricted; commercial vehicles are prohibited from using the road before 6 a.m. and after 6 p.m. So when the five Oxnard drivers arrived at Moorpark, they waited at the bottom of the road until 6 a.m. and then drove into the plant one-by-one. Robert Resendez was working as the batchman at Moorpark that day and saw the drivers come into the plant and line up to get loaded. Three of the drivers were supposed to start before 6 a.m. and were therefore late for their scheduled load times. Ornelas and Vasquez arrived at Moorpark before their scheduled load times and loaded their trucks on time. (Tr. 509–510, 1019–1020, 1168; GC. 13; R. 13)

All five drivers were disciplined for deadheading to Moorpark. And the drivers who arrived at Moorpark after their scheduled start times received an additional discipline for an attendance violation. The evidence shows that: Ambriz received a one-day suspension for deadheading and a verbal warning for attendance because he arrived 18 minutes late; Rivera received a one-day suspension for deadheading and a verbal warning for attendance because he arrived 12 minutes late; Gonzalez received a three-day suspension for deadheading and a verbal warning for attendance because he arrived 39 minutes late; Vasquez received a one-day suspension for deadheading; and Ornelas, who arrived before her scheduled start time and therefore was not late, was fired for deadheading to Moorpark. (Tr. 482–483, 1020, 2948; GC. 11, 12, 27)

2. Decision to discharge Ornelas

*a. Testimony of Brian Forgey*

Brian Forgey testified about his role in Ornelas's termination. Regarding the mechanics of the decision-making process, Forgey said that the steering committee reviewed all employee disciplines, and "would collectively make the decision and move forward . . . if we felt it was a lawful move." (Tr. 112) Forgey said that, while the steering committee reviewed and discussed the decision to fire Ornelas, ultimately he was the final decisionmaker for the termination. (Tr. 113–114, 124)

As for why Ornelas was discharged, Forgey said that while he could not remember all the specifics because of the passage of time, "there were multiple violations of performance. We

had performance issues with her." (Tr. 114–115) Specifically, Forgey said that two incidents stood out regarding the decision to fire Ornelas: (1) "she stopped to get fuel when it was very clear that . . . they were to do that when they were unloaded;" and (2) "her refusing to cooperate with an OSHA inspector on a jobsite in regards to safety issues, or safety questions he had." (Tr. 115)

Forgey said that, when Ornelas was terminated, Cemex had already met with her several times about her performance and had given her "a lot of opportunities" by this point. (Tr. 122) Forgey also said that he believed Respondent "had an agreement with her that was kind of [a]. . . [l]ast chance kind of agreement" giving her one more opportunity to pick up her performance. (Tr. 122–123) Regarding the Moorpark incident, and why Ornelas was the only driver fired, Forgey said that he believed she was the only one fired because it happened after her "last chance agreement" and after Respondent "had given her plenty of opportunities to turn around her performance." (Tr. 123) After the termination decision was made, Forgey said the responsibility to inform Ornelas about her discharge fell to the human resources department, which typically drafts the termination letters. (Tr. 118)

*b. Testimony of Iris Plascencia*

Plascencia was the one who drafted Ornelas's termination letter. When asked why Ornelas was discharged, Plascencia testified that it was because Respondent gave Ornelas "several opportunities in the course of two months" and during this time she had a total of three performance issues: the Hallin & Herrera incident; an incident where Ornelas did not receive any discipline but where she "backed up into the Oxnard plant;" and the unauthorized deadheading to Moorpark on August 31, which Plascencia characterized as Ornelas being "blatantly insubordinate." (Tr. 2946–2947; GC. 11)

Plascencia testified that she was at home on August 31, as it was a Saturday, when she received a call from Faulkner who told her what had occurred. Plascencia said that Faulkner was reaching out for guidance on how to handle the matter, and she told him to start gathering facts so they could assess the matter on Monday. As to why none of the other drivers were discharged, even though they all deadheaded without permission on August 31, Plascencia said that the other drivers were not terminated because their performance record did not warrant termination. (Tr. 2945, 2948, 2967–2968)

*c. Testimony of Jason Faulkner*

Regarding his role in the decision to discharge Ornelas, Faulkner testified that his role was to review and evaluate the investigative documentation, the disciplinary history, speak to different parties, and present this information to human resources as the company has a progressive disciplinary policy with certain steps and procedures. While Faulkner said that he did not know who made the final decision to fire Ornelas, he testified that he knew the reasons why she was fired. According to Faulkner, Ornelas was discharged because of "many issues, different work performance issues. There's incidents, there's accidents, there's safety issues, there's work performance issues. There was conduct issues. There's quite a few

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC

107

things that were involved." (Tr. 477) When asked how he knew these items were considered by the person making the final decision to fire Ornelas, Faulkner said it was because "I commit that information to them," meaning human resources. (Tr. 478) (Tr. 472–475, 477–478)

On Tuesday, September 3, Faulkner sent an email to Plascencia, Forgey, and Charlson with a summary of what had occurred, the employees involved, the times they had clocked in at Oxnard, their scheduled start times at Moorpark, and their actual arrival times in Moorpark. In the email Faulkner said that he was "looking at a couple ways of addressing this," including Policy/Procedures and/or Attendance policy," and asked for advice on how to handle the matter. Forgey replied to the group email that same day saying, "would also depend on how call outs were scheduled." (GC. 27) According to Faulkner, Plascencia was the one who told him to fire Ornelas and someone in Human Resources drafted the termination letter which he signed. (Tr. 476–477, 481; GC. 11)

### 3. Ornelas is fired on September 6

Ornelas went to work the morning of September 6 and found a group of union organizers, including Fabian Leon and Scott Williams, on the sidewalk outside the Oxnard plant. Before clocking in for the day Ornelas walked over to the organizers to say hello. She then clocked in, pre-tripped her truck, and completed her paperwork. As she was doing this, Ornelas saw Faulkner drive into the plant, give a dirty look to the organizers, and make a call on his cell phone. Faulkner then walked into the plant, but walked out soon after and drove past the union organizers again as he left. (Tr. 1021–1022)

At the end of her workday, Ornelas clocked out and was ready to go home when she was stopped by Juan Torres who asked her to go to the conference room to speak with Faulkner. Ornelas walked to the conference room where she found Faulkner waiting with Charlson. Faulkner handed Ornelas her termination letter and told Ornelas to follow along as he read the letter out loud. The letter, which is signed by Faulkner, reads in pertinent part as follows:

> This letter is to advise you that we have completed our investigation into the happenings on August 31, 2019, in which you were instructed to commence work at 6:29 AM in Moorpark and you did not follow directions. You took it upon yourself to arrive to the Oxnard plant instead and head to Moorpark.

> You were suspended on July 10th for insubordination and your actions on August 31st further demonstrates your unwillingness to improve and meet the Company's expectations.

> Following a thorough investigation into the events of August 31st, along with an overall review of your performance record, the Company has concluded that your employment with CEMEX is hereby separated, effective today, September 6, 2019.

After Faulkner finished reading the letter, Ornelas said okay and then walked out. She turned in her keys, phone, and tablet to Torres, walked to her car and drove out of the plant. (Tr. 472, 481, 1021–1023, 1171–1172; GC. 11)

As Ornelas drove out of the plant she saw driver Daniel Gonzalez who waved her down. Ornelas stopped and told him that she had been terminated. Ornelas then drove to a park down the road from the plant, where a group of about five Cemex drivers had been meeting; she told her coworkers at the park that she had been fired. Ornelas also texted about 13 Cemex drivers from the Oxnard, Santa Barbara, Simi Valley, and Santa Paula plants, who were on a group chat list, about her termination. She then told Scott Williams at the Union about it as well. (Tr. 1023–1024, 1027–1029, 1107)

### B. Analysis

#### 1. The General Counsel's prima facie case

Based upon the same factors discussed above regarding her suspension, the General Counsel has presented sufficient evidence of a prima facie case that Ornelas's discharge was unlawfully motivated. Accordingly, Respondent bears the burden of persuasion to show that it would have discharged Ornelas absent her Section 7 protected conduct. *Consolidated Bus Transit*, 350 NLRB at 1066. Because the five Oxnard based drivers decided to take their trucks and deadhead to Moorpark without authorization, Respondent would have been within its right to fire all five drivers. But here, Ornelas was the only one fired, while the other drivers were suspended. An employer cannot simply present a legitimate reason for its actions. *Rhino Northwest, LLC*, 369 NLRB No. 25, slip op. at 3 (2020). Instead, Cemex must show by a preponderance of the evidence that it would have fired Ornelas notwithstanding her protected activity. For the reasons set forth below, I find Respondent has not done so.

#### 2. Cemex's reliance upon Ornelas's July suspension as a reason for her discharge

Both Forgey and Plascencia referred to the Hallin & Herrera incident as one of the reasons for Ornelas's discharge. However, as set forth above, I have found that Ornelas's July 2019 suspension was unlawful. When an employer "disciplines an employee based on prior discipline that was unlawful, any further and progressive discipline based in whole or in part thereon must itself be unlawful." *The Hays Corp.*, 334 NLRB 48, 50 (2001); *NLRB v. RELCO Locomotives, Inc.*, 734 F.3d 764, 787 (8th Cir. 2013) ("An adverse employment decision is unlawful if it relies upon and results from a previous unlawful action."). Because Ornelas's termination was based, in part, upon her July 2019 suspension, which was found to be unlawful, her discharge is similarly unlawful.

The same is true to the extent Respondent relied upon Ornelas's February 2019 discipline for talking with Union representatives as one of the reasons for her discharge. Faulkner's memo regarding this incident was placed in Ornelas's personnel file, and Faulkner testified that Ornelas was fired in part because she had many incidents and performance issues, which he researched and forwarded to human resources. It is reasonable therefore to presume that this discipline was also one of the "multiple violations of performance" that Forgey referenced as a reason for her discharge, as his memo was placed in Ornelas's

108                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

personnel file and the discipline appears on her disciplinary chart.

### 3. Disparate treatment supports a finding that Ornelas's discharge was unlawful

Respondent's disparate treatment of Ornelas is evidence that her termination was unlawfully motivated. *Constellium Rolled Prod. Ravenswood, LLC*, 371 NLRB No. 16, slip op. at 4 (2021) (respondent's blatant disparate treatment forecloses the company from establishing its *Wright Line* defense that it would have fired employee absent his protected conduct); *Apex Linen Service, Inc.*, 370 NLRB No. 75, slip op. at 20 (2021) (disparate treatment shows unlawful motive). Five employees participated in the unauthorized deadheading to Moorpark, but only Ornelas was discharged; the others were suspended. While Respondent argues that Ornelas's actions warranted discharge because of her prior disciplinary record, in comparison to the other four drivers, a review of the record shows that is not so.[38]

Although I have found that the Ornelas's suspension for the Hallin & Herrera incident was unlawful, assuming that a discipline was warranted for the July 9 incident, the record shows that Ornelas's unauthorized deadheading to Moorpark would have only been the second performance-based discipline on Ornelas's record during the 12-month period preceding August 31, 2019. The July 9 incident would have been her first and the August 31 incident her second. Plascencia specifically testified that prior disciplines only stay on an employee's record for 12 months. (Tr. 2895, 2981–2982). The evidence shows that other drivers who only had two performance-based disciplines on their record, and who deadheaded without authorization, were not fired, while Ornelas was terminated.

For example, Agapito Rivera was suspended because he deadheaded to Moorpark on August 31, and the record shows that he engaged in the exact same conduct six weeks later, this time deadheading to the Santa Barbara plant without authorization and arriving over an hour late. (GC. 13) For his second unauthorized deadheading violation, within six weeks after he was suspended for deadheading to Moorpark, Rivera received another suspension, even though Plascencia characterized unauthorized deadheading as blatant insubordination. (Tr. 488, 2977; GC. 13) The fact that Rivera received two suspensions for unauthorized deadheading while Ornelas was discharged the first time she deadheaded without approval is evidence of disparate treatment.

While Respondent argues that Ornelas also received a verbal warning by Faulkner on August 31, 2018, for failing to have her mixer drum turning at full speed resulting in half the load being spilled onto the ground, the preceding 12-month period for Ornelas's August 31, 2019 incident would have started on

September 1, 2018, 1 day after the August 31, 2018 mixer-drum event. Moreover, the evidence shows that Ornelas was never issued a written discipline for what occurred. (Tr. 2906; R. 56) Although Plascencia claimed that Faulkner spoke with Ornelas, giving her an oral verbal warning for the incident, she was not present during their discussion and her testimony is nothing more than self-serving hearsay which is not worthy of credit. Moreover, Plascencia acknowledged that, with roughly 400 drivers, it is a fairly common occurrence for loads of concrete to be thrown away due to driver mistakes. (Tr. 2909) Also, I find it significant that, despite being called by a witness by Respondent, and his extensive testimony, Faulkner was never questioned about this incident or about whether he disciplined Ornelas for what occurred. Therefore I find that, had Faulkner testified about the matter, his testimony would not have supported Respondent's claim that Ornelas received an oral verbal warning because of this incident. *CSH Holdings, LLC*, 365 NLRB No. 68, slip op. at 5 fn. 15 (2017) (where employer failed to present testimony from managers it may be inferred that their testimony would have been adverse to the employer's interests on that issue, and the judge properly drew an adverse inference accordingly). And, because Plascencia testified that she relied upon this incident in determining whether discharge was appropriate (Tr. 2906–2907), this is further evidence of pretext. See *Lord Industries, Inc.*, 207 NLRB 419, 422 (1973) (failure to present discharged employees with copies of written disciplines or tell them that it was contained in their personnel files supports finding of pretext). *Toll Manufacturing Co.*, 341 NLRB 832, 833, 847 (2004) (judge correctly relied on employer's failure to notify worker of warnings as further evidence of unlawful motivation).

Finally, even assuming that Ornelas had been issued two other valid disciplines in the 12-month period before she deadheaded to Moorpark, the evidence shows that driver Daniel Gonzalez also had two performance-based disciplines on his record before he deadheaded to Moorpark with the others, but he was not fired. Gonzalez received a verbal warning on June 1, 2019, for running out of fuel on his way to Simi Valley, causing a 1-hour delay in the delivery, and also received a one-day suspension for an incident on June 8, 2019, for severe damage to his truck's tank and electrical system caused by his inattentiveness. Notwithstanding these two previous disciplines, for deadheading to Moorpark Gonzalez received another suspension while Ornelas was discharged. Accordingly, I find the fact that other drivers who deadheaded to Moorpark on August 31 were suspended, while Ornelas was discharged, is evidence of Respondent's unlawful motive.

### 4. The reason advanced by Forgey for firing Ornelas is evidence of unlawful motive

Forgey testified that he was the final decisionmaker for the termination and that Ornelas was discharged because of Cemex "had issues with her" and "there were multiple violations of performance. We had performance issues with her." (Tr. 114–115) Specifically, Forgey said that two incidents stood out regarding the decision to fire Ornelas: (1) her stopping to get fuel, instead of fueling up while she was unloaded, and (2) "her refusing to cooperate with an OSHA inspector on a jobsite in

---

[38] The fact that Cemex may have believed some of the other drivers who deadheaded to Moorpark were also union supporters, but were not fired, is not relevant in the analysis of whether Ornelas's discharge was unlawfully motivated. An employer's failure to discharge all union supporters "does not disprove the fact that an employee's discharge is based upon an unlawful discriminatory motive." *NLRB v. Challenge-Cook Bros. of Ohio*, 374 F.2d 147, 152 (6th Cir. 1967); See also *George A. Tomasso Construction Corp.*, 316 NLRB 738, 742 (1995).

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC

109

regards to safety issues, or safety questions he had." (Tr. 115) According to Forgey, when Ornelas was terminated Cemex had met with her several times, had given her "a lot of opportunities" and the company "had an agreement with her that was kind of [a]. . . [l]ast chance kind of agreement" giving her one more opportunity to pick up her performance. (Tr. 122) Regarding the Moorpark incident, and why Ornelas was the only driver terminated, Forgey said he believed she was the only one fired because it happened after her "last chance agreement" and after Respondent "had given her plenty of opportunities to turn around her performance." (Tr. 123)

Several factors point to Forgey's explanation as being nothing more than pretext. First, there is no credible evidence that Ornelas was given a last chance agreement, or that she violated such an agreement. The evidence shows that Respondent's last chance/return to work agreements are in writing and signed by both the employee and Respondent. (GC. 15) No such agreement was ever introduced into evidence for Ornelas, and she denied ever being offered such an agreement, let alone signing one. (Tr. 1030) Furthermore, Ornelas's termination letter does not mention the existence of any such agreement.[39] (GC. 11) There is also no evidence that Ornelas ever refused to cooperate with an OSHA inspector, as stated by Forgey. Clearly Forgey was referring to the Hallin & Herrera incident. However, it involved someone working for a third-party contractor named "Premier" which Forgey inflated in his testimony to being an OSHA government regulator. I find that Forgey's hyperbole, when the describing this incident, which he relied upon to terminate Ornelas, is further as evidence pretext. *Continental Pet Technologies*, 291 NLRB 290, 308 (1988) (employer's exaggeration of incident, in support of its decision to discharge employee, "is a makeweight added as a pretext to exaggerate the effect" of the employee's conduct.); *United Parcel Service of Ohio*, 321 NLRB 300, 311–312 (1996) (witness's hyperbole detracts from credibility and supports a finding of pretext).

As for Forgey mentioning the incident involving Ornelas stopping for fuel as a reason for her discharge, the record shows that Ornelas was never disciplined for this incident. Respondent's relying upon conduct for which Ornelas was never disciplined is evidence of unlawful motive. *Lord Industries, Inc.*, 207 NLRB at 422; *Toll Manufacturing Co.*, 341 NLRB at 833, 847; *Conley Trucking*, 349 NLRB 308, 324 (2007) (Respondent developed a pretext by "cull[ing] its manager's memory for incidents and shortcomings that could offer a post hoc and legitimate rationale for [employee's] discharge."). Regarding this incident, Ornelas testified that she was running out of fuel and called the plant foreman/batchman to inform him that she was not going to be able to make it the jobsite and had no choice but to stop for fuel. (Tr. 1127, 1199–1200) I credit Ornelas's testimony, as it was not rebutted by the Oxnard plant foreman/batchman. Ornelas followed the exact process that Faulkner said drivers are supposed to follow if they find themselves in an emergency situation without fuel. Specifically, Faulkner testified that "if there is an emergency . . . they would

contact their plant foreman and let them know that they were going to be stopping." (Tr. 2506) Relying upon an incident in which Ornelas followed Respondent's protocols as a reason to terminate her employment is evidence of unlawful motive.

### 5. Plascencia's testimony about why Ornelas was fired supports a finding of pretext

Plascencia was the one who drafted Ornelas's termination letter. When asked why Ornelas was discharged, Plascencia testified that it was because Respondent gave Ornelas "several opportunities in the course of two months" and during that time Ornelas had a total of three performance issues: the Hallin & Herrera incident; an incident where Ornelas did not receive any discipline but she "backed up into the Oxnard plant;" and the unauthorized deadheading to Moorpark on August 31, which Plascencia characterized as Ornelas being "blatantly insubordinate." (Tr. 2946–2947; GC. 11)

As with Forgey, Plascencia said that, in deciding to discharge Ornelas, Respondent relied upon an incident for which Ornelas was never disciplined, backing into the Oxnard plant. This is evidence of pretext. *Lord Industries, Inc.*, 207 NLRB at 422; *Toll Manufacturing Co.*, 341 NLRB at 833, 847. And, since it was mentioned by Plascencia as a reason for her discharge, a further review of the incident is warranted.

Respondent's mixer-trucks have a set of two "booster" tires located at the back of the truck, one on each side. These tires are attached to a mechanism that lifts the tires up and down as needed. When the booster tires are down, they lengthening the truck's wheelbase and act as an extra set of tires for stability. When they are not in use, the booster tires are lifted up and rest at the top rear of the mixer-truck's drum. When the trucks are at the bath plant, the booster tires are not in use, and are in the up position. (Tr. 1157; R. 14; U. 19–20)

Ornelas testified that sometime in mid-August 2019, she was backing around the corner of the Oxnard plant office and one of her booster tires scraped a steel beam. Ornelas did not realize that she had hit anything. Juan Torres came out of the office and asked if she had hit the steel beam and Ornelas said no, not realizing that her tire had hit the beam. Torres asked her to lower the booster tires and showed Ornelas a scrape on one of the tires. He also showed Ornelas a scrape on the steel beam which is located on the side of the plant. Torres called a fleet mechanic to inspect Ornelas's booster tire and an incident report was filed. The incident report contains a picture showing scuff marks on the booster tire and what looks to be rubber marks on a steel beam. Neither Torres nor the fleet mechanic testified about this incident. And there was no credible evidence presented that Respondent had to change the booster tire, that Ornelas's truck was otherwise taken out of service, or that any repair work was needed on the steel beam. Ornelas was not given a formal discipline for what occurred. Instead she was coached about being aware of her surroundings and was scheduled for refresher driver training with a safety champion. (Tr. 1158–1159, 1161, 2934–2935; R. 12)

During the hearing, Respondent tried to introduce an email about this incident through Plascencia, and have her explain why Ornelas was not disciplined. However, the document Respondent attempted to introduce into evidence was incomplete.

---

[39] When Daniel Gonzalez was eventually fired, his termination letter specifically stated that he breached his last chance/return to work agreement. (GC. 15)

110                                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

The email originally contained a statement about the incident, as an attachment, from someone who Plascencia described as a plant foreman named Mike/Michael, but Respondent never offered that statement into evidence. Nor did Respondent ask that the exhibit be put into the rejected exhibit file. (2933–2937)

In its brief, Respondent compared this incident to one where Daniel Gonzalez was disciplined because he damaged his booster fender while backing under the plant to be loaded, causing the "downing of his truck," in support of the company's claim that Ornelas committed three serious acts of misconduct in less than two months, thereby warranting her discharge. (GC. 14) (Cemex. Br. 158, 161, 163) However, there is no credible evidence that Ornelas's truck had to be taken out of service, that repair work was needed on the steel beam, or that the booster tire needed to be replaced. Although the picture quality on the incident report is poor, it appears that the rubber/tire marks on the steel beam and the scrape on the booster tire are merely cosmetic. And while Plascencia testified that Ornelas's tire needed to be replaced, I find this testimony self-serving and not credible. (Tr. 2932–2933) Plascencia was not present at the time of the incident, there is no evidence that she actually looked at the tire, no documentary evidence was introduced showing that the tire was actually replaced, and this testimony was elicited as part of an incomplete exhibit that was never introduced into evidence. I also find it noteworthy that Respondent did not call Torres as a witness about this incident, or introduce into evidence the complete email with the statement from the person Plascencia described as a plant foreman. This is especially noteworthy because Plascencia identified this incident as one of the reasons supporting Ornelas's discharge. Because Torres is an admitted supervisor, and the email with the statement was in Respondent's possession and control, I take an adverse inference that this evidence would not have corroborated Plascencia's testimony about the incident, or Respondent's position as to the consequences of what occurred. *CSH Holdings, LLC*, 365 NLRB No. 68, slip op. at 5 fn. 15 (2017); *People's Transportation Services*, 276 NLRB 169, 223 (1985) (noting that the adverse inference rule does not require "a subpoena frame of reference" but is triggered by an adequate showing that relevant evidence is in existence and in control of one party but that evidence has been withheld).

In short, Ornelas was never disciplined over the booster tire incident and I find the reason no discipline was issued is because none was warranted. I also find it noteworthy that this incident is not specifically listed in Ornelas's termination letter as a reason for her discharge. As with Forgey's testimony about the "fuel incident" it appears that Respondent developed a pretext by "cull[ing] its manager's memory for incidents and shortcomings that could offer a post hoc and legitimate rationale for [Ornelas's] discharge." *Conley Trucking*, 349 NLRB at 324. Respondent's relying upon an incident in which no formal discipline was issued is simply evidence of Cemex's unlawful motive regarding its decision to fire Ornelas.

### 6. Other incidents where no discipline was issued

Just as both Plascencia and Forgey relied upon incidents where no discipline was issued to justify Ornelas's discharge,

in its brief Respondent points to yet more undisciplined incidents to argue that no violation occurred because Ornelas displayed a lengthy pattern of "policy violations, poor performance, and insubordinate misconduct during her employment that was inconsistent with behavior expected by a Cemex employee." (Cemex. Br. at 16–17).

However, upon closer examination, these incidents are suspect as well. For example, in its brief Respondent points to an August 28, 2018 incident where a Chevy Tahoe collided with Ornelas's truck, claiming that Ornelas failed to yield. (Cemex Br. at 163) However, it was the Chevy Tahoe that failed to yield. The evidence shows that Ornelas had her turn signal on and was trying to merge when the Chevy Tahoe attempted to pass Ornelas's truck while she was merging, causing the Tahoe's right-side mirror to hit the back ladder of Ornelas's truck. This was hardly an incident for which Ornelas was at fault. And again, no discipline was ever issued to Ornelas. (Tr. 1118–1120; GC. 17)

Respondent also claims that Ornelas "[r]eported to the wrong jobsite because she failed to look at the delivery address listed on the order invoice;" as another incident of misconduct that demonstrates her discharge was for "repeatedly violating Cemex's policies and procedures." (Cemex Br. at 162) This claim involves load of concrete Ornelas delivered to a company called Clover Construction on June 28, 2019. (R. 41) It was only after Ornelas was suspended pending investigation for what happened at the Hallin & Herrera jobsite that Resendez reported this incident to Faulkner, who in turn reported it to Plascencia. (R. 41) However, as with the other events for which no discipline was issued, the record evidence shows that no misconduct occurred.

While Respondent claimed that Ornelas went to the wrong address at the wrong jobsite, the evidence shows that the delivery ticket did not contain an address, but instead listed the cross streets closest to the location of the project. And the project name listed on the delivery ticket simply said, "Various Porter Ranch." (R. 41) Faulkner admitted there was no address on the delivery ticket because the jobsite did not have a physical street address as it was a new construction project and they "were actually building the location." (Tr. 2456–2457) Clover Construction had two different new construction projects in the area, which were up the street from each other. Ornelas was not told there were two jobs going on at this location by the batchman, which was against the normal practice when two projects are occurring in the same location. Once she reached the area, realizing there was a problem, Ornelas called a coworker who was delivering the first load of concrete to the project, and he told Ornelas there were two jobs going on in the area. Ornelas drove down the block to the correct location and arrived while her coworker was still in the process of pouring out his load of concrete. Ornelas was on time, the customer was not impacted whatsoever, and she was not disciplined for the incident. (Tr. 1069–1070, 2452–2453, 2457, 2461; R. 41)

Rather than supporting Respondent's defense that Ornelas engaged in a pattern of misconduct, I find that these incidents show that Respondent's supervisors and managers were closely watching Ornelas and forwarding any incident whatsoever to their superiors trying to find a misstep that would subject her to

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC    111

further discipline. This is additional evidence of pretext. Cf. *Station Casinos, LLC*, 358 NLRB 1556, 1559 (2012) (supervisor's unsuccessful attempt to discriminatorily discipline employee based on the pretext of poor work performance evidence of animus).

"The Act protects both stellar and poor employees, and those in between, from unlawfully motivated discharge." *Conley Trucking*, 349 NLRB 308, 324 (2007), enfd. 520 F.3d 629 (6th Cir. 2008) Regarding Ornelas, I find that Respondent has not met its burden to show, by a preponderance of the evidence, that she would have been terminated notwithstanding her union activities protected by Section 7 of the Act. Accordingly, I find that Respondent violated Section 8(a)(1) and (3) of the Act by discharging Ornelas on September 6, 2019.

VI. REQUEST FOR A BARGAINING ORDER

Violations of the Act or objectionable conduct that occur during the critical election period "a fortiori" warrant setting aside an election unless the conduct is "so de minimis" that it is "virtually impossible to conclude" the actions could have affected the results. *Airstream, Inc.*, 304 NLRB 151, 152 (1991) (internal quotations omitted). Here, the unfair labor practices and objectionable conduct that occurred between the filing of the petition on December 3, 2018 and the March 7, 2019 election are hardly de minimis. Multiple violations occurred, including threats, surveillance, and interrogation, some of which were committed by high level management officials. Respondent's conduct certainly warrants setting aside the election. The question remains as to whether a *Gissel* bargaining order is warranted as argued by the General Counsel and the Union. In determining whether a bargaining order is warranted, Cemex's "course of misconduct, both before and after the election" must be reviewed to determine whether the holding of a fair election in the future is possible or instead whether the "employees wishes are better gauged by old card majorities than by new elections." *Overnite Transportation Co.*, 329 NLRB 990, 990 (1999); see also *Alumbaugh Coal Corp.*, 247 NLRB 895, 914 fn. 41 (1980), enfd. in pert. part 635 F.2d 1380 (8th Cir. 1980) (In determining whether a Gissel bargaining order is appropriate, the Board reviews all the unfair labor practices committed by the respondent, not just those committed during the critical period.).

*A. The Board's authority to issue bargaining orders*

In *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 596–597 (1969), the Supreme Court reaffirmed a principle that had been in place "[a]lmost from the inception of the Act, . . . that a union did not have to be certified as a winner of a Board election to invoke a bargaining obligation" and that majority status could be established by other means, including by the "possession of cards signed by a majority of employees authorizing the union to represent them for collective bargaining purposes." *Gissel* involved a review of eight different cases from two different Circuit Courts. Three cases arose from the Fourth Circuit, *NLRB v. Gissel Packing Co.*, 398 F.2d 336 (4th Cir. 1968); *NLRB v. Heck's, Inc.*, 398 F.2d 337 (4th Cir. 1968); and *General Steel Products v. NLRB*, 398 F.2d 339 (4th Cir. 1968), along with one case from the First Circuit, *NLRB v. Sinclair*

*Co.*, 397 F.2d 157 (1st Cir. 1968). In each case the Board had issued a bargaining order based upon valid authorization cards collected by the union. *Gissel*, 395 U.S. at 583–584, 587–589.

Regarding the cases arising out of the Fourth Circuit, the Board found all three employers had engaged in various 8(a)(1) violations: in *Gissel* for interrogating employees, threatening them with discharge, and promising benefits; in *Heck's* for interrogation, threats, creating the appearance of surveillance, and offering benefits; and in *General Steel*, for interrogation and threats of reprisals, including the threat of discharge. Id. at 583. Additionally, in *Gissel* and *Heck's* the company had wrongfully discharged employees (two in *Gissel* and one in *Heck's*). In *Sinclair Co.*, which arose out of the First Circuit, the Board found that the employer threatened employees in violation of Section 8(a)(1) of the Act by telling them the company could close the plant or transfer operations, with the resulting loss of employment, if they unionized. Id. at 588–589. In *Gissel* and *Heck's* an election was never held, while in *General Steel* and *Sinclair Co.*, the election was held but won by the employer. Id. at 581–582, 589. The First Circuit enforced the Board's issuance of a bargaining order, but the Fourth Circuit did not, taking the position that the 1947 Taft-Hartley amendments to the Act withdrew authority from the Board to order an employer to bargain on the basis of a card majority. Id. at 585, 589–590.

In *Gissel*, the Supreme Court reviewed the Board's treatment of authorization cards in three separate phases, "from its early practice" up to the position of the Board in in oral arguments before the Court. Id. at 592. The Supreme Court noted that the "traditional approach utilized by the Board for many years has been known as the *Joy Silk* doctrine." Id. (citing *Joy Silk Mills, Inc.*, 85 NLRB 1263 (1949), enfd. 185 F.2d. 732 (1950)). Under this doctrine, when a union claimed representation based upon a majority of authorization cards an employer could lawfully refuse to bargain "if he had a 'good faith doubt' as to the union's majority status; instead of bargaining, he could insist that the union seek an election in order to test out his doubts." Id. Under *Joy Silk*, the Board could issue a bargaining order if the employer lacked a good faith doubt based upon: (1) independent unfair labor practices, showing that the employer was simply seeking time to dissipate the union's majority; or (2) when the employer had come forward with no reasons for entertaining any doubt of the union's majority. Id. at 592–593. Eventually, the Board modified the *Joy Silk* doctrine, as described in *Aaron Brothers*, 158 NLRB 1077 (1966), by shifting the burden to the General Counsel to show the employer's bad faith. In this phase of the Board's approach to the use of authorization cards, the employer no longer needed to come forward with reasons for rejecting a bargaining demand and not every unfair labor practice automatically resulted in a finding of bad faith. Instead "the Board implied that it would find bad faith only if the unfair labor practice was serious enough to have a tendency to dissipate the union's majority." *Gissel*, 395 U.S. at 592. Finally, at oral argument before the Supreme Court in *Gissel*, the "Board announced . . . that it had virtually abandoned the *Joy Silk* doctrine altogether." Id. at 594. Instead, the Board told the Court that an employer's good faith doubt as to majority support was "largely irrelevant and the key

to the issuance of a bargaining order is the commission of serious unfair labor practices that interfere with the election process and tend to preclude the holding of a fair election." Id.

Ultimately, the Supreme Court rejected the contention that the 1947 Taft Hartley amendments precluded a union from establishing a bargaining obligation through means other than a Board election, including authorization cards. *Gissel*, 395 U.S. at 595–596. While a Board election is the "most commonly traveled route for a union to obtain recognition" and is generally the preferred method of ascertaining majority support, the Court noted that a "union is not limited to a Board election" to establish a bargaining obligation. Id. at 596, 602. Indeed, the Court remarked that it was recognized almost from the inception of the Act that "a union did not have to be certified as the winner of a Board election to invoke a bargaining obligation; it could establish majority status by other means" including through cards signed by a majority of employees. Id. at 596–597. The *Gissel* Court confirmed that "[w]e have consistently accepted this interpretation of the Wagner Act and the present Act, particularly as to the use of authorization cards. Id. (citing *NLRB v. Bradford Dyeing Assn.*, 310 U.S. 318, 339–340 (1940); *Franks Bros. Co. v. NLRB*, 321 U.S. 702 (1944); *United Mine Workers v. Arkansas Flooring Co.*, 351 U.S. 62 (1956)).

Regarding a union's majority status, the Supreme Court stated that it has long held the Board can issue a bargaining order, even without first requiring the union to show that it has been able to maintain its majority status. *Gissel*, 395 U.S. at 610 (citing *NLRB v. Katz*, 369 U.S. 736, 748 fn 16 (1962); *NLRB v. P. Lorillard Co.*, 314 U.S. 512 (1941)). And this authority extends to situations where the union once possessed a card majority but only represents "a minority of employees when the bargaining order is entered." Id. (citing *Franks Bros. Co. v. NLRB*, 321 U.S. 702 (1944)). The Court noted that even the Fourth Circuit acknowledged the Board's policy of imposing a bargaining order without looking into the union's majority status "in 'exceptional' cases marked by 'outrageous' and 'pervasive' unfair labor practices," describing such situations as "Category I" cases. Id. at 613–614. Therefore, the *Gissel* Court remarked that the only effect of its holding was to approve the Board's use of a "bargaining order in less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes," and where the union, at one point, had a majority; these are known generally as Category II cases. Id. at 614; see also *Research Federal Credit Union*, 327 NLRB 1051, fn. 3 (1999) (Board describes "Category I" and "Category II" cases under *Gissel*). In fashioning a remedy for Category II cases, the Supreme Court noted that "the Board can properly take into consideration the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future." Id. If the possibility of erasing the effects of the past practices, and ensuring a fair election through the use of traditional remedies is slight, and "employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order, then such an order should issue." Id. at 614–615.

The *Gissel* Court affirmed the judgement of the First Circuit,

approving the bargaining order in *NLRB v. Sinclair Oil*, and reversed the Fourth Circuit's decisions in *NLRB v. Gissel Packing Co.*, *NLRB v. Heck's, Inc.*, and *General Steel Products v. NLRB*, "insofar as they decline enforcement of the Board's orders to bargain" and remanded those cases with directions "to remand to the Board for further proceedings." Id. at 620. On remand, the Board found the unfair labor practices in *Gissel*, *Heck's*, and *General Steel* sufficient to warrant a bargaining order. *Gissel Packing Co.*, 180 NLRB 54 (1969); *Heck's Inc.*, 180 NLRB 430 (1969); *General Steel Products, Inc.*, 180 NLRB 56 (1969). On appeal, the Fourth Circuit further remanded *General Steel* back to the Board for a hearing on intervening events, including events which were not relevant at the time of the original hearing, but which now had become relevant under the Supreme Court's decision in *Gissel*. *General Steel Products, Inc. v. NLRB*, 445 F.2d 1350, 1355–1356 (4th Cir. 1971). Upon remand, the Board found that a bargaining order was no longer warranted, and ordered a new election, as the ownership and top management of the company had completely changed, there was virtually a complete turnover among the operating supervisors, and "an almost completely new complement" of employees. *General Steel Products, Inc.*, 199 NLRB 859–860 (1972).

### B. The Union's card majority

Here, to prove that a majority of employees had authorized the Teamsters to bargain on their behalf, the General Counsel relies upon authorization cards signed by the Las Vegas and Southern California drivers.[40] (GC. 16) These cards were signed in October and November 2018, and are "single purpose cards, stating clearly and unambiguously" that the signer designates the union as his or her representative." *Gissel Packing Co.*, 395 U.S. at 606.

The parties stipulated that 97 authorization cards contained the authentic signatures of the named employees. For 72 of the cards, the General Counsel presented testimony from employees who either signed a card, or who solicited a coworkers signature on a card and watched them sign it. Finally, I compared employee signatures on 58 authorization cards with comparator signatures on W-4 forms from Respondent's business records and determined the comparator evidence was sufficient to establish that 38 of these cards were signed by the employee in question.[41] *Traction Wholesale Center Co., Inc.*, 328 NLRB 1058, 1059 (1999), enfd. 216 F.3d 92, 105 (DC. Cir. 2000) ("A Board judge . . may authenticate an authorization card by comparing the card signature with an authenticated specimen."). In total, the evidence shows that, by the end of November 2018, the Union possessed authorization cards from at least 207 of Respondent's 366 Unit employees. This is equivalent to 57% of the Unit and well over the 184 cards needed to establish a

---

[40] All parties have analyzed the facts presented under a *Gissel* Category II standard. (GC. Br. at 97–99; Union Br. at 65–74; Cemex Br. at 171–187)

[41] At hearing I ruled that 39 cards matched the comparator evidence. But, the card for J. Estrada was already part of the parties' stipulation as being authentic, and is therefore not counted as part of the signature review. (JX. 12)

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC

113

majority.[42]  (Tr. 1204, 1385–1390, 1495–1500, 1624- 1631, 1708–1710, 1429–1435, 1309, 1565–1569, 1810–1825, 1916– 1922; JX. 12; GC. 16, 28; ALJ. 5)

### C. Severity of Cemex's violations

In determining whether Respondent's unfair labor practices preclude a fair election from occurring in the future, and warrant a bargaining order, I note that Respondent has committed various hallmark violations.  Hallmark violations generally include the threat of plant closure, threat of job loss, the grant of benefits, and the demotion or discharge of union adherents. *NLRB v. Jamaica Towing, Inc.*, 632 F.2d 208, 213 (2d Cir. 1980).  These violations can justify a finding, without extensive explanation, that they will have a lasting negative and coercive effect on the workforce and remain in the memory of employees for a long time. Id; see also *NLRB v. General Wood Preserving Co.*, 905 F.2d 803, 822 (4th Cir. 1990).  Here, the hallmark violations include Ornelas's discharge, along with the threats of job loss and plant closure by Dickson and Santana.  The violations committed by Cemex are at least as severe, if not more severe, than those found warranting a bargaining order in the cases that make up *NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969).  For example, the Court in *Gissel* affirmed the First Circuit's bargaining order in *NLRB v. Sinclair Co.*, 397 F.2d 157 (1st Cir. 1968), where the employer violated Section 8(a)(1) by threatening employees that, if they unionized, the plant would possibly close and production transferred, with the resulting loss of employment.  See *Sinclair Co.*, 164 NLRB 261 (1967).  Also, on remand, a bargaining order issued in *Gissel Packing Co.* 180 NLRB 54 (1969), where the employer interrogated employees, threatened them with discharge, promised benefits, and fired two union supporters.  And, a bargaining order also issued in *Heck's Inc.*, 180 NLRB 430 (1969), where the violations included interrogation, threats, creating the appearance of surveillance, offering benefits for opposing the Union, and discharging one union supporter.

Regarding the types of violations that support a bargaining order, an early commentator analyzing *Gissel* and its progeny summarized it best by saying "[i]f during the course of an organizing campaign the employer commits compound unfair labor practices (i.e., multiple violations of § 8(a) (1) or a combination of §§ 8(a) (1) and (3) violations), and if there are no substantial mitigating factors, the Board will issue an order requiring the employer to bargain with the union upon request." Daniel M. Carson, *The Gissel Doctrine: When a Bargaining Order Will Issue*, 41 Fordham L. Rev. 85, 114 (1972).  Here, the unlawful discharge of Ornelas, the threats of job loss and plant closure, along with the other unfair labor practices committed by Cemex, are certainly severe enough to warrant a bargaining order.  The only question is whether substantial mitigating factors exist that render a bargaining order unnecessary.

---

[42] While Ibrahim Rida told the 11 drivers from whom he solicited authorization cards that they were for a "vote," this does preclude those cards from being included, as he did not say that securing an election was the "only" purpose for the cards. *Duthler, Ben, Inc.*, 157 NLRB 69, 80 (1966), enfd. 395 F.2d 28 (6th Cir. 1968). Even if they were excluded, the remaining 196 cards possessed by the Union still constitutes a majority (54%) of the Unit.

### D. Mitigating factors.

#### 1. Passage of time

Respondent argues that the passage of time since the unfair labor practices were committed would make a bargaining order unenforceable.  (Cemex. Br. at 185)  However, "the Board's established practice is to evaluate the appropriateness of a *Gissel* bargaining order as of the time that the unfair labor practices occurred; changed circumstances following the commission of the violations are generally not considered.  *Milum Textile Services Co.*, 357 NLRB 2047, 2056 (2011).

Also, the time line here is not necessarily unusual, as Courts have enforced bargaining orders where a comparable time lag has occurred.  For example, the Board issued a bargaining order *Evergreen America Corp.*, which was enforced by the Fourth Circuit, even though 4 years had elapsed since the commission of the employer's unfair labor practices.  348 NLRB 178, 182 (2006), enfd. 531 F. 321 (4th Cir. 2008).  In *NLRB v. Intersweet Inc.*, 125 F.3d 1064, 1069 (7th Cir. 1997), the Seventh Circuit enforced a bargaining order even though 3 years had passed since the unfair labor practices occurred and the Board's order issued.  And in *Parts Depot, Inc. v. NLRB*, 24 Fed. Appx. 1 (D.C. Cir. 2001) the DC Circuit enforced a bargaining order when the unfair labor practices occurred 6 years before the Board issued its order.  Here, less than 3 years have passed since Respondent discharged Ornelas.  Also, at least part of the delay in this matter can be attributed to the COVID-19 pandemic, as the complaint issued on April 30, 2020, at a time when live hearings were cancelled for a number of months while the Board transitioned to videoconference hearings due to the compelling circumstances caused by the pandemic.  Finally, the Ninth Circuit, which covers both California and Nevada, does not consider changed circumstances or the passage of time, noting that adhering to this standard "prevents employers from intentionally prolonging Board proceedings in order to frustrate the issuance of bargaining orders." *NLRB v. Bakers of Paris, Inc.*, 929 F.2d 1427, 1448 (9th Cir. 1991).  The passage of time, while regrettable, "does not detract from the necessity for restoring the status quo ante regarding the employees' desires for union representation that the Respondent dissipated through unfair labor practices." *Cogburn Healthcare Center, Inc.*, 342 NLRB 98, 99 (2004) (internal quotation omitted).  Accordingly, I find that the passage of time does not mitigate against the issuance of a bargaining order.

#### 2. Employee turnover

Respondent asserts that employee turnover renders a bargaining order inappropriate.  According to Cemex, of the 366 eligible voters, only 265 remained employed by the company at the time of hearing.  Also, Respondent claims that, since the election, the company has hired additional drivers so that the bargaining unit has now increased to 397 drivers.  (Cemex. Br. at 185–186)

However, as previously noted, the Board assesses the necessity of a bargaining order as of the time of the respondent's unfair labor practices, and has not considered subsequent employee turnover as a factor, as doing so would "reward, rather than deter, an employer who engaged in unlawful conduct during an organizing campaign." *Electro-Voice, Inc.*, 321 NLRB

114                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

444, 444 (1996). And it seems that the Supreme Court has long ago endorsed the Board's approach. *Franks Brothers Co. v. NLRB*, 321 U.S. 702, 703 (1944). In *Frank Brothers*, 45 of the employer's 80 clothing factory employees designated the union as their bargaining representative, and the Board issued a bargaining order. The employer argued the bargaining order was improper, because 13 of the union's supporters had been replaced with new employees, leaving the union with only 31 supporters, which was less than a majority. The Board concluded the Union's lack of majority was not determinative regarding the proper remedy, and this finding was affirmed by the Supreme Court which noted that the "Board's study of this problem has led it to conclude that . . . a requirement that union membership be kept intact during delays incident to hearings would result in permitting employers to profit from their own wrongful refusal to bargain." Id. at 704. "And, 'It is for the Board not the courts to determine how the effect of prior unfair labor practices may be expunged.'" Id. (quoting *Machinists v. NLRB*, 311 U.S. 72, 82 (1940)). Employee turnover does not mitigate against the issuance of a bargaining order.

Notwithstanding, even considering Cemex's arguments about employee turnover, the Board presumes that newly hired employees will support the union in the same ratio as the employees they replace. *Alexander Linn Hospital Association*, 288 NLRB 103, 108 (1988) (citing *Laystrom Manufacturing Co.*, 151 NLRB 1482 (1965); *Mimbres Memorial Hospital*, , 342 NLRB 398, 403 (2004); see also *Glover Bottled Gas Corp.*, 292 NLRB 873, 886 (1989) (Board finds "no reason to believe that as a result of the unit expanding, a majority of employees no longer wished to be represented by the Union."). There is no reason this presumption should be any different because employees expressed their desire to be represented by a union through authorization cards. *Gissel Packing Co.*, 395 U.S. at 579 (legitimate authorization cards obtained from a majority of employees serves as a valid alternate route to majority status). And this presumption has not been rebutted by Respondent. Applying the presumption here, of the 132 newly hired employees, it can be presumed that 57% (75 employees) would support the Union. A review of the employee list submitted by Respondent shows that, of the 397 drivers listed, 143 had originally signed valid authorization cards. (R. 54) Therefore, it can be presumed that 218 employees (143 existing employees and 75 new employees), which is a majority of the expanded Unit, still support the Union.

### 3. Management turnover

I find that management turnover does not mitigate against the issuance of a bargaining order. It is true that Forgey no longer works for Cemex, and Dickson has moved to Arizona. However, Turner, Nunez, Ponce, Faulkner, and Charlson all continue to work for Respondent, as does Plascencia. The ownership of the company has not changed, the general management structure is still in place, and the majority of the various plant foreman/batchmen are still employed by the company. Moreover, Plascencia still oversees human resources and the "steering committee" controlling Cemex's response to the organizing drive is still in place, albeit without Forgey. This is not a situation, as was in *General Steel Products, Inc.*, 199

NLRB 859, 867 (1972), where changed circumstances mitigated against issuing a bargaining order because the ownership of the company had completely changed, all the top management had changed, virtually all operating supervisors were replaced, and almost all the employees were new.

### 4. Dissemination

The extent of dissemination of the unfair labor practices throughout the bargaining unit is a is a factor to consider in determining whether a bargaining order is appropriate. *Cardinal Home Products, Inc.*, 338 NLRB 1004, 1010–1011 (2003) ("The Board considers the extent of the dissemination of serious unfair labor practices to employees not personally affected by them, in determining whether the unlawful conduct created a 'legacy of coercion' that was likely to have poisoned the atmosphere in which any new election would take place."). Respondent argues that the alleged unfair labor practices herein were not disseminated beyond a small number of drivers involved in each incident, and because of the size and scope of the Unit, a bargaining order is unwarranted. The Union and the General Counsel on the other hand claim that the unfair labor practices, particularly Respondent's threats and Ornelas's discharge, were disseminated widely.

#### (a) Dissemination of the 8(a)(1) violations

The evidence shows that, at the time of the election, Respondent had around 325 drivers based in Southern California and about 40 in Nevada. Other than the appearance of the security guards during the election timeframe, which affected every employee in Southern California and Nevada, the unfair labor practices pertaining to employees in Nevada involve the various threats made by Dickson, and his directives that employees remove their union stickers. Dickson's threats that employees would be fired, and Cemex would close the business if they unionized, are very serious violations. That being said, these violations occurred during conversations between Dickson and either one or two other employees. There is limited evidence that these violations were disseminated to other drivers in Las Vegas, and no evidence that Southern California drivers were aware of them.

As for the violations occurring in Southern California, the number of employees affected was certainly greater than what occurred in Las Vegas. But again, other than the security guards stationed at the plants, none of the violations involved all of the Southern California drivers.

The most serious 8(a)(1) violations occurring in Southern California include: (1) Forgey's statements to Oxnard employees about, among other things, Cemex not being able to give out wage increases because of the union, along with management being able to open and close plants at will even if employees unionized; and (2) Santana's threats that Cemex can close its ready-mix operations if employees voted in the union. It appears that all of Oxnard's fourteen drivers heard Forgey's threats, as he testified that he held two meetings for Oxnard drivers with half of the employees in each meeting. That being said, there is little evidence that these statements were disseminated to employees outside of Oxnard.

Regarding the threats made by Santana during a meeting with employees at the Perris plant, it is unclear exactly how

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC                    115

many employees were present during this meeting. Flores, who was assigned to work out of the Temecula plant, testified that "a lot of drivers" were present, but could not specifically remember how many. (Tr. 1370) As for Santana, he testified that he conducted meetings throughout the Inland Empire during the campaign, and specifically mentioned group meetings with employees in Fontana, Perris, and maybe Lytle Creek/Rialto. (Tr. 3037–3038, 3063)

The voter list shows that a total of 84 drivers were assigned to the following six plants in the Inland Empire: Corona (7 drivers); Temecula (11 drivers); Perris (20 drivers); Fontana (11 drivers); Redlands (14 drivers); and Lytle Creek/Rialto (21 drivers). The management structure for the Inland Empire at the time had Andrew Patino serving as the plant superintendent overseeing the Corona, Temecula, and Perris plants in the South, and Gary Garcia as the plant superintendent overseeing the Fontana, Redlands, and Lytle Creek/Rialto in the North. (Tr. 273, 2594, 2247; JX. 9)

Because Flores, who was a Temecula based driver, attended a meeting at the Perris plant where "a lot of drivers" were present, along with the management structure at the time, with Inland Empire drivers split into North and South plants, I believe it is reasonable to presume that at least the 11 Temecula and 20 Perris drivers were dispatched to attend the meeting where Santana made his threats, and most likely the 7 Corona drivers were there as well. Again, however, there is little evidence that Santana's threats were disseminated to other employees outside of the three Inland Empire South plants.

*(b) Dissemination of Ornelas's discharge*

Regarding Ornelas, the voting list shows that 39 drivers were assigned to the Ventura County plants: Moorpark (9 drivers); Simi Valley (7 drivers); Santa Paula (5 drivers); Santa Barbara (4 drivers); and Oxnard (14 drivers). Certainly the 14 Oxnard drivers knew about Ornelas's discharge as she worked with them every day. And, because these drivers would deadhead to the other Ventura County plants, along with the fact that Ornelas was the only female driver in Ventura County, I believe the evidence supports a finding that her discharge was known throughout the Ventura County plants. The fact that Ornelas told a group chat of 13 drivers, who worked out of the Oxnard, Santa Barbara, Santa Paula, and Simi Valley plants about her firing, and also told another group of drivers at a nearby park about her discharge, further supports this finding. (Tr. 1208–1210; JX. 9)

There is also evidence that at least some drivers at plants outside of Ventura County likely learned about Ornelas's discharge. For example, Scott Williams testified that he told about 20–25 drivers about Ornelas's termination, and said that just about every driver he spoke with asked him about Ornelas getting fired. (Tr. 927–928; 938–940). That being said, the evidence is limited regarding the dissemination of her discharge to the other Southern California districts and virtually nonexistent regarding drivers in Las Vegas knowing about her discharge.

5. The appropriate remedy

Respondent argues that a bargaining order is unwarranted, as it is an "extraordinary remedy." (Cemex. Br. at 170–171) However, Cemex committed extraordinary violations. Firing

an employee is the "capital punishment of the workplace" and has "a long lasting coercive impact on the workforce" sharply demonstrating the employer's power over employees. *White Plains Lincoln Mercury*, 288 NLRB 1133, 1140 (1988). The Board has long held that an unlawful discharge "is one of the most flagrant and severe acts an employer can take to dissuade employees" from unionizing. *Groves Truck & Trailer*, 281 NLRB 1194, 1196 (1986). Similarly, "[t]hreats to eliminate the employees' source of livelihood have a devastating and lingering effect on employees, an effect that most effectively can be remedied by an order to bargain." *White Plains Lincoln Mercury*, 288 NLRB at 1140. Extraordinary violations occurred here; nobody should lose their job, or fear losing their job, simply because they want a union in their workplace.

Ultimately however, the fact the unfair labor practices did not affect a substantial percentage of the overall Unit weighs against the imposition of a bargaining order.[43] Cf. *Cogburn Health Center*, 335 NLRB 1397, 1399 (2001) (the possibility of holding a fair election decreases when a substantial percentage of employees in the bargaining unit are directly affected by an employer's serious unfair labor practices). Other than the security guards patrolling the plants, the vast majority of the 40 Las Vegas drivers were not impacted by Respondent's unfair labor practices, which consisted of Dickson's statements to a handful of drivers. The same is true regarding the approximately 49 drivers working in San Diego County and the 58 drivers in Orange County, who do not appear to have been substantially impacted by Respondent's unlawful conduct. And, while surveillance occurred at the Inglewood plant on one occasion, it is unclear exactly how many of Inglewood's 39 drivers were directly affected, and no evidence that this violation was widely disseminated to the approximately 63 drivers working in the other Los Angeles County plants. Also militating against a bargaining order is the lack of evidence that Ornelas's discharge was disseminated to employees in Las Vegas, or that the threats made by Santana and Forgey were disseminated to employees outside of Ventura County or the Inland Empire. Cf. *Cardinal Home Products, Inc.*, 338 NLRB at 1010. Accordingly, I decline to recommend that a *Gissel* bargaining order issue.

Instead, because Cemex's "unfair labor practices are such that they are likely to have a continuing coercive effect on the free exercise by employees of their Section 7 rights long after the violations have occurred," I recommend that additional remedial action be ordered to "dissipate as much as possible the lingering atmosphere of fear created by Respondent's unlawful conduct and to insure" employees will "be able to voice a free choice" when a re-run election occurs. *Haddon House Food Products, Inc.*, 242 NLRB 1057, 1058–1059 (1979) enfd. in pert. part, 640 F.2d 392 (D.C. Cir. 1981), cert. denied 454 U.S. 827 (1981). Specifically, I recommend that, in addition to the

---

[43] Regarding unfair labor practices affecting the entire Unit, I am mindful of the statements made in the 25th hour videos, particularly what was said by Hill to Las Vegas drivers, and the context in which these statements were made. See footnote 5, supra. (citing *Desert Aggregates*, 340 NLRB 289 (2003); *Lutheran Home of NW Indiana, Inc.*, 315 NLRB 103 (1994); and *Wake Electric Membership Corp.*, 338 NLRB 298 (2002)). However, neither the General Counsel nor the Union point to these statements as supporting a *Gissel* remedy.

116                      DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

posting of the redial notice to employees, and as further set forth in the Order section of this decision, Cemex shall: (1) convene a meeting at its various facilities where the notice shall be read aloud to all drivers in the Unit by a Board Agent, or if Respondent desires by a responsible management official in the presence of a Board Agent, and in the presence of a representative of the Union, if they wish to attend; (2) upon request, grant the Union reasonable access to company bulletin boards and all places where notices to employees are customarily posted; (3) upon request, grant the Union reasonable access to Respondent's plants in nonwork areas during employees' nonwork time; (4) supply the Union, upon request made within 1 year of the date of the Board's Decision and Order, the names and addresses of its current employees in the Unit; (5) give notice of, and equal time and facilities for the Union to respond to, any address made by Respondent (or its agents) to its employees on the question of union representation; and (6) afford the Union the right to deliver a 30-minute speech to employees on working time prior to any Board election that is scheduled in which the Union is a participant. Provisions (2), (3), (5), and (6), shall apply for a period of 2 years from the date of the posting of the notice provided by the Order herein or until the Regional Director has issued an appropriate certification following a fair and free election, whichever comes first. Id. at 1060.

Finally, Respondent's assertion that special remedies, like union access to employees and bulletin boards, are punitive is misplaced. (Cemex. Br. at 187–188) Indeed, regarding union access, the Second Circuit has said that providing a union with access to employees is a "traditional remedy," noting that where an employer's misconduct has tainted a prior union election by adversely affecting the employees' freedom of choice, the "traditional remedy" is to "(1) vacate the election, (2) enjoin the employer from engaging in such misbehavior," (3) require the employer to post "contrition notices" to "employees disavowing any future interference," and (4) direct the employer "to give union representatives reasonable access to the employees." *Jamaica Towing, Inc.*, 632 F.2d at 212. Here, the remedies ordered are not punitive but remedial and made to "dissipate the lingering coercive effects created by Respondent's unfair labor practices and to aid in creating an atmosphere free of restraint and coercion so that we will be able to conduct a new election in which we can place some confidence." *United Dairy Farmers Co-Op. Association*, 242 NLRB 1026, 1029 (1979); see also *Teamsters Local 115 v. NLRB*, 640 F.2d 392, 400 (D.C. Cir. 1981).

CONCLUSIONS OF LAW

1. The Respondent is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.
2. The International Brotherhood of Teamsters (Union) is a labor organization within the meaning of Section 2(5) of the Act.
3. The following employees constitute an appropriate unit for purposes of collective bargaining within the meaning of Section 9(b) of the Act:

INCLUDED: All full-time and regular part-time ready-mix drivers, plant operators II who regularly operate ready-mix

trucks, and driver trainers employed by CEMEX Construction Materials Pacific, LLC at its ready-mix facilities in Southern California and Southern Nevada, including its plants in Las Vegas, Nevada and Compton, Corona, Escondido, Fontana, Hollywood, Irvine, Inglewood, Los Angeles, Moorpark, Oceanside, Orange, Oxnard, Perris, Rialto, Redlands, San Diego, San Juan Capistrano, Santa Barbara, Santa Paula, Simi Valley, Temecula, and Walnut, California.

EXCLUDED: All plant foremen, batchmen, dispatchers, yardmen, senior driver trainers/safety champions, fleet mechanics (I and II), plant maintenance (I and II), quality control representatives, office clerical employees, professional employees, guards and supervisors as defined by the Act.[44]

4. By engaging in the following conduct, Respondent has violated Section 8(a)(1) of the Act:
(a) Threatening employees that they could be disciplined or fired for having union stickers on their hardhats;
(b) Threatening employees with termination, reduced hours, or loss of benefits, if they unionized;
(c) Instructing employees to remove union stickers from their hardhats;
(d) Instructing employees to not speak with union representatives;
(e) Threatening employees by inviting them to quit because they engaged in union activities;
(f) Threatening employees with plant closure if they unionized;
(g) Threatening employees by telling them it would be futile to unionize;
(h) Interrogating employees about their union activities;
(i) Engaging in surveillance of employee union activities;
(j) Creating the impression that employee union activities are under surveillance;
(k) Threatening employees by telling them that their work opportunities will be limited if they unionized;
(l) Blaming the union for delayed wage increases;
(m) Threatening employees by telling them that wage increases would possibly be frozen for years if they unionized;
(n) Threatening employees by implying that employees who participate in a strike are not entitled to immediate reinstatement upon their unconditional offer to return to work, regardless of the type of strike or circumstances;
(o) Threatening employees that, if they unionized, they would lose their harmonious relationship with management, lose their right to speak directly with management concerning work-related problems, and lose the ability to have management help them;
(p) Threatening employees by telling them they would not be able to learn new skills and their ability to grow with the

_____

[44] At the hearing the Union and Respondent stipulated to this unit description, which makes minor corrections to the wording of the unit found appropriate by the Regional Director in Case 28-RC-232059 but does not add or subtract from the unit any job classifications, plant locations, or employees eligible to vote. (JX. 12) The General Counsel has adopted the parties' stipulation as to the wording of the appropriate unit. (GC. Br. at 95–96)

company would be curtailed if they unionized;

(q) Prohibiting employees from speaking with union organizers;

(r) Disciplining employees for violating the prohibition against speaking with union organizers;

(s) Promising employees benefits, including a requested transfer, if they voted against the union;

(t) Threatening employees by implying they would no longer be able to get off work early if they unionized

(u) Posting security guards at facilities in the weeks leading up to the election, and on election day, to intimidate employees because they engaged in union activities;

5. By suspending and discharging Diana Ornelas because she engaged in union activities protected by Section 7 of the Act Respondent has violated Section 8(a)(3) of the Act.

6. The above unfair labor practices affect commerce within the meaning of Section 2(6) and (7) of the Act.

REMEDY

Having found that the Respondent has engaged in certain unfair labor practices, I shall order it to cease and desist therefrom and to take certain affirmative actions designed to effectuate the policies of the Act. Having found that Respondent violated Sections 8(a)(1) and (3) of the Act by suspending and discharging Diana Ornelas, I shall order Respondent to reinstate her and make her whole for any loss of earnings and other benefits suffered as a result of the discrimination against her.

Respondent shall compensate Diana Ornelas for any adverse tax consequences of receiving a lump–sum backpay award in accordance with *Don Chavas, LLC d/b/a Tortillas Don Chavas,* 361 NLRB 101 (2014). Respondent shall also compensate Diana Ornelas for her search–for–work and interim employment expenses regardless of whether those expenses exceed interim earnings. *King Soopers, Inc.,* 364 NLRB No. 93 (2016). Backpay, search–for–work, and interim employment expenses, shall be computed in accordance with *F. W. Woolworth Co.*, 90 NLRB 289 (1950), with interest at the rate prescribed in *New Horizons*, 283 NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River Medical Center*, 356 NLRB 6 (2010).

In accordance with *AdvoServ of New Jersey, Inc.,* 363 NLRB No. 143 (2016), Respondent shall also file with the Regional Director for Region 28, within 21 days of the date the amount of backpay is fixed, either by agreement or Board Order, a report allocating the backpay awards to the appropriate calendar years. The Regional Director will then assume responsibility for transmission of the report to the Social Security Administration. In addition, pursuant to *Cascades Containerboard Packaging–Niagara*, 370 NLRB No. 76 (2021), Respondent must file with the Regional Director for Region 28, within 21 days of the date the amount of backpay is fixed either by agreement or Board Order or such additional time as the Regional Director may allow for good cause shown, a copy of Diana Ornelas's corresponding W-2 form(s) reflecting the backpay award.

The Respondent shall also be required to expunge from its files any references to the unlawful discipline, suspension, and discharge issued to Diana Ornelas and notify her and the Regional Director of Region 28, in writing, that this has been done

and that these unlawful employment actions will not be used against her in any way. The Respondent shall also post the attached notice in accordance with *J. Picini Flooring*, 356 NLRB 11 (2010), and *Durham School Services*, 360 NLRB 694 (2014).

Finally, because Respondent's unfair labor practices are such that they are likely to have a continuing coercive effect on the free exercise by employees of their Section 7 rights long after the violations have occurred, Respondent shall be required to undertake additional remedial actions designed to dissipate as much as possible the lingering atmosphere of fear created by its unlawful conduct and to insure that if the question of union representation is placed before employees in the future they will be able to voice a free choice. To achieve these ends, in addition to posting copies of the attached notice at its Southern California and Las Vegas, Nevada plants, Respondent shall be required to: (a) Convene during working time all employees at its Southern California and Las Vegas, Nevada plants, by shifts or otherwise, and have the contents of the attached notice marked as "Appendix" read to the assembled employees by a Board Agent, or if Respondent desires by a reasonable management official in the presence of a Board Agent, and in the presence of a representative of the Union if they wish to attend; (b) Upon request of the Union made within 1 year of the issuance of the Order herein, make available to the Union without delay a list of names and addresses of all employees employed at the time of the request; (c) Immediately upon request of the Union, for a period of 2 years from the date on which the aforesaid notice is posted, grant the Union and its representatives reasonable access to the plant bulletin boards and all places where notices to employees are customarily posted; (d) Immediately upon request of the Union, for a period of 2 years from the date on which the aforesaid notice is posted, permit a reasonable number of Union representatives access for reasonable periods of time to nonwork areas, including but not limited to, lunch rooms, cafeterias, rest areas, break rooms, and parking lots, within its Southern California and Las Vegas, Nevada plants so that the Union may present its views on unionization to the employees, orally and in writing, in such areas during changes of shifts, breaks, mealtimes, or other nonwork periods; (e) In the event that during a period of 2 years following the date on which the aforesaid notice is posted, any manager, supervisor, or agent of Respondent convenes any group of employees assigned to Respondent's Southern California or Las Vegas, Nevada, plants and addresses them on the question of union representation, give the Union reasonable notice thereof and afford twoUnion representatives a reasonable opportunity to be present at such speech and, upon request, give one of them equal time and facilities to address the employees on the question of union representation; and (f) In any election which the Board may schedule involving Respondent's Southern California and Las Vegas, Nevada, plants within a period of 2 years following the date on which the aforesaid notice is posted and in which the Union is a participant, permit, upon request by the Union, at least two union representatives reasonable access to the plant(s) and appropriate facilities to deliver a 30-minute speech to employees on working time, the date thereof to be not more than 10 working days but not less than 48 hours prior to

118                          DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

any such election.

On these findings of fact and conclusions of law, and on the entire record, I issue the following recommended[45]

ORDER

Respondent Cemex Construction Materials Pacific, LLC, its officers, agents, successors, and assigns, shall:

1.  Cease and desist from

(a)  Threatening employees that they could be disciplined or fired for having union stickers on their hardhats;

(b)  Threatening employees with termination, reduced hours, or loss of benefits, if they unionized;

(c)  Instructing employees to remove union stickers from their hardhats;

(d)  Instructing employees not to speak with union representatives;

(e)  Threatening employees by inviting them to quit because they engaged in union activities;

(f)  Threatening employees with plant closure if they unionized;

(g)  Threatening employees by telling them it would be futile to unionize;

(h)  Interrogating employees about their union activities;

(i)  Engaging in surveillance of employee union activities;

(j)  Creating the impression that employee union activities are under surveillance;

(k)  Threatening employees by telling them their work opportunities will be limited if they unionized;

(l)  Blaming the union for delayed wage increases;

(m)  Threatening employees by telling them wage increases would possibly be frozen for years if they unionized;

(n)  Threatening employees by implying that employees who are participate in a strike are not entitled to immediate reinstatement upon their unconditional offer to return to work, regardless of the type of strike or circumstances;

(o)  Threatening employees that, if they unionized, they would lose their harmonious relationship with management, lose their right to speak directly with management concerning work-related problems, and lose the ability to have management help them;

(p)  Threatening employees by telling them they would not be able to learn new skills and their ability to grow with the company would be curtailed if they unionized;

(q)  Prohibiting employees from speaking with union organizers;

(r)  Disciplining employees for violating the prohibition against speaking with union organizers;

(s)  Promising employees benefits, including a requested transfer, if they voted against the union;

(t)  Threatening employees by implying they would no longer be able to get off work early if they unionized;

(u)  Posting security guards at facilities in the weeks leading up to the election, and on election day, to intimidate employees

because they engaged in union activities;

(v)  Suspending, and discharging employees, or otherwise discriminating against them, for engaging in union activities protected by Section 7 of the Act.

(w)  In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed to them by Section 7 of the Act.

2.  Take the following affirmative action necessary to effectuate the policies of the Act.

(a)  Within 14 days from the date of this Order, offer Diana Ornelas full reinstatement to her former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to her seniority or any other rights or privileges previously enjoyed.

(b)  Make whole Diana Ornelas for any loss of earnings and other benefits suffered as a result of the unlawful suspension, discharge, and discrimination against her, including any search-for-work and interim employment expenses, in the manner set forth in the Remedy section of this decision.

(c)  Compensate Diana Ornelas for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and file with the Regional Director for Region 28, within 21 days of the date the amount of backpay is fixed, either by agreement or Board Order, a report allocating the backpay award to the appropriate calendar years for Diana Ornelas.

(d)  File with the Regional Director for Region 28, within 21 days of the date the amount of backpay is fixed either by agreement or Board Order or such additional time as the Regional Director may allow for good cause shown, a copy of Diana Ornelas's corresponding W-2 form(s) reflecting the backpay award.

(e)  Within 14 days from the date of this Order, remove from its files any reference to the unlawful discipline, suspension, and discharge issued to Diana Ornelas, and within 3 days thereafter notify her and the Regional Director for Region 28, in writing, that this has been done and that the discipline, suspension, and discharge will not be used against her in any way.

(f)  Preserve and, within 14 days of a request, or such additional time as the Regional Director for Region 28 may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(g)  Within 14 days after service by the Region, post at its facilities in Southern California and Las Vegas, Nevada copies of the attached notice marked "Appendix."[46]  Copies of the notice, on forms provided by the Regional Director for Region 28, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places

---

[45]  If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

[46]  If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC    119

where notices to employees are customarily posted.[47] In addition to physical posting of paper notices, the notices shall be distributed electronically to all current employees and former employees employed by the Respondent at any time since August 1, 2018, by means including email, posting on an intranet or an internet site, and/or other electronic means if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material.

(h)    Convene during working time all employees at its Southern California and Las Vegas, Nevada plants, by shift or otherwise, and have the contents of the attached notice marked as "Appendix" read to the assembled employees by a Board Agent, or if Respondent desires by a reasonable management official in the presence of a Board Agent, and in the presence of a representative of the Union if they wish to attend.

(i)    Upon request of the Union made within 1 year of the issuance of the Order herein, make available to the Union without delay a list of names and addresses of all employees employed at the time of the request.

(j)    Immediately upon request of the Union, for a period of 2 years from the date on which the aforesaid notice is posted, grant the Union and its representatives reasonable access to the plant bulletin boards and all places where notices to employees are customarily posted.

(k)    Immediately upon request of the Union, for a period of 2 years from the date on which the aforesaid notice is posted, permit a reasonable number of Union representatives access for reasonable periods of time to nonwork areas, including but not limited to, lunch rooms, cafeterias, rest areas, break rooms, and parking lots, within its Southern California and Las Vegas, Nevada plants so that the Union may present its views on unionization to the employees, orally and in writing, in such areas during changes of shifts, breaks, mealtimes, or other nonwork periods.

(l)    In the event that during a period of 2 years following the date on which the aforesaid notice is posted, any manager, supervisor, or agent of Respondent convenes any group of employees assigned to Respondent's Southern California or Las Vegas, Nevada, plants and addresses them on the question of union representation, give the Union reasonable notice thereof and afford two Union representatives a reasonable opportunity to be present at such speech and, upon request, give one of them equal time and facilities to address the employees on the question of union representation.

(m)    In any election which the Board may schedule involving Respondent's Southern California and Las Vegas, Nevada, plants within a period of 2 years following the date on which the aforesaid notice is posted and in which the Union is a participant, permit, upon request by the Union, at least two Union representatives reasonable access to the plant(s) and appropriate facilities to deliver a 30-minute speech to employees on working time, the date thereof to be not more than 10 working days but not less than 48 hours prior to any such election.[48]

(n)    Within 21 days after service by the Region, file with the Regional Director for Region 28 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

IT IS ALSO ORDERED that the complaint and the Union's Objections are dismissed insofar as they allege violations of the Act, or objectionable conduct, not specifically found.

IT I FURTHER ORDERED that the election is set aside and Case 28–RC–232059 is severed from Cases 28–CA–230115, et al. and remanded to the Regional Director to conduct a second election when he deems the circumstances permit a free choice.

Dated, Washington, D.C.  December 16, 2021

APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT threaten you with discipline or discharge for wearing union stickers on your hardhat, or instruct you to remove those stickers.

WE WILL NOT threaten you with termination, reduced work hours, loss of benefits, or limited work opportunities, if you vote to be represented by the International Brotherhood of Teamsters (Union), or any other labor organization, for the purposes of collective bargaining.

WE WILL NOT prohibit you from speaking with union organizers, tell you not to speak with them, or discipline you for doing so.

WE WILL NOT will not threaten you by inviting you to quit your job because you engaged in union activities or tell you that

---

[47] If the facility involved in these proceedings is open and staffed by a substantial complement of employees, the notices must be posted within 14 days after service by the Region. If the facility involved in these proceedings is closed due to the Coronavirus Disease 2019 (COVID-19) pandemic, the notices must be posted within 14 days after the facility reopens and a substantial complement of employees have returned to work, and the notices may not be posted until a substantial complement of employees have returned to work. Any delay in the physical posting of paper notices also applies to the electronic distribution of the notice if the Respondent customarily communicates with its employees by electronic means, and to the reading of the notice to employees.

[48] Subpars. (j), (k), (l), and (m) herein shall be applicable only so long as the Regional Director has not issued an appropriate certification following a free and fair election.

120                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

voting for the Union, or any other labor organization, would be futile.

WE WILL NOT threaten to close our plants and facilities if employees vote to unionize.

WE WILL NOT coercively interrogate you about your union activities

WE WILL NOT engage in surveillance of your union activities or create the impression that those activities are under surveillance.

WE WILL NOT blame the Union, or employee efforts to unionize, for delayed wage increases, or threaten you that wage increases would possibly be frozen for years if you vote to unionize.

WE WILL NOT threaten you by implying that if you participate in a strike you are not entitled to immediate reinstatement upon your unconditional offer to return to work, regardless of the type of strike or circumstances.

WE WILL NOT threaten you by saying that your harmonious relationship with management will be put at risk, that you will not be able to speak directly with management about your work-related problems, or that you will lose the ability to have management help you, if you vote for the Union, or any other labor organization.

WE WILL NOT will not threaten you by saying you will be unable to learn new skills or that your ability to grow with the company will be curtailed if you vote to unionize.

WE WILL NOT promise you benefits, including a requested transfer, if you vote against the Union, or any other labor organization.

WE WILL NOT threaten you by implying you will no longer be able to get off work early if you vote to unionize.

WE WILL NOT post security guards at our facilities in order to intimidate employees because they engaged in union activities.

WE WILL NOT suspend or discharge you because of your union support or because you engaged in union activities.

WE WILL, within 14 days from the date of the Board's Order, offer Diana Ornelas full reinstatement to her former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to her seniority or any other rights or privileges previously enjoyed.

WE WILL make Diana Ornelas whole for any loss of earnings and other benefits resulting from the discrimination against her, less any net interim earnings, plus interest, and WE WILL also make her whole for reasonable search-for-work and interim employment expenses, plus interest.

WE WILL compensate Diana Ornelas for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and we will file with the Regional Director for Region 28, within 21 days of the date the amount of backpay is fixed, either by agreement or Board Order, a report allocating the backpay award to the appropriate calendar years.

WE WILL file with the Regional Director for Region 28, within 21 days of the date the amount of backpay is fixed either by agreement or Board Order or such additional time as the Regional Director may allow for good cause shown, a copy of Diana Ornelas's corresponding W-2 form(s) reflecting the backpay award.

WE WILL, within 14 days from the date of the Board's Order,

remove from our files any references to the unlawful discipline, suspension, and discharge issued to Diana Ornelas, and WE WILL, within 3 days thereafter, notify her in writing, that this has been done and that these unlawful employment actions will not be used against her in any way.

WE WILL read this notice to all our employees, or have an agent of the National Labor Relations Board do so.

WE WILL, upon request of the Union made within 1 year of the Board's Decision and Order, make available to the Union a list of names and addresses of all our employees currently employed.

WE WILL, immediately upon request of the Union, grant the Union and its representatives reasonable access to our bulletin boards and all places where notices to employees are customarily posted.

WE WILL, immediately upon request of the Union, grant the Union and its representatives reasonable access to our plants in nonwork areas during employees' nonwork time in order that the Union may present its views on unionization to employees, orally and in writing, in such areas during changes of shift, breaks, mealtimes, or other nonwork periods.

WE WILL, if we gather together any group of our employees and speak to them on the question of union representation, give the Union reasonable notice and give two union representatives a reasonable opportunity to be present at such speech and, on request, give one of them equal time and facilities to also speak to you on the question of union representation.

WE WILL, in any election which the Board may schedule and in which the Union is a participant, permit, upon request by the Union, at least two union representatives reasonable access to the plant(s) and appropriate facilities to speak to you for 30 minutes on working time, not more than 10 working days, but not less than 48 hours, prior to the election.

WE WILL, apply the four paragraphs immediately preceding this one for a period of 2 years from the date of posting of this notice, or until the Regional Director of the National Labor Relations Board certifies the results of a fair and free election, whichever comes first.

Our employees have the right to join the International Brotherhood of Teamsters, or any other labor organization, or to refrain from doing so.

CEMEX CONSTRUCTION MATERIALS PACIFIC LLC

The Administrative Law Judge's decision can be found at www.nlrb.gov/case/28-CA-230115 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940



CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC                    121